# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **v.** | ) |
| | ) **Case No. 3:22-CR-00282** |
| **GLEN CASADA and** | ) **District Judge Eli J. Richardson** |
| **CADE COTHREN** | ) **Magistrate Judge Alistair Newbern** |
| | ) |
| **Defendants.** | ) |
| | ) |

## DEFENDANT CADE COTHREN'S
## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS INDICTMENT

This Court should grant Defendant Cade Cothren's Motion to Dismiss Indictment for all of the reasons set forth herein.

## I.      INTRODUCTION AND RELEVANT FACTS

On August 22, 2022, Defendants Glen Casada and Cade Cothren were indicted on twenty counts of various purportedly illegal acts: federal program theft (Count Two), bribery and kickbacks concerning a federal program (Counts Three and Four), honest services wire fraud (Counts Five through Ten), use of fictitious name to carry out a fraud (Count Eleven), money laundering conspiracy (Count Twelve), and money laundering (Counts Thirteen through Twenty). Doc. No. 3 ("Indictment"). Count One charges Defendants with engaging in a conspiracy with "Individual 4" (former House Member Robin Smith) to commit federal program theft and honest services wire fraud, and to accept or pay bribery and kickbacks concerning a federal program. Indictment at ¶¶ 15-57. The Indictment is fatally flawed in numerous respects. For the purposes of this Motion only, the facts in the Indictment are accepted as true as required.

The alleged conspiracy and interrelated offenses charged in the Indictment arise from a joint venture between and among Phoenix Solutions, Company 1, and Company 2 (owned by Cothren, Individual 4, and Casada, respectively) to provide constituent mailing services to members of the General Assembly. *See generally*, Indictment. Casada was the Speaker of the House of Representatives from January 2019 until his resignation from that post in August 2019. Indictment at ¶ 3. Individual 4 was also a Member of the House who represented District 26. *Id.* at ¶ 4. Cothren is described in the Indictment as "a businessman and former Chief of Staff" to Casada when he was Tennessee House Speaker. *Id.* at ¶ 9. The government alleges that Cothren formed Phoenix Solutions, LLC ("Phoenix Solutions") in November 2019 and that Phoenix Solutions "provided constituent mail services to Members of the Tennessee General Assembly and to political campaigns for State offices." *Id.* at ¶ 10. The Indictment also alleges that Company 1 and Company 2 were private companies that provided political consulting, constituent mail, and project management services. *Id.* at ¶¶ 4-6.

Conspicuously absent from the Indictment is <u>any</u> allegation that Phoenix Solutions, Company 1, and/or Company 2 <u>failed</u> to deliver goods and services totaling the $51,947 invoiced—a fatal omission. Likewise fatal is the Indictment's failure to allege (because it cannot) that Phoenix Solutions, Company 1, and Company 2 did not do exactly what they agreed to do: produce mail pieces for constituent mailings. Notably, the government <u>does not</u> allege that the State, the Speaker, or individual Members of the Tennessee General Assembly, for their part, would not have approved Phoenix Solutions as one of the private companies allowed to do constituent mailings if Cothren's association with Phoenix Solutions and its joint venture with Company 1 or Company 2 were known. Finally, the government does not allege that any such representation went to the heart of the bargain of producing constituent mail. Instead, the

2

Indictment seeks to create criminal liability for non-disclosure of ownership, false statements about ownership, and/or conflicts of interest.

*Federal Jurisdiction Under 18 U.S.C. Section 666*

The alleged basis for federal jurisdiction under 18 U.S.C. Section 666(a) (Counts Two through Four) is that Individual 4 and Casada were both "agents of Tennessee, a State which during each of calendar years 2019, 2020, and 2021 received federal benefits in excess of $10,000" <u>and</u> they intended to be influenced or rewarded by Cothren <u>and</u> Cothren intended to so influence or reward them "in connection with a business, transaction, and a series of transactions of the State of Tennessee valued at $5,000 or more…" Indictment at ¶¶ 16(a), 16(b), and 16(c).

The Indictment alleges that the three entities at issue received payments totaling $51,947 in funds allocated annually to the General Assembly's "Mailer Program." Indictment at ¶¶ 11, 52.[1] While the Indictment repeatedly (and artfully) refers to the Postage and Printing Allowance as a "Mailer Program" in an attempt to shoehorn these facts into a statute (Section 666) that applies only to "federal <u>program</u> theft," <u>no such "Mailer Program" exists</u>. What <u>does</u> exist is a "Postage and Printing Allowance" of $3,000 that is given to the individual Members of the House out of the legislative branch's operational budget pursuant to the General Assembly's "Administrative Policies and Procedures." *See* Exhibit A: 2019-2020 Tennessee General Assembly Office of Legislative Administration, Administrative Policies and Procedures[2] at pp. 1-2, 8-10 (hereafter,

---

[1] The government avers the Postage and Printing Allowance funds are "federal funds" because the State of Tennessee "received federal benefits in excess of $10,000" during the time period at issue in the Indictment. *See e.g.*, Indictment at ¶ 16(a). This allegation is insufficient to invoke federal jurisdiction, as discussed below in Section II.A.

[2] Consistent with Rule 12, courts may consider undisputed extrinsic evidence and undisputed operative facts in order to "decide that as a matter of law, the defendant's conduct, did not constitute the criminal violation(s) alleged in the indictment." *See United States v. Neill*, 2021 U.S. Dist. LEXIS 165903, at *8 (M.D. Tenn Sept. 1, 2021) (citing *United States v. Levin*, 973 F.2d 463, 471-472 (6th Cir. 1992)) (Health Care Financing Administration letters that were undisputed

"Guidelines"). Phoenix Solutions, Company 1, and Company 2 were paid[3] for the constituent mailer services they provided from each Member's "allowance."

*The Postage and Printing Allowance*

To fully grasp the Indictment's myriad defects, an understanding of the Postage and Printing Allowance and corresponding Guidelines is useful. Every year, the Tennessee General Assembly votes on an operating budget for the legislative branch's operating expenses. *See* Exhibit B: Excerpt from State of Tennessee Budget, Fiscal Year 2019-2020 ("Budget Excerpt"). Out of that, the Joint Legislative Services Committee allocates to each Member of the House a $3,000 allowance to fund postage and printing of items to be sent to the legislators' constituents. Exhibit A: Guidelines at p. 8. The Indictment claims the "State" allocates such funds, but the State of Tennessee and General Assembly are not one and the same. Indictment at ¶ 11. A Member's Postage and Printing Allowance can be used to "design and mail legislative update mailers and legislative surveys" to constituents; however, the Guidelines limit the use of a Member's allowance to certain, non-campaign materials, such as the "printing of letterhead, envelopes, business cards, newsletters and letters and other approved written materials." Exhibit A: Guidelines at p. 8. The Guidelines only require Members to seek and obtain approval of the proposed written materials from the House Speaker's Office. *See* Exhibit A: Guidelines at pp. 9-10. The words "along with a copy of the material to be printed" presumes that the work must have been commissioned and completed before the Speaker's content authorization and approval

---

extrinsic evidence were considered in a motion to dismiss because they established that, as a matter of law, the government was incapable of proving the requisite intent beyond a reasonable doubt).

[3] The Guidelines for this allowance permit House Members to use "private sector printing companies," also referred to as "private sector vendors" as opposed to typical State vendors. *See* Exhibit A: Guidelines at p. 8. Thus, although the Indictment uses the term "Vendor," in an effort to be more legally precise, Cothren will use the term "Private Sector Vendor."

4

process begins. Further, the Guidelines expressly permit printing of constituent mailers "to be handled by private sector printing companies or through the State's print shop." *Id.* at p. 9.

While the Guidelines set out the rules surrounding the Postage and Printing Allowance, what is <u>not</u> in the Guidelines is equally important. The Guidelines <u>do not</u> prohibit Members from using their own or another Member's business when accessing their allowance nor do they require a Member to disclose any financial or other personal interest the Member may have in the company delivering said services or the ownership information and/or identities of any subcontractors used. *See generally*, Exhibit A: Guidelines. The Indictment does not allege as much.

Despite the Indictment's many references to a Printing and Postage Allowance <u>vendor</u> approval process, the Guidelines do not mention any such process. The Guidelines do not mention, imply, or infer that those companies are State vendors at all. Instead, it makes clear they are "private sector printing companies" or "private sector vendors" selected by individual Members. *Id*.

To be sure, the government's reliance on a non-existent "Mailer Program" and vendor approval process (Indictment at ¶ 12) is problematic. However, the primary problem with the government's theory is its failure to allege the Speaker would not have approved Phoenix Solutions, and alleging instead that Defendants' <u>expectations</u> were that such approval was needed but would not be granted. Indictment at ¶ 21. Based on these faulty premises, the government presumptuously charged Cothren and his alleged co-conspirators with deceiving House Members and "pressuring" the Speaker's Office to "approve" Phoenix Solutions as a mail vendor and to pay for the constituent mailing services provided to Members. But Cothren committed no crime, and all charges should be dismissed.

## II.    ARGUMENT

Rule 12 of the Federal Rules of Criminal Procedure directs district courts to "dispose of all motions before trial if they are capable of determination without trial of the general issue." *United States v. Jones*, 542 F.2d 661, 664-65 (6th Cir. 1976). Generally, Rule 12 motions that raise questions of law and not fact are "capable of determination before trial." *Id*. That said, "district courts may make preliminary findings of fact necessary to decide questions of law . . . so long as the trial court's conclusions do not invade the province of the ultimate finder of fact." *United States v. Levin*, 973 F.2d 463, 467 (6th Cir. 1992). In ruling on a motion to dismiss the indictment, the district court is "not limited to the face of the indictment," and is authorized "to determine issues of fact in such manner as the court deems appropriate," consistent with the parameters of Rule 12. *Jones,* 542 F.2d at 665.

To successfully challenge the sufficiency of an indictment, a defendant need only demonstrate that the indictment fails to (1) state all the elements of the crime charged; (2) adequately inform the defendant of the nature of the charges against him; or (3) allow the defendant to assert the judgment as a bar to future prosecutions of the same offense. *United States v. Lee,* 919 F.3d 340, 349 (6th Cir. 2019).

Here, Cothren did not violate federal or state law; thus, "the indictment cannot within reason be construed to charge a crime." *United States v. Gatewood*, 173 F.3d 983, 988 (6th Cir. 1999) (quoting *United States v. Hart*, 640 F.2d 856, 857-58 (6th Cir. 1981)). In other words, the Indictment should be dismissed not because the government cannot prove its case against Cothren (although that is also true), but <u>because there is no case to prove</u>. *See United States v. Risk*, 843 F.2d 1059, 1061 (7th Cir. 1988) ("The district court found no violation [of the governing statute]

6

and correctly dismissed the indictment, not because the government could not prove its case, but because there was no case to prove.").

### A. Counts Two Through Four Should Be Dismissed for Lack of Jurisdiction.

The government charged Cothren with theft, bribery, and kickbacks under the "Theft or bribery of <u>programs</u> receiving federal funds" statute. *See* 18 U.S.C. § 666 (emphasis added); Indictment at ¶¶ 58-69. Preliminarily, all three Counts (Two through Four) should be dismissed because the government has failed to satisfy Section 666's jurisdictional requirements and this statute is unconstitutional as applied to Cothren.

First, these charges do not satisfy Section 666's initial jurisdictional requirements, namely: that the defendant is an "agent" of an "organization, government, or agency receiv[ing] in any one year period, benefits in excess of $10,000 under a Federal program…" *See* 18 U.S.C. § 666(a)(2); *United States. v. Mills*, 140 F.3d 630, 632 (6th Cir. 1998). Second, the Indictment fails to meet Section 666's valuation requirement of a theft, kickback, or bribe associated with an underlying transaction of at least $5,000. *See* 18 U.S.C. § 666(a)(1)(A)(i); 18 U.S.C. § 666(a)(1)(B); 18 U.S.C. § 666(a)(2); and *Mills*, 140 F.3d at 632. Third, the charges under Section 666 are unconstitutional as applied to Cothren. *See United States v. Madison*, 226 F. App'x 535 (6th Cir. 2007). Cothren will address each deficiency in turn, below.

### 1. There Is No Jurisdiction Because the Postage and Printing Allowance Funds Are Not Even State Funds.

As discussed at the outset of this Memorandum, the "Mailer Program" referenced throughout the Indictment does not exist. Sensing—rightly—that the federal program charges in Counts Two through Four require both an "organization" and that organization's receipt of federal benefits, the government has artfully re-branded the annual $3,000 "Postage and Printing Allowance" allocated to each Member as part of the "Administrative Procedures" of Tennessee's

legislative branch's operational budget as the "Mailer Program." *See* Exhibit A: Guidelines at pp. 1-2, 8-10.[4]

Although the Legislature's operating budget is based on its receipt of funds from the State of Tennessee, the Postage and Printing Allowance that each house in the Legislature allocates to its Members loses any arguable connection to the State of Tennessee as soon as those funds are allocated to the individual Members. At that point, each Member's Postage and Printing Allowance becomes the property of his/her district, and funds cannot be transferred "from one district to another." *See* Exhibit A: Guidelines at p. 8 ("All account funds remain with the legislative district to which they were originally allocated.").

Following the United States Supreme Court's ruling in *Fischer v. United States,* 529 U.S. 667 (2000), appellate courts have dismissed Section 666 charges where (as is the case here) the alleged victim did not receive federal funds or benefits. *See, e.g., United States v. Doran*, 854 F.3d 1312 (11th Cir. 2017) (vacating conviction of defendant state college professor convicted of embezzling funds from an independent student investment fund (SIF), finding "the Government has not proven that the relevant local organization, the SIF, received any federal benefits"); *United States v. McLean*, 802 F.3d 1228 (11th Cir. 2015) (affirming judgment of acquittal for defendant city official convicted of bribery, finding there was insufficient evidence that the alleged victim, a local agency with close financial and other ties to the city, had received a federal benefit as defined

---

[4] Additionally, Tennessee's legislative branch received precisely <u>zero dollars</u> in federal funding for their operational expenses in the 2019-2020 fiscal year. *See* Exhibit B: Budget Excerpt. While the State of Tennessee may well receive federal funds and benefits far in excess of $10,000 for numerous programs, none of this money is allocated to, nor does it cover, the operational and administrative expenses of its legislative branch. In the state budget for 2019-2020, for example, the Tennessee's General Assembly was allocated $56,283,300. *Id.* This amount was comprised of $56,145,800 in State funds, $137,500 in funding from "Other" entities, and <u>$0 in federal funding</u>. *Id.*

in *Fischer* and *United States v. Edgar*, 304 F.3d 1320, 1325 (11th Cir. 2002)); *see also United States v. Madison,* 226 F. App'x 535, 547 (6th Cir. 2007).

The facts of this case merit the same conclusions reached in *Doran* and *McLean*. Even if the Postage and Printing Allowance funds are determined to be "state funds," there is no conceivable relationship between those funds and any federal benefits or interest. Thus, Section 666 is unconstitutional as applied to Cothren. The constitutional and statutory limits are clearly delineated in the legislative history of Section 666, in appellate decisions interpreting the same, and are discussed in detail *infra.* Accordingly, Counts Two, Three, and Four, as well as the related conspiracy charge in Count One, should be dismissed.

## 2. Section 666 Is Unconstitutional as Applied to Cothren Because the Alleged Wrongdoing Does Not Touch Federally Funded Assets.

In *Madison*, the defendant argued that federal jurisdiction did not exist under Section 666 and the statute was, therefore, unconstitutionally applied to her because she did not misappropriate any federal benefits received by the non-profit for which she served as executive director. *Madison*, 226 F. App'x at 547. The Sixth Circuit analyzed the defendant's "as-applied" challenge within the framework established by *Fischer v. United States,* 529 U.S. 667 (2000), *United States v. Salinas,* 522 U.S. 52, 55-58 (1997), and *United States v. Suarez,* 263 F.3d 468 (6th Circuit 2001) and followed the *Fischer* recommendation of "a fact-based inquiry into the program's structure, operation, and purpose to determine whether the criminal conduct posed a threat to the integrity of *the federal program.*" *Madison*, 226 F. App'x at 547 (internal citations and quotations omitted).

Before undertaking *Fischer's* fact-based inquiry here, it is helpful to understand the legislative intent behind the jurisdictional limitations of Section 666. This history, combined with the fact-based *Fischer* inquiry, lead to but one conclusion: Cothren's alleged wrongdoing falls well outside the scope of Section 666.

9

a. *History of 18. U.S.C. Section 666.*

When considering jurisdictional challenges under the ambiguous 18 U.S.C. Section 666, courts have examined the history of the statute itself.[5] That history clearly delineates the jurisdictional limitations of this statute—limitations that surely exclude the charges at bar. In *United States v. Foley*, the Second Circuit reversed a bribery conviction under Section 666(a)(1)(B) where the defendant, a state representative, accepted payments to influence the passage of certain exemption legislation affecting a private company because:

> Though it is undisputed that the State of Connecticut, during the pertinent period, was a recipient of more than $ 10,000 in federal assistance, the government did not show that the exemption legislation had any financial value to the State of Connecticut; nor did it show that the exemption had any connection whatever with a federal program. In short, insofar as the evidence presented in this case reveals, the exemption affected neither the financial interests of the protected organization nor federal funds directly.

*United States v. Foley*, 73 F.3d 484, 493 (2nd Cir. 1996). In reaching this conclusion, the appellate court looked to Congress's intention in enacting the statute and found persuasive the Senate Report, which noted "that although § 666's protection of certain federal funds is very broad, this protection extends only to a very specific federal interest, namely, safeguarding the integrity of federal funds that are intended to serve legislatively defined policy objectives." *Foley,* 73 F.3d at 490 (quoting Senate Report at 370, 1984 USCCAN at 3511) (emphasis added)).

---

[5] "Like other courts that have wrestled with an interpretation of section 666(b), we look to the legislative history and the underlying purpose of the statute for guidance." *United States v. LaHue*, 170 F.3d 1026, 1030 (10th Cir. 1999) (*citing United States v. Copeland*, 143 F.3d 1439, 1441 (11th Cir. 1998)); *United States v. Rooney*, 37 F.3d 847, 850-51 (2d Cir. 1994); *United States v. Wyncoop*, 11 F.3d 119, 121 (9th Cir. 1993).

10

By design, Section 666 is limited to protecting organizations receiving federal funds and maintaining the integrity of their participation in those programs.[6] *See Fischer v. United States*, 529 U.S. 667, 678 (2000) ("Coupled with the broad substantive prohibitions of subsection (a), the language of subsection (b) reveals Congress' expansive, unambiguous intent to ensure the integrity of organizations participating in federal assistance programs.").

### b. *Fischer fact-based inquiry.*

In *Fischer*, the owner of a private medical consultant group was convicted under Section 666(a)(1)(A) for securing a $1.2 million dollar loan from a hospital authority (a municipal agency) in order to pay off loans, raise salaries, and invest in speculative securities. *Id.* at 670. He also paid a kickback of $10,000 to the hospital authority's chief financial officer and eventually defaulted on his obligation to the hospital authority and filed for bankruptcy. *Id.* The hospital agency received between $10–$15 million in Medicare federal benefits during the year in question. *Id.*

The defendant appealed his conviction and challenged federal jurisdiction under Section 666, alleging the government failed to prove that the "organization affected by his wrongdoing" received benefits in excess of $10,000 because the beneficiaries of Medicare are the patients and not the hospital. *Id.* at 671. The Supreme Court ultimately rejected the defendant's arguments,

---

[6] The Department of Justice itself recognizes these limitations in its Prosecution Policy Manual:
> As a matter of Departmental policy, Federal prosecutors should be prepared to demonstrate that a violation of 18 U.S.C. § 666 affects a substantial and identifiable Federal interest before bringing charges. This policy ensures that Federal prosecutions will occur only when significant Federal interests are involved. Consultation with the Fraud Section or Public Integrity Section, Criminal Division, is suggested in cases in which prosecutors doubt the degree of Federal interest. Consistent with the legislative history, prosecution under 18 U.S.C. § 666 should be limited to cases in which the Federal assistance is given pursuant to a specific statutory scheme that authorizes assistance to promote or achieve policy objectives. The statute was not intended to reach every Federal contract or every Federal disbursement.

DOJ *Justice Manual*, § 9-46.110 (2020) (emphasis added).

11

finding that the "Government has a significant interest in prohibiting financial fraud or acts of bribery being perpetrated upon Medicare providers . . . [fraudulent acts] raise the risk participating organizations will lack the resources requisite to provide the level and quality of care envisioned by the program." *Id.* at 681-82 (citing *Salinas*, 522 U.S. at 61).

> In reaching its conclusion the *Fischer* Court first reiterated the limitations of Section 666:

> Our discussion should not be taken to suggest that federal funds disbursed under an assistance program will result in coverage of all recipient fraud under § 666(b). Any receipt of federal funds can, at some level of generality, be characterized as a benefit. The statute does not employ this broad, almost limitless use of the term. Doing so would turn almost every act of fraud or bribery into a federal offense, upsetting the proper federal balance.

*Id.* at 681. Next, the Supreme Court identified the need for, and explained how to conduct, a fact-intensive inquiry into the nature of the organization/program and its funding to establish whether the facts support the application of Section 666:

> To determine whether an organization participating in a federal assistance program receives "benefits," an examination must be undertaken of the program's structure, operation, and purpose. The inquiry should examine the conditions under which the organization receives the federal payments. The answer could depend, as it does here, on whether the recipient's own operations are one of the reasons for maintaining the program.

*Id.* In its extensive examination of the relationship between the federal Medicare program and the hospitals receiving Medicare payments, the Court listed several important facts regarding the relationship between the Medicare funds provided and the organization/program. *Id.* at 679-681. The Court also made numerous observations about the federal objectives in providing Medicare funds and its relationship to the organization before finally concluding that Section 666 applied. *Id.* at 681-682.

When the fact-intensive *Fischer* analysis is undertaken in this case, it is quite clear that (1) there is no state "Mailer Program"; (2) the Legislature's operating budget received zero dollars in

federal funds during the years at issue; (3) the funds had been spent by the House when it disbursed the funds to the individual Members' allowance accounts; (4) there are no federal interests or objectives tied to Members' usage of their Postage and Printing Allowance; and (5) there are no conditions imposed by the State of Tennessee on the Members' qualification for, or use of, their Allowance, as these funds are the property of the Members' individual districts and not the State of Tennessee (or the federal government).

In sum, under the *Fischer* inquiry, this case plainly falls well short of the jurisdictional parameters in Section 666, and all Counts (Two, Three, and Four) arising under this statute, including the corresponding conspiracy charge in Count One, should be dismissed.

### 3. The Government Has Not Met the $5,000 Transaction Requirement in 18 U.S.C. Section 666.

The Indictment also fails to satisfy the $5,000 "transaction" element due to the exception found in 18 U.S.C. Section 666(c). Subsection (c) <u>specifically excludes</u> from Section 666's reach and states the statute "does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business." 18 U.S.C. § 666(c).

Accepting as true (for purposes of this Motion only) the government's factual allegations related to Counts Two, Three, and Four, the $51,947 in Postage and Printing Allowance funds paid to Cothren, Casada, and Individual 4, through their respective companies, fall within the statutory exception because were "bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business," for constituent postage and mailing services. 18 U.S.C. § 666(c). Thus, this entire amount is exempted from the jurisdictional calculation, and the government has failed to clear the $5,000 transactional hurdle designed to prevent certain cases from being brought in federal court. *See Mills*, 140 F.3d at 633.

13

Notably, the Indictment does not allege that Phoenix Solutions failed to provide the agreed-upon constituent mailer services to the House Members, or that these services were of an unacceptable or subpar quality. As several courts of appeal (including the Sixth Circuit) have recognized, the legitimacy and *bona fide* nature of the constituent mailer services rendered by Phoenix Solutions, Company 1, and Company 2 and their receipt of an individual Member's Postage and Printing Allowance funds for the same bars the application of, and conviction under, 18 U.S.C. Sections 666(a)(1) and (2). *See, e.g.,* 18 U.S.C. § 666(c); *U.S. v. Mills*, 140 F.3d 630 (6th Cir. 1998).

The case of *U.S. v. Mills*, 140 F.3d 630 (6th Cir. 1998) illustrates this point. In *Mills*, a former chief deputy sheriff was charged under Section 666 with receiving bribery and kickbacks concerning programs receiving federal funds, namely: soliciting payments in various amounts (all less than $5,000) from deputy sheriff job candidates. *Id*. The district court dismissed the bribery counts under 18 U.S.C. Section 666(c), finding that this statutory exception applied because the salaries earned by the deputy sheriffs after they were hired constituted "bona fide salaries, wages, fees, and other compensation" either received by the deputy sheriffs or promised by the defendant, and the amounts paid by the deputy sheriff candidates to secure these positions fell below the statute's $5,000 transactional requirement. *Id.* at 632-633.

The Sixth Circuit affirmed the dismissal and expressly rejected the government's argument that the salaries paid to the co-conspirators who paid bribes and obtained full-time deputy sheriff positions could not be bona fide "because of the illegal nature of the employment procurement process." *Id.* at 633. The appellate court reiterated that Congress "saw fit to exclude from the reach of the federal statute those individuals and those transactions that involved only the payment of bona fide salaries, wages, fees, and other compensation." *Id.* at 634.

14

The court also noted that, in the absence of allegations that "the jobs in question were unnecessary or that the individuals who obtained those employment positions did not responsibly fulfill the duties associated with their employment," the government had "no support for its claims that the salaries paid to the deputy sheriffs were not properly earned 'in the usual course of business.'" *Id.* at 633-634. Ultimately, the dismissal of the 18 U.S.C. Section 666 bribery charges was upheld in large part because "the government failed to allege that the salaries received by the individuals who paid bribes to obtain employment positions within the Shelby County government were unnecessary or unjustified" and, thus, the government failed to clear the jurisdictional hurdle found in Section 666. *Id.* at 634.

Like the salary payments to the sheriff's deputies in *Mills*, the Postage and Printing Allowance payments issued to Phoenix Solutions, Company 1, and Company 2 for constituent mailing services were, in fact, earned. Unlike the defendants in *Mills*, however, there were no "bribes" or "kickbacks" paid to Casada, Individual 4, Company 1, or Company 2. If anything, the facts alleged in the Indictment only <u>confirm</u> that the payments were *bona fide* compensation for the constituent "mailer services" provided to Tennessee House Members. *See* Indictment at ¶¶ 65, 69. Because the government does not allege that these payments were "unnecessary or unjustified," the payments in this case fall squarely within the statutory exception set forth in 18 U.S.C. Section 666(c), and the 18 U.S.C. Section 666 claims and related conspiracy claim all fail as a matter of law. Therefore, Counts Two, Three, and Four must be dismissed, along with the related conspiracy charge in Count One.

15

4. **Defendants' Alleged Non-Disclosure of Information Does Not Create Federal Jurisdiction Under Section 666 or Cure the Indictment's Jurisdictional Defects.**

The Indictment is the government's attempt to make alleged misconduct in the procurement process and non-disclosure of potential conflicts of interest federal crimes—they are not.[7] The Sixth Circuit has affirmatively held that the focus under Section 666 is on the amount and legitimacy of the transaction(s) at issue. Here, the legitimacy of the transactions are not at issue in the Indictment, given the provision of actual, necessary constituent mailer services and the related bona fide payments for these services (and the absence of any allegations to the contrary in the Indictment). Despite the Indictment's focus on Casada's failure to disclose his or his alleged co-conspirator's interest in Phoenix Solutions, the United States Supreme Court has clearly held such non-disclosure is not a federal crime. *Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020) (holding that federal criminal statutes do not "authorize federal prosecutors to 'set[] standards of disclosure and good government for local and state officials,'" but instead leave alleged public corruption to be policed by the States).

Just this year, the Supreme Court again declined to broadly interpret federal criminal statutes in a way that would improperly expand the federal court's jurisdiction. In *Ciminelli*, the defendant was convicted of federal wire fraud based on the "right to control theory" in that he deprived the victims of intangible potentially valuable economic information necessary to make economic decisions." *Ciminelli v. United States*, 134 S. Ct. 1121, 1126–28 (2023). The Supreme Court reversed the conviction, parsing the statutory language to reason that the "scheme or artifice to defraud" must involve "money or property," and therefore the defendant's conviction for fraud to deprive of an intangible "right to control," was improper. *Id.* The Supreme Court reasoned that

---

[7] Cothren adopts and incorporates Defendant Casada's written argument on this issue.

to interpret otherwise would improperly expand federal criminal statutes beyond the text to where "almost any deceptive act could be criminal" and that federal criminal statutes are not vehicles for the federal government to "enforce (its view of) integrity in broad swaths of state and local policymaking." *Id.*

*Mills*, *Kelly*, and *Ciminelli* all support the dismissal of the Section 666 Counts in this case and foreclose Section 666's application to every instance of purportedly misappropriated federal funds (assuming such funds are even at issue and they are not in this case). To find otherwise would make nearly any deceptive act, non-disclosure, or bribe a federal crime, which is not the intent of Congress nor a reasonable interpretation of the language. The Indictment alleges a scheme of secrecy, but the law is clear that an alleged non-disclosed affiliation with a company that <u>actually performed necessary services</u> is not a federal crime.

> **B.  Count Two Should Be Dismissed Also Because the Indictment Fails to Allege a Loss or Contemplated Loss.**

In Count Two of the Indictment, the government charges Cothren with "Theft Concerning Programs Receiving Federal Funds," under 18 U.S.C. Section 666(a)(1)(A) and alleges that he and his alleged co-conspirators "embezzled, stole, obtained by fraud, [and] without authority knowingly converted to the use of any person other than the rightful owner, and intentionally misapplied property worth $5,000 or more…" Indictment at ¶¶ 58-61.  In support of this charge, the government alleges that Cothren and Casada "fraudulently obtained money from the State of Tennessee by falsifying the true owners and operators of Phoenix Solutions and retaining the proceeds of fraudulently induced disbursements from the State to Phoenix Solutions, Company 1, and Company 2 for the Defendants' and Individual 4's own use and benefit." Indictment at ¶ 61.

Theft under Section 666(a)(1)(A), otherwise known as program fraud,[8] "occurs where 1) a person who was an agent of a local government agency receiving federal funding over $10,000 per year, 2) embezzled, stole or fraudulently obtained property (including money), 3) the value of which was $5,000 or more, and 4) which was owned or controlled by the government agency." *United States v. Washington*, 715 F.3d 975, 979 (6th Cir. 2013) (citing *United States v. Hudson*, 491 F.3d 590, 593 (6th Cir. 2007)).

Even accepting all of the allegations in the Indictment as true, the government fails to set forth a *prima facie* case for program theft as a matter of law. As previously discussed, there is no "federal program" or "federal funds" tied to the General Assembly's Postage and Printing Allowance. But even if there was a connection between these federal funds and the Postage and Printing Allowance/fictional "Mailer Program," the government must still allege an <u>actual loss</u> of money or property, or that the Defendants' alleged scheme <u>contemplated</u> a cognizable loss of money or property. *See United States v. Riley*, 621 F.3d 312, 327-28 (3d Cir. 2010). The government has not alleged—and cannot allege—either one of these facts, at least one of which is required to prove the second essential element of this charge. Accordingly, this count should be dismissed.

Another irreparable flaw in the government's federal program theft charge (beyond the non-existence of any federal program or benefits tied to Members' Postage and Printing Allowance) is its failure to adequately allege the requirements of a "scheme to defraud money or property" or facts surrounding the loss that are necessary to satisfy the second element of this

---

[8] Theft charges under 18 U.S.C. Section 666(a)(1)(A) are considered by the Sixth Circuit as program fraud. *See United States v. Washington*, 715 F.3d 975, 979 (6th Cir. 2013) (finding the hours billed on invoices were "fabricated or at least inflated" and holding the conviction would not be overturned).

18

charge. "A scheme to defraud includes any plan or course of action by which someone intends to . . . deprive another by deception of money or property by means of false or fraudulent pretenses, representations, or promises." *United States v. Anming Hu*, No. 3:20-CR-21-TAV-DCP-1, 2021 U.S. Dist. LEXIS 171165, at \*39-40 (E.D. Tenn. Sep. 9, 2021) (citing *United States v. Daniel*, 329 F.3d 480, 485-86 (6th Cir. 2003)). However, "[p]roof of deceit, without more, is not sufficient to find a scheme to defraud." *United States v. Davis*, 2017 U.S. Dist. LEXIS 122643, at \*23-24 (S.D.N.Y. Aug. 3, 2017).

The Indictment fails to allege a loss or contemplated loss. A properly supported charge of federal program theft requires the government to allege that Cothren and Casada actually embezzled, stole, or fraudulently obtained property (including money). *See Riley*, 621 F.3d at 327-28. While the Indictment does use those terms of art, the facts supporting Count Two essentially allege that Defendants fraudulently obtained money by concealing Cothren's name and involvement with Phoenix Solutions and the profit-sharing joint venture between and among that company, Company 1, and Company 2. Indictment at ¶ 61. These allegations, however, are not enough to state a claim for program fraud under Section 666(a)(1)(A) or to survive this Motion to Dismiss.

At best, it seems the government is relying on a "right to control" theory of fraud, which the United States Supreme Court soundly rejected <u>after</u> Cothren was indicted. Under the "right to control" theory, the alleged scheme rests not on an alleged deprivation of property, but on depriving the victim of "potentially valuable economic information necessary to make discretionary economic decisions." *Ciminelli v. United States*, 143 S. Ct. 1121, 1124 (2023) (internal citations and quotations omitted). The government's chief complaint in this case is that Defendants deprived the State of Tennessee of "potentially valuable economic information" by

19

allegedly concealing Cothren's identity and operation of Phoenix Solutions. However, this theory was recently invalidated by the Supreme Court in *Ciminelli*:

> We have held, however, that the federal fraud statutes criminalize only schemes to deprive people of traditional property interests. *Cleveland v. United States*, 531 U. S. 12, 24, 121 S. Ct. 365, 148 L. Ed. 2d 221 (2000). Because "potentially valuable economic information" "necessary to make discretionary economic decisions" is not a traditional property interest, we now hold that the right-to-control theory is not a valid basis for liability under §1343.

*Ciminelli v. United States*, 143 S. Ct. 1121, 1124 (2023) (overturning wire fraud conviction because right to control one's assets is not "property" for the purposes of the wire fraud statute). Thus, to support this charge, the government must allege actual or contemplated loss of legitimate money or property. It does not.

Time and time again, courts have dismissed or acquitted defendants of fraud-based charges (including federal program theft) wherein the alleged victim received the full "benefit of the bargain" because the alleged fraudulent scheme did nothing more than induce the transaction. As the Third Circuit outlined in *Riley*, a violation of Section 666(a)(1)(A) and the mail fraud statute (18 U.S.C. Section 1341) turns on the object of the deprivation and <u>not</u> the underlying fraudulent act. Under both statutes, the deprivation at issue is "money" or "property." *Riley*, 621 F.3d at 327. For this reason, cases examining alleged fraudulent schemes under either statute are enlightening.

In *Anming Hu*, a professor at the University of Tennessee was charged with three counts of wire fraud and three counts of false statement after he performed research under funding and grants from NASA while allegedly covering up the fact that he was also a faculty member of Beijing University of Technology, which allegedly violated NASA's "China Funding Restriction." *United States v. Anming Hu*, No. 3:20-CR-21-TAV-DCP-1, 2021 U.S. Dist. LEXIS 171165, at *2-3 (E.D. Tenn. Sep. 9, 2021).

20

In adopting and analyzing the "scheme to defraud money or property" language, the district court relied heavily on the Eleventh Circuit's decision in *Takhalov* and concluded that "'to defraud, one must *intend* to use deception to cause some injury; but one can *deceive* without intending to harm at all.'" *Anming Hu*, at *41 (quoting *United States v. Takhalov*, 827 F.3d 1307, 1312 (11th Cir. 2016)). Ultimately, the *Anming Hu* court held that, for a scheme to defraud to be shown, the government must show that the defendant had "intent to cause a tangible harm to the victim regarding the benefit of the bargain between the parties" *Anming Hu*, 2021 U.S. Dist. LEXIS 171165, at *51. Ultimately, the district court granted the defendant's motion for judgment of acquittal on all charges of wire fraud, holding the government's evidence:

> is insufficient to show a scheme to defraud because, although, even if we assume that defendant intended to deceive, such deception about his affiliation with [Beijing University] does not show intent to harm NASA. And again, without intent to harm, there is no "scheme to defraud" even if "the transaction would not have occurred but for the trick."

*Id.* at *52 (*citing Takhalov*, 827 F.3d at 1313).

In *Takhalov*, the defendants hired women to pose as tourists, locate visiting businessmen, and lure them to defendants' bars and nightclubs. *Takhalov,* 827 F.3d at 1310. The Eleventh Circuit reversed defendants' wire fraud and related convictions after the district court declined to instruct the jury "that they must acquit if they found that the defendants had tricked the victims into entering a transaction but nevertheless gave the victims exactly what they asked for and charged them exactly what they agreed to pay." *Id.* at 1310, 1323-24.

The *Takhalov* court overturned the fraud convictions based on the lack of <u>actual harm</u> to the alleged victims, but the appellate court also made several observations relevant to the "intent to harm" or contemplated loss aspect of schemes to defraud that the *Anming Hu* court found crucial in its decision:

21

> [A] schemer who tricks someone to enter into a transaction has not "schemed to defraud" so long as he does not intend to harm the person he intends to trick. And this is so even if the transaction would not have occurred but for the trick. For if there is no intent to harm, there can only be a scheme to deceive, but not one to *defraud*.
>
> Consider the following two scenarios. In the first, a man wants to exchange a dollar into four quarters without going to the bank. He calls his neighbor on his cell phone and says that his child is very ill. His neighbor runs over, and when she arrives he asks her to make change for him. She agrees; the quarters pass to the man; the dollar passes to the woman; and they part ways. She later learns that the child was just fine all along. The second scenario is identical to the first, except that instead of giving the woman a true dollar, he gives her a counterfeit one.
>
> The first scenario is not wire fraud; the second one is. Although the transaction would not have occurred but-for the lie in the first scenario—the woman would have remained home except for the phony sickness—the man nevertheless did not intend to "depriv[e] [the woman] of something of value by trick, deceit, [and so on]." *Bradley*, 644 F.3d at 1240. But in the second scenario he did intend to do so.

*Takhalov*, 827 F.3d at 1313.

Other courts have reached similar conclusions. *See United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1179 (2d Cir. 1970) (concluding conviction of stationary seller under the mail fraud statute could not stand where the misrepresentation of sales personnel's identities or customer connections were "not directed to the quality, adequacy or price of goods to be sold, or otherwise to the nature of the bargain"). In *United States v. Jackson,* No. 3:16-CR-31, 2017 U.S. Dist. LEXIS 43295 (N.D.W. Va. Mar. 24, 2017), a district court dismissed a 53-count mail fraud indictment against defendants who conducted "charity" bingo games and made multiple misrepresentations about their charitable status to the Fraternal Order of Police and a county Humane Society while maintaining 90% of the proceeds from said games. *Id.* at *16-17. There, the court held that:

> The Defendants' alleged victims do not have a property right, as recognized by §1341, to the truth. Moreover, any lies must be material and go to the heart of the bargain. Based upon the indictment, the lie alleged is akin to those in *Cleveland*, *Regent*, *Sadler*, and *Takhalov*. Clearly the Defendants received the vast majority of

22

the proceeds derived from the bingo games and raffles. However, the indictment states that the Defendants conducted "charitable bingo and charitable raffle occasions in the name of [FOP #83 and BCHS from 2010 through 2014]." Taken on its face, the indictment alleges a scheme where the Defendants used the charities to obtain licenses so that the Defendants could conduct charitable bingos and raffles, in violation of state law, and they distributed a portion of the proceeds to the charities in return. There is no allegation that the charities were injured in any way. In fact, the charities benefited from the scheme by receiving a portion of the proceeds they otherwise would not have received had the Defendants not used their charities to obtain licenses. The misrepresentation in the instant case is not material and does not go to the heart of the bargain as to any arrangement between the Defendants and the charities. Accordingly, the indictment fails to demonstrate a scheme or artifice to defraud.

*Id.* at *23-24 (internal citations omitted).

Based on this collection of cases, it is clear (in the absence of any allegation in the Indictment to the contrary) that the alleged victims of the purported Postage and Printing Allowance "scheme"—the State and its elected Members—received the full "benefit of the bargain" and the alleged fraudulent misrepresentations or omissions by the Defendants, at best, did nothing more than induce the transaction. In any event, it is clear the allegations and/or omissions did not go to the "heart of the bargain" related to providing constituent mailers.

Although the government summarily alleges Defendants "embezzled, stole, and obtained by fraud" Postage and Printing Allowance funds, the government utterly fails to allege any actual tangible harm or loss to property or money. Instead, the government merely alleges that Defendants assumed certain state officials and representatives would not have done business with Phoenix Solutions had they known about Cothren's role in the company or its joint venture with Individual 4/Company 1 and Casada/Company 2. Indictment at ¶¶ 21, 24, 34.

There are absolutely no allegations in the Indictment that, if proven, would establish that the State of Tennessee lost money or property in the transaction or that the elected Members: (i) did not receive the mailers paid for, (ii) received inferior mailers, (iii) paid more for the mailers

23

than they would have with other companies, or (iv) suffered any other contemplated harm to money or property. The Indictment is likewise devoid of any allegation that the $51,947 in Postage and Printing Allowance payments made to Company 1 and Company 2 were not the fair-market value for the constituent mail services rendered.

As previously discussed, the loss of tangible property or money is the distinguishing feature between wire/mail/program fraud and honest services fraud and must be adequately alleged and proven with respect to Count Two. *See Riley*, 621 F.3d at 327-28. Here, the Indictment does not—and cannot—allege any actual loss because the alleged victims clearly received exactly what they bargained for, despite the alleged concealment of Cothren's association with Phoenix Solutions and his joint venture and profit-sharing with Casada and Individual 4's consulting companies.

Count Two is also ripe for dismissal because the government does not even allege a <u>contemplated</u> injury to another's money or property. "It is not required that the victims of the scheme in fact suffered harm, but the 'government must, at a minimum, prove that defendants contemplated some actual harm or injury to their victims.'" *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015) (*quoting United States v. Novak,* 443 F.3d 150, 156 (2nd Cir. 2006)); *see also United States v. Sadler,* 750 F.3d 585, 590 (6th Cir. 2014) (internal citations omitted) ("To be guilty of fraud, an offender's 'purpose must be to injure,' a common-law root of the federal fraud statutes."); *Riley*, 621 F.3d at 328 ("the risk of exposure to such a loss of money or property is sufficient to distinguish §§ 1341 and 666(a)(1)(A) fraud from honest services fraud."). Thus, courts look to the intent behind the scheme to defraud for any monetary or property loss that would have been contemplated at the outset.

The Indictment fails to allege any actual or contemplated loss of property. In the absence of any alleged "loss" or "contemplated loss," Count Two is fatally defective and should be dismissed.

**C.**      **Counts Three and Four Should Be Dismissed Also Because the Government Has Not Alleged Facts Sufficient to Prove Defendants Received or Solicited Bribery or Kickbacks Concerning Programs Receiving Federal Funds.**

     **1.**      <u>**Casada and Individual 4 Were Acting as Independent Business Owners and Not as Public Officials with Respect to Their Constituent Mail Activities.**</u>

Although the Indictment correctly alleges that Casada and Individual 4 were "elected Representative(s) of the State of Tennessee" during the relevant time period (Indictment at ¶¶ 64, 68), these individuals were not acting as an "agen[t] of the State of Tennessee" when they were soliciting constituent mailing work from their fellow House Members. The Tennessee General Assembly meets for only 90 session days over a two year period, with legislative sessions lasting from approximately "mid-January through late April or May of each year."[9] Because Tennessee General Assembly Members serve the state in a part time capacity, many maintain other employment and/or own their own businesses. Here, the distinction between an elected official's public versus private conduct is critical.

Even if Casada and Individual 4 solicited the constituent mailing work from their colleagues knowing full well that it would be done by Phoenix Solutions, the Indictment acknowledges these solicitations were done on behalf of themselves and their consulting companies (Company 1 and Company 2), and does not allege they were required to disclose their affiliation with Phoenix Solutions or its owner, Cothren. Indictment at ¶¶ 65, 69. Furthermore, <u>the</u>

---

[9]TENNESSEE GENERAL ASSEMBLY,
https://wapp.capitol.tn.gov/Apps/GeneralAssembly/About.aspx (last visited July 25, 2023).

Guidelines governing the usage of Members' Postage and Printing Allowance do not prohibit Members from using their own or other Members' businesses for constituent mailer services or submitting invoices requesting payment for such work to Office of Legislative Administration. *See generally*, Exhibit A: Guidelines; and Indictment at ¶¶ 25, 35, 36.

The D.C. Circuit vacated a U.S. Department of Housing and Urban Development ("HUD") official's bribery conviction under analogous circumstances in *United States v. Muntain*, 610 F.2d 964 (D.C. Cir. 1979). In that case, the HUD official was convicted for allegedly accepting illegal gratuities (in the form of consulting fees and expenses) after mass-marketing group automobile insurance policies to labor unions with whom he interacted as a part of his official duties. The official "frequently combine[d] the promotion of the automobile insurance with trips taken at government expense for the purpose of conferring with labor officials across the United States concerning official business." *Id.* at 966-67. Notwithstanding the defendant's blended public and private activities, the appellate court noted that, "[t]o the extent that [the defendant's] use of his official position to promote a <u>purely private venture</u> created an appearance of impropriety, his conduct is reprehensible, but <u>it is not criminal</u>." *Id.* at 967-68 (emphasis added).

Though not binding on this Court, the Eleventh Circuit's rationale for affirming the district court's dismissal of comparable Hobbs Act extortion charges arising from the private business venture of elected city officials in *United States v. O'Keefe* is also helpful to examine. *United States v. O'Keefe*, 825 F.2d 314 (11th Cir. 1987). In *O'Keefe*, the defendants were city officials who received payments in connection with the consulting and other work they performed in connection with a local nursing home project, which they had also voted to approve in their official capacities. *Id*. The district court found that, while the government met its burden of proving the officials received payments and voted in favor of the project, the government "presented no

26

evidence to show that no services were performed." *Id.* at 320. Ultimately, the fact that the defendants "performed legitimate work to which they were entitled to compensation" led the Eleventh Circuit "to conclude, as did the district court, that no rational fact-finder could reasonably have found beyond a reasonable doubt that the defendants accomplished the alleged extortion." *Id*.

In sum, a charge under 18 U.S.C. Sections 666(a)(1)(B) or 666(a)(2) cannot stand if it arises from a public official's <u>private</u> business activities or if the official is paid <u>bona fide</u> compensation in connection with such a venture. Both factors are present here.

### 2. The Government Has Failed to Allege That Defendants "Corruptly Solicited" the Postage and Printing Allowance Payments at Issue.

"To corruptly solicit or accept anything of value means that it was done with 'intent to give some advantage inconsistent with official duty and the rights of others.'" *United States v. Hills*, 27 F.4th 1155, 1182 (6th Cir. 2022) (quoting *United States v. Buendia*, 907 F.3d 399, 402 (6th Cir. 2018) (holding that defendant "corruptly solicited" by accepting kickbacks (gift cards) to "subvert[] the normal bidding process" and award the contracts "in a manner inconsistent with her duty to obtain goods and services for her school at the best value.")).

The Indictment fails to allege that Casada and Individual 4 subverted any owed duty to the State with regard to their joint venture. This case is easily distinguishable from *Buendia* and other government contract cases because (i) the Indictment alleges no such formal contract or bidding process when it came to a Member's use of his/her Postage and Printing Allowance (again, because that process did not exist); and (ii) the Guidelines clearly vested House Members with the discretion to spend (or not) the $3,000 for constituent mail printing and postage (among other things) allocated to them annually and conditioned such expenditures <u>not</u> on the Speaker's approval of the Member's chosen constituent mail Private Sector <u>Vendor</u>, but on the <u>content</u> of the proposed constituent mailer. Exhibit A: Guidelines at p. 9.

27

Because Counts Three and Four impermissibly seek to criminalize the <u>private</u> business activities of public officials that paid <u>bona fide</u> compensation in connection with such activities, the government has failed to adequately allege all the elements of these charges, and both counts should be dismissed.

### D.     The Government's Alleged Facts, Even If Proven, Would Not Support a Conviction for Honest Services Wire Fraud (18 U.S.C. Sections 1343, 1346, 2).

An honest services fraud case differs from garden-variety fraud or theft case "in which the victim's loss of money or property supplied the defendant's gain . . . ." An honest services case targets "corruption that lack[s] similar symmetry." The Supreme Court in *Skilling v. United States*, 561 U.S. 358, 401 (2010), explained the theory of honest services this way:

> While the offender profited, the betrayed party suffered no deprivation of money or property; instead, a third party, who had not been deceived, provided the enrichment. For example, if a city mayor (the offender) accepted a bribe from a third party in exchange for awarding that party a city contract, yet the contract terms were the same as any that could have been negotiated at arm's length, the city (the betrayed party) would suffer no tangible loss.

*Skilling*, 561 U.S. at 400.

Here, the government must allege facts that, if proven, would establish that Cothren and Casada, aided and abetted by each other and Individual 4, "used the mail to carry out a 'scheme or artifice to defraud' another, 18 U.S.C. § 1341, of 'the intangible right of honest services,' *id.* § 1346." *United States v. Terry*, 707 F.3d 607, 611 (6th Cir. 2013).  <u>For public officials, the intangible right of honest services "covers only schemes in which the defendant deprives another of his honest services by participating in a bribery or kickback scheme."</u> *Id.* (citing *Skilling v. United States*, 561 U.S. 358, 408 (2010)).

As discussed in Section II.B, *supra*, a "scheme or artifice to defraud" "includes any plan or course of action by which someone intends to deprive another by deception of money . . . by

28

means of false or fraudulent pretenses, representations, or promises." *United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003). To satisfy the "scheme or artifice to defraud" requirement, the government must allege facts that, if proven, would establish that the defendant "said something *materially* false." *Daniel*, 329 F.3d at 486. A false statement "is material if it has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decision-making body to which it was addressed.'" *United States v. Birnie*, 193 F. App'x 528, 534 (6th Cir. 2006) (quoting *United States v. Gaudin*, 515 U.S. 506, 509, 115 S. Ct. 2310, 132 L. Ed. 2d 444 (1995)) (internal citation omitted).

A public official accepts a bribe or kickback when he or she "corruptly…receives…anything of value…in return for…being influenced in the performance of any official act." 18 U.S.C. § 201(b)(2). A key element of bribery is the public official's <u>agreement</u> that his/her "official conduct will be controlled by the terms of the promise or the undertaking." *Terry*, 707 F.3d at 612. And, "[t]his agreement must include a quid pro quo—the receipt of something of value 'in exchange for an official act.'" *Terry*, 707 F.3d at 612 (quoting *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 404-05 (1999)). To establish the bribery/kickback element, then, the government must allege and prove that Casada and Individual 4 agreed to perform some "official act(s)" in exchange for the payments their consulting companies received for the postage and mailing services provided to state representatives by Phoenix Solutions.

Dismissal of Counts Five through Ten is warranted for at least four reasons. First, the Indictment fails to sufficiently allege facts that, if proven, would establish Defendants made a "material" misstatement with respect to the purported "scheme and artifice to defraud." Second, neither Casada nor Individual 4 acted as a "public official" with respect to their Postage and Printing Allowance activities. Third, even if Casada and Individual 4 were deemed to be "public

officials" for purposes of their own Postage and Printing Allowance activities, there was no *quid pro quo*—no agreement by Casada or Individual 4 to perform an "official act" in exchange for the Postage and Printing Allowance payments they received. Finally, even if the Court finds that the Indictment sufficiently alleges a material misstatement, the existence of a "public official," and an agreement to pay or receive kickbacks in exchange for an "official act," the due process clause and vagueness doctrine foreclose Cothren's conviction under 18 U.S.C. Sections 1343 and 1346.

      1.      **The Indictment Does Not Plead Facts Showing the Alleged Misrepresentation(s) Related to the Scheme or Artifice to Defraud Was Material.**

      Preliminarily, Counts Five through Ten fail because satisfaction of the "scheme or artifice to defraud" element of an honest services wire fraud charge requires not only proof that the defendant said something false, but that the false statement was "material." *Daniel*, 329 F.3d at 486. While the issue of materiality, and whether the alleged false statement tended to influence or could have influenced the decision-maker in question, is generally reserved for the trier of fact, the Indictment fails to allege any facts that, if proven, would establish that the alleged false statements did, in fact, influence the decision-making of the Tennessee Speaker, his office, or any of the Members who hired Company 1 and Company 2 for their constituent mailing work.

      The Indictment only references <u>Defendants' "expectations"</u> that "Phoenix Solutions would not be approved by the State to be a Private Sector Vendor or hired by individual members of the Tennessee General Assembly if Cothren's operational involvement" in Phoenix Solutions and joint venture with Company 1 and Company 2 were publicly known. <u>The Indictment does not, however, allege that the State or any individual representatives were actually influenced or could have been influenced by the alleged misrepresentations or omissions related to Phoenix Solutions</u>. The

omission of such factual allegations supporting the "scheme or artifice to defraud" element of honest services wire fraud is an incurable defect that merits dismissal.

2.    <strong><u>Absence of a "Public Official."</u></strong>

The absence of a "public official" is also fatal to the government's honest services wire fraud charges (Counts Five through Ten) for the same reasons discussed at length in Section II.D.1, above. And, as explained further below, even if this Court disagrees, there is no question that neither Casada nor Individual 4 performed any "official act" with respect to any Member's Postage and Printing Allowance.

3.    <strong><u>Absence of Bribery/Kickbacks and Agreement to Perform "Official Act."</u></strong>

In Counts Five through Ten, the Indictment broadly asserts that Casada and Cothren, aided and abetted by Individual 4, "devised and intended to devise a scheme and artifice to defraud and deprive Tennessee and the citizens of Tennessee of their right to the honest services" of "elected state officials" (*i.e.*, Casada and Individual 4), "through bribery and kickbacks." Indictment at ¶ 71. The Indictment further avers that Casada, Cothren, and Individual 4, transmitted various wire communications "for the purpose of executing" the aforementioned scheme. Indictment at ¶ 72. The government alleges that Casada and Individual 4 performed three "official acts" in exchange for "bribes and kickbacks" from Cothren:

> (1) pressuring the Tennessee House Speaker's Office and other State officials to approve Phoenix Solutions as a Mailer Program vendor and to disburse State funds to Phoenix Solutions, Company 1, and Company 2;
> (2) advising and pressuring other members of the Tennessee House of Representatives to use Phoenix Solutions, Company 1, and Company 2 as their Mailer Program vendor and to disburse State funds to Phoenix Solutions, Company 1, and Company 2; and
> (3) choosing to use Phoenix Solutions, Company 1, and Company 2 for Casada and Individual 4's mailings to their constituents under the Mailer Program.

Indictment at ¶ 26.

31

Assuming, *arguendo*, that the above allegations were sufficient to establish an agreement with a *quid pro quo*, there can be no honest services conviction because none of these "acts," if proven, was "official" according to *McDonnell v. United States,* 579 U.S. 550 (2016). With respect to the first alleged "official act," as previously outlined, the applicable Guidelines belie the government's contention that a formal <u>vendor</u> approval process existed for representatives seeking to use their Postage and Printing Allowance during the relevant time period: it did not. <u>In reality, the Guidelines devote a total of two sentences to the use of private sector printing companies:</u> "[p]rinting may be handled by private sector printing companies or through the State's print shop;" and "[f]or information regarding payment of private sector vendors for printing and distribution services, please call 741-1100, ext. 44883." *See* Exhibit A: Guidelines at p. 9. These Guidelines also do not prohibit Members from using their own or another Member's business for Postage and Printing Allowance services, nor do they require Members to disclose any financial or other personal interest he/she may have in the company delivering said services. *See generally,* Exhibit A: Guidelines.

Regarding the second supposed "official act," *McDonnell* makes it clear that "advising and pressuring" other Members to use their Postage and Printing Allowance to hire a Private Sector Vendor would not constitute a "decision or action" on a "question, matter, cause, suit, proceeding or controversy" required to sustain a conviction under 18 U.S.C. Section 1343 and Section 1346. As the Supreme Court noted in *McDonnell*, the public official's decision or action on the "question," "matter," "cause," "suit," "proceeding," and "controversy" at issue "must involve a <u>formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee</u>." *McDonnell,* 579 U.S. at 574 (emphasis added). A Member's selection and use of a Private Sector Vendor for routine, optional

32

constituent mailers plainly does not meet this definition, and another public official or individual's advice or "pressure" applied in the context of such decision-making cannot convert these administrative actions into "official" ones. The government's secondary contention that "advising and pressuring" state officials and/or Members to disburse Postage and Printing Allowance funds to Phoenix Solutions, Company 1, and Company 2 constituted an "official act" fails for the same reason and another: the constituent mailer services were actually rendered and the State funds were bona fide compensation for the same. *See* Section II.A.3, *supra*.

With respect to the third purported "official act," there was likewise nothing "official" about Casada's decision to use Individual 4's consulting company (and vice-versa), or Phoenix Solutions, for their constituent mail. As previously explained, both Members had the option to use their Postage and Printing Allowance for constituent mail and their decision to hire Phoenix Solutions and/or a consulting company to generate and send this mail did not involve any "official act" by Casada and Individual 4, even if these two individuals also happened to be elected officials. To the extent that the third and final alleged "official act" is premised on the government's theory of "undisclosed self-dealing"—that is, that Casada and Individual 4 wrongly acted in their own interests when deciding who they would hire to do their constituent mailers—*Skilling* expressly rejected this theory of criminal liability. An undisclosed conflict of interest cannot sustain an honest services conviction under Section 1346. *See Skilling v. U.S.*, 561 U.S. 358, 410 (2010); *see also United States v. Ford*, 639 F.3d 718, 723 (6th Cir. 2011) (conviction of honest services fraud was vacated pursuant to *Skilling* because fraudulent scheme was "based upon [the defendant's] failure to disclose his financial interests, not bribes or kickbacks.").

### 4.　　**Due Process and Vagueness.**

Assuming, for purposes of this Motion only, that the government's reading of the statutes forming the basis for the honest services wire fraud charges against Cothren is correct (which Cothren vigorously disputes), then those statutes are still unconstitutionally vague, and the Indictment should be dismissed on those grounds. "To satisfy due process a penal statute [must] define the criminal offense (1) with sufficient definiteness that ordinary people can understand what conduct is prohibited and (2) in a manner that does not encourage arbitrary and discriminatory enforcement." *Skilling*, 561 U.S. at 402-03. The government's strained reading of the wire fraud statute fails both tests. Thus, Counts Five through Ten should be dismissed.

Defining an "official act" in a way that does not require proof that a public official sought to exercise governmental power on a specific matter will leave public officials second guessing the legality of every single decision facing them, no matter how perfunctory or inconsequential. The government's all-encompassing definition of "official act" would potentially criminalize an elected official's business dealings with other elected officials even if in a wholly private capacity, (like the owners of Company 1 and Company 2 in this case) and an official's choices in purely administrative matters, such as the selection of a Private Sector Vendor and use of the Postage and Printing Allowance that had already been allocated. Such a broad and uncertain standard fails to provide fair notice in accordance with *Skilling*. It would also create a chilling effect on a public official's routine decision-making and create criminal liability for nearly every decision a public official makes, even those in a private capacity.

By way of example, Members of the General Assembly receive, in addition to their salary and Postage and Printing Allowance, a "monthly expense allowance" of $1,000 for "expenses incurred in connection with official duties when away from the seat of government." *See* Exhibit

A: Guidelines at p. 6. This allowance covers, for example, "telecommunications, office space, secretarial and other assistance…." *Id*. If the government's <u>expansive</u> theory of criminal liability is adopted in this case, then a Member who uses his/her monthly allowance to rent office space in a building in which he/she has an ownership interest would be at risk of prosecution for federal program theft or honest services wire fraud if the representative also received a monthly or other financial distribution in connection with his/her building ownership. While this type of self-interested transaction may be viewed by some as <u>unethical</u>, it is not <u>illegal</u> based on the *Skilling* and *McDonnell* line of cases.

Second, such a broad construction of "official act" would lead to arbitrary prosecutions. The danger of arbitrary prosecution is particularly clear here, given that Casada and Individual 4 are clearly not the only state officials whose private businesses benefited—and still benefit—in some way from their political offices.

In short, the government asks this Court to expand the "official act" concept beyond its settled scope. Should the honest services fraud provision be read and revised as the government requests, then those statutes will be rendered unconstitutionally vague. This Court should "resist the Government's less constrained construction absent Congress' clear instruction otherwise." *Skilling*, 561 U.S. at 411.

E.  **Without an Underlying Illegal Act, the Conspiracy Charge in Count One Cannot Stand.**

The government's conspiracy charge in Count One of the Indictment is wholly derivative of the underlying offenses discussed at length above and fails for the same reasons. "The gist of the crime of conspiracy is the agreement to commit an <u>illegal act</u>." *United States v. Fruehauf Corp.*, 577 F.2d 1038, 1071 (6th Cir. 1978) (emphasis added). Without an "illegal act," there can be no conspiracy under 18 U.S.C. Section 371. Stated once more, the government's allegations

35

establish—at best—an agreement among Cothren, Casada, and Individual 4 to engage in <u>lawful</u> constituent mailer work and to split the profits earned from their joint (private) business venture. As such, Count One should also be dismissed in its entirety.

      **F.**    **The Absence of an Unlawful Business Is Fatal to the Fictitious Name to Carry Out a Fraud (18 U.S.C. Sections 1342, 2) Charge in Count Eleven.**

In Count Eleven, the Indictment alleges Cothren used a fictitious name ("Matthew Phoenix") and the United States Postal Service to carry on "an unlawful business, that is, the fraudulent operation of Phoenix Solutions." Indictment ¶ 74. Section 1342 requires proof of the use of a fictitious name or address for "the purpose of conducting, promoting, or carrying on by means of the Postal Service, any scheme or device mentioned in section 1341 ... or <u>any other</u> unlawful business." 18 U.S.C. § 1342. As explained above, the government has not sufficiently alleged a fraudulent scheme or an unlawful act under Section 1341, nor do the facts alleged, if proven, show that Cothren was running some "other unlawful business." Because Phoenix Solutions' business activities, with respect to the Postage and Printing Allowance, were entirely lawful for the reasons already discussed at length herein, this charge also must be dismissed.

      **G.**    **There Can Be Neither Money Laundering nor Conspiracy to Commit Money Laundering in the Absence of Criminal Activity.**

Counts Twelve through Twenty allege both money laundering and conspiracy to commit the same. The federal money laundering statute prohibits certain conduct involving "unlawful activity" or the "proceeds" of unlawful activities. *See* 18 U.S.C. § 1956. "Any person who conspires to commit any offense defined in this section … shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy." 18 U.S.C. § 1956(h).

36

To establish that money laundering or a conspiracy to commit the same occurred, the government must show that a <u>criminal</u> activity occurred in the first place. 18 U.S.C. § 1956(a); *United States v. Santos*, 553 U.S. 507, 511 (2008) (noting money laundering statute requires the government to "prove that a charged transaction in fact involved the proceeds of specified unlawful activity….").

As shown above, the government has failed to adequately allege that Cothren committed any unlawful act. In the absence of any criminal activity, there can be no money laundering and no related conspiracy. Consequently, the government's remaining counts for conspiracy to commit money laundering and money laundering (Counts Twelve through Twenty) cannot stand. Because all counts fail, the Indictment should be dismissed in its entirety.

## III.  CONCLUSION

The political corruption charges brought against Cothren seek to criminalize business activities that were private—not public—in nature and completely lawful. Furthermore, the government seeks to criminalize a company providing the full benefit of the bargain to individual Members for the constituent mailers Phoenix Solutions, Company 1, and Company 2 provided. Adopting the government's theory of the case would make it virtually impossible for these officials to understand what type of conduct is and is not prohibited and create criminal exposure for the wholly private business affairs of public officials. The federal programs, wire fraud, and honest services statutes do not afford federal prosecutors such wide-ranging power. The government's overreaching Indictment therefore fails *in toto*, and all charges should be dismissed.

Respectfully Submitted,

**Sherwood Boutique Litigation, PLC**

/s/ Cynthia A. Sherwood
Cynthia A. Sherwood, #20911
Austin M. Correll, #39561
414 Union Street
Suite 1110
Nashville, TN 37219
T: 615-873-5670
F: 615-900-2312
cynthia@sherwoodlitigation.com
austin@sherwoodlitigation.com
*Counsel for Defendant Cade Cothren*


**Barnes & Thornburg LLP**

/s/ Joy Boyd Longnecker
Joy Boyd Longnecker, #29627
827 19th Avenue South
Suite 930
Nashville, TN 37203-3447
T: 615-925-9506
Joy.Longnecker@btlaw.com
*Counsel for Defendant Cade Cothren*


## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was electronically filed with the Clerk

on July 25, 2023, and service was made upon all persons registered in that case via CM/ECF and/or

by email.


/s/ Cynthia A. Sherwood

38