# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No. 3:22-CR-00282** |
| **GLEN CASADA and** | ) | **District Judge Eli J. Richardson** |
| **CADE COTHREN** | ) | **Magistrate Judge Alistair Newbern** |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANT CADE COTHREN'S REPLY TO GOVERNMENT'S CONSOLIDATED RESPONSE OPPOSING DEFENDANTS' MOTIONS TO DISMISS THE INDICTMENT

Defendant Cade Cothren hereby submits his Reply to the Government's Consolidated Response Opposing Defendants' Motions to Dismiss the Indictment. Doc. No. 75 ("Resp."). Cothren hereby adopts, joins in, and incorporates Casada's Reply in its totality as both Defendants are similarly situated in the Indictment. Cothren will file a Motion to Join Defendant Casada's Reply and Casada's Memorandum in Support of Motion to Dismiss (Doc. No. 60).

## I. ARGUMENT

### A. Count Two Should Be Dismissed Because The Indictment Does Not Sufficiently Allege Section 666's Element Of $10,000 In Federal Benefits.

If one thing is clear, it is that the issues surrounding this element of Section 666 are murky. The Supreme Court's holding in *Fischer v. United States*, 529 U.S. 667 (2000) does, in fact, have applicability in this case, despite the government's argument that it is of no consequence here. As explained in *United States v. Edgar*, 304 F.3d 1320, 1324 (11th Cir. 2002):

> [T]he [*Fischer*] Court rejected the government's contention that any funds distributed from federal coffers would qualify as benefits for purposes of the limitation established by § 666(b). A seven-judge majority stated:

>> Any receipt of federal funds can, at some level of generality, be characterized as a benefit. The statute does not employ this broad, almost

limitless use of the term. Doing so would turn almost every act of fraud or bribery into a federal offense, upsetting the proper federal balance.

*Id.* (*quoting Fischer v. United States*, 529 U.S. 667, 681 (2000)).

The government misreads *Sabri v. United States*, 541 U.S. 600 (2004)*. While Sabri* did hold that "proscribing bribery of state, local, and tribal officials of entities that receive at least $10,000 in federal funds" is constitutional—and that there is no federal nexus requirement—it did not overturn *Fischer's* requirement that the program in question receive federal <u>benefits</u>. *See United States v. Sabri*, 541 U.S. 600, 602 (2004).

"[T]he question before the Supreme Court in *Sabri* was 'whether … § 666(a)(2) … is a valid exercise of congressional authority under Article I of the Constitution' in light of the Court's conclusion in *Salinas* that a bribe need not directly affect federal funds to run afoul of § 666." *United States v. Sunia*, 643 F. Supp. 2d 51, 64 (D.C. Dist. 2009) (quoting *Sabri*, 541 U.S. at 602). The Supreme Court confined its analysis in *Sabri* to the constitutionality of § 666(a)(2). *Id.* (citing *Sabri*, 541 U.S. at 604-10). *Sunia* found that *Sabri* "never so much as mentioned § 666(a)(1)(A), let alone purported to define its meaning and scope." *Id.*

> If anything, *Salinas* and *Sabri* suggest that this Court's interpretation of § 666(a)(1)(A) is consistent with the purposes underlying the statute. As the Supreme Court explained in *Salinas*, Congress intended for § 666 to apply where there is 'a threat to the integrity and proper operation of [a] federal program.'" (quoting *Salinas*, 522 U.S. at 61; citing *Fischer v. United States*, 529 U.S. 667, 678, 120 S. Ct. 1780, 146 L. Ed. 2d 707 (2000) (noting Congress' "unambiguous intent" in passing § 666 "to ensure the integrity of organizations participating in federal assistance programs").

*Id.*

In *Sabri*, a real estate developer proposed to build a hotel and retail structure in Minneapolis. *Sabri*, 541 U.S. 600, 602 (2004). In order to skirt around licensing and zoning laws, he offered bribes and kickbacks to a city councilman who served on a community development

board for the city. *Id.* Sabri did not dispute the fact that the grant involved federal funds but brought a facial challenge to Section 666. *Id.* at 604-605. Sabri argued that the statute is unconstitutional because it does not contain an element requiring a connection between the federal funds and held that the facial constitutional challenge fails. *Id.* at 605. The Court was very clear that the holding was based on a "facial challenge." *Id.* Indeed, the court explained it refused to "presume the unconstitutionality of federal criminal statutes lacking a jurisdictional hook, and there [was] no need to even consider [that]" in the posture of that case. *Id.*

That is not the case here. Cothren's present challenge is that, based on the specific facts alleged in the Indictment, the government cannot constitutionally extend jurisdiction for these acts because any inquiry into the alleged "funding" of the Postage and Printing Allowance shows that the connection is too attenuated. Resp. at 9. The government attempts to support its argument with a *Sabri* quotation from *Hills*. *Id.* The federal nexus footnote in *Hills*, however, is *dicta* because the Defendants "abandoned" that argument. *Hills*, 24 F.4th at 1182 n.12.

In *United States v. Bravos-Fernandez*, the First Circuit found, pursuant to *Fischer*, that, although the parties stipulated that the Commonwealth of Puerto Rico received in excess of $10,000 of federal funding, the government failed to prove, as required, that the Senate of Puerto Rico's childcare program (known as the "Food Program") received any federal benefits:

> [I]n keeping with our own precedent and that of the Supreme Court, we can only conclude that the government failed to meet its burden of establishing that the entity Martínez represented as an agent received the amount of benefits required under § 666(b).

*United States v. Bravo-Fernández*, 913 F.3d 244, 248 (1st Cir. 2019).

Also stated in Cothren's Memorandum, the funds were spent when the State of Tennessee allocated the funds to the General Assembly's operating budget that, in turn, disbursed the funds to individual Members' Printing and Postage Allowances. Mem. at 12-13.

Finally, the government incorrectly argues that this Court cannot consider the governmental policies attached to Cothren's Motion to Dismiss. This Court can, however, consider "undisputed extrinsic evidence" and "undisputed operative facts" when ruling on a motion to dismiss. *United States v. Levin,* 973, F.2d 463, 465067 (6th Cir. 1992). The government cites this case for the proposition that the "Administrative Procedures" is not undisputed extrinsic evidence that this Court can consider*,* but the *Levin* court <u>did</u>, in fact, consider government documents as undisputed extrinsic evidence.

> In that case, the district court reviewed "undisputed extrinsic evidence including a series of official letters issued by the government," and the Sixth Circuit held that the motion to dismiss the indictment was proper, in that the government was incapable of proving beyond a reasonable doubt "the requisite intent required to convict" the defendants. *Id.* As intent was "an integral element" of the statutory violation charged, the government's inability to prove it allowed the court to dispose of a legal issue by granting the defendants' pretrial motion to dismiss. *Id.* at 470.

*See United States v. Huff*, 2011 U.S. Dist. LEXIS 50195 (E.D. Tenn. April 22, 2011) (quoting *United States v. Levin*, 973 F.2d 463, 465-67 (6th Cir. 1992)). Here, the extrinsic evidence attached to Cothren's Motion to Dismiss is government policies and statistics that cannot reasonably be disputed. In fact, it was the government itself who provided the policies to Cothren. As such, this Court should consider them when conducting its *Fischer* analysis.

Thus, Counts Two, Three, and Four should be dismissed.

**B.**    **Count Two Should Be Dismissed Because The Government Is Incorrect That It Does Not Have To Allege A Loss And/Or Contemplated Loss Under Section 666(a)(1)(A) And Incorrect That The Indictment Actually Does Allege A Contemplated Loss.**

Count Two should be dismissed. The government begins by responding to an argument that Cothren does not make. Resp. at 24. It argues that the "Indictment properly alleges that the object of the conspirators' scheme was the State's property." *Id.* Cothren does not dispute that the money paid for the constituent mail services constitutes "property." Cothren, instead, argues

that he did not deprive the State of property and, thus, "Count Two should be dismissed because the Indictment fails to allege a loss or contemplated loss." Mem. at 17.

### 1. The government is required to allege a loss or contemplated loss.

Contrary to the government's argument, the government must allege a loss or contemplated loss of property. Resp. at 24; *see also United States v. Riley*, 621 F.3d 312, 327-28 (6th Cir. 2010).

> Nonetheless, the Government need not prove actual loss to the locality to satisfy the elements of the mail fraud statute. *United States v. Copple*, 24 F.3d 535, 544 (3d Cir. 1994). It seems, therefore, that the risk of exposure to such a loss of money or property is sufficient to distinguish §§ 1341 and 666(a)(1)(A) fraud from honest services fraud. *See United States v. Asher*, 854 F.2d 1483, 1494 (3d Cir. 1988).

*Id*. at 327 (emphasis added).

First, the government acknowledges but ineptly attempts to diminish the import of courts using terms like "deprivation," "harm," or "loss" (Resp. at 25); however, those terms are used consistently and deliberately by courts. Indeed, in *Riley*, the analysis did not stop simply because the defendant received money under a contract. Instead, the court affirmed the conviction only after a painstaking review of the facts and finding proof of a contemplated loss and actual loss. *Id.* at 328. The *Riley* court found that "[t]he government demonstrated that the scheme was to get money into Riley's control when others more qualified than Riley were waiting in line…[and] Riley's lack of experience and privileged position." *Id*. The court held that the issue was not "whether or not the City of Newark actually lost money or experienced significant delay… there was risk of that occurrence because of her lack of experience and privileged position." *Id*. (emphasis added). "Neither is likely to encourage optimal performance under the program." *Id*. As it turns out, in *Riley*, the contractor failed to perform her "contractual obligations." *Id*.

The government cites *United States v. Kachkar*, 2022 U.S. App. LEXIS 19124, No. 19-12685 (11th Cir. July 12, 2022), which completely undercuts its argument and supports Cothren's

5

argument that the government must allege and prove a loss or contemplated loss.  The government cites *Kachkar* for the unremarkable and irrelevant proposition that "harm" does not have to be "long-term financial loss."  Resp. at 25.  Yet, what the government fails to disclose to this Court is that *Kachkar* holds that "<u>one can 'scheme to defraud' under Section 1343 only if he 'intend[s] to harm the victim.</u>"  *Kachkar*, 2022 U.S. App. LEXIS 19124, at *11 (quoting *United States v. Takhalov*, 827 F.3d at 1313 (11th Cir. 2016)) (emphasis added).  *Kachkar* further held that "a defendant displays such intent if he 'lies about the nature of the bargain itself,' usually by misrepresenting 'the price' or 'characteristics of the good,' so that the victim does not receive 'what he bargained for.'"  *Id*.  (quoting *Takhalov*, 827 F.3d at 1313-14).

Despite the clear holdings in *Riley*, *Takhalov*, and *Kachkar*, the government still attempts to discredit this well-established principle by arguing that a showing of loss or risk of loss does not comport with "longstanding Supreme Court precedent."  Resp. at 24-25.  The precedent they cite, however, in *Shaw v. United States*, 580 U.S. 63 (2016), *Loughrin v. United States*, 573 U.S. 351, 366 n.9 (2014), and *Carpenter v. United States*, 484. U.S. 19, 26 (1987) is unavailing.

Significantly, in *Shaw*, a bank fraud case, an actual loss was alleged and occurred.  *See Shaw*, 580 U.S. at 71 ("The parties agree, as do we, that the scheme must be one to deceive the bank <u>and</u> deprive it of something of value.") (emphasis in original).

The appellant's unsuccessful argument in *Shaw* was that, because the loss occurred to a customer of the bank and not the bank itself, the statute did not apply.  *Shaw*, 580 U.S. at 365.  Funds were alleged to have been lost and actually lost by the customer; funds that were in "the custody or control of [the] bank…"  *Id* at 67-68.

Moreover, it should be noted that the *Shaw* court appears to be holding that no long-term or ultimate loss must be shown; however, its factual analysis did not go so far as to hold that no

loss is required. *See Shaw*, 580 U.S. at 68. Shaw explained that, "'Lower courts have explained that, where cash is taken from a bank 'but the bank [is] fully insured[,] [t]he theft [is] complete when the cash [i]s taken; the fact that the bank ha[s] a contract with an insurance company enabling it to shift the loss to that company [is] immaterial.'" *Id.* (quoting *United States* v. *Kucik*, 844 F. 2d 493, 495 (7th Cir. 1988)). In other words, the bank suffered loss prior to being reimbursed.

In *Loughrin*, also a bank fraud case, the defendant submitted six stolen checks "to the retailer Target, for amounts of up to $250," and two of those checks were later paid by a federally insured bank. *Loughrin*, 573 U.S. at 353-54. The issue in *Loughrin* was whether Section 1344 requires a specific intent to deceive the bank itself, as opposed to another entity such as Target. *Id*. at 356. The *Loughrin* court held that "nothing in [1344] additionally demands that a defendant have a specific intent to deceive a bank [and,] indeed, imposing that requirement would prevent §1344(2) from applying to…property 'owned by' the bank but in someone else's custody and control (say, a home that the bank entrusted to a real estate company after foreclosure)." *Id*. at 356-57. Additionally, *Loughrin* held that Section 1344, the bank fraud statute, and Section 1343, the mail fraud statute, "have notable textual differences," and 1344 is not controlled by *McNally*, as are the wire fraud cases. *Id*. at 1359-60.

Additionally, the government misreads *Carpenter.* Resp. at 25 (citing *Carpenter v. United States*, 484 U.S. 19, 26 (1987)). In *Carpenter*, the Court held that "confidential business information" is considered "property" in the context of it being an object of the scheme to defraud. *Id.* Indeed, in that case, the court found that the defendant fraudulently deprived the victim of "confidential business information." *Id. Carpenter* did reject the argument that there must be a "monetary loss" but did not hold that no loss is required under Sections 1341 and 1343. In fact, it specifically held: "Petitioners cannot successfully contend based on *Associated Press* that a

scheme to defraud requires a monetary loss, such as giving the information to a competitor; it is sufficient that the Journal has been deprived of its right to exclusive use of the information, for exclusivity is an important aspect of confidential business information and most private property for that matter." *Id*. at 26. In other words, the victim suffered the loss of exclusivity, which is a loss in value.

The following cases cited by the government also contradict its arguments that there need not be a showing of loss or contemplated loss. Resp. at 24-28. In *United States v. Palma*, 58 F.4th 246, 251 (6th Cir. 2023), the Sixth Circuit reversed the dismissal of a wire fraud count because it found that the deceit went to the substance of the property at issue, not simply the induction of the sale. *Palma*, 58 F.4th at 251. There, the indictment alleged that the defendant artificially inflated vehicle performance numbers and left consumers driving a vehicle "with inferior fuel economy and emissions and that passed regulatory muster through deception." *Id.*

In *United States v. Davis*, 53 F.4th 833, 841 (5th Cir. 2022), a defendant convicted of wire fraud made numerous misrepresentations to the Department of Veteran Affairs inducing them to approve his trade school and pay over $71 million in GI-Bill funding to his school even though the school was statutorily ineligible. *Davis*, 53 F.4th at 841. The Fifth Circuit found that these misrepresentations went to the "nature of the bargain (whether the school was eligible for benefits)" because, without the misrepresentations, the defendants' school would have been summarily denied approval to the funds. *Id.* at 843.

In *United States v. Maxwell*, 579 F.3d 1282, 1302-1303 (11th Cir. 2020), a contractor's scheme and misrepresentations allowed him to obtain government contracts to perform work that was required, by statute and regulation, to be performed by certain disadvantaged groups. *Maxwell*, 579 F.3d at 1302-1303. Defendant, knowingly, did not meet the regulatory requirements

before and after obtaining the contracts, and was, thus, ineligible to receive those contracts. *Id.* It was found to be a scheme to defraud because there was a contemplated loss to the "worthy purpose" of the government's requirements. *Id.*

Nowhere in the Indictment at issue in the case at bar is it alleged that Cothren was not eligible via statute, rule, practice, or procedure, to perform mailer work and receive payment for that work though the Printing and Postage Allowance. The government merely alleges that Cothren had an "expectation that Phoenix Solutions would not be approved by the State to be a mail vendor or hired by individual members" (Indictment at ¶ 21) but not that he was ineligible to do the work or that he would not have received the work but for his misrepresentations—which is the fulcrum on which all the government's cases turn. The absence of that allegation is intentional, wherefore the Court should hold the government to its drafting choices.

### 2. The government did not allege a loss or contemplated loss.

Despite arguing that it is not required to allege loss or contemplated loss, the government next attempts to backfill its Indictment and manufacture a contemplated loss by arguing that Defendants' alleged deceptive acts actually went to the "value of the bargain" of the transaction, thus creating a contemplated loss. Resp. at 26-32. Moreover, the government seemingly admits misrepresentations are not criminal if they do not go to the value of the product by quotation of *Takhalov's* holding: "On the other hand, lies unrelated to the good's characteristics (or price) that nevertheless induce a transaction are not fraudulent because the victim still 'received exactly what they paid for.'" Resp. at 30.

For the first time, and therefore ineffectively, the government alleges that Cothren was "ineligible to receive mailer funds" and that he was not qualified to perform constituent mailer work. Resp. at 26-28. It also alleges for the first time that, because Cothren produced the mailers

and not Matthew Phoenix, the work was inferior because Cothren "lacked promised experience" and that his involvement added "risk" not agreed to by the legislators. *Id.* at 27-28. The government goes so far as to argue Phoenix Solutions was used to avoid perceived conflicts of interest. Resp. at 26. That allegation is absent from the Indictment with good reason. It alleges that Company 1 and Company 2 owned by the legislators were also receiving payments from the Postage and Printing Allowance for work performed. Resp. at 2; Indictment at ¶ 18, 19, 26.

In an attempt to fill the craters in their carefully-crafted Indictment—alleging that the State did not receive the full benefit of the bargain and, thus, Defendants' scheme to defraud resulted in a loss or contemplated loss—the government's Response does much to malign Cothren's capabilities. This is something it failed to do in the Indictment. It now claims the alleged risk is that "by unknowingly entering into business with someone whose 'inappropriate conduct' had been serious enough to cause him to resign as Casada's chief of staff [sic] and Casada to resign as Speaker of the House," and, further, that the "misrepresentations certainly 'affected [the victims'] economic, calculus' and 'impacted [their] valuation of the bargain.'" Resp. at 28 (citing *Porat*, *United States v. Porat*, --- F. 4th ---, 2023 U.S. App. LEXIS 20278 at *2-3 (3d Cir. Aug. 7, 2023)). *Porat* does not support the government's argument.

In that case, the Dean of Temple University's School of Business "reverse-engineered" a national ranking system and submitted false information and statistics to the ranking body in order to falsely inflate the rank of the school. *United States v. Porat*, --- F. 4th ---, 2023 U.S. App. LEXIS 20278 at *2-3 (3d Cir. Aug. 7, 2023). In other words, this is another case in which the misrepresentations go to the benefit of the bargain. This is unlike the case at bar where there is no allegation that Cothren, Casada, and Individual 4 failed to deliver precisely what was ordered and expected—constituent mailers.

The government also cites *United States v. Sams* (a wire fraud case); however, the distinctions are apparent. In *Sams*, the court, citing *Tahkalov*, once again looks at the benefit of the bargain and reaffirms the *Tahkalov* holding. *United States v. Sams*, 769 F. App'x 769, 773 (11th Cir. 2019). The *Sams* court found that the target of the misrepresentations did <u>not</u> receive what he bargained for because the defendant was a hot-air balloon pilot and not the president of a company with a team of software engineers, and he delivered a product that was not designed by the defendant or his "team" of software engineers, was not ultimately successful, and cost the victim quadruple the amount of funds. *Id.*

Essentially, the government alleges that Cothren was unqualified to make single-page mailers because of his alleged scandalous past. Resp. at 27, 39. The Indictment contains <u>no</u> allegations that Cothren was not qualified to perform work for Members as a private vendor or that he was involved in a scandal; it contains no allegations about Cothren's experience or lack thereof. Now, sensing its fatal flaws, the government improperly asks this Court to draw inferences from facts it failed to allege. The government was intentional in its crafting of this Indictment, and it should be held to the allegations within and <u>reasonable</u> inferences therefrom.

None of these allegations the Indictment <u>does</u> contain are similar to *Sams*. Resigning following "inappropriate conduct" is not comparable to a hot-air balloon pilot moonlighting as an app developer. Cothren, as actually alleged in the Indictment, was the former Chief of Staff to the Speaker of the House, a highly sought after and influential position in Tennessee politics. Indictment at ¶ 9. Further, the Indictment alleges Cothren established a political consulting firm that not only provided constituent mail services to Members of the General Assembly but also to political campaigns—separate, private entities. Indictment at ¶ 10. Furthermore, unlike in *Sams*, there are no allegations of quality issues or that payment for the services was unreasonable given

the quality of the services. If anything, according to the Indictment allegations, legislators were promised Pappy Van Winkle and received Pappy Van Winkle or better.

Additionally, as set forth in Cothren's Motion to Strike Surplusage from the Indictment and Incorporated Memorandum in Support (Doc. No. 64), the allegations that Cothren was held out as Matthew Phoenix in efforts to drum up business relate to issues separate and irrelevant to this Indictment and should not be considered in an analysis of the claims for his actions surrounding the Printing and Postage Allowance. However, even if considered, the case at bar is still distinguishable from *Sams* for the reasons cited above.

The government's *post hoc* allegations do not come close to alleging a loss or contemplated loss. The government cites several cases in which misrepresentations affected the actual benefit of the bargain, thus causing a loss or contemplated loss. Resp. at 24-32.

### 3. *Ciminelli.*

Finally, the government misreads *Ciminelli v. United States*, 143 S. Ct. 1121 (2023). Citing mostly Justice Alito's concurrence, the government argues that *Ciminelli* "drew a line between using deception to impinge on 'intangible interests such as the right to control the use of one's assets, which cannot support a fraud prosecution, and fraudulently acquiring traditional property interests like money, which can.'" Resp. at 29. In the wake of this ruling, the government now tries to argue that its Indictment alleges the object of the Defendants' "scheme" falls on the "traditional property-side" of that line. *Id.* However, that argument fails. The government's allegations, reasonably construed, go to the "right to control" intangible—and thus, non-property—objects.

However, the prevailing principle and ultimate holding in *Ciminelli* is that "the right-to-control theory is invalid under the federal fraud statutes." *Ciminelli*, 143 S. Ct. at 1129.

Furthermore, as discussed in Cothren's Memorandum, Count 2 of the Indictment—Program Fraud—is based on a federal fraud statute. *See* Mem. at 18.

The government's basis for this charge is grounded in the "right to control theory" as evidenced by their Response argument that the "'intangible' differences were important," and its argument that "even if Phoenix Solutions did produce mailers the state and legislators that knowingly (and, some, unknowingly) hired the company took on significantly more risk than they anticipated." Resp. at 31. Certainly, this sort of "risk" allegedly deprived from the legislators is encapsulated within the once-recognized property right of the "right to control." Indeed, the *Ciminelli* Court made certain to highlight that it was striking down the holdings that:

> [S]ince a defining feature of most property is the right to control the asset in question, "the property interests protected by the wire fraud statute include the interest of a victim in controlling his or her own assets." *United States* v. *Lebedev*, 932 F. 3d 40, 48 (2019) (alterations omitted). Thus, a "cognizable harm occurs where the defendant's scheme denies the victim the right to control its assets by depriving it of information necessary to make discretionary economic decisions." *United States* v. *Binday*, 804 F. 3d 558, 570 (CA2 2015) (alterations omitted).

*Ciminelli*, at 143 S. Ct. 1127. Thus, a cognizable harm cannot exist where the alleged loss is information necessary to make discretionary economic decisions and nothing more. In addition, the Indictment is deficient because there are no allegations that any alleged victim suffered any loss or contemplated loss.

### C. Counts Three And Four Should Be Dismissed Because The Government Did Not Sufficiently Allege That Casada And Individual 4 Were Public Officials Acting In Their Official Capacity.

The government seemingly admits it failed to allege that Casada and Individual 4 took kickbacks in exchange for using their official positions as public officials. Resp at 34. The government argues, instead, that "[t]he Indictment alleged enough facts to support an inference that Casada and Individual 4 corruptly took kickbacks in exchange for using their official positions

to further the conspirators' scheme." *Id*. It argues that that "[t]he Indictment alleges that the legislators violated their 'fiduciary duty to provide honest services to the State and its citizens.'" *Id.* (citing Indictment at ¶ 7.) "[The Indictment] says that Casada and Individual 4 took shares of Phoenix Solutions' profits in exchange for pressuring their colleagues to approve the company as a vendor, hire it to perform mailing services, and pay its invoices." *Id.* at 35. (citing Indictment at ¶¶ 16, 18, 23, 26, 38–42, 46–49.)

The Indictment does not sufficiently allege that Casada and Individual 4 were acting as public officials or that their acts had any connection to their official positions. A charge under Section 666 cannot stand if it arises from a public official's private business activities or if the official is paid *bona fide* compensation in connection with such a venture. *See* Mem. at 26. The government's Response does not attack this legal distinction, but rather, it argues that Cothren's argument is premature in that it should be left to the fact finder.

The government is correct in its observation that, procedurally, both *United States v. Muntain*, 610 F.2d 964 (D.C Cir. 1979) and *United States v. O'Keefe*, 825 F.2d 314 (11th Cir. 1987) involved the review of the sufficiency of evidence after trial. Resp. at 34. However, here, even when taking the allegations in the Indictment as true, it is clear the Defendants were acting not as public officials but in a private business capacity.

In its Response, the government for the first time alleges that Casada and Individual 4 were performing "no work." Resp. at 21-22, 28. That allegation, however, is absent in the Indictment. Instead, the government asks this Court to liberally construe its vague allegations that Casada and Individual 4 would "exploit their official positions as legislators" to perpetuate their "scheme" and accept its purported inference that they, in fact, did so. It argues that its allegations show that Casada and Individual 4 used their official position "to pressure other State officials to approve,

hire, and pay Phoenix Solutions." Resp. at 33. However, when reviewing the Indictment on its

face, the facts actually alleged, as well as the inferences therefrom, clearly establish that Casada

and Individual 4 were acting in a private business capacity:

> ¶ 5: Individual 4 owned and operated a political consulting company called Company 1. Company 1 provided political consulting, mail, and project management services. Company 1 held Bank Account x0738 at Financial Institution 2.

> ¶ 6: CASADA owned and operated a political consulting company called Company 2. CASADA started Company 2 in or around October 2019. Company 2 held Bank Account x4447 at Financial Institution 2.

> ¶ 9 (in part): COTHREN was a businessman and former Chief of Staff to CASADA when CASADA was Tennessee House Speaker.

> ¶ 10 (in part): In or around November 2019, COTHREN established Phoenix Solutions, LLC, with CASADA and Individual 4's knowledge and support.

> ¶ 40: On or about February 7, 2020, COTHREN texted Individual 4 about outstanding invoices that had been submitted to the State, writing, "Waiting on state payment (between you, glen, Phoenix)" and listed 11 different House members, including CASADA and Individual 4, for a "TOTAL DUE FROM STATE: $34,684.40."

> ¶ 42: On February 12, 2020, COTHREN texted Individual 4, "Glen went to [the Director of Legislation]'s office. They told him his w9 had also been rejected and that's why he hasn't gotten payment."

> ¶ 43: On or about April 2, 2020, COTHREN sent an email to CASADA and Individual 4. The email stated, "Friends, Here's our up-to-date printing spreadsheet. All of these checks have been collected and deposited. All bills related to these print jobs have also been paid. So, let me know what address is best for you and I will cut checks for each of you?" COTHREN provided a breakdown of total profit earned from each client. CASADA, COTHREN, and Individual 4 shared the profits, with COTHREN earning 30%. CASADA and Individual 4 each earned $4,143.64, which was 25% of the business. COTHREN wrote that the remaining 20% of the profit was "left in business." COTHREN also discussed ways to cut Phoenix Solutions' future costs.

> ¶ 44. On or about April 4, 2020, CASADA endorsed and deposited check number 133, dated April 3, 2020, in the amount of $4,143.64, from Phoenix

Solutions' Financial Institution 1 Account x3886 into a personal bank account. COTHREN signed the check in his given name and wrote "Consulting" on the memo line.

¶ 45. On or about April 14, 2020, Individual 4 endorsed and deposited check number 134, dated April 3, 2020, in the amount of $4,143.64, from Phoenix Solutions' Financial Institution 1 Account x3886 into a bank account associated with her consulting firm, Company 1. COTHREN signed the check in his given name and wrote "Consulting" on the memo line.

It is explicit and implicit from these allegations that Casada and Individual 4 were acting as private businesspeople in respect to securing business and payment for work through Members' Printing and Postage Allowance.

The government argues "it does not matter" if Defendants were acting privately instead of as public officials because "the Indictment alleges that Cothren promised [Casada and Individual 4] kickbacks with the intention that they would use their official positions to get Phoenix Solutions approved as a vendor and to pressure their colleagues to hire him using State funds." Resp. at 33. The government misunderstands Cothren's argument. In no way were Casada and Individual 4 acting as public officials, using their official positions, or intending to use their official positions. Instead, the only reasonable inference from the allegations is that they were operating as owners of Company 1 and Company 2 in all respects.

For these reasons, Count 2 should be dismissed.[1]

**D.    Counts Three and Four Should Be Dismissed Because The Government Did Not Allege That Cothren Corruptly Offered And/Or Casada and Individual 4 Corruptly Solicited.**

The government argues that Cothren misconstrues *Hills* as introducing "some new duty element that an indictment must allege to plead federal programs bribery."  Resp. at 35.  The statute, however, already has an element requiring proof that one "corruptly solicits or demands" as to one being bribed and "corruptly gives, offers, or agrees to give" as to one bribing.  *See* 18 U.S.C. § 666.  To be clear, Cothren is arguing that the government has failed to allege the corrupt intent[2] required under both 18 U.S.C. §§ 666(a)(1)(B) and 666(a)(2).  "In other words, a defendant

---

[1] Cothren is aware that the Sixth Circuit does not require a *quid pro quo* under Section 666. Cothren is arguing, out of an abundance of caution, that the statute does require a *quid pro quo*. The Fifth Circuit held last year that a *quid pro quo* is, in fact, required under a plain reading of 666 and, in doing so, analyzed the Circuit split.  *United States v. Hamilton*, 46 F.4th 389, 396 (5th Cir. 2022)

> Despite the similarities between § 201(b) and § 666(a), a lopsided split has emerged about whether § 666(a) criminalizes *both* bribery *and* illegal gratuities. On one side of the issue is the First Circuit, which held that § 666(a) criminalizes only a *quid pro quo* and not mere gratuities. *United States v. Fernandez*, 722 F.3d 1, 26 (1st Cir. 2013); *see also id.* at 39-40 (Howard, J., concurring in part) (concluding that "because it is ambiguous whether [§ 666] criminalizes gratuity," under the rule of lenity, "the defendants cannot be convicted for giving or receiving a gratuity.")).  Likewise, the Fourth Circuit in *dicta* expressed agreement with the approach eventually taken by the First Circuit.  *United States v. Jennings*, 160 F.3d 1006, 1015 & nn.3-4 (4th Cir. 1998).  The Second, Sixth, Seventh, Eighth, and Eleventh Circuits have concluded that § 666(a) covers both bribery and illegal gratuities.  *See, e.g., United States v. Ganim*, 510 F.3d 134, 150 (2d Cir. 2007); *United States v. Porter*, 886 F.3d 562, 565-66 (6th Cir. 2018); *United States v. Agostino*, 132 F.3d 1183, 1195 (7th Cir. 1997); *United States v. Zimmerman*, 509 F.3d 920, 927 (8th Cir. 2007); *United States v. McNair*, 605 F.3d 1152, 1188 (11th Cir. 2010).

*Id.*

[2] The government argues in a footnote that, in Cothren's arguments against Counts 3 and 4 of the Indictment, "Cothren does not dispute his own corrupt intent to give bribes to State agents to influence them in connection with State business," and, thus, he does not directly address Count 4. Resp. at 32 n.6. This assertion is incorrect. Cothren's arguments in this section and throughout

---

violates § 666(a)(2) if he (1) gives a government employee anything of value (2) with the corrupt intent to influence or reward them (3) in connection with any business, transaction, or series of transactions of the government involving anything of value of $5,000 or more." *United States v. Ryans*, 709 F. App'x. 611, 618, 2017 U.S. App. LEXIS 18620, *15 (11th Cir. Sept. 27, 2017). As with Casada and Individual 4, the Indictment is devoid of facts showing Cothren's corrupt intent.

"To corruptly solicit or accept anything of value means that it was done with 'intent to give some advantage inconsistent with official duty and the rights of others.'" *United States v. Hills*, 27 F.4th 1155, 1182 (6th Cir. 2022) (quoting *United States v. Buendia*, 907 F.3d 399, 402 (6th Cir. 2018) (holding that defendant "corruptly solicited" by accepting kickbacks (gift cards) to "subvert[] the normal bidding process" and award the contracts "in a manner inconsistent with her duty to obtain goods and services for her school at the best value.")).

The government argues that "[t]he Indictment alleges that the legislators violated their "fiduciary duty to provide honest services to the State and its citizens." Resp. at 34. (citing Indictment at ¶ 7). The Indictment does not allege that Casada and Individual 4 violated any duty. *See* Indictment at ¶ 7. It merely alleges that such a duty exists. *Id*.

The government cites *Hills* for the proposition that "a public official accepting bribes in exchange for giving somebody preferential treatment is "inconsistent with official duty and the right of others" even if the recipient of the preferential treatment was "worthy." Resp. at 34. *Hills*, instead, held that "subversion of the admission process for the residency program is inconsistent

---

the Memorandum do dispute his criminal liability in terms of "corrupt intent." To the extent Cothren used the term "corrupt solicitation," as opposed to "corrupt intent" which governs both Counts, he is hereby correcting that terminology.

with official duty and the rights of others—that is so even if [the applicants] were also all worthy candidates for the dental residency program." *Id*. at 1182.

*Hills* is of no aid to the government because there is no allegation that Cothren was given any kind of "preferential treatment" or that any formal process was subverted. Instead, the government admits in its Response that the pressure to pay Phoenix Solutions was because it had done work for which the state was "slow to pay." Resp. at 5 ("When the State was slow to pay for work that Phoenix Solutions had done, Casada and Individual 4 pressured State officials to make payments." (citing Indictment at ¶¶ 38–42, 47–48)). Secondly, the "public official" in *Hills* was clearly using his <u>official position</u> and official authority to provide the preferential treatment. *Hills*, 27 F.4th at 1177 (implementing policies; adding official positions to the residency program and using his "authority as department chair" to raise compensation).

The Indictment does not support that Cothren was given "preferential treatment," let alone that he was given preferential treatment "inconsistent with official duty and right of others." As explained in Cothren's Memorandum, the Indictment alleges no formal contract or bidding process when it came to a Member's use of his/her Postage and Printing Allowance (again, because that process did not exist); and the Guidelines the Indictment relies on clearly vested House Members with the discretion to spend (or not) the $3,000 allocated to them in their Postage and Printing Allowance with the sole condition that the Speaker's Office must approve of the <u>content</u> of the mailer, not the private <u>vendor</u>. *See* Mem. at 27. And again, related to the amorphous "fiduciary duty" the government cites, there are <u>no</u> allegations that the duty was subverted, how this duty was in any way subverted, or how anyone was deprived or harmed in any way. For these reasons, Counts Three and Four should be dismissed.

## II.    CONCLUSION

The Government has failed to adequately plead Counts Two through Four (18 U.S.C. § 666) and Counts Five through Ten (18 U.S.C. § 1343,1346).  Because the remaining counts are derivative of those Counts, the entire Indictment fails as a matter of law.  Cothren respectfully requests that this Court grant his Motion to Dismiss in its entirety.

Respectfully Submitted,

**Sherwood Boutique Litigation, PLC**

/s/ Cynthia A. Sherwood
Cynthia A. Sherwood, #20911
Austin M. Correll, #39561
414 Union Street
Suite 1110
Nashville, TN 37219
T: 615-873-5670
F: 615-900-2312
cynthia@sherwoodlitigation.com
austin@sherwoodlitigation.com
*Counsel for Defendant Cade Cothren*

**Barnes & Thornburg LLP**

/s/ Joy Boyd Longnecker
Joy Boyd Longnecker, #29627
827 19th Avenue South
Suite 930
Nashville, TN 37203-3447
T: 615-925-9506
Joy.Longnecker@btlaw.com
*Counsel for Defendant Cade Cothren*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing has been served on the following via the Court's CM/ECF system:

Amanda J. Klopf, Esq.
Assistant United States Attorney
719 Church Street, Suite 3300
Nashville, TN 37203
Amanda.Klopf@usdoj.gov

John P. Taddei, Esq.
Trial Attorney
Public Integrity Section, Criminal Division
U.S. Department of Justice
1301 New York Ave., NW
Washington, DC 20530
john.taddei@usdoj.gov

on this the 30th day of August 2023.

/s/ Cynthia A. Sherwood