UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 3:22-cr-00282 |
| v. | ) | |
| | ) | JUDGE RICHARDSON |
| [1] GLEN CASADA | ) | |
| [2] CADE COTHREN | ) | |

## GOVERNMENT'S RESPONSE TO DEFENDANTS' MOTIONS *IN LIMINE*

The United States, by and through its undersigned attorneys, submits this omnibus response in opposition to Defendants' motions *in limine*. (*See* D.E. #180–88.) All but one of Defendants' motions are largely meritless and thus should be denied for the most part. The one exception is Defendants' motion seeking to exclude evidence about Cothren's former investigator, which the government agrees not to introduce. (*See* D.E. #183.) The Court should deny that motion as moot.

## LEGAL STANDARD

A motion *in limine* to exclude evidence should be granted only if the moving party can demonstrate that the evidence is "clearly inadmissible on all potential grounds." *See United States v. Afyare*, No. 3:10-CR-260, 2013 WL 1386610, at *2 (M.D. Tenn. Apr. 4, 2013). "Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy, and potential prejudice may be resolved in proper context." *United States v. Letourneau*, No. 11-CR-182, 2013 WL 589224, at *2 (N.D. Ill. Feb. 14, 2013) (citation omitted); *see also Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 387–88 (2008) ("Relevancy is not an inherent characteristic of any item of evidence but exists only as a relation between an item of evidence and a matter properly provable in the case." (citation omitted)).

Evidence must be relevant to be admissible at trial. Fed. R. Evid. 402. But "[t]he standard for relevancy is extremely liberal." *United States v. Serrano-Ramirez*, No. 3:17-CR-164, 2018

WL 4220760, at *3 (M.D. Tenn. Sept. 5, 2018) (quoting *United States v. Whittington*, 455 F.3d 736, 738 (6th Cir. 2006)). "Evidence having *any* tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence is relevant." *United States v. Whittington*, 455 F.3d 736, 738 (6th Cir. 2006) (cleaned up) (citation omitted); *see also* Fed. R. Evid. 401. Consequently, "[e]ven if a district court believes the evidence is insufficient to prove the ultimate point for which it is offered, it may not exclude the evidence if it has the slightest probative worth." *Whittington*, 455 F.3d at 738–39 (quoting *DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 475 (6th Cir. 1996)).

Nevertheless, a court may exclude relevant evidence if the opponent to its admission can show that "its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. That standard sets a "high bar for exclusion." *See United States v. Guzman*, 571 F. App'x 356, 361 (6th Cir. 2014) (unpublished) (citation omitted). Its reference to "unfair prejudice" does not permit exclusion based on "the damage to a defendant's case that results from the legitimate probative force of the evidence" but instead aims to keep out "evidence which tends to suggest decision on an improper basis." *United States v. Ford*, 761 F.3d 641, 648 (6th Cir. 2014) (citation omitted). Evidence is thus not excludable under Rule 403 merely because it is "contrary to [the opponent's] view of the facts," *United States v. Schrock*, 855 F.2d 327, 335 (6th Cir. 1988), or because it uses "a term [that] has a negative connotation," *Guzman*, 571 F. App'x at 361 (citation omitted). If the evidence does not invite a decision on an improper basis, then "it is not the role of the [c]ourt to exclude" relevant evidence—even "evidence of 'lesser' probative value." *See Serrano-Ramirez*, 2018 WL 4220760, at *3.

2

**ARGUMENT**

**I.    The Court Should Deny Defendants' Motion to Exclude Bank Records (D.E. #180).**

Defendants ask this Court to exclude "records related to bank accounts that are not involved in the charged conduct" as well as "any witness testimony related to such accounts." (D.E. #180, at 1 (Cothren's motion); *see also* D.E. #189 (Casada's motion to join Cothren's motion).) They claim that the only relevant bank accounts are four referenced in the indictment—Smith's business account, Casada's business account, and two of Phoenix Solutions' accounts. (*See* D.E. #180, at 3.) Only those accounts, they say, "directly concern the charged conduct and the funds that were paid by the State of Tennessee from the state representatives' postage and printing accounts." (*Id.* at 2.) They also assert in a conclusory paragraph that bank records for the conspirators' other accounts "will only serve to confuse the issues," "mislead the jury," and "unfairly prejudice" them by "invit[ing] the jury to make a decision based on emotion or some other improper basis." (*Id.* at 4.) Defendants are wrong on both counts. The Court should therefore deny their motion.

A.    <u>The Bank Records Are Relevant.</u>

To start, Defendants' conception of relevance is too narrow. Contrary to their claims, the bank records they seek to exclude are relevant in at least two ways.

First, the bank records constitute *res gestae* or background evidence because they reveal "other acts that are inextricably intertwined with the charged offense or . . . acts[] the telling of which is necessary to complete the story of the charged offense." *United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000). "[B]ackground evidence has a causal, temporal or spatial connection with the charged offense." *United States v. Churn*, 800 F.3d 768, 779 (6th Cir. 2015) (citation omitted). It "may include evidence that is a prelude to the charged offense, is directly probative

3

of the charged offense, arises from the same events as the charged offense, forms an integral part of the witness's testimony, or completes the story of the charged offense." *Id.* (citation omitted). The admissibility of background evidence reflects "the principle that the jury is entitled to know the 'setting' of a case." *See United States v. Grooms*, 566 F. App'x 485, 491 (6th Cir. 2014) (unpublished) (internal quotation marks and citation omitted).

The bank records that Defendants want to exclude—which include records for their personal bank accounts as well as accounts in which Phoenix Solutions does business under different names—are intertwined with the charged offenses and are necessary to provide context for those offenses. Most obviously, the records establish that Cothren and Casada repeatedly received proceeds from the charged scheme into their personal bank accounts—in the words of the indictment, that they "enrich[ed] themselves" through the scheme. (*See* D.E. #3 ¶¶ 17–20.) According to the indictment, for instance, Casada deposited checks constituting kickbacks from Phoenix Solutions directly into his personal bank account at least two occasions. (*See id.* ¶¶ 44, 55.) The records show that Cothren put mailer program proceeds into his personal accounts too. And importantly, records of those transactions complete the story of the money laundering charges that Cothren and Casada face. (*See id.* ¶¶ 78–81.) For example, on March 5, 2020, Casada's consulting firm Right Way Consulting deposited a state-issued check for mailer work. (*See id.* ¶ 79 (charging the transaction in Count 13).) That same day, Right Way Consulting wrote a check to Cothren that included the state payment, and Cothren subsequently deposited the check into one of his personal bank accounts. Payments from the state to Right Way Consulting ended up in Cothren's personal bank accounts on other occasions too, including state-issued checks that Right Way Consulting deposited on March 9, 2020, and May 18, 2020. (*See id.* (Counts 15 and 18).)

4

In addition to providing context for specific transactions alleged in the indictment, the bank records that Defendants wish to exclude also generally depict each defendant's financial situation and activities during the time of the scheme. Among other things, the records reveal numerous transfers between accounts named in the indictment and other accounts. This general evidence may be relevant to Defendants' motives, their ownership and control over accounts involved in the scheme, and how Defendants profited from the scheme. To exclude records for a bank account just because the indictment did not specifically identify the account would unduly restrict the jury's view of Defendants' financial conduct during the scheme. Given the many grounds on which the bank records Defendants seek to exclude could be relevant background evidence, the Court should not order them excluded. *See United States v. Williams*, No. 14-CR-153, 2016 WL 6584712, at *3 (E.D. La. Nov. 6, 2016) (admitting bank record evidence as "inextricably intertwined" with the charged conspiracy, because the evidence showed the "conspiratorial relationship between the co-conspirators," how the conspirators paid for drugs, how they profited from the sales, how they concealed their actions from law enforcement, and "how the conspiracy . . . was structured").

Second, the bank records for Cothren's other business entities—Faith Family Freedom Fund PAC, Redbird Strategies, Dixieland Strategies, and Bulletproof Research—are relevant to show that Cothren intentionally concealed his identity when conducting political business.[1] The government will argue at trial that Cothren concealed his involvement in those businesses and in Phoenix Solutions because he knew that, due to his tainted reputation, his public involvement in political business would drive away potential clients. It will not assert that Cothren's mere

---

[1] Notably, records for Cothren's business entities reveal funds transfers between those entities, Phoenix Solutions, and Cothren's personal accounts. So for the reasons previously stated, the records are relevant background evidence too.

5

ownership of these other accounts was "improper or nefarious." (*Cf.* D.E. #180, at 3.) And in fact, the bank records for Cothren's businesses constitute some of the evidence that the government seeks to admit under Rule 404(b) (*see* D.E. #179-1, at 16–17), so they will be the subject of a limiting instruction on their proper usage, *see United States v. Merriweather*, 78 F.3d 1070, 1077 (6th Cir. 1996). The Court should not exclude bank records that are relevant to motive and materiality.

### B. The Bank Records' Present a Negligeable Risk of Unfair Prejudice.

Defendants cannot overcome Rule 403's heavy burden of showing that the probative value of the bank account records they seek to exclude is substantially outweighed by the risk of unfair prejudice—especially given that Rule 403's balancing test "is strongly weighted toward admission." *See United States v. Asher*, 910 F.3d 854, 860 (6th Cir. 2018). Defendants claim in just two sentences that the admission of the bank account records will confuse the issues, mislead the jury, and invite the jury to make an emotion-based decision. (*See* D.E. #180, at 4.) Their arguments are unfounded.

First, the risk that the bank records will confuse or mislead the jury is negligible. If anything, for the reasons stated in the previous section, the bank records will reduce confusion by providing the jury with integral context that completes the story of the charged offenses. Second, the risk that the challenged records will cause the jury to an emotion-based decision is slim, considering that bank records are not exactly shocking or inflammatory. *Cf. Asher*, 910 F.3d at 862 (explaining that a juror is unlikely to be "uncontrollably impassioned" when presented with evidence of a prior act that is "less shocking" than the charged crime). And finally, the Court will reduce whatever minimal risk of prejudice exists by providing a limiting instruction to the jury. *See United States v. Smith*, 70 F.4th 348, 353 (6th Cir. 2023). There is thus no reason to exclude

6

the bank records as unfairly prejudicial.  *See United States v. Duranseau*, 19 F.3d 1117, 1120–21 (6th Cir. 1994) (rejecting a defendant's argument to exclude bank records showing that he used aliases as confusing and improper when he was charged only for lying about his income, reasoning that the court did "not believe that a jury would be confused as to the crime charged simply because the United States introduced evidence that the defendant used aliases" and the district court gave a limiting instruction); *United States v. Fairbanks*, No. 1:19-CR-00114, 2022 WL 3576281, at *4 (D. Utah Aug. 19, 2022) (declining to exclude bank records because "records or testimony regarding the transfer of money into and out of bank accounts is [not] likely to inflame the jury" and the jury was "competent to parse the evidence and avoid confusion about which evidence is relevant to each count").

## II.     The Court Should Deny in Part Defendants' Overly Broad Motion to Exclude Evidence Related to a Campaign Finance Investigation (D.E. #181).

Defendants next ask the Court "to exclude any evidence of the Davidson County Chancery Court proceeding styled *Bureau of Ethics and Campaign Finance, Tennessee Registry of Election Finance Division v. Cade Cothren*, No. 22-0570-III."  (D.E. #181, at 1 (Cothren's motion); *see also* D.E. #189 (Casada's motion to join Cothren's motion).)  As the exhibit they attached to their motion shows, that proceeding related to an "audit/investigation of a political campaign committee named Faith Family Freedom Fund PAC."  (*See* D.E. #181-1, at 2.)  Included in the evidence that Defendants say should be excluded are "the fact the Registry subpoenaed Mr. Cothren, his challenge of the Registry's subpoenas, and any facts related to the investigation."  (D.E. #181, at 1.)  Their request is too vague and too broad.

As an initial matter, the government has no intention of introducing evidence of the existence of the Registry's proceeding, the fact that the Registry investigated Cothren, or the fact

that Cothren challenged Registry subpoenas. But Defendants' request to exclude "*any* facts related to the investigation" goes too far. (*See* D.E. #181, at 1 (emphasis added).) Presumably, their request would encompass any evidence related to the Faith Family Freedom Fund PAC that was the subject of the Registry's investigation. As the government has argued above and elsewhere, however, evidence about the PAC is admissible under Rule 404(b). (*See* D.E. #179-1, at 16–17.) The measures Cothren took to conceal his role in the PAC are relevant in this case to show that he knew his public involvement in Tennessee politics would be materially problematic. So contrary to Defendants' suggestion that the facts underlying the Registry investigation are not "even remotely connected to a fact of consequence in this case" (*see* D.E. #181, at 3), the evidence is in fact relevant to the disputed issues of motive and materiality.

In any case, if there is any question about the admissibility of some of the evidence related to the Faith Family Freedom Fund PAC, now is not the time to exclude it. The Sixth Circuit has warned that "[o]rders in limine which exclude broad categories of evidence should rarely be employed." *Sperberg v. Goodyear Tire & Rubber Co*., 519 F.2d 708, 712 (6th Cir. 1975). Instead, the "better practice is to deal with questions of admissibility of evidence when they arise." *Id.* Defendants' proposal to exclude a wide swath of evidence—encompassing "any facts related to [an] investigation" (*see* D.E. #181, at 1)—risks inadvertently excluding relevant evidence that would help the jury in its deliberations. The Court should therefore deny their broad pretrial motion and instead make case-by-case determinations at trial when it can resolve questions of relevancy and potential prejudice in context.

8

### III. The Court Should Deny Defendants' Motion Regarding Case Agent Testimony Because It Asks for More than the Federal Rules of Evidence Require (D.E. #182).

Defendants seek an order *in limine* ostensibly requiring that the testimony of the government's law enforcement witnesses abide by the Federal Rules of Evidence, including Rule 701. (*See* D.E. #182, at 1 (Cothren's motion); *see also* D.E. #189 (Casada's motion to join Cothren's motion).) They also assert than any of their statements introduced through a law enforcement witness must be introduced in its entirety. (*See* D.E. #182, at 2, 4.) Of course, the government has no objection to a requirement that it follow the Federal Rules of Evidence. But Defendants' motion mischaracterizes what the Rules require.

Defendants first attempt to exclude several categories of evidence, including testimony "interpreting the temperament [and] body language" of Defendants and other witnesses; "speculating" about Defendants' intentions and motives; and "describing findings of their investigation in summary form, without attribution." (*Id.* at 1.) They assert that those kinds of evidence fall outside the bounds of Federal Rule of Evidence 701. (*Id.* at 3.) That Rule permits a lay witness to testify in the form of an opinion so long as it is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based in scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701; *see also United States v. Freeman*, 730 F.3d 590 (6th Cir. 2013).

Rule 701's scope is not as cramped as Defendants claim. Opinion testimony based on a witness's observations of another person's appearance and body language is classic Rule 701 evidence. *See United States v. Gyamfi*, 805 F.3d 668, 672–73 (6th Cir. 2015) (affirming admission of officers' testimony that the defendant was "fidgety" and "tripping over his own words"). For

9

example, the Sixth Circuit has upheld the admission of lay testimony—based on a law enforcement officer's interpretation of a defendant's body language—that the defendant appeared "nervous." *See id.* at 673; *United States v. Kaufman*, 92 F. App'x 253, 257 (6th Cir. 2004). Rule 701 even permits lay testimony about what a witness inferred that another person was thinking based on the person's body language. *See United States v. Curescu*, 674 F.3d 735, 740 (7th Cir. 2012) (affirming the admission of a bribe-payor's testimony regarding the meaning of statements the defendant made to her); *see also Gyamfi*, 805 F.3d at 674 (affirming the admission of a law enforcement officer's testimony that the defendant made a "giving up motion"); *United States v. Reyes*, 24 F.4th 1, 24 (1st Cir. 2022) (affirming the admission of a law enforcement officer's testimony that the defendant was "trying to make up a story"). A witness's testimony along those lines does not speak to "what [the other person] actually meant but to what [the witness] understood him to mean, which [is] probative of what [the other person meant] but [is] based entirely on [the witness's] mental processes." *See Curescu*, 674 F.3d at 740 (describing such testimony as "unexceptionable"). Far from encroaching on the jury's role in assessing the evidence (*cf.* D.E. #182, at 3), testimony about a defendant's "demeanor" while discussing a possible criminal offense "help[s] the jury," *Kaufman*, 92 F. App'x at 257.

Under a proper understanding of what Rule 701 permits, Defendants' request to exclude lay testimony based on law enforcement witnesses' firsthand perceptions is premature. The defense can ensure that the testimony of law enforcement witnesses complies with the Federal Rules of Evidence at trial. They can object when testimony wanders into the realm of "generalized or speculative responses." *See United States v. Prange*, 771 F.3d 17, 29 (1st Cir. 2014). And they can explore the limitations of each witness's testimony on cross-examination. *See id.*; *see also*

10

*Reyes*, 24 F.4th at 23.  But it would be inappropriate to exclude lay testimony about Defendants' demeanor categorically at this pretrial juncture.

Second, Defendants' motion overstates the rule of completeness by asserting that it simply requires all their statements to law enforcement agents be introduced in their entirety.  (*See* D.E. #182, at 2, 4.)  If the government introduces part of a statement at trial, Federal Rule of Evidence 106 will permit the defense to demand the introduction of additional contextual statements only if those statements "in fairness ought to be considered at the same time."  Fed. R. Evid. 106.  The Rule's fairness standard restricts its application, requiring that "the portion sought to be admitted be relevant to the issue" and that "only those parts which qualify or explain the subject matter of the portion offered by opposing counsel . . . be admitted."  *United States v. Dotson*, 715 F.3d 576, 582 (6th Cir. 2013) (citation omitted).  Determining whether fairness requires the introduction of one statement to provide context for another statement is thus a highly fact-dependent exercise. *See id.* (laying out four determinations that a court must make when evaluating whether a contextual statement must be introduced to explain the already admitted statement and avoid misleading the jury).  The Court cannot make that determination without knowing what statements the government will move to introduce at trial and what other, specific statements the defense will claim provide necessary context.  It should therefore deny Defendants' broad pretrial demand and wait to assess any specific requests they have at trial.

In sum, Defendants' motion *in limine* regarding law enforcement witness testimony is premature.  The Court should deny the motion in favor of making case-by-case determinations under Rules 701 and 106 at trial.

**IV. The Court Should Deny Defendants' Motion to Exclude Evidence that Cothren Supported the Harassment of Witnesses in this Case (D.E. #184).**

Defendants ask the Court to exclude evidence obtained during a separate investigation that Cothren used social media to attack potential witnesses in this case. (*See* D.E. #184 (Cothren's motion); *see also* D.E. #189 (Casada's motion to join Cothren's motion).) As the government explains in its motion *in limine* to introduce the evidence under Rule 404(b), in the spring of 2023, Cothren encouraged users on X to discredit Tennessee House Speaker Cameron Sexton. (D.E. #179-1, at 17–18.) Defendants claim that evidence is irrelevant and prejudicial. (*See* D.E. #184, at 2–4.[2]) They are mistaken.

For one thing, Cothren's encouragement of credibility attacks on someone he anticipated could testify against him are relevant because it shows consciousness of guilt. "[T]hreats against a witness constitute an effort by the defendant to tamper with the substance of the government's case[] and thus are probative of a defendant's awareness that the government is likely to prevail at trial." *United States v. Copeland*, 321 F.3d 582, 597 (6th Cir. 2003). Evidence of witness intimidation is also "probative of [a defendant's] intent, knowledge, and lack of mistake." *See United States v. Cordero*, 973 F.3d 603, 619 (6th Cir. 2020). In this case, Cothren's encouragement of reputational attacks on a witness against him may give the jury reason to doubt any defense that he acted "unwittingly or with honest intent." *See id.* at 620. Offering consciousness-of-guilt evidence like witness intimidation for all these purposes is proper under Rule 404(b). *See id.* (*Contrast* D.E. #184, at 3–4.)

For another thing, spoliation evidence—like evidence of threats against witnesses—is

_____

[2] Defendants also mention in their motion that they had not received copies of the evidence or the search warrant affidavit the government used to obtain it. (*See* D.E. #184, at 1–2.) Since Defendants filed their motion, however, the government has provided them with both.

"highly probative" and thus "not sufficiently inflammatory to warrant exclusion under Rule 403." *Cordero*, 973 F.3d at 620–21. All but one of the cases that Defendants cite in their Rule 403 argument fail to grapple with the significant probative value of spoliation evidence. (*See* D.E. #184 at 3–4.) And the one exception upheld the admission of testimony that the defendant "threatened and attempted to bribe" a witness under Rule 404(b) as evidence of consciousness of guilt. *See United States v. Mendez-Ortiz*, 810 F.2d 76, 78–79 (6th Cir. 1986). The court reasoned in its Rule 403 analysis that, although the testimony was "highly probative," it "was not inflammatory and presented little danger of unfair prejudice." *Id.* at 79. The same is true for evidence of Cothren's harassment of witnesses. And whatever minor risk of unfair prejudice may exist, the Court can address it through limiting instructions. *See Cordero*, 973 F.3d at 621 ("The trial court's delivery of consistent, frequent, and accurate limiting instructions weighs against a finding of unfair prejudice.").

The Court should reject Defendants' attempt to exclude evidence regarding Cothren's support for the harassment of witnesses in this case.

### V. The Court Should Reject Defendants' Request to Exclude Evidence of the Tennessee Constitution, Casada's Oath of Office, and the House Ethics Code (D.E. #185).

Defendants want to prohibit the introduction of evidence from the Tennessee Constitution, Casada's oath of office, and the Tennessee House's Code of Ethics. (*See* D.E. #185 (Casada's motion); *see also* D.E. #190 (Cothren's motion to join Casada's motion).) They first assert that the evidence is irrelevant because none of it is probative of whether Casada took bribes or participated in a kickback scheme. (*See* D.E. #185, at 3–5.) Defendants then claim that, even if the evidence is relevant, the Court should exclude it because it will confuse the jury. (*See id.* at 6–7.) Neither argument is correct.

## A. The Ethical Provision Evidence Is Relevant to Proving the Conspirators' Fraudulent Intent.

Defendants say that evidence of ethics provisions in the Tennessee Constitution, Casada's oath of office, and the Tennessee House's Ethics Code is irrelevant because violations of those provisions do not amount to honest services fraud. (*Id.* at 3.) But no one said they did.

The provisions are relevant because they demonstrate Casada's (and Smith's) fraudulent intent. *See United States v. Macrina*, 109 F.4th 1341, 1349–50 (11th Cir. 2024) (collecting cases for the proposition that "[e]vidence of violations of ethical rules or regulations can establish corrupt intent and be admissible if it is relevant to the charged conduct"); *cf. United States v. Sawyer*, 239 F.3d 31, 42 (1st Cir. 2001) (observing that, even though honest services fraud did not require proof of a violation of state law, the government was permitted to structure an indictment around such a violation to "narrow the issues of intent and good faith" (citation omitted)).[3] Intent will be a critical battleground at trial. To secure convictions on the honest services counts, the government will have to prove that the conspirators had intent to defraud when they devised or knowingly participated in a scheme to defraud that included a material misrepresentation or concealment. *See* Sixth Circuit Pattern Jury Instructions (Criminal) § 10.02 (2025).[4] That does

---

[3] Official state documents like a constitution, oath of office, and ethics code could also be evidence of a fiduciary duty. *See, e.g.*, *United States v. Mandel*, 591 F.2d 1347, 1363 (4th Cir. 1979) (citing the Maryland Constitution in finding that a governor had a fiduciary duty to state citizens). (*See also* D.E. #94, at 11 (government's briefing on the elements of honest services wire fraud).) But the government will not need to use the challenged documents for that purpose here, because the parties and the Court agree that Casada and Smith inherently owed fiduciary duties to Tennessee and its citizens by virtue of their positions as elected officials. (*See* D.E. #94, at 9 (the government); D.E. #95, at 11 (Casada); D.E. #96, at 9 (Cothren); D.E. #133, at 34–35 (the Court).)

[4] Strictly speaking, the Sixth Circuit's pattern jury instruction for wire fraud "does not cover wire fraud based on a deprivation of the intangible right to honest services." *See* Sixth Circuit Pattern Jury Instructions (Criminal) § 10.02 cmt. But because the honest services statute merely adds a definition to the statutory phrase "scheme or artifice to defraud," 18 U.S.C. § 1346, the usual elements of wire fraud still apply. *See United States v. Pinson*, 860 F.3d 152, 168 (4th

14

not mean the government will have to prove that the conspirators knew what they were doing was illegal.  *See id.* cmt. (explaining that the pattern jury instruction for wire fraud is worded "to avoid any suggestion that knowledge of illegality is an element").  But Defendants appear prepared to argue that they did not believe they were doing anything wrong.  And a defendant's "good faith"— including "a belief or opinion honestly held, an absence of malice or ill will, and an intention to avoid taking unfair advantage of another"— can be "a complete defense" to wire fraud.  *See id.* § 10.04.

The government will assert that Casada and Smith's breaches of their ethical obligations under the Tennessee Constitution, Casada and Smith's oaths of office, and the House Ethics Code belie any suggestion of good faith.  The Tennessee Constitution required members of the state House of Representatives to swear that they "will, in all appointments, vote without favor, affection, partiality, or prejudice" and that they will not "consent to any act or thing . . . that shall have a tendency to lessen or abridge [the people's] rights and privileges.  Tenn. Const. art. II, § 2. Similarly, the House Code of Ethics cautioned that members "should avoid conduct that even appears to violate the trust that the people have placed in them."  (D.E. #3 ¶ 8.)  It prohibited members from conduct such as "abus[ing] . . . the representative's official position, including . . . placing undue influence upon any state . . . governmental subdivision" and taking "[a]ctions that are a personal interest in conflict with the proper discharge of the representative's duties."  (*Id.*)

Casada and Smith violated those ethical obligations by secretly participating in a scheme in which they pressured state officials to dispense state money in exchange for kickbacks.  Even if

Cir. 2017); *United States v. Gaw*, 817 F.3d 1, 7 (1st Cir. 2016); Third Circuit Model Criminal Jury Instructions §§ 6.18.1343, 6.18.1341-3 (2023); William J. Bauer Pattern Criminal Jury Instructions of the Seventh Circuit 619, 624–25 (2023).

15

those ethical violations did not themselves amount to crimes, they show that Casada and Smith did not act in good faith. *Cf.* Sixth Circuit Pattern Jury Instructions (Criminal) § 10.04(3) ("A defendant does not act in good faith if . . . that defendant also knowingly makes false or fraudulent pretenses, representations, or promises to others."). And because good faith and fraudulent intent are two sides of the same coin, *see id* § 10.04(5)–(6), evidence negating Casada and Smith's good faith is relevant to the intent element. (*See* D.E. #133, at 42–43 (the Court appearing to recognize the ethical provisions' relevance when it refused to strike references to them from the indictment).)

### B.    Evidence of the Ethical Provisions Is Not Likely to Confuse the Jury.

Defendants also assert that the jury is likely to adjudge their guilt based on compliance with the ethical provisions. (*See* D.E. #185, at 6–7.) Specifically, they suggest that the jury will confuse the standard for conviction of honest services fraud with the standards set out in the ethical provisions. (*See id.* at 7 ("[T]he honest services doctrine is complex enough without references to various irrelevant standards.").) Not so.

The Fifth Circuit upheld the admission of similar evidence in *United States v. Ramos*, 537 F.3d 439 (5th Cir. 2008). In *Ramos*, two Border Patrol agents were convicted on nearly a dozen charges after shooting at a suspect and then covering up the shooting. *Id.* at 446. The agents argued on appeal that the government had convicted them based on violations of Border Patrol policies rather than the charged crimes. *Id.* at 459. At trial, the district court admitted evidence of the policies—which "covered such matters as high-speed pursuits, reporting firearm discharges, preserving evidence, and the use of deadly force"—"as relevant to intent and knowledge of wrong-doing." *Id.* In approving the admission, the Fifth Circuit observed that "the government never suggested that violation of one of the policies was sufficient for conviction" and that "testimony . . . was elicited by the defendants to the effect that violation of Border Patrol policies

was not identical to a violation of criminal law." *Id.* at 460. Furthermore, the district court had "repeatedly admonished the jury that it was only to consider guilt in terms of the crimes actually charged in the indictment." *Id.*

This Court should likewise admit evidence of Casada and Smith's ethical obligations. The government will introduce the evidence only to prove Casada and Smith's criminal intent—namely, their lack of good faith. It will not suggest that a violation of the obligations is sufficient for conviction. And as the Court acknowledged when refusing to strike the ethical provisions from the indictment, even allegations that Casada and Smith violated the provisions are not "particularly inflammatory" compared to the other accusations the indictment levies at the conspirators. (*See* D.E. #133, at 43.) The Court can minimize any risk of inflaming or confusing the jury with limiting instructions and other trial management techniques. (*See id.* at 43–44 (the Court remarking that it "has lots of ways" to reduce the ethical provisions' prejudice, including by not including them in the summary of the indictment it reads to the jury).); *see also Macrina*, 109 F.4th at 1350 (holding that a limiting instruction "cured" any unfairness that could have resulted from the admission of a city ethics code in a bribery trial). Defendants thus cannot show that those minor risks "substantially outweigh[]" the probative value that the ethical obligations carry. *See* Fed. R. Evid. 403.

VI.    **The Court Should Deny Defendants' Motion to Exclude Evidence of Phoenix Solutions' Non-State-Funded Campaign Work (D.E. #186).**

Defendants next seek to exclude evidence of the work that Phoenix Solutions performed other than state-funded mailer work. (*See* D.E. #186 (Casada's motion); *see also* D.E. #191 (Cothren's motion to join Casada).)[5] That evidence is background evidence critical to understand

---

[5] Defendants correctly draw a distinction between Phoenix Solutions' state-funded mailer

17

the conspirators' scheme.  The Court should therefore deny Defendants' motion.

Evidence of Phoenix Solutions' campaign work is "inextricably intertwined with the charged offense" and "necessary to complete the story of the charged offense."  *See Hardy*, 228 F.3d at 748.  The government expects to introduce evidence at trial that Phoenix Solutions sought both state-funded mailer work and non-state-funded campaign work from the beginning.  *See Churn*, 800 F.3d at 779 (describing background evidence as including that with a "temporal . . . connection with the charged offense" and that which "arises from the same events as the charged offense" (citations omitted)).  It will also argue that the conspirators targeted the state-funded mailer work to get a foothold in the mailing industry with an eye toward eventually attracting more

_____

work and the other work that it performed for campaigns, but their reasoning for drawing that distinction is wrong.  They repeatedly and incorrectly ground the distinction in whether the money the conspirators obtained came from federal funds.  (*See, e.g.*, D.E. #186, at 2 ("It is this alleged federal nexus, the State of Tennessee's receipt of $10,000 in federal benefits per year to the 'Mailer Program'/P & P Accounts, which provides the prosecution's basis for charging a federal criminal offense."); *id.* at 3 ("[T]he Indictment artfully combines the allegations of these campaign-related services with allegations of the non-campaign work without noting the sharp and important distinction—the former did not come from state-directed federal funds." (emphasis omitted)); *id.* at 4 (faulting the indictment for "failing to allege that the funds obtained from both [state-funded and campaign] services were connected to federal funds" (emphasis omitted)).)

It is true that Defendants can be guilty here—whether under the federal program theft and bribery statute, 18 U.S.C. § 666, or the honest services wire fraud statutes, 18 U.S.C. §§ 1343, 1346—only if they unlawfully obtained state funds.  But Section 666 does not "require proof of connection with federal money as an element of the offense."  *Sabri v. United States*, 541 U.S. 600, 605 (2004).  Its jurisdictional hook depends on the state of Tennessee receiving federal funds, so it criminalizes the conspirators' fraud and bribery only to the extent their conduct related to Casada and Smith's agency relationship with the state.  *See* 18 U.S.C. § 666(a)(1).  Wire fraud's jurisdictional hook does not rest on federal funding at all but instead on the use of interstate wires.  *See id.* § 1343.  Nevertheless, the conspirators can commit honest services fraud only to the extent their conduct violated Casada and Smith's fiduciary relationship to the government and people of Tennessee.  *See Skilling v. United States*, 561 U.S. 358, 407 (2010) (describing the "solid core" of honest services fraud as "offenders who, in violation of a fiduciary duty, participated in bribery or kickback schemes").  So yes, Defendants' liability turns on them wrongfully obtaining money from the state mailer account.  But the prosecution does not have to show that the money ultimately came from the federal government.

18

profitable campaign work. (*See* D.E. #3 ¶¶ 34, 46, 49, 51.) Evidence of the campaign work is thus important for understanding the conspirators' motive. *See Churn*, 800 F.3d at 779 (describing background evidence as including that with "a causal . . . connection with the charged offense" and that which "completes the story of the charged offense" (citations omitted)). On top of all that, the conspirators sought to provide the same clients both kinds of work, so trying to limit witnesses' testimony to just the state-funded work would both be practically difficult and inaccurately depict the witnesses' relationships with the conspirators. *See id.* (approving a district court's admission of background evidence that "explain[ed] the relationship between the witness and the defendant and the nature of their business relationship and the course of their business dealings"). In short, excluding evidence of Phoenix Solutions' campaign work would improperly distort the jury's picture of the conspirators' scheme. *See United States v. Vincent*, 681 F.2d 462, 465 (6th Cir. 1982) ("The jury is entitled to know the 'setting' of a case. It cannot be expected to make its decision in a void—without knowledge of the time, place and circumstances of the acts which form the basis of the charge." (citation omitted)).

Defendants also claim that evidence regarding the campaign work would confuse the jury. (*See* D.E. #186, at 6.) But despite Defendants' confusing briefing on the issue, *see supra* note 5, the takeaway for the jury is straightforward: only the conspirators' wrongful acquisition of state funds can permit their conviction of the charged bribery crimes. The indictment explicitly delineates the income the conspirators received from the state (*see* D.E. #3 ¶ 52)—as Defendants acknowledge (*see* D.E. #186, at 5). And the Court can take additional steps to clarify the distinction for the jury at trial. (*See* D.E. #133, at 45–46 (the Court declining to strike related allegations from the indictment in part because it had the ability to mitigate any prejudice, such as

19

omitting the allegations from the summary of the indictment read to the jury).) Indeed, withholding evidence of the conspirators' motives and the full scope of Phoenix Solutions' business could bring more confusion than clarity. *See Old Chief v. United States*, 519 U.S. 172, 188 (1997) ("[T]here lies the need for evidence in all its particularity to satisfy the jurors' expectations about what proper proof should be.").

Yet Defendants complain at length that it would somehow be unfair to admit evidence that the conspirators concealed Cothren's identity with respect to campaign work in addition to the state-funded mailer work. (*See* D.E. #186, at 3–6.) Given all the evidence of the conspirators' dishonesty regarding the state-funded mailer work, Defendants' suggestion that also admitting evidence of the campaign work will be so incrementally prejudicial to become unfair is far-fetched. More to the point, however, trying to disentangle concealment aimed at state-funded work and campaign work only underscores the connectedness between the two kinds of evidence: the conspirators had to conceal Cothren's identity while seeking both state-funded mailer work and non-state-funded campaign work because they could not conceal it with respect to one but not the other. That the conspirators concealed Cothren's identity when seeking non-state-funded campaign work is probative evidence that they knew his involvement in political business would drive clients away. In light of Rule 403's strong tilt toward admissibility, *see Asher*, 910 F.3d at 860, Defendants have not justified the exclusion of such probative evidence.

Defendants lastly declare in passing that evidence of the campaign work falls under Rule 404(b) and assert that the Court should exclude it because the government has not yet provided the notice that Rule requires. (*See* D.E. #186, at 7.) That attack misses the mark too. "Proper background evidence [that] has a causal, temporal or spatial connection with the charged

20

offense"—like that related to the conspirators' campaign work—"does not implicate Rule 404(b)." *See Hardy*, 228 F.3d at 748.

The Court should deny Defendants' attempt to keep from the jury context necessary to understand the conspirators' scheme.

### VII.    The Court Should Deny Defendant's Motion to Exclude Evidence of a Bureau of Ethics and Campaign Finance Audit into Casada (D.E. #187).

Defendants ask the Court to exclude evidence regarding an audit that the Tennessee Bureau of Ethics and Campaign Finance conducted into Casada.  (*See* D.E. #187 (Casada's motion); *see also* D.E. #192 (Cothren's motion to join Casada's motion).)  The challenged evidence includes "the Bureau's decision and underlying conduct" that occurred from January 1, 2018, to June 30, 2019.  (D.E. #187, at 1.)  The government does not intend to introduce evidence of the audit's existence and findings.  And the Court should deny Defendants' request to exclude evidence of any "underlying conduct" related to the audit because the request is vague, overly broad, and premature.

Defendants do not spell out exactly what "underlying conduct" covers.  Aside from the audit's existence and findings, they have "not identified any particular piece of evidence that should be excluded, and that makes it impossible for the Court to "assess the likely relevancy or prejudice of the challenged evidence."  *See Jackson v. O'Reilly Auto. Stores, Inc.*, 131 F. Supp. 3d 756, 760 (M.D. Tenn. 2015) (denying without prejudice a motion to introduce any evidence of a plaintiff's misconduct "that was not a factor in [the defendant's] decision to terminate" him).  Defendants point out that the "underlying conduct" they wish to exclude predates the charged conspiracy.  (*See* D.E. #187, at 3.)  But that is hardly a foolproof test of relevance.  Events during the period of "underlying conduct" were undoubtedly relevant to the jury's assessment of

21

Defendants' guilt.  *Cf. Churn*, 800 F.3d at 779 (explaining that admissible background evidence "may include evidence that is a prelude to the charged offense" (citation omitted)).  For instance, the scandal that cost Cothren his job at the Tennessee House and tarnished his reputation occurred in the spring of 2019.  (*See* D.E. #3 ¶ 9.)  Defendants' vague request thus threatens the exclusion of relevant, otherwise admissible evidence.  And in any case, even if the Court were to grant the request, the ambiguous guidepost "underlying conduct" will merely lead to confusion and additional litigation down the road.  All of this is why "[o]rders in limine which exclude broad categories of evidence should rarely be employed."  *Sperberg*, 519 F.2d at 712.  While some evidence related to Casada's campaign finance violations may not be relevant here, the "better practice is to deal with questions of admissibility of evidence as they arise."  *Id.*

**VIII.  The Court Should Reject Defendants' Attempt to Exclude Evidence of Casada's Politics (D.E. #188).**

Finally, Defendants demands that the Court exclude "evidence regarding Casada's affiliations to a political party or political ideology," actions he took as Speaker of the House, and "all duties and responsibilities he was charged with as Speaker."  (D.E. #188, at 1 (Casada's motion); *see also* D.E. #193 (Cothren's motion to join Casada's motion).)  They claim those categories of evidence are irrelevant and could inflame the jury.  (D.E. #188, at 1.)  Defendants are wrong, and their demand is impractical.  It should be denied.

  A. <u>Evidence of Casada's Political Affiliation and Former Leadership Position Are Relevant.</u>

Evidence of Casada's political affiliation and previous position as Speaker of the House clears the "low bar" of relevance in at least two ways.  *See United States v. Wilder*, 87 F.4th 816, 819 (6th Cir. 2023) (citation omitted).  First, that evidence explains the conspirators' relationship with one another.  Casada and Cothren formed their relationship over years of working together in

the Tennessee House Republican Caucus—Casada as a member of leadership and Cothren as a staff member. When Casada became Speaker of the House, he named Cothren his chief of staff. (*See* D.E. #3 ¶ 3.) Smith, formerly the chair of the Tennessee Republican Party, met Casada and Cothren through state Republican politics. She then worked with them when she became a member of the Tennessee House, including by supporting Casada's election as Speaker. Even after Casada stepped down from the Speakership, Smith worked alongside him in the House Republican Caucus. So in sum, evidence of the conspirators' shared political party affiliation and respective positions within the party will be critical for the jury to understand the conspirators' relationships with each other. And the government will need to establish those relationships to prove the charged conspiracy. *Cf. Ford*, 761 F.3d at 649 ("Evidence of gang affiliation is relevant where it demonstrates the relationship between people and that relationship is an issue in the case, such as in a conspiracy case."); *United States v. Gibbs*, 182 F.3d 408, 430 (6th Cir. 1999) ("Gang affiliation is particularly relevant, and has been held admissible, in cases where the interrelationship between people is a central issue." (citation omitted)).

Second, evidence of Casada's political party affiliation and former leadership role will help show that the conspirators had the "opportunity to commit a crime." *See United States v. Jobson*, 102 F.3d 214, 221 (6th Cir. 1996) ("[D]efendant's gang membership would be admissible to establish his opportunity to commit the crime."); *accord United States v. Anderson*, 333 F. App'x 17, 24 (6th Cir. 2009). Opportunity evidence includes evidence that establishes "access to . . . the scene of the crime or the possession of distinctive or unusual skills or abilities employed in the commission of the crime charged." *Jobson*, 102 F.3d at 221 (internal quotation marks omitted) (citation omitted). Here, Casada and Smith had access to their fellow Republican legislators (none

23

of their clients were Democrats) because of their shared political affiliation and their histories of leadership in the Republican party. Casada and Smith then exploited their relationships with Republican legislators to get state mailer business. In addition, Casada's leadership roles within the House and Republican caucus made him familiar with the House mailer account program—after all, the Speaker of the House oversaw the program (*see* D.E. #3 ¶ 12). In simple terms: Casada's politics help explain how the conspirators did what they did. *Cf. United States v. Mooney*, No. 03-6050, 2005 WL 8159085, at *5 (6th Cir. Jan. 12, 2005) (unpublished) ("Mooney's gang membership helped to explain why he did what he did . . . .").

In support of their motion, Defendants offer a laundry list of cases they claim excluded "irrelevant political affiliations and divisive topics." (*See* D.E. #188, at 3 & nn.1–2.) These cases do not help them. One case Defendants cite actually admitted evidence of a defendant's political beliefs because it "contextualize[d] the speech at issue"—threats against FBI agents—including by "speak[ing] to [the defendant's] broader online persona or character." *See United States v. Kaye*, No. 21-CR-80039, 2022 WL 860379, at *1 (S.D. Fla. Mar. 23, 2022). So too would admitting evidence of Casada's politics. Another case Defendants cite did not proscribe references to political party affiliations at all but rather warned the parties not "to suggest that party affiliation is an inherent sign of dishonesty." *See United States v. Householder*, 645 F. Supp. 3d 844, 851 (S.D. Ohio 2022). Rest assured, the government will not do that. In the remaining cases, political affiliations were tangential to the dispute. *See Murgida v. Ohio Dep't of Transp., Dist. No. 11*, No. 5:17-CV-229, 2019 WL 460477, at *4 (N.D. Ohio Feb. 6, 2019) (excluding references to the "Me Too" movement in sex discrimination case); *Low v. Trump Univ., LLC*, No. 3:10-CV-940, 2016 WL 6732110, at *4 (S.D. Cal. Nov. 15, 2016) (excluding references to political affiliation in

fraud lawsuit against business entity associated with President Trump); *Am. Heartland Port, Inc. v. Am. Port Holdings, Inc.*, No. 5:11-CV-50, 2014 WL 2931929, at *2 (N.D.W. Va. June 30, 2014) (excluding evidence of a plaintiff's political beliefs in a business and contracts dispute); *McCabe v. Mais*, No. 05-CV-73, 2008 WL 5111361, at *2 (N.D. Iowa Oct. 24, 2008) (excluding evidence of the defendant's political views in civil rights trial in which "the sole remaining issue" was damages).  By contrast, this case centers on happenings that took place around a legislative body— a political entity.  The conspirators knew each other and many of the witnesses that will testify at trial through politics.  Defendants cannot close the jury's eyes to such obviously relevant context like what political parties the conspirators belonged to and Casada's former position as Speaker of the House.  Nor would it be practical to do so.

B.  <u>Evidence of Casada's Politics Are Not Unfairly Prejudicial.</u>

Defendants also argue that evidence of Casada's political affiliation and former role as Speaker is so unfairly prejudicial that it substantially outweighs its probative value.  (*See* D.E. #188, at 3–5.)  That is an implausible claim.  Given the important context that Casada's political affiliation and political leadership experience provide for this public corruption case, the risk of unfair prejudice would have to be serious to come close to warranting exclusion.  *Cf. Cook v. Ill. Dep't of Corr.*, No. 09-CV-133, 2010 WL 4292941, at *1 (S.D. Ill. Oct. 21, 2010) (denying motion *in limine* to exclude evidence of "political affiliation or political activism" because it was relevant to the plaintiff's "theory of the case").  But mere political affiliation and leadership experience carry little risk of unfair prejudice.  *See United States v. Sampson*, No. 13-CR-269, 2015 WL 2066073, at *17 (E.D.N.Y. May 4, 2015) (denying defendant's motion to exclude the positions he held as a New York state senator—which included positions with the Senate Democratic Conference and Democratic Senate Campaign Committee—because the positions were not

25

irrelevant, unduly prejudicial, confusing, or likely to cause undue delay). Even assuming the evidence will have a "negative connotation" to some jurors (and potentially a positive one to others), that is not enough to "meet Rule 403's high bar for exclusion." *See United States v. Guzman*, 571 F. App'x 356, 361 (6th Cir. 2014) (citations omitted) (affirming the admission of the use of the term "pill mill"). Indeed, the Sixth Circuit routinely admits evidence of a defendant's gang membership so long as the government can prove its relevance, *see, e.g.*, *Ford*, 761 F.3d at 650; *Gibbs*, 182 F.3d at 430, and gang membership is far more likely to be unfairly prejudicial than political affiliation and leadership. Defendants have not justified the evidence's exclusion.

## CONCLUSION

For the reasons stated above, the Court should largely deny the defense's motions *in limine*.

Respectfully submitted,

ROBERT E. McGUIRE
Acting United States Attorney for the
Middle District of Tennessee

*/s/ Taylor Phillips*
TAYLOR PHILLIPS
Assistant United States Attorney
719 Church Street, Ste 3300
Nashville, Tennessee 37203
Telephone: 615-736-5151

*/s/ Blake J. Ellison*
BLAKE J. ELLISON
Trial Attorney
Public Integrity Section, Criminal Division
1301 New York Ave. NW, Tenth Floor
Washington, DC 20530
Telephone: 202-514-1412

26