UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 3:22-cr-00282 |
| v. | ) | |
| | ) | JUDGE RICHARDSON |
| [1] GLEN CASADA | ) | |
| [2] CADE COTHREN | ) | |

**GOVERNMENT'S REPLY IN SUPPORT OF ITS MOTIONS *IN LIMINE***

The United States, by and through its undersigned attorneys, submits this omnibus reply in support of its motions *in limine*. (*See* D.E. #180–88.) For the reasons stated below, Defendants' responses to the government's motions are largely unconvincing. (D.E. #280) The Court should therefore grant the government's motions.

**ARGUMENT**

**I.      Phoenix Solutions' Actual Performance of Work Under the Mailer Program Is Not a Defense to Criminal Liability**

Defendants plan to argue that they cannot be convicted of bribery and related charges because Phoenix Solutions in fact sent the legislative updates and surveys for which it was paid. (*See* D.E. #280, at 3, 5-13.) The government will not argue or insinuate that Phoenix Solutions sent no mailers. But Defendants have not established how evidence of Phoenix Solutions' work is relevant—either to assessing the charges against them or to an affirmative defense. Instead, Defendants' response indicates that they intend to focus the jury on a red herring. They claim that the jury will inevitably ask, "Did Phoenix Solutions actually perform those services?" (*Id.* at 4.) In a bribery case like this one, however, that is the wrong question. Actual performance of work is no defense to criminal liability when a defendant obtains that work through bribery.

A.     Count 2: 18 U.S.C. § 666(a)(1)(A)

In their Section 666 argument, Defendants assert that theft or fraud concerning programs concerning programs receiving federal funds requires intended pecuniary loss, which in turn makes their actual performance of mailer work relevant. (*Id.* at 6-7.) They support their assertion with a string cite of wire fraud cases, most prominently *United States v. Sadler*, 750 F.3d 585, 590 (6th Cir. 2014). (D.E. #280, at 6-7.) But even assuming that wire fraud cases like *Sadler*—which turned on the interpretation of the word "deprive," *see* 750 F.3d at 590—apply to Section 666(a)(1)(A), Phoenix Solutions' delivery of mailer work is not relevant.

As the government explained in opposing Defendants' motions to dismiss the indictment, fraud's intent-to-deprive element does not require a showing that the defendant intended the victim to suffer a pecuniary loss—just that the defendant intended to obtain the victim's money or property. (*See* D.E. #75, at 24–26.)  And like the defendant in *United States v. Bolos*, 104 F.4th 562 (6th Cir. 2024), Defendants here are charged not with depriving the State of "intangible rights" like the "right to valuable economic information," but instead "with fraud to obtain the *money*" of the State. *See id.* at 568, 570 (citation omitted). In the same way that what mattered in *Bolos* was "that the defendant misrepresented material facts that induced the [victims] to make . . . payments," what matters here is that Defendants misrepresented material facts that induced the State to make payments from its postage and printing account. *See id.* at 571; *see also United States v. Robinson*, 99 F.4th 344, 358 (6th Cir. 2024) ("[I]t is sufficient that the defendant by material misrepresentations intends the victim to issue additional funding that otherwise would not have been provided to show intent. In other words, any good-faith belief that [defendant's nonprofit] would use [grant] funds as it was required to does not excuse the fraudulent misrepresentations

2

made to get those funds." (cleaned up) (citation omitted)); *United States v. An*, 733 F. Supp. 3d 77, 93 (E.D.N.Y. May 7, 2024) ("*Ciminelli* did not reject the premise that depriving a victim of information in order to induce the victim to part with traditional property can be fraud. *Ciminelli* simply rejected the notion that *information itself can be property*."); *United States v. Venkata*, 709 F. Supp. 3d 9, 28–29 (D.D.C. Jan. 3, 2024) (concluding that *Ciminelli* did not prevent the government from charging a defendant with wire fraud for a scheme to obtain a lucrative contract using material misrepresentations or omissions because the object of scheme was "to obtain a traditional form of money or property—about $150,000 in the first year and roughly $40,000 a year thereafter") (internal quotation marks omitted)). Because Defendants made fraudulent representations with the aim of obtaining state money, they had fraudulent intent—regardless of whether Phoenix Solutions performed the work it was paid for.

B.       Counts 3 and 4: 18 U.S.C. § 666(a)(1)(B) and 18 U.S.C. § 666(a)(2)

Defendants address Section 666 bribery only in passing.  They suggest that, if Phoenix Solutions completed the mailer work for which it was paid, "then a jury could find that the Defendants' intent from the time of agreement through time of payment was to provide and be paid for a mail service actually rendered, instead of a . . . corrupt bribe/kickback." (D.E. #280, at 6.) Courts have roundly rejected the Defendants' contention that this type of mixed-motive argument is a defense to bribery. *See City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 378 (1991) ("A mayor is guilty of accepting a bribe even if he would and should have taken, in the public interest, the same action for which the bribe was paid."); *United States v. Coyne*, 4 F.3d 100, 113 (2d Cir. 1993) ("[A] valid purpose that partially motivates a transaction does not insulate participants in an unlawful transaction from criminal liability."); *United States v.*

3

*Woodward*, 149 F.3d 46, 71 (1st Cir. 1998) ("A defendant may be prosecuted for deprivation of honest services if he has a 'dual intent,' i.e., if he is found to have intended both a lawful and an unlawful purpose to some degree."); *see also* Final Jury Instructions, *United States v. Hills et al.*, No. 1:16-cr-329, ECF No. 360 at 93–96 (N.D. Ohio Oct. 1, 2018) (instructing the jury "if you find beyond a reasonable doubt that a defendant solicited or received as a public official a thing of value in exchange for the performance of official action, then it makes no difference that the public official may also have had another lawful motive for soliciting or receiving the thing of value"), *aff'd*, 27 F.4th 1155 (6th Cir. 2022), *cert. denied*, 143 S. Ct. 305 (2022), 143 S. Ct. 606 (2023). Under Defendants' theory, a defense contractor who handed a government official a sack of cash in exchange for a government contract would not be guilty of bribery if it later completed the corruptly procured contract. That is not the law.

Completing corruptly obtained work is no defense to bribery. *Cf., e.g.*, *United States v. McDonough*, 727 F.3d 143, 161 (1st Cir. 2013) ("The issue in this case is not whether the defendants truly thought the software was a benefit to the Commonwealth; instead it is whether they intended to exchange payments to [a politician] for assistance to [a contractor]."); *United States v. Morgan*, 635 F. App'x 423, 465 (10th Cir. 2015) (Holmes, J., concurring) ("Bribery is not illegal because it leads to inferior legislation; it is illegal because it betrays the public trust."). And because a defendant who performs good work can still benefit from securing business through bribery—for instance, by buying access to clients who would otherwise be out of reach—whether the defendant ultimately performed the work is irrelevant. *See United States v. Shields*, 999 F.2d 1090, 1096 (7th Cir. 1993) ("[S]ince even parties with winning cases may benefit from fixing a case—by buying certainty of a favorable ruling—a legally correct decision conveys no useful

4

information about the likelihood that the judge has been bribed."). That was the case here. Cothren bribed Casada and Smith to obtain legislative mailer work that his brand-new, unknown business would not have gotten by itself. It does not matter whether Phoenix Solutions completed that work.

C.    Counts 2-4: 18 U.S.C. § 666(c) Safe Harbor Provision

Defendants also retry their rejected motion-to-dismiss arguments about Section 666's safe harbor provision. (D.E. #280, at 7-9.) That provision reads: "This section does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business." 18 U.S.C. § 666(c). The term "'bona fide salary . . . in the ordinary course of business,' is fixed compensation for services obtained without fraud or deceit and in the normal routine of a business." *United States v. Walsh*, 156 F. Supp. 3d 374, 384–85 (E.D.N.Y. 2016) (omission in original); *see also United States v. George*, 841 F.3d 55, 62 (1st Cir. 2016) ("'[B]ona fide salary' means salary actually earned in good faith for work done for the employer."). It does not include "salary payments . . . paid to [a public official] as the *quid* in a *quid pro quo* bribery arrangement." *See United States v. Bryant*, 556 F. Supp. 2d 378, 427 (D.N.J. 2008).

The reason that the payments Cothren made to Casada and Smith were not bona fide has nothing to do with Phoenix Solutions' performance of mailer work. As the Court observed when addressing the Defendants' motions to dismiss, based on the allegations in the indictment, the payments were not bona fide because they stemmed from an arrangement rife with fraud and deceit—from Cothren operating a business using a fake persona, including his submission of a fraudulent W-9 to the State, to Casada and Smith abusing their positions as legislators to obtain business for the venture under false pretenses. (*See* D.E. #133, at 38 (this Court explaining "I am never going to find, unless someone makes me, that where payment is made pursuant to a W-9

5

that falsifies who's completing it, is a bona fide payment of fees or payment of fees that are bona fide or in the usual course of business.")). Consequently, whether Phoenix Solutions performed mailer work has no bearing on the safe harbor provision's application.

D.     Counts 5–10: 18 U.S.C. §§ 1343, 1346

Defendants contend that "[t]here can be no *quid pro quo* if the alleged bribe or kickback was a legitimate and lawful payment for services rendered." (D.E. #280, at 10.) This argument misstates both the law and the factual allegations contained in the indictment. What makes the exchange unlawful is if the bargained-for "services" consist of a public official performing an official act in exchange for a thing of value. In addition, Defendants appear to misunderstand the unlawful bribes and kickbacks at issue here. The State's payments to Phoenix Solutions for mailer work—what Defendants suggest were "payment for services rendered"—were not the kickbacks. The kickbacks were Cothren's payments to Casada and Smith in exchange for official acts that the two legislators took to benefit Phoenix Solutions.

Similarly, Defendants' focus on the government's burden to prove an intent to "deceive *and* cheat" misunderstands the object of the scheme to defraud alleged in Counts Five through Ten. (*See* D.E. #280, at 10.) Defendants committed honest services wire fraud because their bribery scheme deprived the State and its citizens of Casada and Smith's honest services. *See* 18 U.S.C. § 1346. (*See also* Indictment, D.E. #3, at ¶ 71 (alleging that Defendants "devised and intended to devise a scheme and artifice to defraud and deprive Tennessee and the citizens of Tennessee of their right to the honest services of a public official . . . through bribery and kickbacks").) So for the honest services fraud counts, it does not matter whether the State received services for the money it paid out. *See Skilling v. United States*, 561 U.S. 358, 400 (2010) ("Even if the scheme

6

occasioned a money or property gain for the betrayed party, courts reasoned, actionable harm lay in the denial of that party's right to the offender's 'honest services.'").

Finally, Defendants argue that, because wire fraud is a specific intent statute, their "subjective beliefs as to the lawfulness of their conduct" are relevant. (*See* D.E. #280, at 10.) They misstate the intent element for wire fraud. Wire fraud requires intent to defraud, not willfulness. *See United States v. Sittenfeld*, No. 1:20-CR-142, 2022 WL 2192955, at *6 (S.D. Ohio June 17, 2022) ("The statutes the government accuses Sittenfeld of violating, which prohibit bribery, extortion, and honest services wire fraud, are not 'highly technical,' and none expressly requires a 'willful' violation.").

### E.  Count 11: 18 U.S.C. § 1342

Defendants are correct that 18 U.S.C. § 1342 requires proof of either wire fraud or "any other unlawful business." But Phoenix Solutions did not conduct unlawful business because it did not do the work for which it was paid. Rather, the company conducted unlawful business because it obtained work through kickbacks and lies. Because proof that Phoenix Solutions provided mailer services would do nothing to undermine the allegation that Defendants violated Section 1342, that evidence is not relevant to Count Eleven.

### F.  Counts 12–18: 18 U.S.C. § 1956(a)(1)(B)(i)

As to the Section 1956 money-laundering counts, Defendants essentially argue that if they performed the mailer work, they did not engage in "unlawful activity." (*See* D.E. #280, at 12.) That argument is off the mark in several ways. As an initial matter, Section 1956(a)(1)(B)(i) does not require proof that the *defendant* engaged in the underlying unlawful activity. More importantly, "specified unlawful activity" is a defined term, not a free-floating phrase open to interpretation.

7

*See* 18 U.S.C. §§ 1956(c)(7), 1961(1). In this case, "proceeds of specified unlawful activity" refers to proceeds of violations of 18 U.S.C. §§ 666 and 1343. (*See* Indictment, D.E. #3, at ¶ 79.) Accordingly, because Phoenix Solutions' performance of mailer program work is irrelevant to the Section 666 and honest services fraud charges, it is irrelevant to the money-laundering charges as well.

## II. Casada and Cothren's Statements and the Rule of Completeness

Defendants propose that the Court enter an order requiring: first, that the government disclose the portions of Defendants' statements that it intends to introduce; and second, that Defendants then identify any other portions of those statements that they propose introducing, as well as the basis for admitting more than the government intends. (D.E. #280, at 16-17, citing *United States v. Mack*, 2014 U.S. Dist. LEXIS 12198, at*21–22 (N.D. Ohio Jan. 31, 2014).)

The government joins that proposal. Under the scheduling order, the parties plan to review case-in-chief exhibits by April 8, 2025. At that exhibit review, the government will disclose the portions of emails, text messages, and recordings of Defendants that it intends to introduce. To permit adjudication before trial on April 22, 2025, Defendants should be required to identify the other portions of Defendants' statements that they propose introducing, as well as the basis for admitting more than the government proposes, by April 15, 2025.

## III. The Court Should Conditionally Admit Statements of the Defendants' Charged Co-Conspirator Robin Smith

The Court should exercise its discretion to follow its typical practice of conditionally admitting co-conspirator Robin Smith's statements in furtherance of the conspiracy under Rule 801(d)(2)(E) pursuant to *United States v. Vinson*, 606 F.2d 149, 153 (6th Cir. 1979). Defendants' alternative proposal comes from an unpublished magistrate judge's order to which the government

8

did not object. *See United States v. McArdle*, No. 2:20-CR-56, 2021 WL 149411, at *8 (E.D. Tenn. Jan. 15, 2021). In *McCardle*, the government offered just two summaries of communications that a co-conspirator made in furtherance of the conspiracy. Notice of Intent to Introduce Co-Conspirator Statements, *United States v. McArdle*, No. 2:20-CR-56, D.E. #134 (E.D. Tenn. Sept. 30, 2021).

In this case, the government anticipates that multiple witnesses—including Smith herself—will testify about Smith's communications in furtherance of the conspiracy. More significantly, Smith exchanged dozens of texts and emails with her co-conspirators. She also sent a substantial number of written communications to other legislators, state officials, and others in furtherance of the conspiracy.

In contrast to *McArdle*, requiring the government to provide a pretrial 801(d)(2)(E) summary of each of those communications would be unreasonably burdensome and, ultimately, unlikely to produce any material benefit. Writing out, for each of the dozens of Smith's statements, "when, where, and to whom" the statement was made and a "summary of the evidence that the Government will present to establish . . . that the statement[ was] made in furtherance of the conspiracy" would accomplish little beyond what is apparent from the face of those communications (namely, participants, dates, mediums, and substance).[1]

Furthermore, the government has already provided the defense with reports of witness interviews describing Smith's oral statements in furtherance of the conspiracy. And by April 8,

---

[1]     *McArdle* also required the prosecution to describe the evidence that would be offered to prove the existence of the conspiracy and the declarant's role in it. 2021 WL 149411, at *8. A sufficient proffer of that evidence is already included in the lengthy speaking indictment and the factual basis in support of Smith's plea. At trial, Smith herself will also attest to her participation in the conspiracy.

2025, it will allow Defendants to review the government's case-in-chief exhibits pursuant to the scheduling order. Accordingly, writing summaries of those already-produced and largely self-explanatory documents would be a significant waste of resources. Given the nature of the anticipated proof and the discovery in this case, the far more efficient path is for Defendants to raise 801(d)(2)(E) objections after the exhibit review.

### IV. This Court Should Allow the Admission of Intrinsic Evidence and Evidence of Certain Other Acts Pursuant to Federal Rule of Evidence 404(b)

The government has moved for an order recognizing the admissibility of four kinds of evidence under Rule 404(b): (1) evidence of a texting scandal that cost Casada his Speakership and Cothren his position as Casada's chief of staff; (2) evidence related to a House ethics bill that Casada and Smith opposed; (3) evidence that Cothren concealed his identity when operating political organizations other than Phoenix Solutions; and (4) evidence that Cothren supported social media attacks on witnesses in this case. Defendants oppose the admission of each kind of evidence. The Court should nevertheless permit the government to admit them.

#### A. Evidence of the 2019 Text Message Scandal Is Admissible

Defendants' first argument to prevent the jury from hearing about their disturbing text messages is that "proof of the motivation or purpose of the misrepresentation is not required." (D.E. #280, at 23.) That is an insufficient basis to exclude the evidence. Even if motive is not itself an element of a charged offense, it can be relevant to *mens rea*. *See, e.g.*, *United States v. Jackson-Randolph*, 282 F.3d 369, 376 (6th Cir. 2002) (affirming introduction of motive evidence in fraud case). Motive evidence is relevant here as well, given that Defendants have claimed they operated Phoenix Solutions in good faith—despite hiding Cothren's involvement.

Second, Defendants contend that the government can establish that state legislators wanted

nothing to do with Cothren on account of his misconduct without delving into the text messages themselves. (D.E. #280, at 24.) That is only half of the compromise the government offered in its opening brief: "[T]he government does not plan to introduce the texts themselves *unless the defense asserts that the texts and fallout from them were not material*." (D.E. #179-1, at 15 (emphasis added).) Defendants have not offered to stipulate that the concealment of Cothren's involvement in Phoenix Solutions was material, however. Accordingly, the government may seek to introduce the content of the text messages in response to such an argument.

Defendants' reliance on *United States v. Hazelwood*, 979 F.3d 398, 402 (6th Cir. 2020), is also misplaced. As this Court knows well, the district court in *Hazelwood* erred when it permitted jurors to hear recordings of a defendant singing racist and chauvinist songs in rebuttal to that defendant's good character evidence. *Id.* at 414. Given the context of that case, the Sixth Circuit held that the offensive songs failed to clear even the low bar of Rule 401. *Id.* at 408.

Here, the government would not offer Defendants' text messages and the reporting of the scandal to rebut good-character evidence. Rather, the government would likely offer that evidence to establish the significance of information concealed by Defendants (namely, Cothren's involvement in Phoenix Solutions); Defendants' intent to conceal that information (given that they knew that Cothren was radioactive); and their motive for doing so. Even Defendants' own description of the case shows the probative value of this evidence: in their view, the case "boils down to whether the Defendants made a material misrepresentation amounting to fraud—i.e. the affiliation of one or more co-conspirators with Phoenix Solutions." (D.E. #280, at 23.)

As the Supreme Court famously stated in *Old Chief*, 519 U.S. 172 (1997):

[T]he accepted rule that the prosecution is entitled to prove its case free from any defendant's option to stipulate the evidence away rests on good sense. A syllogism

11

is not a story, and a naked proposition in a courtroom may be no match for the robust evidence that would be used to prove it.

*Id.*, at 189. Here, too, the bare fact that Tennessee legislators and others wanted nothing to do with Cothren is no match for the power of the *reasons* they wanted to keep him at a distance. In short, the government is entitled to explain why Cothren's affiliation with Phoenix Solutions was "material" to others in the manner supported by the evidence.

Finally, the "spillover" prejudice of which Casada complains is easily distinguishable from *Hazelwood* as well. In that case, one of Hazelwood's co-defendants "silently" stood by during Hazelwood's racist and sexist songs, and another was not even present. *Hazelwood*, 979 F.3d at 413. Here, by contrast, Casada also participated in offensive conversations with Cothren (even if Cothren was the primary instigator). Furthermore, even Casada's mere receipt of the messages from Cothren shows the former Speaker's awareness that his Chief of Staff was engaged in offensive behavior—and, by extension, Casada's knowledge that they would need to hide Cothren's involvement in Phoenix Solutions.

B.    Evidence of the Ethics Bill Is Admissible

Defendants challenge the admissibility of evidence related to an ethics bill that proposed prohibiting State officials from selling their services to the State. (D.E. #280, at 28–30.) They claim that Casada and Smith's opposition to the bill is no more relevant than the "dozens of [other] bills" they may have supported or opposed during the time period of the charged conspiracy. (*See id.* at 29.)

But the proposed ethics bill was not just any random bill. It would have prohibited exactly the kind of political consulting work that Casada and Smith used to facilitate and conceal their participation in the kickback scheme with Cothren. And House leadership proposed the bill right

12

when Casada and Smith were perpetuating the charged scheme. *See United States v. Churn*, 800 F.3d 768, 779 (6th Cir. 2015) ("[B]ackground evidence has a causal, temporal or spatial connection with the charged offense." (citation omitted)). Indeed, the government anticipates introducing evidence that the bill's proponents sought to bar state legislators from selling services to the State to avoid the appearance of conflicts of interest. Casada and Smith's opposition to the bill thus arguably shows that they knew what they were doing was improper. And even if the bill technically permitted Casada and Smith to continue to provide services to the State despite the general prohibition, a juror could justifiably conclude that they—as elected officials—would want to avoid the scrutiny that the apparent violation of a conflict-of-interest rule would attract. The evidence clears the "low bar" of relevance. *See United States v. Wilder*, 87 F.4th 816, 819 (6th Cir. 2023) (citation omitted).

Defendants raise several facts they claim sap the probative value of the ethics bill evidence. (*See* D.E. #280, at 28–29.) Perhaps they are right, but those facts go to the weight of the evidence—not its admissibility. Defendants are welcome to add context to Casada and Smith's opposition to the ethics bill at trial. But they have failed to articulate how evidence of that opposition—contextualized with evidence they can elicit on cross-examination and from their own witnesses—would "suggest decision on an improper basis." *See United States v. Ford*, 761 F.3d 641, 648 (6th Cir. 2014) (citation omitted). So given the evidence's relevance, Defendants have not satisfied Rule 403's "high bar for exclusion." *See United States v. Guzman*, 571 F. App'x 356, 361 (6th Cir. 2014) (unpublished) (citation omitted). The jury can decide how probative it is.

13

C.    <u>Evidence that Cothren Concealed His Involvement in Other Politically Affiliated Endeavors Is Admissible</u>

Evidence that Cothren concealed his identity in other political activities is plainly relevant to show that he knew he needed to conceal his involvement in Phoenix Solutions. And Defendants have not justified the evidence's exclusion.

*United States v. Walters*, 226 F. Supp. 3d 821 (E.D. Ky. 2016), which Defendants cite, is inapposite. In *Walters*, the government sought to introduce evidence of the defendants' kickbacks to private entities to prove fraud on Medicare and Medicaid. *Id.* at 823–824. The district court excluded the kickback evidence, reasoning that it did little, if anything, to show the defendants intended to defraud the government and that it was too inflammatory. *Id.* at 825.

Here, the government offers evidence of Cothren's identity concealment for relevant, non-propensity purposes: to prove that he knew his reputation was negative and, by inference, that he intended to conceal his involvement in Phoenix Solutions. Furthermore, showing that Cothren concealed his involvement in other ventures is unlikely to inflame the jury—they will already hear how he took great pains to conceal his involvement in Phoenix Solutions, so a few other comparable deceits will be no more provocative. Indeed, Defendants themselves contend that "there is nothing 'bad' or 'illegal' about these acts, even if proven." (D.E. #280, at 31.) If there is "nothing bad" about the evidence the government intends to introduce, Defendants cannot credibly claim unfair prejudice.

Relatedly, Defendants mischaracterize the holding in *United States v. Joseph*, 270 F. App'x 399 (6th Cir. 2008). They suggest that "common scheme or plan" evidence under Rule 404(b) must involve "two or more crimes" and point out that "there are no prior convictions or charges concerning Cothren's other business activities." (*See* D.E. #280, at 32–33 (quoting *Joseph*, 270 F.

14

App'x at 404).) While the evidence the government intended to introduce in *Joseph* was evidence of other crimes, the court of appeals did not hold that criminal convictions were necessary to establish "a common scheme or plan" under Rule 404(b). Indeed, that would conflict with the plain text of Rule 404(b), which covers evidence of "any other crime, *wrong*, or *act*." (emphasis added).

      D.    <u>Evidence that Cothren Targeted and Harassed Trial Witnesses Is Admissible</u>

Defendants' attempts to keep out evidence of Cothren's encouragement of attacks against trial witnesses fall short. First, they argue that "Cothren has not been charged with witness tampering, so these direct messages would not assist the government in proving the elements of the charged offenses in this case." (D.E. #280, 35.) But there is no requirement that a defendant be charged with witness tampering before the government can introduce evidence that he harassed a witness—it is spoliation evidence admissible to show consciousness of guilt. *Cf., e.g.*, *United States v. Mendez-Ortiz*, 810 F.2d 76, 79 (6th Cir. 1986) ("Though not listed in Rule 404(b), spoliation evidence, including evidence that defendant attempted to bribe and threatened a witness, is admissible to show consciousness of guilt.").

Defendants also assert that the messages the government quoted in its motion *in limine* are not attacks on Sexton but rather "Cothren encouraging others to speak out about issues of public interest." (D.E. #280, 35.) They insist that the messages "had absolutely nothing to do with Cothren's pending case" and instead related to political news events. (*Id.*) Even though the messages may discuss specific news events separate from the events of this case, a juror could reasonably conclude that Cothren's vociferous support for attacks on Sexton stem from Sexton's role as a witness in this case. In particular, given that Cothren and Sexton once worked alongside each other in State politics, some jurors may question whether Cothren's criticisms of Sexton's

15

political choices are sincere, or, instead, a thinly veiled effort to intimidate a person he anticipates testifying as a witness in Cothren's own criminal trial. Either way, such considerations go to weight—which is the province of the jury—not admissibility.

Finally, Casada argues that admission of this evidence will have a spillover effect on him. As an initial matter, the risk of unfair prejudice from this type of evidence is low: the Sixth Circuit has repeatedly ruled that spoliation evidence is highly probative and not sufficiently inflammatory to warrant exclusion under Rule 403. *United States v. Cordero*, 973 F.3d 603, 620–21 (6th Cir. 2020). As to any spillover prejudice, the Court can alleviate that concern by issuing a limiting instruction to the jury that this evidence should not be considered when assessing Casada's guilt. *See, e.g.*, *United States v. Bell*, No. CR 17-20183, 2022 WL 1060737, at *8 (E.D. Mich. Apr. 8, 2022) ("Generally, a cautionary instruction will be sufficient to cure any unfair prejudice." (cleaned up) (quoting *United States v. Davis*, 838, F.2d 909, 916 (7th Cir. 1988)).

### V. The Court Should Preclude Improper Character Evidence or Argument About Others' Purported Misconduct.

The allegations that Sexton resided outside the district that he represented, falsely certified to his residence in the district, and thereby obtained a *per diem* to which he was not entitled, are conceivably relevant to his character for truthfulness under Rule 608. Defendants may therefore ask Sexton if he lied about his place of residence when he submitted *per diem* payment requests. But a witness's answer to such a question under oath in open court must be the end of the inquiry. If the witness denies that he was untruthful, Defendants cannot introduce extrinsic evidence to the contrary. *See* FED. R. EVID. 608(b).[2]

---

[2]     Defendants also state that they need to explore this issue as it relates to Sexton's supposed bias to stay in the "good graces" of the government. (D.E. #280, at 41.) The government does not

16

Going further than that would invite a minitrial far removed from the facts of this case. To establish that Sexton in fact lied, Defendants would first need to show the jury Sexton's *per diem* payment requests. They would then need to explain to the jury the state statute that governs permissible travel expenses for members of the General Assembly. *See* TENN. CODE ANN. § 3-1-106(b). The relevant provision distinguishes between payments available to members whose "principal residence" is fifty miles from the capitol or less and those whose "principal residence" is farther away. TENN. CODE ANN. § 3-1-106(b)(3). After that, the Court would have to instruct the jury on the facts to consider when evaluating whether Sexton's "principal residence" was within fifty miles of the capitol. "Principal residence" is not defined by the statute, but the parties could submit separate briefing on a proposed definition. A non-exhaustive list could include the following:

1) Possession of inhabitable property;

2) Location of occupation;

3) Place of licensing or registration of personal property;

4) Place of payment of taxes;

5) Purpose of Sexton's presence in a particular place;

---

oppose Defendants asking Sexton whether he is aware of any investigation into his conduct by the Federal Bureau of Investigation or the Department of Justice. If Defendants have extrinsic evidence to contradict his response, they may introduce that evidence to show bias. *See United States v. Phillips*, 888 F.2d 38, 41 (6th Cir. 1989).

But Defendants seem to expect that Sexton will deny any such knowledge, and they appear eager to argue instead that the government did not investigate Sexton when it should have. (*See* D.E. #280, at 38, n.7.) Consistent with typical Department practice, the government will neither confirm nor deny the existence of any investigation. Regardless, however, the government's investigation decisions are not proper impeachment for Sexton, nor proper argument to the jury. The Court should prohibit the argument that Defendants allude to.

17

6) Place of Sexton's licensing for activities such as driving;

7) Where Sexton's spouse and family had their habitation;

8) Whether Sexton left his Crossville residence for Nashville with the definite intent of returning; and

9) Whether Sexton's presence in Nashville was due to his employment by the State.

*See* TENN. CODE ANN. § 2-2122. The parties could, of course, offer other definitions of "principal residence" based on various canons of statutory construction and the common law. Once the Court defined "principal residence" for the jury with the benefit of dueling briefs, the parties could then question Sexton as to facts that would support or detract from each of the factors in the Court's definition.

It is possible that this multistep procedure would enable the jury to evaluate whether Sexton lied on his *per diem* payment requests. But the whole enterprise would confuse the issues, mislead the jury, unduly delay the trial, and waste time. *See* FED. R. EVID. 403. The Court should not let Defendants start down a path that would inevitably meander far from the issues in this case. Defendants are on trial, not Sexton.

Relatedly, Defendants indicate that they wish to raise the expulsion from the House of three Democratic state representatives to show the allegedly "extreme" lengths Sexton will go to punish political enemies. (*See* D.E. #280, at 41.) This line of cross-examination—which would not go to Sexton's character for truthfulness—would be even more time-consuming than the questions about his "principal residence." More than a minitrial, the expulsion of Democratic state representatives is in active litigation. *See Jones v. Tennessee, et al.*, 3:23-cv-1033 (M.D. Tenn.). Replicating that case within this trial would create a Russian nesting doll of confusion and delay. And the

18

propensity basis that Defendants articulate for this evidence's relevance puts it squarely within Rule 404(a)(1)'s prohibition.

Finally, Defendants allege that Sexton's "ostensible willingness to trade his office's support or legislative action for sexual favors certainly calls his credibility and motives into question." (D.E. #280, at 41.) As the government stated in its initial motion, it has no evidence to substantiate the allegations of infidelity. Likewise, the government has no evidence of Sexton engaging in *quid pro quo* sexual bribery of the type Defendants now baldly assert. For the reasons set forth in the many cases cited in the government's initial motion—none of which Defendants addressed—infidelity allegations are not proper impeachment material. If the Court disagrees, then the exceptionally inflammatory question of whether Sexton received bribes in the form of "sexual favors" warrants the Court first confirming Defendants' good-faith basis for asking it during a jury-out hearing. *See United States v. Zidell*, 323 F.3d 412, 426 (6th Cir. 2003) ("[C]ourts have required that there be a 'good faith basis' for cross-examination under Rule 608(b) . . . .").

## VI. This Court Should Preclude Evidence or Argument Concerning Cothren's Cooperation in Other Federal Investigations

Evidence of Cothren's cooperation with federal law enforcement agencies is not relevant to this trial, and nothing in Defendants' response demonstrates otherwise. As an initial matter, Defendants are mistaken that this case came about when the FBI "expanded" a prior investigation into the House's 2019 Education Savings Account vote. (*See* D.E. #280, at 42.) Similarly, the government does not concede that the FBI Special Agent named in the defense filing made the statements that Defendants attribute to him. (*See id.*)

Setting aside those factual corrections, Defendants' response cites no legal authority. It does not even identify which facts of consequence in this case would be made more or less

19

probable by evidence of Cothren's cooperation. *See* FED. R. EVID. 401. That is unsurprising, given

that Cothren's purported cooperation with the government occurred *after* the crimes alleged in the

indictment. And insofar as Defendants contend that an FBI agent's statements about Cothren's

cooperation are admissible to impeach the agent, their response does not identify any alleged false

statement, any evidence of bias, nor any other proper ground for impeachment. Finally, whatever

marginal relevance the cooperation evidence may have is overwhelmed by the likelihood that it

would lead the jury to acquit on an improper basis (for example, that regardless of whether Cothren

committed the charged crimes, he deserves to be let off the hook due to his purported cooperation).

### VII.   This Court Should Preclude Improper Use of Law Enforcement Agent Reports to Impeach Witnesses

Defendants contend that Jencks Act–related caselaw is inapplicable to the definition of a

"statement" under Rule 613. (D.E. #280, at 43–44.) They are wrong:

> Under the Jencks Act, non-verbatim summaries of a witness' prior oral statements
> are excluded from mandatory production because it would be "grossly unfair to
> allow the defense to use statements to impeach a witness which could not fairly be
> said to be the witness' own rather than the product of the investigator's selections,
> interpretations, and interpolations." *Palermo v. United States*, 360 U.S. 343, 350,
> 79 S.Ct. 1217, 1223–24, 3 L.Ed.2d 1287 (1959). For the same reasons, we conclude
> that a witness may not be impeached with a third party's characterization or
> interpretation of a prior oral statement unless the witness has subscribed to or
> otherwise adopted the statement as his own.

*United States v. Saget*, 991 F.2d 702, 710 (11th Cir. 1993) (footnote omitted); *see also United*

*States v. Crinel*, No. 15-CR-61, 2016 WL 6441249, at *4 (E.D. La. Nov. 1, 2016) ("[C]ase law

regarding the Jencks Act provides insight into whether or not information in an agent's report can

in fact be considered a witness' statement [for purposes of Rule 613]."). That makes sense, given

Congress's determination when drafting the Jencks Act "that only those statements which could

properly be called the witness' own words should be made available to the defense for purposes

20

of impeachment." *See Palermo*, 360 U.S. at 352.

Should Defendants contend that an agent's report is a "verbatim transcript of the witness's own words" and therefore admissible, they bear the burden to establish that fact. *United States v. Almonte*, 956 F.2d 27, 29 (2d Cir. 1992) ("The burden of proving that notes reflect the witness's own words rather than the note-taker's characterization falls on the party seeking to introduce the notes."). And if Defendants press this argument, the Court should make its determination in a jury-out hearing. Otherwise, the jury will be exposed to the evidence the government seeks to exclude, whatever the outcome of the Court's ruling. *See* FED. R. EVID. 105(c)(3).

Finally, Defendants have subpoenaed multiple FBI agents to testify regarding other witnesses' statements as memorialized in the agents' reports. Should Defendants need extrinsic evidence of a witness's prior inconsistent statement under Rule 613(b), they can call the agent whom they have subpoenaed.[3]

## CONCLUSION

For the reasons stated above, the Court should grant the government's motions *in limine*.

Respectfully submitted,

ROBERT E. McGUIRE
Acting United States Attorney for the
Middle District of Tennessee

*/s/ Taylor Phillips*

---

[3] Defendants also argue, without citation, that "[i]f the government can rely on a[n] FD-302 report to charge a witness with making a false statement pursuant to 18 U.S.C. § 1001, then the defense can surely rely on such a report to impeach a witness." (D.E. #280, at 45.) They cite no law for this sauce-for-the-goose/sauce-for-the-gander argument, nor is the government aware of any. And of course, there is not even a proverbial goose here: in a Section 1001 prosecution, an agent's report is *not* substantive proof of the defendant's false statement.

21

TAYLOR PHILLIPS
Assistant United States Attorney
719 Church Street, Ste 3300
Nashville, Tennessee 37203
Telephone: 615-736-5151

*/s/ Blake J. Ellison*
JOHN P. TADDEI
BLAKE J. ELLISON
Trial Attorneys
Public Integrity Section, Criminal Division
1301 New York Ave. NW, Tenth Floor
Washington, DC 20530
Telephone: 202-514-1412