```
 1                IN THE UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF TENNESSEE
 2                        NASHVILLE DIVISION

 3
     UNITED STATES OF AMERICA           )
 4                                      )
                                        )
 5        v.                            ) Case No. 3:22-cr-00282
                                        ) JUDGE RICHARDSON
 6                                      )
     GLEN CASADA                        )
 7   CADE COTHREN                       )
                                        )
 8   -----------------------------------------------------------
 9

10

11

12

13      BEFORE THE HONORABLE ELI J. RICHARDSON, DISTRICT JUDGE

14
                          TRANSCRIPT OF PROCEEDINGS
15

16                          April 24, 2025

17
                          Trial Volume 3 of 19
18

19

20

21

22   -----------------------------------------------------------

23   DEBORAH K. WATSON, RPR, CRR
     Official Court Reporter
24   713 Church Street, Suite 2300
     Nashville, TN 37203
25   DebbieWatsonFOCR@gmail.com
```

APPEARANCES:

For the Government:

TAYLOR J. PHILLIPS
U.S. Attorney's Office
719 Church Street
  Suite 3300
Nashville, TN 37203
(615) 736-5151
Email: taylor.phillips@usdoj.gov

BLAKE J. ELLISON
Public Integrity Section
Criminal Division
U.S. Department of Justice
1301 New York Ave. NW
  10th Floor
Washington, D.C. 20530
(202) 262-7011
Email: blake.ellison@usdoj.gov

JOHN P. TADDEI
U.S. Department of Justice
Public Integrity Section
1301 New York Ave. NW
  10th Floor
Washington, DC 20530
(202) 514-1412
Email: john.taddei@usdoj.gov

```
 1    APPEARANCES   (Continued):

 2

 3
      For the Defendant, Glen Casada:
 4
                   EDWARD M. YARBROUGH
 5                 Spencer Fane LLP
                   511 Union Street
 6                    Suite 1000
                   Nashville, TN 37219
 7                 Email: eyarbrough@spencerfane.com

 8                 CHASE FANN
                   Spencer Fane LLP
 9                 511 Union Street
                     Suite 1000
10                 Nashville, TN 37219
                   (615) 238-6395
11                 Email: cfann@spencerfane.com

12                 JONATHAN P. FARMER
                   Spencer Fane LLP
13                 511 Union Street
                     Suite 1000
14                 Nashville, TN 37219
                   (615) 238-6309
15                 Email: jfarmer@spencerfane.com

16

17    For the Defendant, Cade Cothren:

18                 CYNTHIA A. SHERWOOD
                   Sherwood Boutique Litigation, PLC
19                 414 Union Street
                     Suite 1110
20                 Nashville, TN 37219
                   (615) 873-5670
21                 Email: cynthia@sherwoodlitigation.com

22                 JOY BOYD LONGNECKER
                   Barnes & Thornburg LLP
23                 1600 West End Avenue
                     Suite 800
24                 Nashville, TN 37203-3447
                   (615) 925-9506
25                 Email: joy.longnecker@btlaw.com
```

**I N D E X**

PRELIMINARY MATTERS .......................................7

JURY WAS IMPANELED AND SWORN ............................21

PRELIMINARY INSTRUCTIONS TO THE JURY ...................22

OPENING STATEMENTS:
    By Mr. Phillips ....................................32
    By Mr. Yarbrough ...................................42
    By Ms. Longnecker ..................................54


**GOVERNMENT'S CASE IN CHIEF**


PATSY HAZLEWOOD
    Direct Examination By Mr. Phillips .................85
    Cross-Examination By Ms. Sherwood .................102
    Cross-Examination By Mr. Farmer ...................139
    Redirect Examination By Mr. Phillips ..............140
    Recross-Examination By Ms. Sherwood ...............141

ESTHER HELTON-HAYNES
    Direct Examination By Mr. Taddei ..................146
    Cross-Examination By Ms. Sherwood .................180
    Cross-Examination By Mr. Farmer ...................203
    Redirect Examination By Mr. Taddei ................204
    Recross-Examination By Ms. Sherwood ...............209
    Recross-Examination By Mr. Farmer .................212

JAY REEDY
    Direct Examination By Mr. Taddei ..................213
    Cross-Examination By Mr. Farmer ...................228
    Cross-Examination By Ms. Longnecker ...............242


**GOVERNMENT'S EXHIBITS**

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 105 | Image of e-mail communication from Robin Smith to Esther Helton, October 12, 2020, Fwd: Esther Helton Invoice - Invoice (B-93871) (2 pages) | 176 |

GOVERNMENT'S EXHIBITS (CONTINUED)

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 106 | Image of e-mail communication from Esther Helton to Robin Smith, October 19, 2020, Re: Phoenix Solutions sent you an invoice (B-93876)-Esther Helton-Law & Order (2 pages) | 179 |
| 109 | Image of e-mail communication from Esther Helton to Robin Smith, November 27, 2019, Subject: Re: Survey or legislative update for you  (1 page) | 155 |
| 110 | Image of e-mail communication from Robin Smith to Esther Helton, January 11, 2020, Subject: Your Legislative update, with attachments (3 pages) | 157 |
| 117 | Color image of text communications, Cellebrite, Extraction Report, Apple iPhone between "thesmithgroup@yahoo.com" "Esther Helton" and Rep. Robin Smith* (owner) (2 pages) | 187 |
| 268 | Image of invoice from Phoenix Solutions to Rep. Jay Reedy, Invoice Number -0000002, Subtotal 4,263.00 (1 page) | 224 |
| 354 | Images of First Horizon banking documents for Phoenix Solutions LLC (4 pages) | 99 |
| 428 | Image of Application for Certificate of Authority Limited Liability Company, Phoenix Solutions, LLC (5 pages) | 98 |

DEFENSE EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 42 | Color mailer for Esther Helton, State Representative (two-sided) (1 document) | 211 |

```
 1              DEFENSE EXHIBITS (CONTINUED)

 2   NUMBER              DESCRIPTION                PAGE

 3   52       Color image of mailer for Jay Reed, State   233
              Representative, 2020 Survey (2 pages)
 4
     53       Image of invoice from Phoenix Solutions     263
 5            to Rep. Jay Reedy, Invoice Number
              0000002, Amount due $4,481.48 (1 page)
 6
     84       Color mailer for Patsy Hazlewood, State     138
 7            Representative (two-sided) (1 document)

 8   86       Image of Invoice from Phoenix Solutions,    131
              Billed to: Patsy Hazlewood, Invoice
 9            Number 0000013, Subtotal 3,257.40 (1
              page)
10
     111      Image of check from Jay D. Reedy, to Glen   231
11            Casada, October 8, 2019, $550.00 (1 page)

12   115      Color image of e-mail communication         191
              between Robin Smith and Esther Helton,
13            with attachments, January 11, 2020,
              Subject: Your legislative update (4
14            pages)

15   116      Color image of text communications          196
              between "thesmithgroup@yahoo.com" "Esther
16            Helton" "Rep. Robin Smith* (Owner)" (10
              pages)
17
     119      Color images of three text                  111
18            communications, Cellebrite, Extraction
              Report, Apple iPhone, between
19            "thesmithgroup@yahoo.com", "Patsy
              Hazlewood" and "Rep. Robin Smith*
20            (owner)" (2 pages)

21   122      Color image of two text communications      124
              (green box and blue box), between "Rep.
22            Robin Smith (owner)* and "Patsy
              Hazlewood" (1 page)
23

24

25
```

                              *    *    *

          The above-styled cause came on to be heard at
9:09 a.m. on April 24, 2025, before the Honorable Eli J.
Richardson, District Judge, when the following proceedings
were had, to-wit:


          THE COURT:  All right.  We are here for Day 3 of
trial in *United States v. Casada and Cothren*.  And, of
course, we'll be doing opening statements in just a bit
here.  The Court wants to ask the parties if they have any
preliminary matters.  I do have one.
          Mr. Phillips?
          MR. PHILLIPS:  No, Your Honor.  Thank you.
          THE COURT:  Mr. Yarbrough?
          MR. YARBROUGH:  No, Your Honor.
          THE COURT:  And Ms. Sherwood?
          MS. SHERWOOD:  Preliminary matters, Your Honor?
          THE COURT:  Yeah.
          MS. SHERWOOD:  Yes, Your Honor.  Just -- may I
raise a media issue?  And I know there are -- not a lot
that -- nothing can be done with the media, but yesterday
Phil Williams is breathlessly reporting about -- that the
prosecution is potentially prepared to introduce evidence of
this years-old Justin Jones controversy.
          And that is not going to be evidence in this

1   case.  And I was wondering if we could get -- and I know

2   your instructions are more than clear, and they were

3   exhaustive with the jury yesterday.  But something like the

4   media has no idea -- because we're worried about their

5   family reading it.

6          If they follow your instruction, their family

7   coming up and saying something.  An instruction such as "the

8   media has no idea what is being put into evidence in this

9   case, and that information has no basis in fact," because

10  that's just factually incorrect what Phil Williams wrote.

11         **THE COURT:**  Well, I think -- one of the things

12  that I typically tell them is that things you hear in the

13  media and the -- here's what I say -- and I'm going to

14  instruct them on this this morning:

15         "Just like tweets and internet posts, things on

16  the internet and in the media are often inaccurate or

17  incomplete.  And it is certainly not given under oath with

18  all parties present," and I go on from there.

19         I think making the general point is the way to go

20  rather than maybe being more specific.  But the point will

21  be made.  And I'm sure that they understand that anyway.

22  Things are inaccurate or incomplete.

23         But having said that, Mr. Phillips, what's your

24  take on saying anything more than what the Court ordinarily

25  says?

1        Because I understand the concern, but, you know,

2   sometimes you -- and I'm not saying this is the case.  It

3   could be, though.  You make a potential risk worse by

4   throwing too much attention to it.

5        What do you think, Mr. Phillips?

6        **MR. PHILLIPS:**  Your Honor, the government defers

7   to the Court on the admonishments to the jury.

8        I guess to address the other half of what I

9   understood Ms. Sherwood's concern to be would be the jurors

10  speaking with somebody at home about media that that person

11  had seen.  I understand that's also part of the Court's

12  typical instructions that they should not be doing that --

13  discussing the case at all with --

14       **THE COURT:**  Yeah, that piece is definitely

15  already covered, like, that risk.  I don't know what more I

16  could do, particularly after what I read here.

17       You know, I could say -- I could modify it this

18  way.  All right?  The typical language to say, "Just like

19  tweets and internet posts, things on the internet and in the

20  media are often inaccurate and incomplete, and that could be

21  the case" -- well, how about this -- if you want something

22  like this:

23       "And that could be true with respect to anything

24  said online or in the media about this particular case."

25  You know, and if they can't -- you know, I think they -- if

1    they don't, I think, get the message from that, I think

2    they'd be disinclined to get the message any -- with more

3    specific language.

4              **MS. SHERWOOD:**  Thank you, Your Honor.

5              **THE COURT:**  All right.  I think that that should

6    cover the concern, so I will add that language.  Okay.

7              Now, as these things happen, we have a juror

8    issue, another one.  This one is regarding Juror No. 2.

9              And if counsel are able to consult their notes as

10   to who that is.  Don't want to gratuitously mention the name

11   if I don't have to.

12             Well, Juror No. 2 has raised with the jury

13   administrator the fact that it did not occur to her and she

14   did not disclose that she would lose four weeks of income if

15   she were to serve as a juror and is requesting not to serve

16   and has provided information from whomever it is she works

17   for with respect to her employment, which is nursing, to

18   substantiate that.

19             Now, I believe that the Court and counsel did

20   everything they could to ferret out exactly that, and the

21   notion of losing income as being a potential reason for

22   being excused from service was made abundantly clear.  And

23   yet the statement is that it did not occur to this

24   particular juror until afterwards.

25             So that's where we are.

1          So I wanted counsel to take a minute and think

2    about this.  You'll note I also handed out that chart, and

3    this just is for informational purposes only, for what it's

4    worth, from Tennessee Department of Health showing the sort

5    of percentages, based on the information they have from the

6    sources they have from providers, about sort of where we are

7    on sickness and, you know, illnesses -- RSV, flu, COVID-19.

8          I point that out just on the issue of, well, gee,

9    you know, if we're down to two alternate jurors, you know,

10   what are our risks of losing them all?  I would say

11   statistically -- even though we've already lost one juror

12   due to illness, statistically, we're definitely -- and this

13   is my assumption, but I wanted to check the figures.

14         You know, the conventional wisdom from statistics

15   like this is we're at a time of the year where this risk

16   should be low, and it should be statistically low, of losing

17   people even though there are some illnesses out there.

18   That's why I provided that information.

19         Something else to note, just thinking about sort

20   of where we are, if there are 12 jurors and no alternates

21   when the jury commences deliberations, the Court, in its

22   discretion, can allow, if someone needs to be excused for

23   illness or otherwise, in the deliberations room, the Court

24   has the discretion to have a jury of 11 return a verdict.

25   We want to avoid that, but the Court has the discretion.

1          We also have the discretion to put something on

2     pause if there's an emergency and, you know, take a day off

3     to accommodate some emergency if it arises.  So we have some

4     options.  But I point that out to note that if we did excuse

5     this juror, we'd be down to two folks, and it's not ideal to

6     lose two alternate jurors before you've even done opening

7     statements, and I realize that.

8          What do you think, Mr. Phillips?

9          **MR. PHILLIPS:**  Your Honor, the government will

10    ultimately defer to the Court on whether to excuse

11    Juror No. 2.

12         The only other comment I would have is that the

13    government is optimistic that, notwithstanding the Court

14    appropriately previewed a potential four-week trial for the

15    venire, that we will not be going a full four weeks, and

16    that gives the government a little bit of hope that even if

17    we went down to two alternates, we'd be okay.

18         **THE COURT:**  I appreciate that.  And the four

19    weeks, I did build in time for the deliberations themselves,

20    which is good.  We are talking -- we're not talking four

21    weeks to get to the deliberation room.

22         Particularly at this time of year, two should be

23    fine.  It really should.  And so I agree with you in that

24    regard.  But, of course, it's always disappointing to lose,

25    you know, the alternate jurors.

1        I do think -- you know, I think we did the right

2   thing doing four.  It's easy for us to give ourselves all

3   sorts of extra -- you know, extra cushion on alternate

4   jurors for our purposes, but it comes at a real cost to the

5   alternate juror who -- or jurors who may end up not being

6   used.

7        What do you think, Mr. Yarbrough?

8        **MR. YARBROUGH:**  If Your Honor please, my

9   thought -- certainly we defer to the Court also.  But my

10  thought is if it was not significant enough to bring up in

11  two days, that maybe it's more remorse than it is a

12  hardship.

13       **THE COURT:**  You know, and I think that's a fair

14  thought to have when you're scratching your head about what

15  happened here.  I will -- if -- you know, if counsel want to

16  see it, I can show you the information that was from,

17  really, the -- from apparently the person -- and, again, I

18  think it's -- can't be employment status, from what I can

19  tell.  It must be some kind of contract basis employment

20  suggesting, you know, that there is going to be this loss in

21  income.

22       Why that didn't get raised on the front end, I

23  don't know.  But I'm happy to show it to counsel if they

24  want to see what I have in this regard.  You want to see it?

25       **MS. LONGNECKER:**  We wouldn't mind seeing it, but

1  I just have a question from a logistical standpoint.  It

2  sounds like the Court is speaking in terms of the juror that

3  was ill yesterday, that juror has been excused?

4          **THE COURT:**  Oh, sorry.  Yeah, I had a discussion

5  about illness in connection with, you know, can we expect to

6  lose a whole bunch of people -- additional jurors for

7  illness.  And that was the purpose of that discussion.

8          So right now, we're talking about a different

9  juror, Juror No. 2.  The other one, I think, was

10 Juror No. 5.

11         **MS. LONGNECKER:**  Is she here and ready to serve,

12 Your Honor?  Has she recovered?

13         **THE COURT:**  You're talking about No. 5, yeah.

14 And I should say -- let me say about No. 5.  No. 5 is faring

15 worse and is going to be unable to serve, yeah.  And I

16 probably should have confirmed that, but yeah.  So that

17 means we're down to three.  This loss here would get us down

18 to two.

19         Do folks want to see this information?  I don't

20 want it sort of floating around out there, but we can hand

21 it around if you want to see it.

22         You know, there is -- from this information,

23 there's a basis for saying, you know, what -- you do lose

24 your pay.  But if counsel want to see it, I think they're

25 entitled to.  I don't want to hand it out gratuitously,

1  though.

2         MR. YARBROUGH:  We don't need to see it.

3         MS. SHERWOOD:  We don't need to see it.

4         THE COURT:  All right.

5         MS. SHERWOOD:  But, Your Honor, my concern is --

6  and I guess we don't want a juror that doesn't want to

7  serve.  But --

8         THE COURT:  That's an issue, right.

9         MS. SHERWOOD:  But from Mr. Cothren's

10 perspective, we also don't want a jury of 11.

11        THE COURT:  Right.  Yeah.

12        MS. SHERWOOD:  So I would prefer the latter

13 option if we get to there.

14        THE COURT:  Yeah.  And I do think -- you know,

15 one of the -- when that does happen, you know, it's not a

16 rubber-stamp thing to say, oh, we'll return a jury of --

17 with 11 folks.  There's definitely an analysis that goes on

18 as to whether that's appropriate to -- for the Court to

19 exercise its discretion.

20        And none of us like to even think about these

21 possibilities, losing additional alternate jurors and so

22 forth.  But I just did point that out as an issue.

23        But it's definitely, in that hypothetical

24 scenario, you're right that, you know, you would be able to

25 be heard on whether this is appropriate.

1          So all right.  I think the thing to do -- and you

2    know, Ms. Sherwood put her finger on it.  I'm confident that

3    other counsel are thinking the same thing.

4          You know, part of it is we don't want undue

5    hardship on jurors.  I'm satisfied, based on what I've seen,

6    that that's the case here.  It's disappointing that we

7    didn't have an opportunity to sort of flesh this out and

8    account for it on the front end.

9          On the back end, because, you know, raised

10   belatedly or not, this is a hardship.  And because, you

11   know, it's -- it's not fair to the parties to have a juror

12   that's distracted and perhaps displeased about jury service,

13   I think it's appropriate to excuse her.

14          And so what I'm thinking of doing is the

15   following -- and I think we -- if the parties want this sort

16   of procedure to go on in open court, we can actually, you

17   know, do it in open court.

18          But what we could also do is instruct the jury

19   administrator to do the following downstairs so that the

20   alternates are just sort of plugged in for the departing

21   jurors downstairs and put in the right order.

22          And what I'm envisioning is Alternate No. 1,

23   Mr. Fitzcharles, going in place of Juror No. 5, the one who

24   was ill.  And then -- one moment.

25          And then having Alternate No. 2, Ms. Watson, go

1    in for Juror No. 2.  And just have them come in that way.

2    We'll be down to 14.  We can fit 14 in the box.  The two

3    that are alternates won't know they're alternates, which is

4    appropriate, because they may end up being actually serving,

5    of course.

6              And so does that work for you, Mr. Phillips?

7         **MR. PHILLIPS:**  Yes, Your Honor.

8         **THE COURT:**  Work for you, Mr. Yarbrough?

9         **MR. YARBROUGH:**  Yes, Your Honor.

10        **THE COURT:**  And you, Ms. Sherwood?

11        **MS. SHERWOOD:**  Yes, Your Honor.

12        **THE COURT:**  Okay.  Thank you.

13             So we'll send a message downstairs to have the 14

14   folks come up.  Alternate jurors who we've identified as

15   Nos. 3 and 4 will have Seats 13 and 14.  Okay.  So we'll

16   have them brought in here momentarily.

17             (Respite.)

18        **THE COURT:**  While we're waiting, let me ask

19   counsel, in terms of the discussion we were talking about --

20   there was some discussion yesterday about narrowing down

21   some issues or reaching an accommodation on various matters.

22             Anything to report on that?

23        **MR. PHILLIPS:**  Your Honor, I believe the two

24   things the Court may be referring to are the manner in which

25   the government will bring up the 2019 scandal as well as

1    certain exhibit issues that may be used with Mr. Sexton.

2              I think the parties have had some useful

3    discussions on that, but I don't know if the defense is

4    ready to have reached an agreement on any of that yet.

5              **THE COURT:**  Okay.  And probably, yeah, the -- one

6    moment.

7              Probably the -- thank you.

8              Probably the first thing to bring up is the

9    more -- what I understand is the more time-sensitive one

10   about documentation concerning Mr. Sexton.

11             Do you think, Ms. Sherwood, that there is sort of

12   an agreement that's been reached about, you know, what can

13   be shown to the jury versus what should be not presented to

14   them or presented to them or redacted from a page that is

15   presented to them?

16             **MS. SHERWOOD:**  We have not reached an agreement,

17   but I'm prepared to discuss that in more detail with -- with

18   Mr. Phillips and the prosecution team.  I think we will

19   reach one.

20             I'm thinking -- I don't know -- they may not

21   reach Speaker Sexton today, so we are working on -- I'm

22   having -- you know, my office is working on the records.  So

23   we're getting close to having them done, but . . .

24             **THE COURT:**  Okay.  Well, we'll kind of see how

25   that looks.  I mean, if we need to take something up

1  tomorrow morning, I guess we can do that if we come in here

2  early and -- or at least make ourselves all available to

3  come in early and discuss that as needed, hopefully an

4  accommodation can be reached.

5       Okay. You know, the questioning regarding, you

6  know, the sort of the -- how to bring up the issue of the

7  scandal. When do you think that would need to be sort of

8  resolved, Mr. Phillips?

9       **MR. PHILLIPS:** To provide a little bit of context

10  first, Mr. Farmer provided a sort of counterproposal

11  yesterday around lunchtime. The government responded to

12  that via e-mail yesterday evening. It's my understanding

13  from some brief discussions this morning that the defense is

14  still mulling over the government's counterproposal.

15       So to directly answer the Court's question about

16  when that comes up, that would be with the government's

17  first witness today.

18       **THE COURT:** Okay. So it may -- are we in a

19  situation where there may be -- you know, may be objections?

20  If there's no agreement, there could be objections to

21  whatever the --

22       **MS. SHERWOOD:** Yes.

23       **THE COURT:** -- government is doing.

24       **MS. SHERWOOD:** Yes, Your Honor, very much so. We

25  have agreed to talk on the break, the morning break.

1          THE COURT:  Okay.  All right.  We'll -- you know,

2  we will have that break after openings.  And, you know,

3  maybe you can resolve that.  To the extent it's not

4  resolved, maybe we can resolve it, any dispute that remains

5  prior to the jury coming back in for the first witness.

6          Okay.  Let's call in the jurors.  Thank you.

7          (WHEREUPON, the jury reentered the courtroom at

8  9:31 a.m., with matters being heard in open court as

9  follows:)

10          THE COURT:  All right.  Thanks to everyone for

11  being back here today and for continuing to serve as we

12  begin the trial portion of the trial.

13          And hope everyone had a good night and survived

14  yet another one of these monsoons that's been afflicting

15  Middle Tennessee this spring.

16          Thanks for being here again.

17          What we're going to do in a moment here is start

18  by giving you a different oath than the one you previously

19  took.  And this is one that addresses your duties as actual

20  sitting jurors.  And then, after that, I'm going to give you

21  some preliminary instructions.

22          The preliminary instructions, I'm going to read

23  essentially off the page because these are tried-and-true

24  instructions at the beginning of a trial for jurors in a

25  criminal case.

1        One of the things you'll note is I'm going to
2   touch on something that we've gone over a few times.  And
3   it's the part about no communications, investigations, and
4   research.  This one is a little more detailed.

5        You know, I think what I've said so far, you
6   know, tends to be adequate, but this one is a little more
7   detailed.  So, you know, after I give that detailed version,
8   that's a particular instruction that I give from time to
9   time during the trial as a reminder.

10       And you'll note that although I give instructions
11  at the end of the trial to tell you about the law and some
12  principles regarding deliberations in the jury room, during
13  the course of the trial, the judge occasionally has to give,
14  from time to time, instructions about matters that happen to
15  come up from time to time.

16       All right.  So at this time, if you would please
17  stand and raise your right hand, please, and repeat after
18  Ms. Jackson.

19       (WHEREUPON, the jury was impaneled and sworn,
20  after which proceedings were had, as follows:)

21       **THE COURT:**  All right.  Thanks, folks.  You may
22  be seated.

23       And now that you have been sworn, I will give you
24  some preliminary instructions to guide you in the
25  performance of your duties here at trial.

It will be your duty to find from the evidence what the facts are. You and you alone are the judges of the facts.

You will then have to apply to those facts the law that I will give to you. You must follow that law whether you agree with it or not.

Nothing I may say or do during the course of the trial is intended to indicate, nor should be taken by you as indicating, what your verdict should be. In fact, you shouldn't give any thought to what I think the verdict should be. The verdict is to be your verdict.

The next thing I want to talk about is the evidence. The evidence from which you will find the facts will consist of the testimony of witnesses, documents and other things received into the record as exhibits, and any facts the lawyers agree to or stipulate to that I may instruct you to find.

Certain things are not evidence and must not be considered by you. Among these things are statements, arguments, and questions by lawyers. That's number one.

2. Objections to questions. Lawyers have an obligation to their clients to make objections when they believe evidence is being offered that is improper under the rules of evidence.

You should not be influenced by the objection or

1  by my ruling on it.  If an objection is sustained, ignore

2  the question.  If it is overruled, treat the answer like any

3  other answer.

4          If you are -- that some item of evidence is

5  received for a limited purpose only, you must follow that

6  instruction and therefore consider that evidence for the

7  specified limited purpose only.

8          3.  Testimony that I have excluded or told you to

9  disregard.  Again, this is not evidence.

10          4.  Anything you may have seen or heard outside

11  the courtroom.  This is not evidence and must be

12  disregarded.

13          You are to decide the case solely on the evidence

14  presented here in the courtroom.

15          There are two kinds of evidence:  Direct and

16  circumstantial.

17          Direct evidence is direct proof of a fact, such

18  as testimony of an eyewitness about that fact.

19          Circumstantial evidence is proof of the facts

20  from which you may infer or conclude that other facts exist.

21          I will give you further instructions on these as

22  well as other matters at the close of the case, but keep in

23  mind that you may consider both kinds of evidence.

24          It will be up to you to decide which witnesses to

25  believe, which witnesses not to believe, and how much of any

1 particular witness's testimony to accept or reject. I will

2 give you some guidelines for determining the credibility of

3 witnesses at the end of the case.

4 As you know, this is a criminal case. There are

5 three basic rules about a criminal case that you must keep

6 in mind.

7 First, the defendant is presumed innocent until

8 proven guilty. The indictment against the defendant brought

9 by the government is only an accusation, nothing more. It

10 is not proof of guilt or anything else. The defendant

11 therefore starts out with a clean slate.

12 And in this case there are two defendants. Each

13 defendant starts out with a clean slate.

14 Second, the burden of proof is on the government.

15 The defendants have no burden to prove their innocence or to

16 present any evidence or to testify.

17 Since the defendants have the right to remain

18 silent, the law prohibits you in arriving at your verdict

19 from considering that the defendants may not have testified.

20 Third, the government must prove the defendants'

21 guilt beyond a reasonable doubt. I will give you further

22 instructions on this point later, but please bear in mind

23 that, in this respect, a criminal case is different from a

24 civil case.

25 I now have a few words about your conduct as

jurors. These instructions are necessary for a fair trial and are very important.

First, during the trial, you are to avoid contact with any witness, the parties, any lawyer, or anyone else who may have an interest in the outcome of this case. Do not talk to or have any other communication with them.

Because you may not know whether a particular person in the courthouse falls into one of these categories, during breaks you should not speak to anyone in the courthouse you do not know.

If anyone tries to talk to you about the case, bring it to the Court's attention promptly.

The lawyers know that they should not be talking to you. So if during breaks they basically act like you aren't even there at all, this is why. It is not because they are rude people or because they disrespect you.

Second, during the trial, you are not to discuss the case with anyone or permit anyone else to talk about it with you. This prohibition includes your family, friends, and coworkers.

It also includes any form of communication whatsoever, whether it is over the internet such as e-mail, instant messaging, tweeting, Facebook, or other social media posts, websites, and blogs, the use of cell phones for text messaging or video and audio recording or the use of any

1  recording or transmitting device.

2  People who aren't in the courtroom and haven't

3  heard the evidence and seen the evidence may nevertheless

4  express opinions about the case.  And your verdict is not to

5  be based on what others have said about the case; it is to

6  be based only on what the evidence is.

7  So don't post or e-mail or tweet or text anything

8  about the case and don't read anything else that anyone else

9  might post, e-mail, tweet, or text, or write about the case.

10  And, of course, don't talk about the case and don't listen

11  to anyone else talk about the case.

12  The prohibition includes even your fellow jurors.

13  You should refrain from case-related discussions with one

14  another until all the evidence is received, final

15  instructions are given by me, and you retire to the jury

16  room to deliberate on your verdict.

17  One of the main reasons for this is that

18  discussing the case can lead to forming an opinion.  And

19  that is not a good idea before you have heard all the

20  evidence.

21  Even after deliberations begin, you may talk

22  about the case among your fellow jurors only when all are

23  present.

24  Until deliberations begin, by all means, you may

25  speak to one another and get to know one another on your

1    breaks as you wish.  You can talk about anything you like

2    but nothing related to the case, nothing about the lawyers,

3    or me or the defendant or the evidence or the allegations,

4    nothing like that.

5              Third, during the trial, you are not to gather

6    information or investigate or do anything else to learn

7    about the case outside the properly admitted evidence.

8              For example, do not attempt to investigate the

9    case on the internet or travel to a particular location that

10   may be of interest in the trial.

11             You should also avoid exposure to media coverage

12   of the charges or trial until after you render your verdict.

13   So don't read or listen to any news or internet reports

14   about the case.

15             Just like tweets and internet posts, things on

16   the internet and in the media are often inaccurate or

17   incomplete, and that could be true with respect to anything

18   online and in the media regarding this case in particular.

19             And information on the internet and in the media

20   certainly is not given under oath with all parties present,

21   nor is it subject to cross-examination and close scrutiny

22   like the evidence you will hear and see in this courtroom.

23             During the trial, you will receive all the

24   evidence that may properly be considered by you in reaching

25   your verdict.  I know you may be used to looking at these

1  kinds of things up online, but doing any type of research is

2  unfair to the parties, can lead to bad decisions, and can

3  cause major problems and require us to start the trial

4  process over.

5          You must decide the case based solely on what is

6  presented here within the four walls of this courtroom.

7          Finally, do not form any opinion until all of the

8  evidence is in.  The last witness is often just as important

9  as the first witness or any other witness.  So keep an open

10 mind until I instruct you to start deliberations at the end

11 of the case.

12         These rules are necessary for a fair trial, and

13 violations of these instructions does subject you to

14 punishment as allowed by law for contempt of court.

15         I will repeat or summarize some of these

16 instructions for you regularly throughout the trial, and

17 this is not because I think you aren't paying attention but

18 because, in my experience, jurors find some of these

19 instructions difficult to follow.

20         I know of no other situation in our culture where

21 we ask strangers to sit together, watching and listening to

22 something, then go into a little room together and not talk

23 about the one thing they have in common, what they have just

24 watched and heard together.

25         We are all, or at least almost all of us, wired

into the digital world and used to looking stuff up online
and talking and posting about our lives.  So please remember
the reasons I gave to you about why these rules are
important to follow and really need to be followed
throughout this trial.  And please let me know if there are
any problems with following these instructions, either on
your part or on the part of any fellow juror.

If at any time during the trial you have personal
needs that must be taken care of, raise your hand or
otherwise notice the court security officer.  Your comfort
is important to us, and we want to accommodate you any way
we can as necessary.

Now, the trial is, of course, about to begin.
Here's how it works.

First, the government will make an opening
statement, which is simply an outline to help you understand
the evidence as it comes in.  Next, the defendants'
attorneys, one by one, may make an opening statement.

Opening statements are neither evidence nor
arguments.  The purpose of an opening statement is for
counsel to tell you what they think the evidence will show.

Next, the government will examine its witnesses,
and counsel for the defendant may cross-examine each witness
in turn.  I also may allow additional rounds of questioning.
So it could be the government asks questions, the defendant

1  asks questions, then maybe the government can ask more, and

2  maybe the defendants can ask more.  So there will be rounds

3  of questioning for each witness.

4          Following the conclusion of the government's

5  case -- that is, when the government has presented its

6  witnesses -- each defendant may, if he wishes, present

7  evidence.  And if the defendants do choose to call

8  witnesses, after the defendants question them, then the

9  government may cross-examine the defendants' witnesses, and

10 we may have additional rounds of questioning.

11         As I advised you before, neither defendant has

12 any burden of proof and has no obligation to present

13 evidence and may or may not choose to do so.

14         Now, after all the evidence is in, the attorneys

15 will present their closing arguments to summarize and

16 interpret the evidence for you, and I will instruct you on

17 the law.  After that, you will retire to deliberate on your

18 own.

19         One final point:  If the defendants do choose to

20 present evidence, the government has an opportunity,

21 potentially, to present additional witnesses of its own.

22         Now, at the end of the trial, you must make your

23 own decision based on what you recall of the testimony.  You

24 will not have a written transcript to consult, so you must

25 pay close attention to the testimony as it is given.

1    And now, if you wish, in particular to help you

2 remember the testimony of witnesses since you won't have a

3 transcript, you may take notes to help you remember what the

4 witnesses said.  If you do take notes, please keep them to

5 yourself until you and your fellow jurors go to the jury

6 room and decide the case.  And do not let note-taking

7 distract you so that you do not hear other answers by the

8 witnesses.

9    Now, the courtroom deputy has provided each of

10 you with a pad of paper and a writing implement.  At each

11 recess, please leave these items on your seat in the jury

12 box.  When you leave at night, your notes will be secured

13 and not read by anyone.

14    One final point about note-taking:  If you do

15 take notes, it's important not to treat your notes as being

16 more reliable than your memory.  You are to seek to recall

17 what the witnesses said and use your notes as a memory aid.

18 And if there is some conflict between your memory and your

19 notes, it is important to search your memory for what the

20 witness said.

21    All right.  So those, then, are the instructions

22 for you on a preliminary basis.  Thank you for your

23 attention.  And as I say, there will be later instructions

24 intermittently throughout the trial and at the conclusion of

25 the case.

1          All right.  Wanted to ask, then, Mr. Phillips, is

2     the government ready to proceed with its opening statement?

3          **MR. PHILLIPS:**  Yes, Your Honor.

4          **THE COURT:**  All right.  You may proceed.  Thank

5     you.

6                         **OPENING STATEMENTS**

7          **MR. PHILLIPS:**  Thank you.

8          This is a case about powerful politicians who

9     used their influence to line their pockets.  In this trial,

10    you will hear about how Glen Casada, Cade Cothren, and

11    another legislator named Robin Smith wanted to crack into a

12    special pot of state money that only legislators could get

13    ahold of.  To do that, to move the money from the state to

14    their own pockets, the defendants used kickbacks,

15    pass-through companies, and a fake identity with an

16    elaborate made-up backstory.

17         **MR. YARBROUGH:**  Excuse me, Your Honor.

18         Excuse me, Counsel.

19         It sounds like argument, may it please the Court.

20         **MR. PHILLIPS:**  Your Honor, I discussed some of

21    these terms with defense counsel, albeit not Mr. Yarbrough,

22    immediately before opening.

23         **THE COURT:**  All right.  If counsel want to

24    approach.

25              (WHEREUPON, a bench conference was had out of the

1  hearing of the jury, as follows:)

2        **THE COURT:** One of my concerns with the

3  objection, Mr. Yarbrough, it sounds to me like that probably

4  is fairly within the realm of what he thinks the evidence

5  will show. I kind of thought so.

6        **MR. YARBROUGH:** It appeared to me, Your Honor,

7  that the word "kickback" is a legal conclusion.

8        **MR. PHILLIPS:** That is a specific term I

9  discussed with Mr. Farmer and Ms. Sherwood prior to opening,

10  which they assented to, and which the Court already

11  described in the summary of the case.

12        **THE COURT:** Yeah. I didn't think it was

13  controversial that the government is alleging and,

14  therefore, intends to prove something known as a kickback.

15  And understanding your view that it's a loaded term and, in

16  a sense, I understand it sort of instead of expressing the

17  facts, sort of puts a label on facts. But I -- and I

18  understand that.

19        I do think it's fair, the way we talk about

20  facts, to refer to that as a fact that the government

21  intends to show. So I think it's fair. And, of course, you

22  are allowed to say, look, you know, whatever the evidence is

23  going to show, it's not going to show a kickback. And if

24  that sounds a little like argument, I would understand that,

25  but it's not over the line for you to say that.

1        **MR. YARBROUGH:**  So we won't have to come back up,

2   I could -- since he has said that, I could talk about

3   commissions and outsourcing and all the other things?

4        **THE COURT:**  Well, I think -- and we'll -- you

5   know, I guess we'll take it as it goes.  If you do think

6   that there's -- that evidence will come in that will show

7   that, look, this was just legitimate commissions and

8   outsourcing, you are allowed to talk about it.  And if the

9   government wishes to object, we'll take it up as it comes.

10       **MR. YARBROUGH:**  Fair enough.

11       **MS. SHERWOOD:**  I just wanted to say I did not

12   have any objection to that.  So I just wanted to --

13   because --

14       **MR. YARBROUGH:**  I guess we left somebody out.

15       **MR. TADDEI:**  Mr. Farmer is your co-counsel.

16       **THE COURT:**  Because you cleared it with

17   Mr. Farmer, right?

18       **MR. PHILLIPS:**  Yes, sir.

19       **THE COURT:**  Okay.  All right.  So do you want to

20   start over?

21       **MR. PHILLIPS:**  Your Honor, I think I'll probably

22   just reemphasize that "I just said this; I'm going to say it

23   again," and that will be sufficient for me.

24       **THE COURT:**  Okay.  Thank you.

25            (WHEREUPON, the bench conference concluded, and

1  the following took place within the presence and hearing of
2  the jury:)
3       **MR. PHILLIPS:**  Ladies and gentlemen, as you just
4  heard me say, the defendants used kickbacks, pass-through
5  companies, and a fake identity with an elaborate, made-up
6  backstory to execute this scheme.  To understand why
7  politicians would do something like this, we need to go back
8  to an epic falling from power.
9       In early 2019, Glen Casada was riding high.
10 After more than 15 years in Tennessee politics, his party
11 had just been swept into this House of Representatives and
12 he had been rewarded with the title of Speaker of the House
13 of Representatives.
14      Along with the governor and the speaker of the
15 senate, the other half of the Tennessee legislature, the
16 speaker of the house was one of the three most powerful
17 elected men in the state of Tennessee.  And on Mr. Casada's
18 ascent to that throne, he brought along his right-hand man,
19 Cade Cothren.
20      When Mr. Casada became speaker, he made Cade
21 Cothren his chief of staff, his top aide.  But in the spring
22 of 2019, just months after they'd ascended to that peak, the
23 defendants were engulfed in a scandal of their own making.
24      Now, others in Tennessee politics will tell you
25 how bad that scandal was.  But for now, it's enough to say

that Mr. Cothren was forced to resign from that state job as

chief of staff just days after the scandal broke.  And

Mr. Casada's colleagues pushed him out of the office of the

speaker of the house shortly after that, although he did

remain an ordinary representative in the house.

And so in late 2019, out of power, and for

Mr. Cothren out of that state job, the defendants and

another representative, Robin Smith, hatched a scheme.  See,

they knew about that special pot of money that I told you

about at the beginning.

That money was there so that members of the House

of Representatives could communicate with the folks back

home.  They could send them mail that had legislative

updates in them, things that would explain what the members

of the house had been doing up on Capitol Hill to their

constituents; or they could send them surveys, in which they

asked their constituents what they thought the legislators

should be doing up on Capitol Hill.

Now, because these were official legislative

communications paid for by taxpayer dollars, payments for

these kind of mailers had to be approved by a state official

as authorized by the speaker of the house.

If authorized, the state would pay up to $3,000

each year for each of the 99 house representatives to send

these kind of mail pieces.

1    Now, the state didn't spend all of that money

2  every single year.  The legislators didn't use it up that

3  quickly.  In fact, some of them didn't even know it existed.

4  But the defendants did because just months earlier they had

5  been in the office of the speaker with the authority to

6  approve payments for this program.

7    And so in late 2019 Cade Cothren wanted to get

8  hold of that special pot of state money.  He wanted to do

9  mailers for Tennessee's representatives.  But there was a

10  problem -- that scandal.  It meant that he would be

11  considered a political liability by many others in Tennessee

12  politics.  And if he approached legislators directly as Cade

13  Cothren, many of them wouldn't touch him with a 10-foot pole

14  and he never would have been approved by state officials or

15  the new speaker of the house, who had authority over that

16  mail program.

17    So Cothren created a front company, a company

18  called Phoenix Solutions.

19    Now, he used his name on some of the paperwork

20  that created the company, but for anything that went to the

21  state, he did his best to make sure the name Cade Cothren

22  was nowhere to be seen.

23    And the conspirators went further than that.

24  They created a fake identity, a phantom political consultant

25  named Matthew Phoenix, who they said was connected to a

1  high-profile Washington, D.C., firm.  This was all in an

2  effort to hide the fact that Cade Cothren was the one behind

3  Phoenix Solutions.

4          And because Mr. Cothren couldn't approach

5  legislators directly, he made a corrupt bargain with Casada

6  and Representative Smith.  Mr. Cothren used their positions,

7  including their easy access to their fellow legislators and

8  their access to the state officials who held the purse

9  strings on that program that sent out mailers.

10         Specifically, Mr. Cothren paid Casada and Smith

11  bribes or kickbacks for three things.

12         First, he paid them in exchange for them using

13  their own mail allowances on his company, Phoenix Solutions.

14         Second, he paid them to entice other legislators

15  to do the same thing.

16         And, third, he paid them to pressure state

17  officials to approve Phoenix Solutions as a vendor and, when

18  the state wasn't paying Phoenix Solutions's invoices fast

19  enough for the conspirators, to pressure those state

20  officials to pay up.

21         To conceal this scheme, the conspirators'

22  deceptions went even further than Phoenix Solutions and that

23  particular identity, Matthew Phoenix.  For some of the

24  invoices that went to the state, they added another layer.

25  In some cases, the conspirators used company that Mr. Casada

 1  controlled and a company that Ms. Smith controlled to submit

 2  to those invoices for work that Phoenix Solutions had done.

 3          Mr. Casada's company was called Right Way

 4  Consulting.  Ms. Smith's company was called River's Edge

 5  Alliance.  And the conspirators used those companies to

 6  submit invoices to the state for work that Phoenix Solutions

 7  and Cade Cothren had done.  That added an additional layer

 8  of concealment.

 9          Ultimately, Mr. Cothren, Ms. Smith, and

10  Mr. Casada did not just agree to this scheme; they actually

11  pulled it off.  Before the FBI shut it down, those kickbacks

12  and lies had led to a lucrative, thriving business.  Phoenix

13  Solutions was pumping out mailers, and Mr. Cothren paid

14  Mr. Casada and Ms. Smith thousands of dollars in bribes and

15  kickbacks.

16          Now, by this point, you're probably wondering why

17  isn't Representative Smith sitting at this table too?

18          Well, the answer to that is that Representative

19  Smith has accepted the fact that she criminally abused her

20  office.  She is going to come into this courtroom and

21  testify under oath from that witness stand, and she is going

22  to take you inside the conspiracy.

23          She will tell you about the bribes that she was

24  paid by Mr. Cothren.  She will tell you about the lies that

25  the conspirators told.  And her testimony will be

1   corroborated by dozens of text messages and e-mails in which

2   the conspirators discuss deceiving their fellow legislators,

3   in which they discuss the bribes and the kickbacks, in which

4   they discuss putting pressure on state officials to get more

5   money for Phoenix Solutions.

6           We'll also show you the fake paperwork that the

7   defendants submitted to state officials, which includes a

8   federal tax form signed by Matthew Phoenix, that fake

9   phantom political consultant who was actually Cade Cothren.

10          We'll also show you the bank records that show

11  the flow of funds from the state to some of the companies in

12  the middle, to Mr. Cothren, and then kick back to Casada and

13  Smith.

14          And on top of that, you're going to hear the

15  defendants' own words because they gave recorded interviews

16  to the FBI.  You're going to hear Mr. Cothren admit that he

17  was Matthew Phoenix and admit that he knew Robin Smith was

18  going to other legislators saying, "You should use Matthew

19  Phoenix for your mailers."

20          And you're going to hear Mr. Casada say he had no

21  idea who Matthew Phoenix was.  But you're also going to see

22  text messages and correspondence that will show he knew

23  exactly who Matthew Phoenix was.  He knew it was his former

24  chief of staff, Cade Cothren.

25          To work through all this evidence, you're going

to hear from Ms. Smith and law enforcement agents, of course, but you're going to hear from other witnesses as well. You'll hear from some of those other state legislators who were deceived by the conspirators. You're going to hear from the woman who oversaw the mailer program. She's going to tell you how it worked. She's going to tell you how she was pressured by the conspirators to approve the payments that they wanted.

You're going to hear from a member of the Tennessee Republican House Caucus, who will tell you about a fake document he got from Matthew Phoenix. And you're going to hear from an FBI forensic accountant, who is going to walk you through how the money flowed.

Now, ladies and gentlemen, this wasn't just clumsy politics or aggressive business. The evidence will show that the defendants chose to betray the trust that the people of the state of Tennessee put in them. That betrayal violated federal law. The defendants have been charged with counts including bribery, fraud, money laundering, and conspiracy.

And so after you've heard all of the evidence in this case, we will be back in front of you and ask that you return a unanimous verdict of guilty on every count presented to you.

Thank you.

1      **THE COURT:**  All right.  Thank you, Mr. Phillips.

2      Mr. Yarbrough?

3      **MR. YARBROUGH:**  Yes, Your Honor.  Thank you.

4      May it please the Court, counsel, and ladies and

5  gentlemen of the jury.  It's my privilege to represent Glen

6  Casada, and it's still my privilege despite what has just

7  been said by the lawyer for the government.

8      The proof of this case will indicate that Glen

9  Casada was born in Jeffersonville, Indiana, in 1959, and

10  that he was educated at Western Kentucky University and got

11  a degree there in agriculture and education in 1983, that he

12  ended up living in Tennessee, primarily in eastern

13  Williamson County.  And he was working as a pharmaceutical

14  salesman for the Merck company during most of his career.  I

15  think he was with that company approximately 30 years.

16      But when he was living in Arrington, Tennessee, a

17  small town south of Nolensville, he became interested in a

18  park.  And for some reason, the county commission, the

19  Williamson County, would not approve the park that so many

20  people in that community wanted.  So he took his first step

21  into politics.  Not powerful politics, but politics at the

22  grassroots level.

23      His experience with the county commission turning

24  down that park repeatedly led him to run for a seat on the

25  county commission.  And I'm proud to say that at some point

1    later on, Arrington got its park, and I believe the park is

2    still there.

3            As a result of his political activity on the

4    commission at a very low level, Mr. Casada became more

5    interested in government and, as a result of that, was

6    elected to the Tennessee House of Representatives in, I

7    believe, the year 2000.

8            He went to the house.  He became a leader.  He

9    was elected at one point as the majority leader, a chair of

10   the caucus, the Republican caucus.  And then as you've just

11   heard, he was elected in the -- I believe the beginning of

12   January.  Actually, the caucus chose him in 2018, but he was

13   elected by the house to the position of speaker in 2019, the

14   beginning of the general assembly in that year.

15           There was a -- what's been called a scandal, for

16   lack of a better word.  As a result of that, Mr. Cothren did

17   lose his job.  But Mr. Casada, after agreeing to step down

18   as speaker, was reelected to the House of Representatives by

19   the people of his district in Tennessee in the year 2020 and

20   served until the year 2022, when he elected to retire from

21   the house.

22           Now, let me back up a minute because I've gotten

23   ahead of myself on the timetable.

24           After he stepped down as speaker but still more

25   than two years before he decided to leave the house, he

retired from the Merck company, and this is when he considered going into business -- not a big business by any means -- as the Right Way Consulting company that the prosecutor mentioned a moment ago.

This was a small company wholly owned by Mr. Casada, and the whole purpose of it was to do constituent services and legitimate communications services for other members of the house. And at that time that was perfectly legal in the state of Tennessee; and, in fact, the associates of Mr. Sexton, who you'll hear testify later in this case, I believe Timothy and Matthew Hill, were involved in that for many years.

The process of approval for that was fairly relaxed. The approval for the vendors, who were going to get this $3,000 allowance that the members had, was basically handled by staff in the speaker's office. It was not considered by them to be an important matter.

But, obviously, later on, it became important because, when Mr. Sexton took over as speaker of the house, he found out that Mr. Casada and Mr. Cothren at some point were involved in this type of thing; and because he didn't like either one of those individuals, he decided that he was going to try to cut it off.

Now, let me tell you a few things about Mr. Sexton while I'm on that subject.

1          Mr. Sexton, right after he became speaker of the

2     house, began to meet with the FBI.  He and his lawyer went

3     to Memphis and met with the FBI in Memphis and started

4     talking to them about something unrelated to this case.

5     That's in October of 2019.  And at that time the companies

6     that you've heard about, Phoenix Solutions and Right Way,

7     didn't even exist.

8          But it turns out that Mr. Sexton developed a

9     relationship with the FBI and met with them multiple times

10    after that, in fact, off and on, for almost 4 1/2 years.

11    And the last time he met with them was just a few days ago.

12         During that period of time, we expect the proof

13    will show that the investigation of Mr. Casada and

14    Mr. Cothren began.  They had an investigation and came to a

15    head on an early morning in August of 2022 when Mr. Casada,

16    at his home in Williamson County, heard a knock on the door

17    at 8:00 a.m.  He's in his bathrobe.  He comes to the door.

18    FBI agents are standing in front of him, and directly behind

19    them are television cameras.

20         The fact that television cameras were there would

21    indicate that somehow they had been tipped off.

22         For the next 2 1/2 hours, without a lawyer,

23    Mr. Casada had a conversation with the FBI -- which was

24    recorded and I anticipate you'll hear the whole thing --

25    during which he talked openly about what he thought was a

legitimate business transaction between himself and
Mr. Cothren and the state of Tennessee.

You'll hear him say at times things that -- he
was avoiding talking about Mr. Cothren because he knew
Mr. Cothren had been a bit of a problem in the past, and he
avoided it for a little while.  But after a while, he
realized what the FBI was telling him, that this was a
serious matter, and he pretty much fessed up to what he
thought was a completely legitimate relationship, creating
business -- which, by the way, he used the term thousands of
dollars, but we anticipate the proof will show that the
so-called profit that Mr. Casada got was somewhere between 4
and $7,000 total.

So that's the money that's going into the pocket
of the powerful politicians who are trying to line their
pockets that we're talking about in this case.

Now, let me go back a step or two.  Why do we say
that Mr. Sexton might have developed a relationship with the
FBI and had some degree of animus or -- or anger about
Mr. Casada?

When Mr. Sexton ran for the legislature in
Crossville, Cumberland County, another district right on the
border of East Tennessee, he had an opponent named Eric
Swafford.  Turned out that Mr. Casada had supported the
opponent that Mr. Sexton beat.  So they started out as

political rivals. Later on, they became rivals again during elections in the caucus for the speakership and so on and so forth.

But Mr. Casada always -- not always, but mostly won those contests, and it's not unusual to expect that Mr. Sexton would have developed a little bit of anger with Mr. Casada over political matters.

So when Mr. Casada was brought down by the conduct of Mr. Cothren, it presented an opportunity to Mr. Sexton to get Mr. Casada completely out of his political life.

And so we say the proof is going to show that that's exactly what he did, that he turned this relatively small -- and to us, it was insignificant. Not anymore, obviously. But he turned that whole matter over to the FBI and now for -- what? -- five years, we've been talking about this, and we're finally going to resolve it hopefully in a proper way.

There are certain things that the proof in this case we believe will show you regarding the necessary ingredients of a conspiracy. Again, Mr. Casada was very open with the FBI to say that he had no idea that this was criminal activity in any way.

And you'll hear -- assuming the judge allows it, you'll hear the FBI agent trying to explain to him why it

1  might be.  But in order to convict, you will have to hear

2  proof of criminal intent.  And we are saying to you now that

3  the proof will not be that there was criminal intent, that

4  it was an innocent transaction by Mr. Casada.

5           They also have to show that, somehow or another,

6  federal money was a part of this.  And I didn't hear

7  anything in the opening statement about that, but I assume

8  they're going to put on some kind of proof with respect to

9  that.

10          The other proof that we expect to show, ladies

11  and gentlemen, is simply this:  If Mr. Casada wanted to make

12  a lot of money as a politician, would he have done it this

13  way?

14          Look for the proof as it comes out and is

15  revealed both by the government -- and, by the way, the

16  government calls most of the witnesses in the case, but the

17  defense may call some.  I don't know.

18          But the point of that is listen to the proof and

19  look for indications of whether, at any time, it makes any

20  kind of sense to you for Mr. Casada to put his life on the

21  line and come to all of this for between 4 and $7,000.

22          Or -- or will the proof show that this is a

23  political matter between rivals and it's sort of the final

24  chapter in something that was started way back in late 2019.

25          Don't know how much the COVID issue will come

1  into the case, but certainly you will know -- and I think

2  you'll probably hear about it through some of these

3  witnesses -- that right after the businesses started,

4  Right Way and Phoenix Solutions, we hit the COVID era when

5  everybody was told to stay home and communication oftentimes

6  was not as good as it should have been.

7          We expect the proof will show that there was no

8  investigation done of who these vendors were because there

9  was no real concern about it.

10          But then the proof will show that at some point

11 somebody said, well, this -- who is Phoenix Solutions?  And

12 they began to look at it.  And they realized that Cade

13 Cothren was actually the owner of that entity, and yet they

14 continued to do business after they knew that it was him.

15          And the prosecutor has already said that he

16 thinks the proof will show that this was a fraud and a bribe

17 and so on and so forth because that fact was hidden.

18          In reality, that fact was -- if it was hidden at

19 all, very poorly hidden, because people like Connie Ridley,

20 Nick Crawford, and ultimately the speaker himself realized

21 that this company was owned and operated by Cade Cothren.

22          Now, I can't give you everything in this

23 statement that I expect the case to show because it's going

24 to last a pretty long time, but I will say this and probably

25 do this in conclusion:

1       Glen Casada, not knowing that he was doing

2   anything wrong, stepped into something that involved people

3   other than him.  You'll need to be careful to watch the

4   proof as it comes out little by little as to whether he was

5   really that involved in anything other than as a vendor who

6   expected to make a small amount of money and who had no

7   participation whatsoever in the creation of this company

8   that they say was created falsely.

9       And, by the way, it was created in New Mexico,

10  which permits creation of corporations by anonymous people.

11  That doesn't sound good to us in Tennessee, but that's what

12  they do out there.  There was nothing illegal about that.

13      We're confident that, after you consider all of

14  these things, ladies and gentlemen, that you will come to

15  the conclusion that the only possible verdict as to Glen

16  Casada is that of not guilty.

17      Thank you.

18          **THE COURT:**  All right.  Thank you, Mr. Yarbrough.

19          Ms. Sherwood?

20          **MS. LONGNECKER:**  Your Honor, may I approach,

21  please?

22          **THE COURT:**  Yeah.

23          (WHEREUPON, a bench conference was had out of the

24  hearing of the jury, as follows:)

25          **MS. LONGNECKER:**  Two questions for the Court.

1          One is I really need a restroom break; and, two,

2    my opening is probably going to take, like, 45 minutes to

3    50 minutes.

4          THE COURT:  Oh, you're going to -- how did I --

5          MS. LONGNECKER:  Yes.  I'm sorry.  And so would

6    the Court be willing to take a break now?

7          THE COURT:  Yeah.  The only reason I didn't break

8    now was I thought you might want to, you know, get your

9    story out there before there was a break.  And if you don't,

10   I'm certainly fine with that.

11         MS. LONGNECKER:  Nature is calling, so . . .

12         THE COURT:  Yeah, it's understood.  It's probably

13   a more logical time to break in terms of our overall

14   schedule.  So that's fine.

15         MS. LONGNECKER:  I really can't.

16         THE COURT:  Well, you know, these things happen.

17   So we'll take a 15 minutes.

18         All right.  Thanks.

19         (WHEREUPON, the bench conference concluded, and

20   the following took place within the presence and hearing of

21   the jury:)

22         THE COURT:  All right, folks.  Had a discussion.

23   It does make sense at this time to take a break, and so

24   we'll go on our midmorning break.  Take about 15 minutes,

25   come back, and then Ms. Longnecker will deliver an opening

1   on behalf of Mr. Cothren.

2          So please remember my admonitions, and you may

3   step down.  Thank you.

4          (WHEREUPON, the jury was excused from the

5   courtroom at 10:21 a.m., with matters being heard in open

6   court as follows:)

7          THE COURT:  All right.  Thanks, folks.  The Court

8   would encourage discussion on break to sort of further

9   address the issues that are still outstanding between the

10  parties, particularly the ones that may come up on the first

11  witness.

12         All right.  We'll stand in recess.

13         (Recess 10:22 a.m. to 10:40 a.m.)

14         THE COURT:  All right.  Anything to raise with

15  the Court?

16         MR. PHILLIPS:  Just briefly, Your Honor, to

17  update the Court on the way that the parties, I believe

18  jointly, agree that the government should approach the 2019

19  scandal in its direct examination at least.

20         I believe that the parties have an agreement that

21  there are sort of a series of six yes-no questions that the

22  government will direct its witnesses to answer as to yes or

23  no regarding some of those underlying facts that will not

24  delve into the substance of the scandal.

25         The parties agree that the government may ask

1   open-ended questions that go to materiality and, for

2   example, the effect of the defendants' reputations on the

3   witnesses in the wake of that scandal, and that this does

4   not -- this agreement does not limit the scope of the

5   defense's cross at all nor, you know, the government's on

6   redirect.

7           If something changes in that assessment, the

8   government has advised at least its first witness, who is

9   all we had a chance to confer with on the break, that that

10  witness should not get into the substance of the scandal

11  unless and until directed that she may by the Court.

12          **THE COURT:**  Very well.  Thank you, Mr. Phillips.

13  That sounds reasonable to me.

14          Does that sound right to defense counsel?  Is

15  that where we are on this?

16          **IN UNISON:**  Yes, Your Honor.

17          **THE COURT:**  All right.  Sounds like the way to

18  proceed.  Thank you.

19          All right.  Anything else of a preliminary

20  nature?

21          No?  All right.  We can call in the jury.  Thanks

22  very much.

23          (WHEREUPON, the jury reentered the courtroom at

24  10:42 a.m., with matters being heard in open court as

25  follows:)

1          THE COURT:  All right.  Thanks very much, folks.

2     Please be seated.

3          All right.  Ms. Longnecker, if you're ready to

4     proceed.

5          MS. LONGNECKER:  Thank you, Your Honor.

6          Good morning, ladies and gentlemen.  My name is

7     Joy Longnecker, and my co-counsel is Cynthia Sherwood, and I

8     represent Cade Cothren in this case.

9          Cade Cothren is innocent of every single charge.

10    And this is our first opportunity -- our first chance to

11    finally tell Cade's side of the story.

12         The prosecution has literally made a federal case

13    out of junk mail.

14         How do I know that?  How can you know that?

15         Because the State of Tennessee didn't lose a

16    single dollar.  Because everybody got what they paid for.

17    And because these supposed bribes and kickbacks that were

18    lining the pockets of Glen Casada and Cade Cothren were

19    actual compensation, payment, for services, payment for work

20    that they did on these constituent mailers.

21         Now, the world of politics is a different world.

22    Most of us are not familiar with that world.  We don't live

23    in that world.  We don't work in that world.

24         You and I may not treat our colleagues the same

25    way that you're going to hear some of these legislators talk

1    about.  We may not conduct business the same way that you're

2    going to hear some of these legislators talk about in this

3    case.  But at the end of the day, what you will see is what

4    happened in this case, which is politics and business as

5    usual on the hill.

6           The prosecution wants you to believe that the

7    Tennessee General Assembly is filled with people of the

8    highest utmost character.  They hold themselves to the

9    highest moral standards.  And they would never work with

10   anyone who had made a mistake, who had exercised poor

11   judgment, who had made a bad decision at any point in their

12   life.

13          In other words, the prosecution wants you to

14   believe that the general assembly is like a house of worship

15   whose members cannot abide a scandal.  But you will see in

16   this case that the Tennessee General Assembly is not a house

17   of worship; it's a fraternity house.

18          And in this case, we expect you will see evidence

19   that, contrary to what the prosecution is selling you, these

20   Tennessee legislators work every day with people who have

21   been involved in scandals:  Tennessee state senator,

22   multiple state representatives, our own secretary of state.

23          And I don't mention these other scandals in an

24   effort to try to embarrass any one member of the general

25   assembly; I only mention it to encourage you all to keep all

of this in context and to understand that this is the
general assembly that we have in Tennessee.  This is the
backdrop for this case.

And you all, your job will be to decide what to
make of this evidence.  Your job will be to decide was this
scandal really as impactful?  Did these legislators really
care as much as they may say now after the fact?

The prosecution will do everything they can to
make you think the worst of Cade.  But no matter what they
say in this case, they will not be able to prove that Cade
committed a single federal crime.

During this case, we fully believe the evidence,
the full story will be told.  You will find out what really
happened, why there is no crime and why the prosecution is
wasting your time.

Now, we don't think this case is, and we don't
think it ever was, about the roughly $51,000 that the state
paid for these constituent mailers that are at issue in this
case.

Now, I say $51,000 total.  Okay?  Anybody in
business understands that the amount of money that comes
into the business is not the profit that is earned by the
people in that business.  And we think you'll hear that,
just like Mr. Casada, Cade Cothren's portion, his profits,
what he lined his pockets with, ladies and gentlemen, on

these constituent mailers was somewhere in the neighborhood of $8,000.

Now, the evidence will show that Cade was a skilled political strategist, someone who was good at helping people get elected. And helping people get elected was one of the reasons he founded Phoenix Solutions.

And we think you'll hear witnesses say that members of the Tennessee House of Representatives continued to reach out to Cade even after he resigned, even after this terrible scandal broke. Okay?

Cade was, we expect you'll hear, so good at what he did, in fact, that the speaker of the house, Cameron Sexton, approached him, asked him for help, asked him to help him win the race for speaker after Mr. Casada stepped down.

And Mr. Sexton did, in fact, win that speaker's house race with Cade's help.

And you'll also hear that, as Mr. Yarbrough said, right after Cameron Sexton became the speaker of the house, he very quickly started meeting with the FBI. And you'll also see in the evidence that this was months before Phoenix Solutions was ever even formed.

Now, you've heard people mention Glen Casada's company, Right Way Consulting. You've heard about Ms. Smith, Robin Smith, the cooperator in this case. You'll

hear that she had her own company, River's Edge Alliance.

And we expect the testimony to be that these companies were similar. They were private businesses that each of these two state representatives had that they would use to help people campaign, to help them get elected, when they weren't working in the legislature.

And we think you'll hear that Robin Smith, just like Mr. Casada, had a knack. Just like Cade, she was good at helping people get elected.

Now, we think you'll hear that, after Cade helped Cameron Sexton win the race for speaker of the house, that Glen and Robin and Cade started talking about this constituent mail business in the fall of 2019. And at this time, you'll also hear that Glen and Robin were still serving. They were still elected members of the Tennessee House of Representatives.

The first thing I'm going to ask you to pay very close attention to in this case is the thing that Mr. Casada and Ms. Smith were doing for their private political consulting businesses and the things that they were doing as state representatives. That critical difference will make a huge, huge impact in this case.

That's the first thing I'm going to ask you to pay attention to. When you're listening to the evidence, ask yourselves how is Glen acting? How is Robin acting? Is

she acting as a state representative or acting as a private business owner?

And understanding the difference between what Glen and Robin are doing as public officials is also important for Cade because Cade is charged with federal crimes that involve helping someone, a public official, commit crimes by paying them bribes and kickbacks.  So that distinction is really important for Cade too.

Now, this matters too because, as you heard during jury selection, our Tennessee legislature only meets part time.  They are only in session for part of the year from about January to April.  And so a lot of legislators have jobs outside of the legislature that they work at when they're not going up on Capitol Hill.

And, in fact, you may see people testify who have been subpoenaed in this case, state representatives who have hired another state representative who also happens to be a lawyer.  So state representatives in Tennessee, they often wear two hats in that way.

Now, towards the end of the fall of 2019, Cade Cothren started his own company, Phoenix Solutions.  And, as the government and the prosecutor mentioned -- and Mr. Yarbrough mentioned that you'll see evidence showing that Cade did what entrepreneurs do.

When they start a business, they register to do

business.  He filed articles of incorporation.  He opened a
bank account.  He built a website.

And you'll hear testimony about the formation of
Phoenix Solutions.  And you'll hear that Cade used a
pseudonym, Matthew Phoenix.  We don't and we won't deny that
Cade set up Phoenix Solutions in a way that would allow his
ownership information to remain private.

So why was privacy so important to Cade?  Well,
you'll see and hear evidence showing what his life was like
after he resigned.  People who were in Tennessee, and
particularly Nashville, in 2019 when news of the scandal
broke, they understood.  It was in the papers every single
day.

And what we don't often hear about is the person
who's the subject of those articles, what life is like for
that person who is being written about every single day, how
the media camped outside his apartment, how they followed
him everywhere he went, how they wrote about his every move,
how they went through his trash.  So privacy was very
important to Cade in this business.

You may hear and see evidence that privacy was
important for Phoenix Solutions clients as well.  This is
politics, after all.

Now, there are three different types of mailers,
three different types of work that you're going to hear

1   about in this case. And the difference among these three

2   types of mailers is also really important. So that's the

3   second biggest thing that I'm going to ask you to pay

4   attention to.

5           The first thing is how is the person acting? Are

6   they acting as a public official or are they acting as a

7   private business owner?

8           This is the second big thing that I'm going to

9   ask you to pay attention to in this case, the three

10   different types of mailers.

11           The first type you've already heard about.

12   That's the constituent mailer. The constituent mailer is

13   the only mailer that matters in this case. The constituent

14   mailer is what every single one of these charges in this

15   case are about. What's a constituent mailer?

16           A constituent mailer is similar to those things

17   that you see come into your mailbox. There can be two

18   different kinds. All right? So the content of a

19   constituent mailer is really important. That's what makes

20   it different from other types of political mailers.

21           And the most significant difference between the

22   constituent mailer, the reason why it and not the other work

23   is the subject of federal charges in this case, is because a

24   constituent mailer involves public taxpayer money. Okay?

25           So a constituent mailer involves public dollars

that can be used to send this mail out to the particular
people in a representative's district.

The other difference between a constituent mailer
and the other types of mailers you may hear about is the
content of that mailer.

A constituent mailer, because public money is
being used to pay for that mailer, cannot be political.  I'm
going to explain just in a moment the difference in the
other types of mailers that can be political.

A constituent mailer has to be informative.  It
cannot take a position on an issue.  It cannot say vote for
me.  All it can do is one of two things, and you'll see both
types in this case.

A constituent mailer can be a survey.  It's a way
for a representative to reach out to the voters in this
district and say, hey, I want to hear from you.  How do you
feel about this issue?  How do Tennesseans feel about this,
right?

So they would send a survey out.  And some of the
voters might fill out that survey and send it back and let
their representative know how they feel about a certain
issue.

A second type of constituent mailer you may see
is a legislative update.  Here's what we've been up to in
the legislature.  Here are some of the bills that have been

passed.  Here are some of the great things that are
happening in this district.  Or here are some of the things
that we're going to tackle in this upcoming legislative
session.  I want you, the voters, to know what we're doing
up on Capitol Hill.

So two types of constituent mailers, the only
mailer that matters, the only mailer that involves public
dollars:  Nonpolitical content; has to be informative.
Okay.

Above all else, a constituent mailer cannot be a
campaign piece.  It can't be a campaign mailer.  A campaign
mailer is a political mailer.  It's the kind of junk mail
that it was also filling our inboxes -- or our real
mailboxes, rather -- at the end of 2024.  We just finished
an election cycle.  We had a presidential election and a
bunch of other elections.  You probably saw lots of these
mailers filling your mailbox.

Campaign mailers are different from constituent
mailers in two big ways:  First, how they're paid for.
Campaign mailers are paid for with private donor money,
nontaxpayer dollars.

A campaign mailer is also different because of
the content, because you are allowed in a campaign mailer to
say pretty much whatever you want.  You can say vote for me,
I'm the best person, here's what I stand for.  Or you can

say don't vote for that person.  You shouldn't vote for that person, and here's why.  It can be an attack ad.  Anything for a campaign mailer.  It's political.  It's private money.

And the process for doing a campaign mailer is pretty simple.  The representative or the person running for office says I want to do a mailer.  And then they go out and they hire somebody to do their mailer.  And that's it. Again, this is private money.  There's no controls that matter in this case for campaign work.

The constituent mail did have a process, and we think you'll hear about that process in this case because the constituent mail was using taxpayer dollars.  And because the content could only be informative, it couldn't be political, there was a review process in place.

So the process was pretty informal.  And it worked a little something like this:  Again, state representative A says I want to do a constituent mailer. They decide who they're going to hire.  Could be Glen's company, could be Robin's company, could be whoever.

That mail vendor will work with them and decide what kind of constituent mailer do you want?  Do you want an update?  Do you want a survey?

Once the design of the mailer is ready, in this case, Glen or Robin would take that design.  They would run it by the state representative, make sure they were okay

with it.  And then they would send it to the speaker's
office, the speaker of the house.

And the speaker of the house's rule when it came
to these constituent mailers, you'll see it was very
limited.  It was literally looking at the proof of the
mailer, looking at the content, making sure it wasn't
political.  If it was political, they might suggest some
changes.  Then they would send it back to Glen or Robin and
say this is approved or it's approved but you've got to make
these changes.  Okay?

Once the proof was ready, Glen and Robin would
turn it over to Cade.  Cade handled all of the operation
like the back office piece, the logistics, of doing the
mailers.  He worked with the graphic designer.  He worked
with the printer.  He worked with the bulk mailer.

And at the end after these mailers had gone out,
Glen and Robin again would work with the state
representative and they would help submit the request for
payment from the state from the representatives' postage and
printing account.

The third type of mailer that you'll hear
about -- you may hear about is the caucus mailer.  Okay?

So constituent mailer is the only mailer that
matters.  Campaign mailers, private dollars.  Caucus
mailers, also private dollars.  And when I say "caucus," you

may be sitting there wondering what is the caucus?

Well, the Republican caucus is just the organization or group of all of the elected Republicans in the House of Representatives. They are all -- they all make up the Republican caucus. There's also a group for Democrat elected state representatives. That's the Democratic caucus. Okay? So when you hear about caucus, that's what it's referring to. It's referring to the group of state representatives in the house who are registered Republicans.

And importantly, as I said, caucus work too is paid for with private dollars. And you may hear about the caucus work and that it had its own process that was very different than what I just described the constituent mail process. It had nothing to do with the speaker's office, had nothing to do with content approval. These were campaign political mailers that were funded or routed through the Republican caucus.

Now, why? Why is it different? Why is understanding the difference -- why am I taking the time to tell you about these different types of mailers?

Well, the distinction is really important because Cade has been charged with federal crimes which involve public money and public officials. And because all of the charges in this case arise only from that constituent mail work, please listen very carefully when the witnesses are

1  talking and ask yourselves are they talking about a

2  constituent mailer?  Because that's the only mailer that

3  matters.  Or are they talking about a campaign mailer?  Or

4  are they talking about a caucus mailer, something to do with

5  the caucus?

6          That distinction is really important.  So now

7  that you know the differences and the three different

8  buckets, I'm going to turn back to the facts.

9          Now, the prosecution, not surprisingly, spent a

10  lot of time in their opening talking about all the ways that

11  Robin and Glen and Cade tried to keep Cade's identity and

12  their relationships with Phoenix Solutions a secret.

13          We think you'll soon see that Glen and Robin were

14  pitching themselves when it came to the constituent mailer

15  work, not Phoenix Solutions.  And, ultimately, we think the

16  evidence will show that Glen and Robin, not mentioning every

17  single person who was going to be working on the mailer with

18  them, including Cade and Phoenix Solutions, didn't matter

19  one bit.  No.

20          You will also likely hear very soon that Robin

21  and Glen were not approaching complete strangers in the

22  legislature.  They approached their friends, their

23  colleagues, the people that they had been serving with in

24  the house for years.

25          And -- and this is really important -- we expect

you'll hear witnesses testify that what Glen and Robin were doing, that state representatives doing mailer work, being paid with postage and printing dollars for work that they're doing for other state representatives, had been going on for years.

Glen and Robin were not the first state representatives to do this, ladies and gentlemen, and you will see that in this case. In other words, what Glen and Robin were doing was just politics and business as usual on the hill.

Now, the fact that Glen and Robin actually worked actively on these constituent mailers is something else we expect to be revealed in the e-mails and the text messages and through the witness testimony that you'll hear in this case. And we expect those same witnesses to testify that Glen and Robin and Cade did a great job with these mailers. They were very happy with the work. And everybody got what they paid for.

Now, from the prosecution's perspective, this case stems, arises from the scandal and Cade's resignation as chief of staff. But Cade Cothren's story begins well before that.

To fully understand the evidence in this case, you need to know who Cade Cothren is, why he was so good at helping people get elected, and why people continued to want

1  to work with him even after he resigned.

2  This world, this world of politics, was really

3  familiar to Cade.  He grew up around politics.  He's a

4  native of Lawrenceburg, Tennessee.  His dad, Eddie, ran for

5  city council.  His Grandpa Elmer ran for sheriff.  His Uncle

6  John served as an elected state representative.  And some of

7  Cade's earliest memories are working as a page on the floor

8  of the house, going and getting water, pens, or notebooks,

9  paper for the representatives when the legislature was in

10 session.

11 So it should be no surprise that Cade went to

12 college.  He went to community college and had a 4.0 GPA,

13 went on to finish his undergrad at the University of

14 Tennessee, Knoxville.

15 There -- politics is in his blood -- he majored

16 in political science.  But he still wasn't quite sure what

17 he wanted to do with his life, so he saw a posting for an

18 internship in the Tennessee General Assembly.  He applied,

19 and he was selected for this prestigious internship that he

20 started his spring semester of his senior year at UTK, the

21 spring of 2010.

22 We think you'll hear that he spent the whole

23 semester working for two different state representatives.

24 He learned all about the legislative process, how a bill

25 becomes a law, Robert's Rules of Order, some of the things

that you're going to hear about in this case, which I
apologize in advance. May feel like eighth grade civics
again. But he learned all about that when he was interning
in the Tennessee house.

And he fell in love with it. He loves politics.
He's built for this. And so it's no surprise that after he
graduated from college, he started working on two different
state representatives' campaigns that fall. That was the
2010 election cycle.

We think that after that you may hear he worked
for a U.S. congressman, and after that he was recruited by
the Tennessee Republican caucus, that I just mentioned to
you, to be hired as press secretary. You know who hired
him? Glen Casada. That was 2013. That was the start of
Cade and Glen's working relationship together.

And as Glen rose through the ranks of the
leadership in the house, Cade also rose. When Glen became
house majority leader, Cade became the director of
communications for the caucus. When Glen became speaker of
the house, he hired Cade to be his chief of staff.

And Cade, when he was hired by Glen Casada to be
chief of staff, he was 32 years old. This was his dream
job.

Now, Cade's political savviness quickly earned
him the respect of the elected state representatives he

1  worked with in the house and on the campaign trail.  But we

2  do expect the evidence to show that Cade and Glen made a few

3  enemies along the way, as politicians tend to do.

4           And we also expect that you'll hear that, when

5  Cade was a young 20-something-year-old staffer working in

6  the Tennessee General Assembly, working for the -- one of

7  the three most powerful men in Tennessee, he said and he did

8  things that he deeply regrets.

9           We expect witnesses will testify about the

10  scandal.  We fully expect they will testify about Cade's

11  resignation.  Other witnesses may tell you what they saw and

12  observed about what he went through after he resigned.

13          But let me pause here and say we are not trying

14  to make you feel sorry for Cade Cothren.  Cade resigned from

15  his chief of staff position for a reason, a good reason.  He

16  made some mistakes, and he has paid dearly and continues to

17  pay dearly to this day for those mistakes and the things

18  that he did as a young man nearly a decade ago.

19          So the prosecution has already mentioned this

20  scandal involving Cade and Glen that prompted Cade's

21  resignation.  And again, we're not here to defend, we're not

22  here to condone any of the things that led to Cade's

23  resignation.

24          But you will see throughout this case that

25  people -- and by "people," I mean the prosecution and the

1  federal agents -- thought that what Cade did was so bad,

2  that he was such a bad person and a sinner, that he must

3  have committed a crime.

4            **MR. PHILLIPS:**  Your Honor, objection to the

5  argument.

6            **THE COURT:**  Response?

7            **MS. LONGNECKER:**  This is what I expect the

8  evidence to show, Your Honor.

9            **THE COURT:**  Well, the -- well, all right.  If

10  counsel want to approach, please.

11            (WHEREUPON, a bench conference was had out of the

12  hearing of the jury, as follows:)

13            **THE COURT:**  All right.  And this matches my

14  recollection reading from this statement.

15            "You'll see throughout this case that people --

16  and by 'people,' I mean the prosecution and the federal

17  agents -- thought that what Cade did was so bad, that he was

18  such a bad person and a sinner, that he must have committed

19  a crime."

20            That was a comment on what counsel expects the

21  evidence to show.  So I think that's fine.  I do think --

22  and I think I've given this warning before -- if it turns

23  out that, at the end of the day, no agent said something

24  like that or the evidence doesn't otherwise support what

25  counsel told the jurors to expect, the government's welcome

1  at closing to make it blow back on the defendants.

2          So to me, when counsel makes a statement in the

3  form of what we expect the evidence to show, that -- and

4  there can be a line between that and argument.  I think this

5  was clearly on the side of what we expect the evidence to

6  show, and I think that's fine.

7          I think the government's remedy would be on the

8  back end to say why it doesn't matter or why the expectation

9  was not, in fact, met, the expectation set by the defense

10 counsel was not met.

11         So I'll overrule that objection.

12         **IN UNISON:**  Thank you.

13         (WHEREUPON, the bench conference concluded, and

14 the following took place within the presence and hearing of

15 the jury:)

16         **THE COURT:**  All right, Ms. Longnecker.  You may

17 proceed.

18         **MS. LONGNECKER:**  Thank you, Your Honor.

19         As I was saying, we think the evidence will show

20 that certain people made a decision, the prosecution made a

21 decision.  They thought that what Cade did was so bad, that

22 he was such a sinner, that he must have committed a crime.

23         And we also expect you'll hear testimony that

24 certain state representatives and people in the general

25 assembly, they didn't like Cade.  Some of them didn't like

1   Glen.  They wanted them both gone from the general assembly

2   forever.

3         But while Cade may very well be a sinner, he is

4   not a criminal.  Cade Cothren is innocent of every single

5   charge, every single crime he's been charged with.  And at

6   the close of all the evidence, we think you'll agree.

7         So let me be clear.  We are not going to put on

8   evidence, not going to try to convince you that anybody

9   involved in this case is a bad person.  But we do think that

10   you will see evidence throughout the prosecution's case of

11   confirmation bias.  This means that we think the evidence

12   will show that the prosecution was looking at the evidence

13   through the eyes of someone who already decided that Cade

14   had committed a crime and went out looking for evidence to

15   support that conclusion.  He went out to confirm what they

16   already believed.

17         But confirmation bias also means that you ignore

18   evidence that doesn't intend to prove your belief.  You

19   ignore evidence that tends to prove someone's innocence.

20   And we think that you'll see that evidence too, evidence

21   that was ignored because it didn't jibe with the

22   prosecution's theory that Cade had committed a crime.

23         As jurors, we are counting on you to evaluate the

24   evidence fairly, to look at the witnesses and the evidence

25   with a fresh set of eyes without any confirmation bias or

1  any bias at all.  That's why we spent so much time in jury

2  selection yesterday.  And without that and without any bias,

3  ladies and gentlemen, we think you will clearly see that

4  there is no crime and the prosecution is wasting your time.

5          Let's talk about the charges.

6          At the end of the case, the judge will instruct

7  you on the law.  We expect the judge will tell you all of

8  the elements that the prosecution will have to prove beyond

9  a reasonable doubt for every single one of these charges.

10 And they will have to prove all of those elements beyond a

11 reasonable doubt.

12          The first charge is federal program theft.  The

13 prosecution has charged Cade with helping Glen essentially

14 steal money, obtain money, by fraud, defrauding the state of

15 Tennessee through their constituent mailer work.  I'm going

16 to focus on a few of the elements, few of the things related

17 to federal program theft that we expect the judge will

18 explain at the end of the case and which the prosecution

19 will have to prove to you, again beyond a reasonable doubt.

20          First, we think the judge will tell you that you

21 have to find that Glen, maybe even Robin, too, were acting

22 as public officials when they were doing this constituent

23 mail work.  They were acting as public officials in

24 connection with the -- hang on -- in connection with the

25 charges in the indictment.

1        **MR. PHILLIPS:** Your Honor, this is legal

2   instruction for closing.

3        **THE COURT:** Yeah, I would agree with that, so I'm

4   going to sustain the objection on that.

5        I think counsel's allowed to continue to remark

6   on what she thinks the evidence will show. I do think that

7   that goes beyond that. So I'll sustain --

8        **MS. LONGNECKER:** It's not what we think the

9   instructions will be but what we think the evidence will

10  show.

11       **THE COURT:** I myself didn't take it that way, so

12  I'm going to sustain the objection. But you're welcome to

13  phrase your next remark however you see fit. We'll see how

14  it goes.

15       **MS. LONGNECKER:** Thank you, Your Honor.

16       Second, we think that you will have to find some

17  evidence of a fraudulent intent in this case. We think that

18  the prosecution will have to prove to you that Glen and Cade

19  intended to commit fraud in this case, intended to harm the

20  state of Tennessee. And we think the issue of whether Glen

21  and Robin and Cade earned this money or if they were, in

22  fact, bribes and kickbacks is also an issue that you will

23  have to pay attention to in this case.

24       Now, the second charge is federal program bribery

25  and kickbacks.

1          The prosecution just sat up here and told you

2    that Cade's constituent mailer payments to Glen and Robin

3    were kickbacks.  Here again, I'm going to talk about some

4    things that may be important for you to think about when

5    you're evaluating the evidence, when you're thinking about

6    whether Cade ever paid any kickbacks to anyone, including

7    Glen Casada.

8          First, we think it's going to be important for

9    you to look at how Mr. Casada was acting.  Was he acting as

10   a state representative, or was he acting as a private

11   business owner?

12         Second, we think it's going to be important to

13   consider whether Glen and Robin earned the money that they

14   were paid for their constituent mailer work.

15         Third, we think it will be important for you to

16   consider whether there will be evidence of a quid pro quo.

17   That's a Latin term.  It just means this for that.  We think

18   there will have to be evidence of a quid pro quo, a corrupt

19   agreement between Mr. Casada and Mr. Cothren where

20   Mr. Cothren agrees to pay Mr. Casada some money in exchange

21   for something Mr. Casada is going to do, an official act.

22         Some of you heard that term during jury

23   selection.  So I wanted to provide further context for what

24   that means.

25         Now, the judge will tell you exactly what a quid

1   pro quo is.  The judge will tell you exactly what an

2   official act is.  But for right now, think about an official

3   act as if --

4           **MR. PHILLIPS:**  Your Honor, I'm going to object to

5   the definition of an "official act" in opening.

6           **THE COURT:**  I'm going to sustain the objection.

7   I really think, instead of discussion about what the

8   evidence is going to be, we have a discussion about what

9   evidence might be important and what evidence is required to

10  prove the crime.  So I'm going to sustain the objection.

11          You may continue.

12          **MS. LONGNECKER:**  Now, as I said, the judge is

13  going to instruct you on all of these charges.  The judge is

14  going to tell you what the prosecution is required to prove.

15  So in that vein, there are five very key points that I want

16  you to keep in mind as you listen to the witnesses and you

17  look at all the evidence in this case.

18          First, I want you to remember that the only

19  mailer that matters is the constituent mailer.  The

20  constituent mailer is the only mailer that public taxpayer

21  dollars were used to pay for.  Campaign mailers are not at

22  issue.  Caucus work and mailers are not at issue in this

23  case.

24          And we think that you'll hear that Glen and

25  Robin, again, doing this constituent mail work for other

state representatives was nothing new.  Other
representatives have been doing it for years.

Second, the alleged fraud.  Want you to pay
attention to this theory that the prosecution has, that the
scandal was so bad that no state representative would have
dared work if they knew that Cade Cothren was in some way
involved with their constituent mailer.

We do not expect the evidence will support that
theory.  We think you'll have plenty of reasons to question
any state representative's testimony in that regard, and it
will be your job, as the jury, to decide what to make of
this testimony, whether Cade's participation or involvement
with the constituent mailers really made a huge difference
to these state representatives.  We think the evidence will
show it did not.

Third, the third thing I want you to pay
attention to is the amount of money, the amount of dollars
that the state of Tennessee lost as a result of this
constituent mailer work.  And that, ladies and gentlemen,
the evidence will show is zero.  Zero dollars.  We expect
witness after witness after witness to testify that Glen and
Robin did exactly what they were hired to do.

Fourth, the lack of any bribes, the lack of any
kickbacks, the lack of any agreement to pay Glen or Robin
any bribes or kickbacks for their constituent mail work.

1    Pay close attention.  We want you to pay close

2    attention to the evidence on this issue.  We want you to be

3    looking for evidence of some agreement by Glen to do

4    something in his role as a public official in exchange for

5    these constituent mailer payments.

6    We want you to listen to the evidence about what

7    Cade was paying Glen and Robin for.  This is important

8    because we think the evidence will show that Cade paid Glen

9    and Robin's companies for their constituent mailer work, not

10   for anything official they were going to do as state

11   representatives.

12   Please, when you're listening to this evidence,

13   decide, ask yourselves, was this money earned?  Did Glen and

14   Robin do work?  Did they work on these mailers?  We think

15   the evidence will show that they did.  And, again, we expect

16   every single state representative to testify that they got

17   what they paid for.

18   Fifth, the last thing I want to ask you to pay

19   attention to, is again the roles of Glen and even Robin

20   Smith.  I want you to pay attention and ask yourself what is

21   Glen doing?  Is he doing it as a state representative?  Or

22   is he doing it as a private business owner?  Same thing for

23   Robin Smith.

24   We think the evidence will show that Glen and

25   Robin just went around to their friends and their

colleagues, people they had known for years in the legislature, and asked, "Hey, can I do your constituent mailer?"

In other words, we expect the evidence to show that Glen and Robin were asking their fellow state representatives for their business, not their vote. That difference between a state representative's official duties and a state representative's private business activities is extremely important here, particularly when it comes to the bribery and kickback charges.

Now, if you paid close attention to these five key points, these five things that you know what to look for in this case, we are confident that the evidence will support just one conclusion, and that is that Cade did nothing unlawful, he did nothing illegal.

So if this is all true, some of you might be sitting there asking yourselves, why are we here? This may not be the only time you're asking yourself that question if you're already asking yourself that question.

Others of you, like we talked about yesterday or the day before, might be thinking like, well, I mean, Cade probably wouldn't be here in this courtroom if he didn't do something wrong.

This is an impressive courthouse. These are serious proceedings. It's understandable that some of you

might be thinking that Cade did something wrong just because we're here.  Right?

But we are counting on you not to assume anything here.  You are the finders of fact.  You are responsible for finding the truth.  It is now your sworn duty.

So let me tell you why I think we're here.  I think you'll see from the evidence that we are here because the justice system sometimes makes mistakes.  And we believe the evidence and the law in this case supports the defense and that it will allow you, as the jury, to correct that mistake.

And so since the main questions for you to decide are whether Cade committed any of the federal crimes that he's been charged with, let me take a few things off the table for you.  Okay?  Things you don't need to spend a lot of time deciding as a jury.

You don't need to decide whether Cade formed Phoenix Solutions or whether he used the pseudonym Matthew Phoenix when he was dealing with the state legislature.  I'm telling you he did those things.

You don't need to decide whether the State of Tennessee paid Phoenix Solutions or Glen Casada's company, Right Way Consulting, or Robin Smith's company, River's Edge Alliance, for the constituent mailer work.  It did.

And you don't need to decide whether Glen and

1    Robin and Cade tried to keep Cade's ownership and their

2    association with Phoenix Solutions a secret.  They did.

3            Now, we fully expect the prosecution will keep

4    throwing more and more evidence of you -- at you of Cade's

5    sins.

6            You should ask yourself each time why is the

7    prosecution doing that?  You should ask yourself how much of

8    this evidence is really about the constituent mail work that

9    we're all here about and what's not about constituent mail

10   work?  And you should ask yourself if the prosecution would

11   be showing you evidence of things that have nothing to do

12   with constituent mail work if they had enough evidence of a

13   crime related to the constituent mail work alone.

14           There will be dozens of witnesses and hundreds of

15   documents.  This is a pretty simple case.  Ultimately, you,

16   as the jury, are the only thing in our system that stands

17   between the government -- the prosecution -- and citizens,

18   like Mr. Cothren, who we believe have been wrongfully

19   accused.

20           So when you're listening to the witnesses and

21   you're reviewing the evidence, if you don't remember

22   anything else that I've said other than the constituent

23   mailers are the only mailers that matter, ask yourself two

24   things:  Does this evidence have anything to do with the

25   constituent mailer?  Does all of this evidence, does this

1 evidence that we're seeing right now prove that Cade

2 committed a sin, or does it prove that he committed an

3 actual federal crime?

4         Now, you probably won't like some of the things

5 you're going to see and hear about our Tennessee General

6 Assembly in this case -- the backstabbing, the infighting,

7 the competition, the ambition, and yes, the lies.

8         But here in this courtroom, in this country that

9 we are all fortunate to call home, the United States of

10 America, your job, as the jury, is not to decide whether

11 Cade Cothren committed a sin.  Your job is to decide whether

12 he committed a federal crime.

13         Now, the prosecution has tried to make a federal

14 case out of junk mail.  But we are confident that you, the

15 jury, will see the evidence much more clearly than they have

16 and, because Cade has not committed a federal crime, the

17 prosecution is wasting your time.

18         And at the end of this case, we will come back

19 and we will ask you for the verdict that -- the only verdict

20 that we believe that the evidence will support in this case,

21 and that is a verdict of not guilty on every single charge.

22         On behalf of Cade Cothren, Ms. Sherwood and I

23 thank you for your service.

24         **THE COURT:**  All right.  Thank you,

25 Ms. Longnecker.

        Okay.  Mr. Phillips, if the government wishes to
call its first witness.

        **MR. PHILLIPS:**  Yes, Your Honor.  The government
calls Patsy Hazlewood.

        **THE COURT:**  All right.

        (The witness was sworn.)

                    *   *   *

                **PATSY HAZLEWOOD,**

**was called as a witness, and after having been first duly**

**sworn, testified as follows:**

                **DIRECT EXAMINATION**

**BY MR. PHILLIPS:**

Q.    Good morning, Ms. Hazlewood.

A.    Good morning.

Q.    Would you just briefly introduce yourself to the jury.

A.    My name is Patsy Hazlewood.  I served in the Tennessee
legislature in the state house from November of 2014 to
November of 2024.

Q.    And what do you do currently, Ms. Hazlewood?

A.    I'm retired.

Q.    You mentioned that you served in the general assembly.
Is there a document that establishes the existence of the
general assembly?

A.    There is.  The Tennessee Constitution.

Q.    And what are the houses in the general assembly?

1  A.    There is the Senate, and then there's the House of

2  Representatives, of which I was a part.

3  Q.    And is representative in the House of Representatives

4  an elected position?

5  A.    It is.

6  Q.    Are there political parties in the state of Tennessee?

7  A.    There are.

8  Q.    Were you elected to office as a member of one of those

9  political parties?

10  A.    I was.

11  Q.    Are you familiar with the House Republican Caucus?

12  A.    I am.

13  Q.    And what was that?

14  A.    It is -- the House Republican Caucus is just simply a

15  group of house members who are part of the Republican party.

16  Q.    Are you familiar with someone named Glen Casada?

17  A.    I am.

18  Q.    And how are you familiar with Mr. Casada?

19  A.    I served with him in the legislature.  Also, he was

20  speaker in the legislature for a short period of time while

21  I served.

22  Q.    And do you see Mr. Casada in the courtroom today?

23  A.    I do.

24  Q.    Can you point him out by an article of clothing?

25  A.    In a blue suit.  There, standing.

```
 1              MR. PHILLIPS:  Your Honor, we'd ask that the
 2     record reflect that the witness has identified the
 3     defendant.
 4              THE COURT:  It will so reflect.
 5     BY MR. PHILLIPS:
 6     Q.    Ms. Hazlewood, did you know someone named Cade
 7     Cothren?
 8     A.    I do.
 9     Q.    Would you identify him by an article of clothing if
10     you see him in the courtroom today.
11     A.    He has a blue suit and a red tie, with a beard.
12              MR. PHILLIPS:  Your Honor, we'd ask that the
13     witness identified Defendant Cothren.
14              THE COURT:  All right.  The record will so
15     reflect.
16     BY MR. PHILLIPS:
17     Q.    Ms. Hazlewood, for this series of questions, I just
18     want you to answer yes or no.  Okay?
19     A.    Okay.
20     Q.    Was there a scandal relating to Mr. Cothren and
21     Mr. Casada around May of 2019?
22     A.    Yes.
23     Q.    Was that scandal widely reported in Tennessee media?
24     A.    Yes.
25     Q.    Did you read any news articles about that scandal?
```

1  A.    Yes.

2  Q.    Did the defendants give any quotes to the media in

3  those articles that you read, if you recall?

4  A.    Yes.

5  Q.    Did Mr. Cothren resign from his position as chief of

6  staff just days after the news broke?

7  A.    Yes.

8  Q.    Due in whole or in part to the scandal, did the House

9  Republican Caucus hold a vote of no confidence in Mr. Casada

10  as speaker of the house -- and let me -- sorry -- rephrase

11  that.

12        Due in whole or in part to the scandal, did a majority

13  of the House Republican Caucus vote that they had no

14  confidence in Mr. Casada as speaker of the house?

15  A.    Yes, we did.

16  Q.    And did Mr. Casada step down from the speakership

17  shortly after that and remain an ordinary house

18  representative?

19  A.    Yes.

20  Q.    All right.  I appreciate you bearing with me on that

21  line.

22        Going back to the normal way we were talking, do you

23  know Robin Smith?

24  A.    I do.

25  Q.    And how do you know Ms. Smith?

1 A.    Robin headed the Republican party.  She was the GOP

2 party chair in Hamilton County as well as for the state.  I

3 have known her for probably at least 15 years or more and --

4 casually.

5      I think the first time we actually worked together is

6 when I was working for the Department of Economic and

7 Community Development.  She represented a client that we

8 worked with.  Then when I decided to run for political

9 office, Robin is the person that I went to to manage my

10 campaign.

11 Q.    Are you familiar with something called the postage and

12 printing allowance?

13 A.    I am.

14 Q.    And would you explain to the jury a little bit about

15 what that is.

16 A.    Members of the legislature have dollars allocated.  I

17 think it's $3,000 per year that, as a member, you can use to

18 mail legislative updates to let your constituents know about

19 what bills you're carrying or what the hot-topic issues in

20 the legislature are going to be or are under consideration.

21      You can also use that to pay for things like flags for

22 schools or not-for-profit organizations.  We do a lot of

23 resolutions honoring and memorializing people.  You can use

24 those dollars to frame those and make a nice gift for a

25 constituent.  Those are the kinds of things that it's used

1  for.

2  Q.    You may have said this, but who is allowed to use the

3  postage and printing allowance?

4  A.    Each member has an allocation that they can use.

5  Q.    Had you used the postage and printing allowance before

6  2019?

7  A.    Yes.  I had used it for -- I think I had done one

8  legislative mailer before, and I'd actually used it for

9  flags and the other things that I mentioned.

10  Q.    So if my math is correct, you'd done one update

11  between when you joined in 2014 and 2019 roughly?

12  A.    I believe that's correct.  It's hard to remember

13  exactly.  It's been a while.

14  Q.    So were legislators allowed to use the postage and

15  printing allowance for things like campaign mail?

16  A.    No.  These are taxpayer dollars funded from the

17  budget, so they're not to be used for political purposes.

18  They can be used, as I said, for legislative updates to let

19  your constituents know what's happening, what you're doing

20  or what you're focused on, but not for a campaign.

21  Q.    Do you know a woman named Connie Ridley?

22  A.    I do.

23  Q.    And who is Ms. Ridley?

24  A.    Ms. Ridley was at the time -- I believe she's retired

25  now, but she was the person who oversaw the distribution of

1    those funds.

2    Q.    And in addition to her role overseeing the

3    distribution of those funds, did she have other

4    responsibilities?

5    A.    Many.  HR responsibilities, a number of other

6    responsibilities in her role.  Director of legislative

7    affairs, I believe is the title.

8    Q.    Do you know if that's a state position?

9    A.    It is.

10   Q.    Do you know who had the authority to approve or deny

11   payments under the postage and printing allowance?

12   A.    The speaker of the house for the house side had the

13   ultimate approval to deny or approve those expenses.

14   Q.    Did you communicate with Robin Smith about doing mail

15   pieces under the postage and printing allowance?

16   A.    I did.

17   Q.    Could you tell the jury about those communications

18   with Ms. Smith.

19   A.    She had done -- as I said, I believe I had done one

20   mailer prior to that.  She had done that mailer for me

21   because Robin had run all of my campaigns.  Then when she

22   was elected in 2018, I asked her about a mailer, but

23   recognizing her new role -- because she, like me, was busy

24   in the legislature -- asked her about creating a mailer or

25   how to go about doing one during that particular session.

1    Q.    Have you heard of a company called Phoenix Solutions?

2    A.    Now I have.

3    Q.    How did you first hear about Phoenix Solutions?

4    A.    When the mailer that was sent out in 2020, the one

5    that was -- that I paid for in 2020, when the invoice came,

6    although Robin had forwarded it from her company's e-mail,

7    River Edge Alliance, the invoice actually was to Phoenix

8    Solutions.

9         I didn't initially even notice that.  When it came to

10   my attention, I asked Robin about the company.  And she gave

11   me a -- she told me that she knew Matthew Phoenix, that he

12   had worked -- she had done work with him, that he worked for

13   a company previously in northeast Tennessee, that he and a

14   partner had decided to go out on their own and they had

15   moved to Santa Fe for the lifestyle, but they were familiar

16   with Tennessee politics and they were going to continue to

17   do Tennessee political work, and that they could do the work

18   for me.

19   Q.    And this may be obvious, but I think you explained

20   what she told you about Matthew Phoenix.  Did she say

21   whether there was a connection between Matthew Phoenix and

22   Phoenix Solutions?

23        **MS. SHERWOOD:**  Objection; leading.

24        **THE COURT:**  Response?

25        **MR. PHILLIPS:**  I can rephrase.

1          **THE COURT:**  Okay.  All right.

2          The question is withdrawn.

3  **BY MR. PHILLIPS:**

4  Q.    So you explained what Ms. Smith said about Matthew

5  Phoenix.  Did she say anything else about the company

6  Phoenix Solutions?

7          **MS. SHERWOOD:**  Your Honor, I need to object.  Is

8  the government offering this pursuant to 801(d)(2)(E)?

9          **MR. PHILLIPS:**  Yes.

10         **MS. SHERWOOD:**  May we approach?

11         **THE COURT:**  You may.

12         (WHEREUPON, a bench conference was had out of the

13 hearing of the jury, as follows:)

14         **MS. SHERWOOD:**  I was a little bit asleep at the

15 switch over there, but we'd object to a coconspirator's

16 statement until the conspiracy has been proven.

17         **THE COURT:**  All right.  Have you read my order

18 about how we're doing this?

19         Okay.  This is conditionally admitted, subject to

20 later proof of all requirements for the coconspirator

21 exception.  And, you know, of course, counsel doing the

22 right thing by taking note of a witness and the approximate

23 time of the day and can raise this later.

24         So the Court conditionally admits it.  And one of

25 the things I would note in the future is what we can do to

1  avoid sidebars is to have counsel, for the bench, say, look,

2  this is -- this is hearsay.  You can invoke the

3  coconspirator exception.  I will say it's conditionally

4  admitted, and that will preserve the issue for you.

5          **MS. SHERWOOD:**  Okay.

6          **MS. LONGNECKER:**  Is it possible -- I don't want

7  to interrupt the direct every question.  He's trying to

8  elicit a statement from Ms. Smith.  Could we have a standing

9  objection to 801 -- and the conditional admittance pursuant

10  to 801(d)(2)(E), or do you want us to stand up each time and

11  object for him to make that -- lay that foundation?

12          **THE COURT:**  Well, I mean, if we think -- I mean,

13  we can probably do it conversation by conversation, right?

14  So Mr. Phillips turns the subject of the testimony to a

15  particular conversation between an alleged coconspirator and

16  a witness, I think it's fine to do it, yeah, on a

17  conversation-by-conversation basis so that this objection,

18  for example, covers this whole conversation.  And it would

19  be prudent to reraise the objection every time there is a

20  new conversation or a new e-mail string.

21          You know, multiple e-mails within the same

22  string, I don't think you'd have to make the objection, for

23  example, if there is -- you know.  So if we want to do it

24  that way, if there's a question about that, what's

25  encompassed by the objection, feel free to raise it.  But

```
1   hopefully that won't give folks heartburn as to the -- sort
2   of the block of questioning that's appropriately encompassed
3   by one objection.
4            MS. LONGNECKER:  So this is the -- can we call
5   this the constituent mailer conversation or topic?
6            MR. PHILLIPS:  That's fine by me.
7            THE COURT:  Do you expect for this witness to
8   cover other conversations with Ms. Smith at a later time?
9            MR. PHILLIPS:  No.
10           MS. LONGNECKER:  This may be the only one.
11           THE COURT:  That should make it easy.
12           MR. TADDEI:  I will preview there will probably
13  be some e-mail chains that will be independent exhibits
14  where this may come up, but my understanding of the Court's
15  approach to this would be an objection will be made exhibit
16  by exhibit as long as it's one contained e-mail exchange.
17           THE COURT:  Correct.  Yeah, that could be exhibit
18  by exhibit, yeah.  And not to every particular statement in
19  the exhibit or, if it's an exhibit that's an e-mail string,
20  every particular e-mail, yeah.
21           MS. LONGNECKER:  All that we ask is that we have,
22  like, maybe 30 seconds to try to find the exhibit so we know
23  who the topic is about.  And I don't want to object
24  unnecessarily, but I just want to be able to see the exhibit
25  first and see if it's a different topic or if it's --
```

| | |
|---|---|
| 1 | **THE COURT:** I mean, I do think if, you know, the |
| 2 | offer is made when -- the time the offer is made, if you |
| 3 | need more time to respond to the offer to decide whether to |
| 4 | object or say no objection, just let me know, and I'll give |
| 5 | you the time. |
| 6 | **IN UNISON:** Thank you, Your Honor. |
| 7 | (WHEREUPON, the bench conference concluded, and |
| 8 | the following took place within the presence and hearing of |
| 9 | the jury:) |
| 10 | **THE COURT:** All right. So, Mr. Phillips, you |
| 11 | want to ask another question? You want to proceed that way |
| 12 | or read back kind of where we were? |
| 13 | **MR. PHILLIPS:** I think I'd like to ask the same |
| 14 | question subject to the defenses' reservation. |
| 15 | **THE COURT:** Yeah, yeah. Subject to that |
| 16 | reservation, you may do so. |
| 17 | BY MR. PHILLIPS: |
| 18 | Q.  Thank you, Your Honor. |
| 19 | So Ms. Hazlewood, before we broke, I think that I was |
| 20 | asking you if Ms. Smith had told you anything else about the |
| 21 | company Phoenix Solutions. |
| 22 | **MS. SHERWOOD:** Objection; hearsay. |
| 23 | **MR. PHILLIPS:** 801(d)(2)(E), Your Honor. |
| 24 | **THE COURT:** That is conditionally admitted within |
| 25 | the scope of what we just talked about. |

1    **MS. SHERWOOD:**  Thank you, Your Honor.

2    **THE COURT:**  All right.

3    **BY MR. PHILLIPS:**

4    Q.    You may answer, Ms. Hazlewood.

5    A.    She just mentioned again that Mr. Phoenix had started

6    this company.  It was somebody that she had worked with

7    before and knew personally, and she vouched for his work.

8    Q.    Thank you.

9    **MR. PHILLIPS:**  Ms. Fastenau, could we put up for

10   Ms. Hazlewood, the Court, myself, and the defense

11   Government's Exhibit 428.

12   **THE COURT:**  Yeah.  And while you're doing that,

13   if counsel would approach real quick.  Sorry about that.

14   (WHEREUPON, a bench conference was had out of the

15   hearing of the jury, as follows:)

16   **THE COURT:**  Something just occurred to me, and I

17   think it applies here.

18   When making hearsay objections, keep in mind that

19   there's only a hearsay problem if something is offered to

20   introduce the -- you know, for the truth of the matter

21   asserted.

22   I think we had a classic example where the offer

23   was not at all for the truth of the matter asserted; it was

24   to the contrary.  So my -- you know what I mean?

25   So I would say, to help keep our record cleaner,

1    just to keep in mind that distinction when deciding whether

2    there's a hearsay issue at all.  Okay?

3              All right.  Thank you.

4              (WHEREUPON, the bench conference concluded, and

5    the following took place within the presence and hearing of

6    the jury:)

7              **MR. PHILLIPS:**  And, Ms. Fastenau, can we go to

8    page 3 of Government's Exhibit 428?

9              Your Honor, this exhibit is covered by the

10   parties' stipulation, and we'd move for its admission.

11             **THE COURT:**  All right.  Any objection?

12             **MS. SHERWOOD:**  No, Your Honor.

13             **MR. YARBROUGH:**  No, Your Honor.

14             **THE COURT:**  All right.  Pursuant to the

15   stipulation without objection, Government 428 is admitted.

16             (Government Exhibit 428 was marked and admitted

17   into evidence.)

18   **BY MR. PHILLIPS:**

19   Q.    So, Ms. Hazlewood, do you see where that says Office

20   of the Secretary of State of New Mexico on page 3 of

21   Government's Exhibit 428?

22   A.    I do.

23   Q.    And, under that, it's a certificate of good standing

24   and compliance, right?

25   A.    Yes.

Q.    Can you tell what company that's for?

A.    Phoenix Solutions, LLC.

Q.    And if you look just under that a little bit, do you see the date on which it purports to have filed its articles of organization?

A.    The certificate was issued on November 20th of 2019. The organization date is November 12th of 2019.

Q.    Thank you.

MR. PHILLIPS:  Ms. Fastenau, for the witness and the parties and the Court, can we put up Government's Exhibit 354.

And, Your Honor, the parties have previously stipulated to the authentic and nonhearsay nature of this exhibit.  The government moves for its admission.

THE COURT:  All right.  Any objection?

IN UNISON:  No, Your Honor.

THE COURT:  All right.  Thank you.

Government 354 is admitted.

(Government Exhibit 354 was marked and admitted into evidence.)

BY MR. PHILLIPS:

Q.    So, Ms. Hazlewood, can you see what that document at 354 is?

A.    It is a bank account -- bank account information for Phoenix Solutions, LLC, from First Horizon Bank here in

1    Nashville.

2    Q.    Do you see the signature line there in the middle of

3    page 1?

4    A.    Yes.

5    Q.    If we can scroll to the next page of Government

6    Exhibit 354.

7          And do you see at the top of that page where someone

8    has written their name as the duly designated chief manager

9    of Phoenix Solutions?

10   A.    I do.  It says Cade Cothren.

11   Q.    And when you look down to the middle of the page,

12   as -- at the authorized signer's section, who is identified

13   there?

14   A.    The president, Cade Cothren.

15   Q.    So I think we can take down Government Exhibit 354

16   now.

17         And, Ms. Hazlewood, I'll ask you, at the time that you

18   learned about Phoenix Solutions, did you know that Cade

19   Cothren was behind it?

20   A.    I most certainly did not.

21   Q.    And circling back to that scandal with Mr. Cothren

22   that you described earlier in your testimony, what impact,

23   if any, did that have on Mr. Cothren's reputation in

24   Tennessee politics?

25   A.    I think it pretty much destroyed it.  I know

1   personally I was incredibly upset.  I know it was an

2   embarrassment for the general assembly, for Tennessee, for

3   our caucus, for our party.  And it was certainly an

4   embarrassment to me.  For the very graphic things that were

5   publicized, that I have grandchildren, 10 and 12 years old

6   at the time, and --

7   Q.    I'm sorry to --

8   A.    -- it was -- I'm sorry.

9   Q.    No, I appreciate what you're saying.

10          I think for the purposes of this one, we won't go too

11  far down into what the scandal was, but I appreciate you

12  explaining what the impact was, as you just did.

13          Did you care about the reputation of people involved

14  in your communications with your constituents?

15  A.    I did because I think that reflects on me personally

16  as well as on the legislature itself.

17  Q.    And what impact, if any, did that scandal that we've

18  been talking about have on your views of Mr. Cothren's

19  integrity?

20  A.    Again, as I mentioned, the reputation was pretty much

21  destroyed.  I had no faith or trust in his integrity and no

22  interest in working with him in any fashion.

23  Q.    If you had believed that Mr. Cothren was going to be

24  involved in your constituent communications, would that have

25  been capable of influencing your decision on whether to work

1    with Phoenix Solutions?

2    A.    It would have.

3    Q.    Did Ms. Smith ever tell you anything about a financial

4    arrangement with Mr. Cothren in connection with these

5    constituent communications?

6    A.    She did not.

7    Q.    If you had believed that she had a financial

8    arrangement with Mr. Cothren in connection with the

9    constituent mailings that we've discussed today, would that

10   have had any impact on your decision to work with Ms. Smith?

11   A.    It would have.

12   Q.    In what way?

13   A.    I would not have chosen to do that.  There are many

14   other folks out there who could have done the work.

15              **MR. PHILLIPS:**  Thank you, Ms. Hazlewood.

16              Nothing further from the government at this time.

17              **THE COURT:**  All right.  Thank you.

18              All right.  Ms. Sherwood.

19                          **CROSS-EXAMINATION**

20   **BY MS. SHERWOOD:**

21   Q.    Good morning, Ms. Hazlewood.

22   A.    Good morning.

23   Q.    I'm Cynthia Sherwood, and I represent Cade Cothren.  I

24   have a few questions for you.

25              And the prosecutor governed -- covered quite a few of

1  those questions.  So I will start with first question.

2       Do you agree with me that the general assembly and the

3  state legislature's primary job is to make laws?

4  A.    Yes.

5  Q.    And the general assembly is also responsible -- your

6  duties are also to -- reviewing the annual budget, approving

7  the annual budget.  Is that one of the legislature's jobs?

8  A.    To approve the annual budget is the legislature's job.

9  Q.    Okay.  The general assembly also elects certain state

10 constitutional officers; is that correct?

11      Is that part of your job as well?

12 A.    Yes, we do.

13 Q.    That one of those is Secretary of State Tre Hargett?

14 A.    That's correct, along with the treasurer and

15 comptroller.

16 Q.    And Mr. Hargett was first appointed by the

17 secretary -- to be the secretary of state in 2009, if you're

18 familiar?

19 A.    That was prior to my service.

20 Q.    Okay.  At the most recent vote for Tre Hargett, did

21 you vote for Tre Hargett?

22 A.    I did.

23      The most recent vote where I was present.

24 Q.    Okay.

25      Would it be fair to call those things that we've

```
1    talked about your official duties?

2    A.    I believe so.

3    Q.    Those are the things that the people of Tennessee

4    elected you to do as their representative?

5    A.    Yes.

6    Q.    And the Tennessee legislature is part time; is that

7    right?

8    A.    That's correct --

9    Q.    You meet --

10   A.    -- in theory.

11   Q.    In theory.  As far as when you're in the -- well, I'll

12   go into that a little bit.

13        When you're in the legislature, you meet about 90 days

14   a year; is that right?

15   A.    Approximately, yes.

16   Q.    Okay.  And a lot of people in the -- some legislatures

17   across our country are full-time legislatures; is that

18   right?

19   A.    I believe so.

20   Q.    And then Tennessee's is designated as a part-time one?

21   A.    Yes.

22   Q.    Okay.  Are you aware that many state representatives

23   have other jobs?

24   A.    Yes.

25   Q.    We've got a lot of business owners.  Are you familiar
```

1    that Jeremy Faison owns a pest control business?

2    A.    Yes.

3    Q.    And Jeremy Faison, are you aware that that pest

4    control business used to provide services to the State of

5    Tennessee?

6    A.    No.

7    Q.    Okay.  You're aware that Bud Hulsey was the owner of

8    Burlington Logistics?

9    A.    Actually, I was not.

10   Q.    What about Jay Reedy and his cattle farm?

11   A.    I knew he had a locksmith company.  I don't know about

12   the cattle farm.

13   Q.    Okay.  He has a locksmith company too?

14         And what about Tim Rudd?  Do you know about his direct

15   mail consulting company that he's got?

16   A.    I'm aware he has a company who does some of that work,

17   yes.

18   Q.    Does constituent mail?

19   A.    I believe so.  I've never used him, so I'm not sure.

20   Q.    But a lot of them have separate jobs; is that right?

21   A.    Yes.

22   Q.    And would you agree with me that if you had a real

23   estate company, part of your official duties wouldn't be to

24   sell houses if you were -- for a representative wouldn't be

25   to sell houses, right?

1       They're separate?

2   A.      Right.

3   Q.      Are you aware about Timothy Hill, Matthew Hill --

4   those are also two state representatives, right?  Or one may

5   be a former now.

6   A.      Yes.  I served with both of them.

7   Q.      Okay.  And are you aware that they own a marketing and

8   consulting company?

9   A.      I think I knew that Matthew did something with that.

10  I'm not sure.  I'm not sure I knew what Timothy did.

11  Q.      What about Antonio Parkinson?  He's in the senate, so

12  you might not be as familiar.

13  A.      No, Antonio Parkinson is in the house.

14  Q.      Oh, excuse me.

15          So are you familiar with his consulting company?

16  A.      No, I'm not.

17  Q.      Were you aware that Glen Casada owned a company called

18  Right Way Consulting?

19  A.      I am aware now.  I'm not quite sure when I became

20  aware of that, but I am aware now.

21  Q.      Did Glen Casada ever help you fundraise or help with

22  your campaigns?

23  A.      He was the majority leader, so that was -- part of the

24  job is helping to set up fundraising opportunities for

25  members.

1  Q.    And that's part of a campaign process, correct?

2  A.    That's correct.

3  Q.    And so he helped with yours as part of his role as

4  majority leader?

5  A.    Yes.  Helped in the sense of helping set up events

6  here in Nashville.  I -- he never helped with any event in

7  my district.

8  Q.    And did Cade Cothren help with that as well?

9  A.    Probably since he was on his staff.  But, again, I

10  didn't have direct interaction.

11  Q.    And that was pretty successful work for everybody

12  because you were elected and you've continued to be elected;

13  is that right?

14  A.    I continued to be elected until 2024, yes.

15  Q.    Okay.  You said Ms. Smith has helped you with all of

16  your campaigns since you first ran; is that right?

17  A.    Up until the point that she was elected herself.

18  Q.    Okay.

19  A.    At that point, you know, I felt like she's running her

20  own campaign and so probably did not have time to focus on

21  mine.

22  Q.    Okay.  So once she got elected, she didn't do your

23  campaigns anymore, but she started as your campaign

24  manager -- is it way back in 2010?  What date -- year was

25  that?

1  A.    2014.

2  Q.    2014.  And you said she had done one legislator or

3  constituent mail project for you before you became elected?

4  A.    No.  One prior to the one in 2020.

5  Q.    Okay.  So now I want to move to the postage and

6  printing allowance.  Is that governed by the policies and

7  procedures?  Have you ever read the policies and procedures

8  related to the postage and printing allowance?

9  A.    Probably early on, just in terms of what they could be

10  utilized for.

11  Q.    Okay.  And that is taxpayer-funded money.

12  A.    Those monies come from the general budget, which are

13  taxpayer dollars.

14  Q.    And Ms. Smith reached out to you and offered to do

15  your constituent mailer, the one that you sent out that is

16  at issue here.

17        Do you remember that?

18  A.    I remember us talking about the mailer, yes.

19  Q.    Okay.  And when she reached out to you, did she

20  pressure you in any way to use her company?

21  A.    Actually, it wasn't her company that we used.  I

22  thought it was, but it turned out to be another company.

23  Q.    Well, let's just talk about what -- the conversation.

24  When she reached out to you, she said, "Can I do your

25  mailer?" and you thought she meant River's Edge, correct?

1    A.    You know, it's been a very long time.  I don't

2    remember the specifics of the conversation.  We had a

3    conversation about the viability of doing a legislative

4    mailer.  And she offered to help me pull together pictures,

5    graphics, and the information to go into that mailer.

6              MS. SHERWOOD:  Can you pull up Tab 6,

7    Exhibit 116 -- 119?

8              (Discussion off the record.)

9    BY MS. SHERWOOD:

10   Q.    Okay.  Can you see that, Ms. Hazlewood?

11   A.    I see it.  I'm not sure I can read it.

12   Q.    Can you --

13         Can we make that any bigger?  Thank you.

14         Okay.  Take a look at that and tell me if you

15   recognize that as a text message exchange between you and

16   Ms. Smith on November 14th, 2019.

17   A.    Yes.  That's what is stated, and it's from Robin to

18   me.

19   Q.    Okay.

20         Can you scroll through that so she can take a look at

21   that.

22         Okay.  So looking at that first page, can you -- this

23   is a true and correct text message exchange between you and

24   Ms. Smith; is that right?

25   A.    As far as I can tell, yes.

            MS. SHERWOOD:  Okay.  Your Honor, I'd like to
introduce this as Defendants' Exhibit 119.

            THE COURT:  116?

            MS. SHERWOOD:  119.

            THE COURT:  Is that right?  Okay.  I thought you
said 116.

            MS. SHERWOOD:  I think I did at first, but then I
changed it.

            THE COURT:  Okay.  Any objection to 119 being
admitted?

            MR. PHILLIPS:  Your Honor, we'd ask that the
witness be permitted to review the entire exhibit before
it's admitted.

            THE COURT:  All right.  Fair enough.

            MS. SHERWOOD:  Yes.

            THE COURT:  There was a second page?

            MS. SHERWOOD:  Can you scroll through that so she
can see the exhibit?

            THE COURT:  Are you able to see that bottom green
part?

            THE WITNESS:  Can you bump it up?  Evidently, I
need new contacts.

            THE COURT:  There we go.

            THE WITNESS:  Thank you.  Okay.

///

1 | **BY MS. SHERWOOD:**

2 | Q.    Okay.  So this is a text message exchange between you

3 | and Ms. Smith?

4 | A.    Yes, it is.

5 | Q.    November 14th, 2019, is when it begins; is that right?

6 | A.    Yes.

7 |          **MS. SHERWOOD:**  I would like to introduce this as

8 | Defense Exhibit 119 and publish.

9 |          **THE COURT:**  All right.  Any objection?

10 |          **MR. PHILLIPS:**  If it's just those three pages,

11 | Your Honor, no objection.

12 |          **THE COURT:**  Okay.  I think that's it.  Right?

13 |          **MS. SHERWOOD:**  Yes, that's it.

14 |          **THE COURT:**  All right.  Defendants' 119 is

15 | admitted.

16 |          (Defense Exhibit 119 was marked and admitted into

17 | evidence.)

18 |          **THE COURT:**  Does Mr. Cothren have exhibits that

19 | are specially numbered in his name, or are both defendants'

20 | exhibits all collectively numbered together?

21 |          **MS. SHERWOOD:**  They're collectively numbered

22 | together.

23 |          **THE COURT:**  So this would be Defendants' --

24 | meaning ending S apostrophe -- Defendants' Exhibit 119.

25 |          All right.  Thank you.

1          **MS. SHERWOOD:**  Can you scroll to the top and call

2   out the first text, please?

3   **BY MS. SHERWOOD:**

4   Q.    Okay.  And this is a text from Ms. Smith just reaching

5   out and saying, "Hey, I'm going to work on a mailer.  I want

6   to do a mail survey for you in your district," right?

7   A.    Yes.

8   Q.    And then we look at your response, which is the next

9   text.

10         So do you see that?

11  A.    Yes.

12  Q.    Your immediate response is "I have a healthy balance

13  but will check for the exact amount."

14  A.    Correct.

15  Q.    So would you agree with me that she didn't pressure

16  you in any way to use her company?

17  A.    No.

18  Q.    Okay.  She wouldn't have to because she'd been doing

19  this type of work for you for many years, right?

20  A.    Right.  That's correct.

21         **THE COURT:**  One of the things I think we want to

22  keep in mind as we do the examination, if you look at how

23  that last exchange went:  "Would you agree with me that she

24  didn't pressure you in any way to use her company?"

25         The answer was no.  Makes it sound like you

1  didn't agree with her, but actually you do.

2          **MS. SHERWOOD:** Thank you, Your Honor.

3  **BY MS. SHERWOOD:**

4  Q.  Did Ms. Smith pressure you to use her company?

5  A.  No.

6  Q.  She -- Ms. Smith did not mention Phoenix Solutions to

7  you at all when she asked you if she could do your mailer,

8  did she?

9  A.  No.

10  Q.  She didn't mention Matthew Phoenix to you?

11  A.  No.

12  Q.  In fact, you never even heard the name Phoenix

13  Solutions until you saw the invoice that you received?

14  A.  That's correct.

15  Q.  So she didn't tell you any lies as far as who.  She

16  didn't say, "Hey, can this great company named Phoenix

17  Solutions do your mail work?" did she?  She didn't say that

18  to you?

19  A.  She told me lies about who they were.

20  Q.  We're not there yet.  We're talking about when she

21  offered to do the work for you for this constituent mail,

22  did she mention Phoenix Solutions?

23  A.  There was no conversation.  I was under the assumption

24  that Robin would be doing the work.

25  Q.  Okay.  But just answer my question instead of adding

1  on.  If you want to explain something, you can ask to

2  explain.  But my question was did she tell you -- when she's

3  asking you to do this constituent mail work, did she tell

4  you a single lie when she was trying to get the business,

5  about Phoenix Solutions?

6  A.    No.

7  Q.    Okay.  It was only after -- you say after you got this

8  and I guess you noticed that the invoice is Phoenix

9  Solutions, you said, "Hey, who is this company?" and then

10 she told you what you had mentioned on direct?

11 A.    That's correct.

12 Q.    Right.

13       By that time -- the work had been done, had it not?

14 A.    Yes.  The invoice was postwork.

15 Q.    When Ms. Smith asked you if she could do your

16 constituent mail, did you think she was going to do every

17 single task herself or that she hires vendors to do things?

18 A.    She hired vendors to do printing and those sorts of

19 things, but I assumed that she was doing the work of putting

20 the prototype together.

21 Q.    So -- and, quite frankly, you don't know who did what

22 particular portions of this project, do you?

23 A.    No, I don't.

24 Q.    Okay.  And so you didn't think Ms. Smith was going to

25 be doing every one of these tasks herself, did you?

1    A.    I thought she was going to be developing the mailer.

2    I knew that she wasn't going to physically print it or mail

3    it.

4    Q.    She wasn't going to print it, and sometimes

5    consultants also use designers to help them; is that right?

6    A.    I believe so.

7    Q.    Okay.  Did you ask her who she was going to use as a

8    designer?

9    A.    I don't recall that I did, no.

10   Q.    Did you ask her who she was going to use as a printer?

11   A.    No.  Again, I assumed we would use the same one we had

12   used previously for my other mailings and so forth.

13   Q.    Did you ask her, "Tell me everybody who is going to be

14   working on this mailer with me"?

15   A.    No, I did not.

16   Q.    Okay.  You didn't ask her any questions.  You left it

17   to her own devices who she wanted to use?

18   A.    Again, I assumed that --

19   Q.    That's not my question.  The question is -- I'm not

20   trying to be argumentative, but just --

21   A.    Seems that way, but go ahead.

22   Q.    Did you ask her -- question was did you ask her

23   anything about who she was going to use to help her put this

24   piece together?

25   A.    No.  I didn't.

1    Q.    In one of the exhibits -- it's actually Exhibit 119,

2    again, at page 14.  If we could pull that up.

3         And one of her messages to you, Ms. Smith even

4    mentioned, she said, "I'm going to be sending the copy off

5    to the" -- the copy she wrote off to her design guy?

6            **THE COURT:**  One moment.  If counsel want to

7    approach.  I think I may know what the issue could be

8    logistically.  One moment.

9              (WHEREUPON, a bench conference was had out of the

10    hearing of the jury, as follows:)

11            **THE COURT:**  All right.  I'm going to raise my

12    concern and see whether it was Mr. Phillips'.  I thought 119

13    was just those three texts.

14            Is that your belief and that's why we admitted

15    it?

16            **MR. PHILLIPS:**  That's why I asked if it was only

17    those three pages that were going to be admitted.

18            **MS. SHERWOOD:**  We're just doing those first three

19    pages.

20            **MR. PHILLIPS:**  There was a reference to page 14.

21            **THE COURT:**  Yeah, page 14, right?

22            **MS. LONGNECKER:**  Yes.  Can I offer to give the

23    government a paper copy of this?  And then probably should

24    have done that at the beginning.

25            **MR. PHILLIPS:**  No, that's fine.  I appreciate

1    that.  But I do want, as I said, to have an opportunity to

2    review the whole thing that's going to get admitted before

3    the questioning.

4              **THE COURT:**  I thought what we were all agreeing

5    to admit was the first three texts only.

6              **MS. SHERWOOD:**  That is correct.  So I guess

7    that's just a page in there, so I guess it would have to be

8    119A.

9              **THE COURT:**  All right.  So if the record

10   Ms. Jackson should have is 119, the first two pages is what

11   you have?

12             **MS. SHERWOOD:**  First three.  The first three

13   pages there.

14             **THE COURT:**  All right.  Here's what we're going

15   to do.  We'll take a break now to sort this out, but what we

16   had admitted was three texts, and so that should be clear.

17             Anything else from that that you want entered

18   separately, you need to mark separate and offer separately.

19   Think about what all is going in.

20             So, Ms. Jackson, turns out we'll have a little

21   communication about, you know, making sure that, you know,

22   what is the 119 that was admitted.  And if you had anything

23   in your stack that was bigger than what's going to be

24   admitted, make sure to give it back.

25             **COURTROOM DEPUTY:**  Yes, sir.

1      **THE COURT:**  All right.  Thanks, folks.  We'll let
2  the jury go.
3          (WHEREUPON, the bench conference concluded, and
4  the following took place within the presence and hearing of
5  the jury:)
6          **THE COURT:**  Okay.  Thanks, folks.  Appears to be
7  a good time to make the -- make time for the afternoon
8  break.  We're showing 12:15.  If y'all can be back about
9  1:15, and we'll continue with the cross-examination of
10  Ms. Hazlewood.
11          Please, as always, remember the admonition that I
12  keep giving.  And we'll see you in about an hour.
13          Thank you.  You may step down.
14          (The witness left the witness stand.)
15          (WHEREUPON, the jury was excused from the
16  courtroom at 12:17 p.m., with matters being heard in open
17  court as follows:)
18          **THE COURT:**  Okay.  Thanks.  Please be seated.
19          Do you have something, Mr. Phillips?
20          **MR. PHILLIPS:**  May Ms. Hazlewood be excused,
21  Your Honor?
22          **THE COURT:**  Yeah, yeah.  So she can be excused,
23  and if she's back by 1:15, we should all be good to go.
24  Thank you.
25          All right.  Thanks, folks.  Please be seated.  I

1    did have one question.

2              All right.  So here's the question.  There was a

3    motion in limine directed to, you know, not getting into the

4    precise political party involved that's associated with the

5    defendants.

6              I would say that, you know, maybe things change

7    and that explains it, but I think the defendants themselves

8    took the horse out of that barn with their comments in

9    opening statements.

10             Is that where we are?  Like, there's no secret

11   we're talking about the Republicans here?

12             **MS. SHERWOOD:**  Right.

13             **MR. PHILLIPS:**  I don't think so.

14             **MR. FARMER:**  I actually thought we struck that

15   motion in limine, Your Honor.

16             **THE COURT:**  Did you on the back end?

17             **MR. FARMER:**  Yes.  I think we withdrew that one.

18   You're talking about my motion in limine, I think.

19             **THE COURT:**  Was it?  Yeah.

20             **MR. FARMER:**  And, yeah, I do believe we struck

21   it, but if we didn't --

22             **THE COURT:**  Okay.  And if you did, I think that's

23   great.  We were still all sort of talking around it a little

24   bit during voir dire maybe out of an abundance of caution.

25   So sounds like there's no issue there anymore.

1    **MR. PHILLIPS:**  I think that's right, Your Honor.

2  I just wanted -- this may be a good time to slip one thing

3  in, which is my recollection of the resolution of that

4  motion was that there was also a desire to keep out

5  conservative political ideology.  As the government said,

6  we're really not planning to get into that.

7           It did occur to us that some of the legislative

8  updates and mailers and things like that may have some

9  indicia of political ideology.  Again, we're not really

10 interested in getting very close to the line on that, but we

11 just want the Court to be aware of that issue.

12           **THE COURT:**  You don't plan to introduce any

13 testimony on that point, correct?

14           **MR. PHILLIPS:**  Not other than, you know, these

15 mailers went out.

16           **THE COURT:**  Right.  And you don't plan to

17 introduce any mailers specifically to show conservative

18 ideology; is that right?

19           **MR. PHILLIPS:**  That's right, Your Honor.

20           **THE COURT:**  All right.  Very well.

21           **MS. SHERWOOD:**  We may have -- I mean --

22           **MR. FARMER:**  We do anticipate introducing some

23 mailers, Your Honor, not for the purpose of conservative

24 ideology, but for the purpose that the work was done and

25 this is the product.  But I think, like I said, vis-à-vis

1    the motion in limine, my memory is it was stricken.

2           **THE COURT:**  Yeah.  And, of course, you know, one

3    of the things to note, you would -- and your recollection is

4    probably better than mine on that.  It is -- and possibly

5    because a party that strikes a motion in limine still

6    reserves the right to object at trial even if they're

7    withdrawing the right to seek a ruling in advance of trial

8    excluding the evidence.

9           You know, it still remains possible that that

10   objection could have been raised.  But it sounds like no one

11   is interested in making an issue out of political party

12   affiliation.  And I think that's where we are on that piece,

13   right?

14          Okay.  All right.  Anything else of a preliminary

15   nature that we need to -- or I should say procedural nature

16   or otherwise before we break?

17          Mr. Phillips?

18          **MR. PHILLIPS:**  No, Your Honor.

19          **THE COURT:**  Thank you.

20          Mr. Yarbrough?

21          **MR. YARBROUGH:**  No, Your Honor.

22          **MS. SHERWOOD:**  No, Your Honor.

23          **THE COURT:**  All right.  Thanks, counsel.  We'll

24   see you in about 55 minutes.

25          (Lunch recess 12:22 p.m. to 1:31 p.m.)

        THE COURT:  All right.  We get things sorted out
with Exhibit 119?

        MS. SHERWOOD:  Yes, Your Honor.

        THE COURT:  All right.  Very well.  So I believe
we could have Ms. Hazlewood take the stand.  She can get up
there and . . .

        (The witness resumed the witness stand.)

        THE COURT:  All right.  Ms. Sherwood, if you want
to take the podium, and then we'll call in our jury.  Thanks
very much.

        (WHEREUPON, the jury reentered the courtroom at
1:32 p.m., with matters being heard in open court as
follows:)

        THE COURT:  Thanks, folks.  Please be seated.

        All right.  We'll continue with the
cross-examination.

        MS. SHERWOOD:  Thank you.

BY MS. SHERWOOD:

Q.   Good afternoon, Ms. Hazlewood.

     So where we left off on the break, I was asking you
about a text exchange between you and Ms. Smith.

        MS. SHERWOOD:  And if we could pull that back up,
Exhibit 119.

        And, Your Honor, 119 has been entered; is that
correct?

 1              THE COURT:  So -- and we're talking about the one
 2   with the three texts that we've seen?
 3              MS. SHERWOOD:  Yes, Your Honor.
 4              THE COURT:  That one remains admitted.  And for
 5   clarification, it consists of three different text messages.
 6   All right.  Thank you.
 7              MS. SHERWOOD:  Can we publish that?  Actually,
 8   let's go to -- we've already -- I'm sorry, Your Honor?
 9              THE COURT:  Do you want to pull it up?
10              MS. SHERWOOD:  Actually we can go to 122.  I
11   think we've already discussed 119.
12              THE COURT:  Okay.
13              (Discussion off the record.)
14              THE COURT:  Are y'all seeing the document
15   displayed on your screens?
16              MR. YARBROUGH:  No, sir.
17              (Discussion off the record.)
18   BY MS. SHERWOOD:
19   Q.    Okay.  Ms. Hazlewood, can you look at this and tell me
20   if you recognize this as a text exchange between you and
21   Ms. Smith?
22        Do you need it to be bigger?
23   A.    That would be helpful.
24   Q.    I do too.
25        Do you recognize that as a text exchange between you

1  and Ms. Smith on December 16th, 2019?

2  A.    Yes.

3  Q.    Okay.  And here, you're talking about your constituent

4  mail project that she's doing for you.  And you see in the

5  first sentence she says, "Holding sending" --

6          MS. SHERWOOD:  Well, let me -- I'm sorry.  Before

7  I get into this, could I have this admitted as Defendants'

8  Exhibit 122, please?

9          THE COURT:  Any objection?

10          MR. PHILLIPS:  No objection.

11          THE COURT:  All right.  122 is admitted.

12          (Defense Exhibit 122 was marked and admitted into

13  evidence.)

14          MS. SHERWOOD:  And published?  Okay.

15  BY MS. SHERWOOD:

16  Q.    Do you see on the first line Ms. Smith says, "Holding

17  sending the copy to design until we get it to avoid extra

18  cost."

19          You didn't ask her at that time who she was using for

20  her design work, did you?

21  A.    No.

22          MS. SHERWOOD:  Okay.  Okay.  And then I want to

23  go to Exhibit 123.

24          THE COURT:  Could I ask as point of clarification

25  do we all know just what we mean by "design work" and

1  distinguish that from other work?

2            MS. SHERWOOD:  Yes.

3            THE COURT:  That may be helpful.

4            From your perspective, did you make a distinction

5  between design work and, let's say, content work?  With the

6  content work, I mean like the words, the actual words.  Was

7  there a distinction between that?

8            THE WITNESS:  There probably is, but there really

9  wasn't in my mind.  Again, I was working with Robin on the

10 pictures and the words, so to me it was all one thing.

11           THE COURT:  Okay.  All right.  Then when you --

12 the questioning -- so I'll just leave it to you whether you

13 question when you refer to design work was received the way

14 you want it to be.  And if so, that's fine.

15 BY MS. SHERWOOD:

16 Q.    Okay.  Let me just back up because I've been in the

17 weeds on this for a while, so I'm probably not asking as

18 detailed of questions as I should.

19           With the constituent mail or any of your other types

20 of mail, you just know that you were ordering a product,

21 like a mailer to go to constituents, correct?

22 A.    Yes.

23 Q.    And it came with photographs and printed copy on it

24 and with the constituent mail, like a survey or just updates

25 for your constituents, correct?

1  A.    Yes.

2  Q.    You don't do that type of work, do you?

3  A.    I do not.

4  Q.    So you don't know what all goes into putting together

5  that item?

6  A.    No.

7  Q.    Okay.  And when you look at it, could you see, like,

8  well, maybe, yes, a designer might be involved or a content

9  writer or there's just a lot of pieces to this mail piece?

10  Is that right?

11  A.    There are a lot of pieces.  But previously when I had

12  worked on other mailers with Robin, to my knowledge, she was

13  the only one working on the content.  She might have someone

14  else doing the layout, I guess you would call that, the

15  graphic design; but the content, Robin had always done.

16  Q.    Had you ever asked her, "Are you the only one working

17  on this"?

18  A.    No.

19  Q.    So you don't really know how Robin put together her

20  pieces?

21  A.    No.

22  Q.    So when you read this text, this Exhibit 122, you

23  think, well, she is working with somebody on this to do some

24  type of design work?

25  A.    I probably didn't think about it at all.  It's just

1  this is where we are in the process.  We're waiting for the
2  rest of the information to fill in the hole, and I really
3  didn't give it a lot of thought.
4  Q.    Okay.  Because you trusted Robin to get your mailer
5  done?
6  A.    I did.  I trusted Robin pretty implicitly.
7  Q.    And you guys were friends?
8  A.    Yes.
9  Q.    And she never -- did she ever promise you anything to
10 get you to do this mailer with her?
11       Well, let me say this:  Did she ever promise to vote
12 on a particular bill if you did this mailer with her?
13 A.    No.
14 Q.    Did she ever promise to help you get on a certain
15 legislative committee if you did this mailer with her?
16 A.    No.
17 Q.    It was just as simple as, hey, Patsy, may I do your --
18 do a legislative update for you, and you said sure?
19 A.    As the previous exhibit showed.
20 Q.    Okay.  And you had the freedom to hire whomever you
21 wanted to do your legislative updates, did you not?
22 A.    I did.
23 Q.    At the end of the day, the most important thing that
24 you wanted was a quality mail piece to go to your
25 constituents; is that right?

1    A.    Yes.

2    Q.    Were you satisfied with the quality of this mailer?

3    A.    To the best of my recall.

4    Q.    Do you remember giving any -- you don't remember any

5    complaints about this mailer, do you?

6    A.    No.  Not five years ago, no.

7    Q.    Before the mailer was sent out to the constituents, it

8    had to go to the speaker's office, correct, to get approval

9    or content.  Is that right?

10   A.    That's correct.

11   Q.    So the process is you hire Ms. Smith, then she does

12   it, and then you have to send the prepared mailer to the

13   speaker's office to make sure that it doesn't have any

14   campaigning content, correct?

15   A.    That's my understanding, correct.

16   Q.    Okay.  That's what -- okay.

17         And then, after that, Ms. Smith sends it -- has her

18   printer or whoever send it out, and then you got the

19   invoice.  Right?

20   A.    Yes.

21   Q.    You don't remember having any questions about the

22   invoice amount, do you?  You didn't ask Ms. Smith any

23   questions about it?

24   A.    No.  In the throes of the legislature, I got the

25   invoice, I forwarded it to my treasurer to be paid.

1  Q.    Well, as you sit here today, you don't have any

2  concerns about the amount of the invoice, do you?

3  A.    Perhaps I do at this point.

4  Q.    Oh, because of who did it?

5  A.    Because I'm not certain that the number of pieces that

6  I paid for to be mailed were actually mailed.  I have no way

7  to know.

8  Q.    You don't have any reason to believe that the number

9  of pieces you ordered were not mailed, do you?

10  A.    Only that prior mailings, I'd always received

11  undeliverables back to my post office, because there are

12  always accounts or -- you know, from the database, there are

13  always people whose addresses had changed or whatever.  And

14  I don't recall getting any on this mailer.

15  Q.    Well, you said just a moment ago you had a hard time

16  recalling things from so many years ago.  Is it possible

17  that you don't recall?

18  A.    It's possible that I don't recall, but I am fairly

19  certain that I did not get any because I would have had to

20  go to my post office box to retrieve them.  And I don't

21  recall having a pile of those there, which would have

22  been -- happened in other cases.

23  Q.    Okay.  So you are able to recall that from all those

24  years ago?

25  A.    To the best of my knowledge, I do not recall receiving

1    any returned mailers, which, at the time, didn't really

2    strike me.  But later when I thought about it, it was an

3    anomaly that that had not occurred.

4    Q.    Did you call Ms. Smith or contact Ms. Smith and say,

5    you know, I'm just wondering why I didn't get any returned

6    mailers?

7    A.    No, because by the time I had really got concerned

8    about that, all of this had hit the fan, so to speak.  So

9    no, I did not contact her.

10   Q.    Okay.  So you're saying that, after it became

11   publicized that Phoenix Solutions was involved in preparing

12   the mailers, that's when you became concerned about that?

13   A.    That's when I realized that, you know, I don't think I

14   ever got any return mailers from that particular mailing,

15   yes.

16   Q.    That's just the sole reason that you say that?

17   A.    Yes.

18   Q.    Okay.  Is it possible that you -- that Mr. Cothren and

19   Ms. Smith had a better database?

20   A.    It's possible, but it's entirely -- it would be very

21   odd for there not to be any returned mail.

22   Q.    And, again, you don't do this line of work; is that

23   right?

24   A.    No, but I have sent out a number of mailers.  And

25   always before some were returned.

1  Q.    And I think you said you had done one constituent mail

2  piece with Ms. Smith before?

3  A.    I believe that's correct, yes.

4  Q.    Did you ever complain to anybody about this, what

5  you're saying now, before this -- all of this was in the

6  press?

7  A.    No.

8  Q.    After the invoice was sent to Connie Ridley's office,

9  if the work had been done as it -- let me see if we've got

10 defense exhibit --

11     Can we pull up Defense Exhibit 86.

12     Do you recognize this as the invoice that you got from

13 Phoenix Solutions?

14 A.    Yes.

15 Q.    And this -- it is --

16          MS. SHERWOOD:  Well, I'd like to move to

17 introduce this as exhibit -- sorry about that -- Exhibit 86,

18 please.

19          THE COURT:  Any objection?

20          MR. PHILLIPS:  No objection.

21          THE COURT:  All right.  Defense Exhibit 86 is

22 admitted.

23          (Defense Exhibit 86 was marked and admitted into

24 evidence.)

25 ///

1   **BY MS. SHERWOOD:**

2   Q.    And when you got this invoice, you expected Connie

3   Ridley to approve payment and pay the invoice; is that

4   right?

5   A.    That's correct, since this was for a mailer from the

6   legislative account.

7   Q.    Okay.  And that's her signature on the bottom

8   approving the mailer?

9   A.    Yes.

10  Q.    I mean, not approving the mailer; signing off on the

11  invoice?

12  A.    Yes.

13  Q.    Okay.

14          THE COURT:  The amount of the invoice is

15  $3257.40, right?  Is that what you're saying?

16          THE WITNESS:  Yes.

17          THE COURT:  And that's in excess of $3,000,

18  right?

19          THE WITNESS:  That's correct.

20          THE COURT:  Did the whole invoice get paid or

21  just up to $3,000?

22          I mean, did the -- well, did you get reimbursed

23  for the whole 3,000 to -- did you get reimbursed for the

24  whole $3257.40 or just up to 3,000.

25          THE WITNESS:  It isn't a reimbursement process.

1  This was paid for from the state --

2              THE COURT:  Directly.

3              THE WITNESS:  Yes.  And it was -- there's $3,000

4  per year that's put into the legislative account -- postage

5  account.  But if you don't use it, it accrues.  So I

6  actually had more than $3,000 in the account.  So there was

7  money to cover it.

8              THE COURT:  Gotcha.  Thank you.

9  BY MS. SHERWOOD:

10  Q.   I might be very close to being through.  Just let me

11  check these few more we have.

12       Just want to talk a little bit about the process.  So

13  when you hired Robin to do your mailer, you were -- you had

14  an agreement with Robin; is that right?  If you do my

15  mailer, then I will pay you whatever it is that you agree

16  upon.  Is that right?

17  A.   The cost of the mailer, yes.

18  Q.   Yes.  And she told you what that was going to be, and

19  you agreed to pay that?

20  A.   Actually, I'm not sure that we ever discussed the

21  total price other than I made sure that the balance was in

22  the account to cover.

23  Q.   So she just said I'm going to do your mailer, and

24  you'd worked with her long enough, you said fine, send me

25  the bill?

1   A.    That's pretty much correct.

2   Q.    Okay.  And the agreement was with her.  So let's say

3   if you decided that you were not going to pay her, she'd

4   done the work, they'd put it together, and you were not

5   going to pay her.  It would be you that she would have to

6   come after to try to get her money if she wasn't paid,

7   correct?

8        You were the one that made the agreement with her; is

9   that right?

10   A.    Yes, but the payment would have gone through the

11   state, so I'm not sure how that would have worked in that

12   case.

13   Q.    In this case, the state would pay for the agreement

14   that you reached with Ms. Smith?

15   A.    That's correct.

16   Q.    Because you -- okay.  Because what would have

17   happened -- I don't know that this has ever happened to you

18   because it doesn't sound like you've done too many of these

19   constituent mailers, but if you had not had enough money in

20   your constituent mail account and she did this work, you

21   would have been responsible for paying the balance to

22   Ms. Smith; is that right?

23   A.    That would be my expectation.

24   Q.    The state of Tennessee's only two -- strike that.

25        The state of Tennessee's only involvement with these

1  constituent mailers, sounds like from your testimony, was

2  two things:  Approving the content, which was the speaker's

3  office, and then processing the payments; is that correct?

4  A.    That's my understanding.

5  Q.    When you hired Robin to do your mailer, you expected

6  her to make a profit on that mailer.  That was her business,

7  correct?

8  A.    That's correct.

9  Q.    I wanted to ask just a couple of questions about bills

10  you've gotten passed but not particular bills.

11        So in passing bills, you have to work with various

12  other members of the legislature, sometimes on the house

13  side and the senate side; is that right?

14  A.    Yes.  They have to be passed in both bodies in order

15  to become law.

16  Q.    Sometimes you work with the speaker of the house to

17  get a bill passed if maybe it's one he's interested in or

18  you're interested in?

19  A.    Obviously, you have conversations with the speaker if

20  he has problems with a bill or if you need his support on a

21  bill that you think may be in trouble or you just need

22  guidance.

23  Q.    Is the speaker the one who appoints the officers of

24  the house?

25  A.    He appoints the committee chairs and vice chairs.  The

1  caucus officers are elected --

2  Q.    Okay.

3  A.    -- by the body.

4  Q.    What would you say the most powerful committee chair

5  is?

6  A.    Probably the one I chaired for a while, the house

7  finance, ways, and means.

8  Q.    That's one Speaker Sexton appointed you to?

9  A.    He did ultimately, yes.

10  Q.    Did you ever have any conversations with Glen Casada

11  about that committee?

12  A.    I did.

13  Q.    What was that?

14  A.    When he was running for speaker, we had a number of

15  conversations and -- never overtly, but I think the

16  conversation was along the lines if you can support me, then

17  perhaps that committee chair might be available.  But I was

18  supporting his opponent, Curtis Johnson, and continued to do

19  so.

20  Q.    Okay.  Does the speaker's office have control over

21  assignments where someone's office is?

22  A.    Yes.

23  Q.    Does the speaker have the power to expel an elected

24  state representative from the house?

25  A.    No.

1  Q.    Has Speaker Sexton ever expelled someone from the

2  house before?

3  A.    Speaker Sexton has not.  The house expelled -- we

4  voted to expel three members -- well, two members.  I'm

5  sorry.

6  Q.    Hold on.

7        Are you aware -- there's -- we've talked a little bit

8  about a public scandal earlier.  Are you aware of a public

9  scandal involving Secretary of State Tre Hargett in 2022?

10  A.    I think I know what you're referring to, yes.

11  Q.    Okay.  And yet you support him and you voted him --

12  voted for him in the most recent election to be the

13  secretary of state?

14  A.    Actually, I had voted for him prior to that.  I was

15  not in the legislature to vote post that occurrence.

16  Q.    So you hadn't -- okay.  So you haven't?

17  A.    No.

18  Q.    So what about -- let me see if I have any other

19  questions.  Hold on a second.  We might be done.

20            (Respite.)

21            **MS. SHERWOOD:**  Can we pull up Tab 7, Exhibit 84.

22            **COURTROOM DEPUTY:**  What is the exhibit?

23            **MS. SHERWOOD:**  Defense Exhibit 84.

24  **BY MS. SHERWOOD:**

25  Q.    Ms. Hazlewood, can you see that?

1   A.    No.

2         Now I can.

3   Q.    Okay.  Do you recognize that?

4   A.    Yes, it's a mailer -- one of my mailers.

5   Q.    Is that the constituent mail piece that Ms. Smith did

6   for you that we've been discussing?

7   A.    I honestly don't know.  You'd have to show me the back

8   side.

9   Q.    Let's look at the back side.

10  A.    Yes, I believe that's it.

11          **MS. SHERWOOD:**  All right.  I'd like to introduce

12  that into the record as Defendants' Exhibit -- I believe we

13  said 84.  Yes.

14          **IN UNISON:**  No objection.

15          **THE COURT:**  No objection?  All right.

16          Then 84 will be admitted.

17          (Defense Exhibit 84 was marked and admitted into

18  evidence.)

19          **MS. SHERWOOD:**  Okay.  And I'd like to introduce

20  the original to -- for the Court.

21  **BY MS. SHERWOOD:**

22  Q.    And is this what it looks like in its paper form?

23  A.    Yes.

24          **THE COURT:**  That can be received as the original.

25          **MR. PHILLIPS:**  No objection.

1          **THE COURT:**  Okay.  All right.  Thank you.

2          **MS. SHERWOOD:**  No further questions.

3          Thank you, Ms. Hazlewood.

4          **THE COURT:**  All right.

5          Mr. Farmer?

6                    **CROSS-EXAMINATION**

7    **BY MR. FARMER:**

8    Q.    Good afternoon, Ms. Hazlewood.

9    A.    Good afternoon.

10   Q.    My name is Jonathan Farmer.  I represent Glen Casada.

11         I actually just have a couple questions for you.

12         I heard you testify in response to Ms. Sherwood that

13   the house had voted to expel a couple of legislators.  I

14   just want to be crystal clear.  Glen Casada was not one of

15   those legislators?

16   A.    No, he was not.

17   Q.    And, in fact, Glen Casada was reelected in 2022.  Is

18   that your understanding?

19   A.    I believe that's correct.

20         **MR. FARMER:**  Thank you, Ms. Hazlewood.

21         **THE COURT:**  All right.  Redirect examination?

22         **MR. PHILLIPS:**  Very briefly, Your Honor.

23         **THE COURT:**  All right.

24   ///

25   ///

**REDIRECT EXAMINATION**

**BY MR. PHILLIPS:**

Q.    So, Ms. Hazlewood, on cross-examination from

Ms. Sherwood before lunch, do you remember when she was

asking you if there were any lies that Ms. Smith told you in

connection with getting the business for the constituent

mailer that we discussed?

A.    Yes.

Q.    Do you have any opinion about whether Ms. Smith was

honest with you in that process?

A.    I think she was incredibly dishonest.

Q.    There were also some questions on cross-examination

about whether she pressured you.

      Do you remember those questions?

A.    I do.

Q.    Would you have used Phoenix Solutions if it wasn't for

Ms. Smith?

A.    No, I would not have.  I wouldn't even have known

about them.

          **MR. PHILLIPS:**  Nothing further, Your Honor.

          **MS. SHERWOOD:**  Recross?

          **THE COURT:**  All right.  Within the scope of

redirect.

///

///

1       **RECROSS-EXAMINATION**

2   **BY MS. SHERWOOD:**

3   Q.    Just to clarify, Ms. Hazlewood, you didn't use Phoenix

4   Solutions, did you?  You hired River's Edge; is that right?

5   A.    Actually, there was not a contract with River's Edge.

6   There was just -- I didn't have a contract, period.  I just

7   received an invoice from Phoenix Solutions.

8   Q.    Okay.  You had a contract.  Do you know a contract can

9   be verbal, an offer and an acceptance, right?

10  A.    Right.  But there's never a discussion about the

11  contract or the identity.  I just made an assumption that it

12  was River's Edge.

13  Q.    Okay.  And so the verbal agreement that you entered

14  into Ms. Smith was as simple as this:  She said, "I'll do

15  your mailer," and you said, "Accepted.  Okay.  I'll pay you

16  when you send the invoice," right?

17  A.    Pretty much.

18  Q.    Okay.  So that agreement was with Ms. Smith, not

19  Phoenix Solutions?

20  A.    That's right.

21  Q.    Okay.  What it is, is you're just -- you don't like

22  the fact -- because you don't like Mr. Cothren, you don't

23  like the fact that Ms. Smith used him to work on your

24  mailer; is that right?

25  A.    I don't like the fact that I was misled, that I was

1  led to believe that work was being done by someone that I

2  would have never known of, heard of.

3      I was told -- I was lied to and told that Matthew

4  Phoenix was a real person.  Phoenix Solutions was a company

5  headquartered in Santa Fe, New Mexico, and that this person

6  had previously, as Matthew Phoenix, done work in Tennessee

7  for political campaigns and would continue to do so from

8  Santa Fe.

9      All of that was a total and complete fabrication.

10 Q.    Ms. Hazlewood, did Ms. Smith tell you any of those

11 things before you hired her to do the mail piece?

12 A.    No.

13 Q.    Did she tell you any of those things while she was

14 working on the mail piece?

15 A.    Not that I recall -- well, no, not that I recall.

16 Q.    You thinking now maybe you might have heard about it

17 while she was working on the mail piece?

18 A.    No, because I didn't know about Phoenix Solutions

19 until after the invoice came, which would have been after

20 the development of the piece.

21 Q.    Okay.  So you -- she never mentioned any of those

22 things you just said while she was working on the piece?

23 A.    No.  I was told that when I questioned who --

24 Q.    Just yes or no.  Just yes or no.

25 A.    No.

1  Q.    And she never told you any of those things before the

2  work was completed?

3  A.    I can't be certain about the timing, but I don't think

4  so.

5  Q.    Okay.  So Ms. Smith told you no lies while she -- when

6  she made this offer to you?

7  A.    No.

8  Q.    Thank you.

9        You're saying no -- you're saying she did not?

10 A.    She did not overtly lie.

11 Q.    You're just saying you would have liked to have known?

12 A.    I'm saying I would have liked to have known.  It was a

13 decision.  There are many other people who could have done

14 the work, and I would not have used Cade or his company.

15 Q.    Did you ask her who she was using?

16 A.    I did not.  And that's bad on me.

17        **MS. SHERWOOD:**  No further questions.

18        **THE COURT:**  All right.

19        You may step down.  Thank you, Ms. Hazlewood.

20        Oh, do you --

21        **MR. FARMER:**  No.  I was simply going to say

22 nothing from Mr. Casada, Your Honor.

23        (The witness stepped down.)

24        **THE COURT:**  Okay.  Thank you.  I'll tell you

25 what, though.  I'll be careful to double-check you don't

1  have any recross in the future.

2          MR. FARMER:  Thank you.

3          THE COURT:  All right.  If counsel want to

4  approach on something real quick.

5          (WHEREUPON, a bench conference was had out of the

6  hearing of the jury, as follows:)

7          THE COURT:  All right.  I'm hesitant to raise

8  this because I don't like to put ideas in counsels' head

9  where I don't have to.  And here, I think I just need to

10  raise this.

11          Do the defendants plan to bring out or make the

12  point -- I think this is where you were going -- that

13  such-and-such politician had a scandal and yet witnesses

14  continued to support them?

15          I don't understand that.  Once you do that,

16  aren't you drawing a -- aren't you inviting the government

17  to draw a comparison between the scandal that you're drawing

18  out and their scandal?

19          Because if I'm the government and you're saying,

20  "That's interesting.  This guy had a scandal, and you

21  continued to support him, isn't that interesting," if that

22  happens, the government absolutely can get into the game of

23  comparing scandals.  And you don't want that, right?

24          MS. SHERWOOD:  I guess that's where -- we thought

25  it through thinking if we'd just use this same order, but I

1  guess didn't think it through.

2       **THE COURT:**  Yeah, I do think if -- once you go

3  there, then it's only fair for the government to say to the

4  witness why the scandal was different.  So I just wanted to

5  caution that because that makes sense.

6       And I think that will help us stick to what we

7  agreed to earlier and do what I'm -- I only speak for

8  myself, but I'm confident that what counsel want to do is if

9  we can prevent this from being a trial about really

10 unfortunate remarks on those matters, so --

11      **MS. SHERWOOD:**  Thank you.

12      **THE COURT:**  -- does that make sense?

13      **MS. SHERWOOD:**  Yes, Your Honor.

14      **THE COURT:**  Okay.  Thank you.

15      **IN UNISON:**  Yes.

16      (WHEREUPON, the bench conference concluded, and

17 the following took place within the presence and hearing of

18 the jury:)

19      **THE COURT:**  All right.  If the government wishes

20 to call its next witness.

21      **MR. TADDEI:**  Your Honor, the government calls

22 Esther Helton.

23      **THE COURT:**  All right.

24      (The witness was sworn.)

25 ///

```
1                        *   *   *

2                  ESTHER HELTON-HAYNES,

3    was called as a witness, and after having been first duly

4    sworn, testified as follows:

5                      DIRECT EXAMINATION

6    BY MR. TADDEI:

7    Q.    Good afternoon, ma'am.

8    A.    Good afternoon.

9    Q.    Can you please introduce yourself to the jury.

10   A.    Yes.  My name is Esther Helton-Haynes.

11   Q.    And what's your job, Ms. Helton-Haynes?

12   A.    I serve in the House of Representatives.  I represent

13   District 30.

14   Q.    How long have you worked in the House of

15   Representatives?

16   A.    For seven years.

17   Q.    By House of Representatives, do you mean here in

18   Tennessee?

19   A.    Yes, I do.

20   Q.    And is representative an elected position?

21   A.    It is.

22   Q.    What did you do before you were a representative?

23   A.    I served on the East Ridge City Council, and I've

24   also -- have a career as a nurse.  I'm currently not

25   practicing.
```

1    Q.    Are you a member of a particular caucus within the
2    House of Representatives?
3    A.    I am.
4    Q.    And what caucus is that?
5    A.    The Republican caucus.
6    Q.    Do you know an individual named Glen Casada?
7    A.    I do.
8    Q.    Do you see Mr. Casada in the courtroom today?
9    A.    Yes, I do.
10   Q.    Can you identify him by an article of clothing?
11   A.    Looks like he has on a -- maybe a gray tie.
12             MR. TADDEI:  Your Honor, may the record reflect
13   the witness has identified --
14             MR. YARBROUGH:  Your Honor there's not really an
15   issue of identity in this case.
16             THE COURT:  Let's approach on this real quick.
17             (WHEREUPON, a bench conference was had out of the
18   hearing of the jury, as follows:)
19             THE COURT:  And I think I know what you're
20   saying.  I also have seen different approaches to the extent
21   to which you need to have a particular witness point out who
22   it is you're talking about.  But I think if we can get a
23   stipulation that, when a witness refers to Mr. Cothren or
24   Mr. Casada, it's y'all's clients, then you can probably
25   forego that.

1          And I think one of the issues that I think is

2    fair on Mr. Yarbrough's behalf is, you know, sort of shining

3    a spotlight personally on the defendant over and over, if

4    it's not necessary, is not a good thing.

5          **MR. TADDEI:**  I think that's fair, Your Honor.

6          **MR. YARBROUGH:**  We're not going to raise any

7    issues about who's who.

8          **MR. TADDEI:**  The only question that I would have,

9    if I could add one more thing, is if there are questions

10   that are raised about -- the only thing I'll raise in

11   addition to that, if there are questions raised about how

12   familiar a particular witness is with these people, to the

13   degree they could recognize them, they know exactly who they

14   are, could be relevant in that circumstance --

15         **THE COURT:**  Well, I will say, look, if there

16   seems to be some issue that arises for a particular witness,

17   then -- you know, then I think you can address it.  I don't

18   know if I need to say something to the jury.  We have an

19   objection here.  If I think -- if I resolve the objection, I

20   should probably -- you know, I have to say something about

21   whether I'm sustaining the objection.

22         So do we let this slide, this one slide, or do I

23   sustain the objection but instruct the jury, you know, that

24   unless instructed otherwise, if a counsel refers to

25   Mr. Cothren, it's Defendant 2, and if it refers to

1    Mr. Casada, it's Defendant 1, so we don't have to do this.

2         **MS. LONGNECKER:**  We're going to frame it in terms

3    of the stipulation that the parties have agreed -- you're

4    sustaining the objection that the parties agreed that people

5    are referring to Mr. Casada and Mr. Cothren.

6         **THE COURT:**  Unless otherwise instructed.

7         **MS. LONGNECKER:**  Yeah.

8         **THE COURT:**  Does that work?

9         **MR. TADDEI:**  That works.

10        (WHEREUPON, the bench conference concluded, and

11   the following took place within the presence and hearing of

12   the jury:)

13        **THE COURT:**  All right, folks.  I'm going to

14   sustain the objection.  There was a question basically

15   asking the witness to specifically identify Mr. Casada.  The

16   parties have stipulated, and therefore, you should accept as

17   true, that if a party refers to Mr. Cothren, you know, the

18   testimony indicates they're talking about Cade Cothren or

19   Mr. Cothren, then he's talking about our defendant

20   Mr. Cothren here; and that if a party refers to Mr. Casada

21   or Representative Casada or Glen Casada, anything along

22   those lines, he's referring to Mr. Glen Casada, our

23   defendant in this case, unless I happen to instruct you

24   otherwise.  And that way, we won't have to go through the

25   identification each time by the witness.

```
 1              All right.  Thank you.  You may proceed,
 2    Mr. Taddei.
 3              MR. TADDEI:  Thank you, Your Honor.
 4    BY MR. TADDEI:
 5    Q.    To back up, Representative Helton, the question was,
 6    do you know Mr. Casada?
 7    A.    Yes, I do.
 8    Q.    How do you know Mr. Casada?
 9    A.    I know him through the legislature.  I served with
10    him.
11    Q.    Okay.  By serve with him, do you mean were you and
12    Mr. Casada both members of the House of Representatives
13    together?
14    A.    Yes.
15    Q.    Do you know a person named Cade Cothren?
16    A.    Yes.
17    Q.    How do you know Mr. Cothren?
18    A.    He was the chief of staff for Glen Casada.
19    Q.    For the following questions, I'm going to ask you if
20    you can just answer yes or no.
21         Around May 2019, was there a scandal relating to Cade
22    Cothren and Glen Casada?
23    A.    Yes.
24    Q.    Was the scandal widely reported in Tennessee media?
25    A.    Yes.
```

1  Q.    Did Cothren resign from his position as chief of staff

2  soon after news of the scandal broke?

3  A.    Yes.

4  Q.    Due in whole or in part to the scandal, did the

5  majority of the House Republican Caucus vote they had no

6  confidence in Casada as speaker?

7  A.    Yes.

8  Q.    Did Mr. Casada step down from his speakership shortly

9  after that and remain an ordinary house representative?

10  A.    Yes.

11  Q.    Switching gears a little bit, do you know a person

12  named Robin Smith?

13  A.    I do.

14  Q.    How do you know Ms. Smith?

15  A.    I served with her in the legislature, but I knew her

16  prior as well.

17  Q.    What context did you know her prior?

18  A.    Through political circles, and she was friends with --

19  we had mutual friends.

20  Q.    Are you familiar with the Tennessee legislature's

21  postage and printing account program?

22  A.    I am.

23  Q.    What is that program?

24  A.    You can do legislative updates with that.  You can buy

25  flags for constituents.  You can have certificates framed,

1  things like that.

2  Q.    By "you," who can use it?  Who do you mean?

3  A.    I can use it.

4  Q.    By "I," in your position as a state representative?

5  Is that what you mean?

6  A.    Yes.  Yes.

7  Q.    Had you used it before 2019?

8  A.    No.

9  Q.    Where does the money come from to pay for some of

10 those things that you just mentioned?

11 A.    State.

12 Q.    Who has the authority to approve the expenditure of

13 that money for a constituent mailer?

14 A.    I believe Connie Ridley did and the speaker of the

15 house.

16 Q.    Okay.  And you mentioned the name Connie Ridley.  Who

17 is Connie Ridley?

18 A.    She was a legislative -- I think she was legislative

19 director.

20 Q.    Okay.  Did she work under the speaker's office in some

21 way?

22 A.    I think so.

23 Q.    Who had the authority to approve or deny a vendor for

24 the printing account program?

25        MS. SHERWOOD:  Objection; assumes facts not in

1    evidence.

2              **THE COURT:** All right.  Response to that?

3              **MR. TADDEI:** I can rephrase, Your Honor.

4              **THE COURT:** The question is withdrawn.

5    **BY MR. TADDEI:**

6    Q.   If you know, did somebody within the Tennessee

7    legislature have the authority to approve or deny a vendor

8    for the postage program?

9    A.   Yes.

10   Q.   Who had that authority?

11   A.   I think the speaker's office.

12   Q.   In early 2020, did Robin Smith offer to do mailer work

13   for your house office?

14   A.   Yes, she did.

15             **MR. TADDEI:** If we could bring up, just for the

16   witness and for the Court, Government Exhibit 109.

17   **BY MR. TADDEI:**

18   Q.   Ms. Helton-Haynes, if I could direct your attention to

19   the screen in front of you, is this an e-mail chain?

20   A.   It is.

21   Q.   Who is on this e-mail chain?  What people?

22             **MS. SHERWOOD:** Objection; hearsay.

23             **THE COURT:** I don't think the question invited

24   any testimony about a statement --

25             **MS. SHERWOOD:** Okay.

1      **THE COURT:**  -- so I'm not sure I see a basis for

2  the hearsay objection.  Can you clarify?

3      **MS. SHERWOOD:**  I would just say the e-mail being

4  hearsay.

5      **THE COURT:**  Oh, you're objecting to -- okay.  So

6  you're a little ahead of us, but all right.

7      Okay.  Is this -- well, I'll tell you what.

8  Let's -- let's walk through the process of getting to the

9  point where you do offer the exhibit, and then we can see

10  where we are.

11      You can make an objection at that time.

12      **MS. SHERWOOD:**  Thank you.

13      **THE COURT:**  Thank you.

14      **MR. TADDEI:**  Thank you, Your Honor.

15  **BY MR. TADDEI:**

16  Q.   Ms. Helton-Haynes, so the question was:  What

17  individuals are on this e-mail chain?

18  A.   Me and Robin Smith.

19  Q.   And what's the subject?

20  A.   It's about a legislative update.

21      **MR. TADDEI:**  Your Honor, the government moves to

22  admit Government Exhibit 109.

23      **MS. SHERWOOD:**  No objection.

24      **THE COURT:**  All right.  Government Exhibit 109 is

25  admitted.

         1              MR. TADDEI:  Could we publish this for the jury,
         2   please.
         3              MS. SHERWOOD:  Your Honor, the first objection --
         4   I object because admitting this e-mail, I was -- the content
         5   of the e-mail is a coconspirator -- I mean, it's hearsay,
         6   the content of the e-mail.
         7              THE COURT:  Is not the purpose of the exhibit
         8   actually the effect on the listener?  Are there any factual
         9   assertions in here that really are -- this is being offered
        10   for?
        11              I can ask the government, but it seems to me it's
        12   really effect on the listener, right?
        13              MS. SHERWOOD:  I withdraw it, Your Honor.
        14              THE COURT:  All right.  Thank you.  So 109 is
        15   admitted.
        16              (Government Exhibit 109 was marked and admitted
        17   into evidence.)
        18              MR. TADDEI:  Thank you, Your Honor.
        19   BY MR. TADDEI:
        20   Q.    So drawing your attention to the bottom e-mail first.
        21   What's being discussed here?
        22   A.    It's the legislative update.  If I want a survey or a
        23   legislative update, and I said legislative update.
        24   Q.    Okay.  And what's the date of this e-mail?
        25   A.    November 27th, 2019.

1  Q.   Okay.  What are you, I guess, agreeing to do with

2  Ms. Smith here?

3  A.   A legislative update.

4  Q.   Okay.

5       And we can take down that exhibit, please.

6       In terms of this legislative update, who do you think

7  would be doing the work to put that together?

8  A.   Robin.

9  Q.   Was there a company that you think would be associated

10  with the work?

11  A.   Her company, River's Edge Alliance.

12  Q.   Now, did you go forward with hiring Ms. Smith to do

13  that legislative update on behalf of your office?

14  A.   I did.

15       **MR. TADDEI:**  Can we bring up Government

16  Exhibit 110 for the witness and for the Court, please.

17  **BY MR. TADDEI:**

18  Q.   Is this an e-mail?

19  A.   It is.

20  Q.   And who are the parties on the e-mail?

21  A.   Robin Smith and me.

22  Q.   And what's the subject?

23  A.   The legislative update.

24       **MR. TADDEI:**  Your Honor, the government moves to

25  admit Government Exhibit 110.

1            **MS. SHERWOOD:**  No objection.

2            **THE COURT:**  All right.  110 will be admitted.

3            (Government Exhibit 110 was marked and admitted

4    into evidence.)

5    **BY MR. TADDEI:**

6    Q.    Directing your attention, Ms. Helton-Haynes, to the

7    body of the e-mail, what is the -- I guess the banner at the

8    bottom, what does that say?

9    A.    River's Edge Alliance.

10    Q.    And what is Ms. Smith communicating to you in the body

11    of the e-mail?  You don't have to read the whole thing; you

12    can summarize your understanding.

13    A.    Well, she said it was approved by the speaker's office

14    and going to send it to, most likely, GOP voters.

15    Q.    Okay.  Is this the process that you understood for the

16    approval and the sending of legislative mailers?

17    A.    Yes.

18            **MR. TADDEI:**  We can take down this exhibit as

19    well, please, Lauren.

20    **BY MR. TADDEI:**

21    Q.    Around this time that that e-mail is sent in January

22    of 2020, had you heard of a company called Phoenix

23    Solutions?

24    A.    I had not.

25    Q.    When you hired River's Edge Alliance, did you think

1  any of the money would go to a company called Phoenix
2  Solutions?
3  A.    I did not.
4  Q.    Did you care about the reputation of people involved
5  in your communications with your constituents?
6  A.    Yes.
7  Q.    Why?
8  A.    Because if they have a bad reputation, it reflects
9  poorly on me.
10  Q.    Could it reflect poorly on your office?
11  A.    It could.
12  Q.    Circling back to the 2019 scandal between Mr. Casada
13  and Mr. Cothren, after that scandal, what was Mr. Cothren's
14  reputation in the Tennessee legislature community?
15  A.    It was not good.
16  Q.    What's Mr. Casada's reputation in the Tennessee
17  legislature community?
18  A.    Not good.
19  Q.    If you had believed that Mr. Cothren would have been
20  involved in your constituent communications, would that have
21  been capable of influencing your decision to do this project
22  with Robin Smith?
23  A.    Yes.
24  Q.    If you had believed that Mr. Casada was involved in
25  the company handling your constituent communications, would

```
1    that have been capable of influencing your decision?
2              MS. SHERWOOD:  Objection; leading.
3              THE COURT:  All right.  Response as to whether
4    that's leading.
5              MR. TADDEI:  It's not leading, Your Honor.  It's
6    permissible to ask hypotheticals.  And if Your Honor would
7    like to inquire further, I'd be happy to approach and
8    discuss with more detail.
9              THE COURT:  All right.  Yeah, let's approach on
10   this one.
11             (WHEREUPON, a bench conference was had out of the
12   hearing of the jury, as follows:)
13             THE COURT:  Okay.  So the general idea is you're
14   thinking if -- you know, the question is if you had known or
15   understood or believed that Mr. Casada was involved -- you
16   know, the way you asked the question, the yes-or-no question
17   was -- how do you recall the way you said it?
18             MR. TADDEI:  The way I believe I said it was if
19   you had believed that Mr. Casada was involved in the company
20   handling your communications, would that have been capable
21   of influencing your decision?
22             MS. SHERWOOD:  That's yes-or-no.
23             THE COURT:  And so --
24             MR. FARMER:  For the record, Your Honor, we join
25   in the objection as well.
```

1          THE COURT:  Yeah.  I think, based on this

2     objection, it's -- and it's so clearly geared directly to an

3     element, I think the way to do it is to ask it more -- I

4     think it's fair to ask about it more open-ended, and then,

5     you know, whatever -- one or more open-ended questions.  And

6     then when the time comes in closing arguments to say that

7     this -- the answers given reflect that.

8          Otherwise, I do think we're having the witness

9     being asked, really, in the -- in words that were pretty

10    much like the element, whether it is, in fact, the case.

11         So you'll have discretion to ask open-ended

12    questions and discretion to ask the jury to draw the

13    inference at closing you need them to draw.  But I think

14    it's -- probably sustain the objection.

15         All right.  Thank you.

16         **IN UNISON:**  Thank you, Your Honor.

17         (WHEREUPON, the bench conference concluded, and

18    the following took place within the presence and hearing of

19    the jury:)

20         **THE COURT:**  All right.  So that objection is

21    sustained.

22         Mr. Taddei may ask another question.

23    **BY MR. TADDEI:**

24    Q.   When you discussed River's Edge Alliance with

25    Ms. Smith, did she mention anyone else being involved in our

1  company?

2  A.    No.

3  Q.    Did you know whether Mr. Casada was involved or

4  associated with her company?

5  A.    No.

6  Q.    If you had believed that he was, would that have

7  influenced your decision to work with Ms. Smith?

8              MR. FARMER:  Your Honor, same objection.

9              THE COURT:  Yeah, I think I'm going to sustain

10 that objection.  You're welcome to ask another one,

11 nonleading, related to the topic you're interested in.

12             MR. TADDEI:  We can move on, Your Honor.

13 BY MR. TADDEI:

14 Q.    Moving past early 2020, did you eventually become

15 familiar with a company called Phoenix Solutions?

16 A.    Yes.

17 Q.    In fall 2020 did you hire Phoenix Solutions to do work

18 for your campaign?

19             MS. SHERWOOD:  Objection.

20             THE COURT:  And what is the basis for the

21 objection?

22             MS. SHERWOOD:  Relevance.

23             May we approach?

24             THE COURT:  You may.

25             (WHEREUPON, a bench conference was had out of the

1    hearing of the jury, as follows:)

2              **THE COURT:**  Okay.  All right.

3              **MS. SHERWOOD:**  This is campaign-related work, so

4    this is the objection that we were talking about at the

5    pretrial conference.  We object to any of the campaign work

6    being admissible.  First of all, it's not relevant.  It's

7    not res gestae.  And it's -- for all the reasons that we

8    said at the hearing.  I don't know if we need to --

9              **THE COURT:**  Well, okay.  Yeah.  Let me say this:

10   First thing to say is I thought that a big part of the

11   motion in limine was that the jury would be confused by the

12   difference between the three.  I just thought on the opening

13   statement, defense counsel -- and this is to their credit --

14   over and over hammered home the difference.  And to

15   Ms. Longnecker's credit, anyone that doesn't understand the

16   difference wasn't listening.

17             And I think the notion of any confusion is right

18   out the window because -- and I also think the defendants --

19   even the defendants themselves have, without conceding that

20   this is relevant -- that's not what I'm saying.  I -- but

21   what I am saying is the defendants themselves have said --

22   have raised the issue of, hey, it's important to realize the

23   distinction between the different kinds of work.  And it

24   is -- and I think the defense is in prime position on

25   cross-examination and closing to limit the effect or any

```
1   improper inferences that could be drawn to references to the
2   caucus work.
3            Now, having said that, that's -- so I think that
4   goes to a main part of, I think, the motion in limine.  I'm
5   not at all thinking there's going to be confusion.
6            Now, on the issue did have -- but that's a 403
7   thing, right?
8            On the issue of relevance, what is the relevance?
9            MR. TADDEI:  The issue of relevance is, this was
10  continued concealment and false statements by Robin Smith --
11           MS. SHERWOOD:  You're too loud.
12           MR. TADDEI:  I'm not too loud.
13           MS. SHERWOOD:  He's too loud.
14           MR. TADDEI:  -- continued concealment and efforts
15  by Robin Smith to hide the fact that Cade Cothren was
16  involved in not only Phoenix Solutions but associated with
17  her and her companies.  She lies about --
18           Can I please finish my answer?
19           THE COURT:  All right.  You're thinking he's
20  speaking too -- all right.  We'll all speak as softly as we
21  can.  It's not easy up here.
22           MR. TADDEI:  So continued concealment,
23  Your Honor.  Her opinion as to working at Phoenix Solutions
24  is also relevant for materiality as to earlier unknowing
25  work with Phoenix Solutions through River's Edge Alliance.
```

1        **THE COURT:** One of the things that I would say

2   about this -- I mean, part of me would be inclined to take

3   the following approach, that when I came into today, take

4   the following approach: Maybe there could be a little

5   evidence of concealment on non-mailer-related stuff, non-PPA

6   stuff on the issue of concealment, but there wouldn't

7   necessarily need to be that much because I thought the fact

8   of concealment was not really an issue.

9        I did hear the opening statement to hear

10  defendants downplay the fact of concealment or that it

11  mattered or that it was being concealed from everyone. And

12  I think that puts in play the need for additional evidence

13  as to the extent of the concealment, and it definitely makes

14  this relevant.

15       Now, I'm happy to give considerable limiting

16  instruction. But another piece on the 401/403 analysis is

17  sort of, you know, a waste of time and cumulativeness and so

18  forth.

19       How long are you going to take on this?

20       **MR. TADDEI:** I mean, I think I have seven or

21  eight questions.

22       **MS. SHERWOOD:** Your Honor, just an additional

23  piece, this isn't the same. She just -- you just heard that

24  what -- she wasn't lied to about --

25            (Reporter clarification.)

 1          MS. SHERWOOD:  You just heard this witness

 2   testify -- well, you haven't heard yet; you heard

 3   Ms. Hazlewood testify.  There were no lies told to her.

 4   None.  There was concealment.  Okay?  Didn't tell.

 5          What you're about to hear is that there were lies

 6   told.  They don't have it on the postage and printing.

 7   Ms. Helton is going to say she never heard of any exclusions

 8   either for the postage and printing.  So they want to bring

 9   in the campaign to get the lie they don't have.  It's not

10   the same.

11          THE COURT:  Well, is the lie about concealment?

12          MR. TADDEI:  The lie is continuing.

13          MS. SHERWOOD:  No, it's overt, to say, "I'm

14   Matthew Phoenix" to her, which he did not do that in the

15   postage and printing.

16          THE COURT:  Okay.  Here's what I'm saying,

17   though.  You know, my view is that the -- whether it

18   mattered that Matthew Phoenix's identity was concealed, the

19   extent of the concealment, whether the defendants really

20   cared about concealing, has been put in issue.  And I just

21   don't see that, well, just because it's not the postage and

22   printing allowance matter, that somehow that means we can't

23   have evidence related to concealment.  That's kind of where

24   I'm coming from.

25          I'm happy to give a limiting instruction, but I

1    do think -- you know, and I think -- you know, I'm really

2    not taking a sort of a one-size-fits-all approach.  I'm

3    basing it on what I'm hearing the -- what's really in

4    dispute in this case.  I think it does go to an issue that

5    is in dispute as identified.

6            So I think it's relevant.  I'm not seeing a 403

7    issue where anything substantially outweighs the probative

8    value, which may not be great, but I just think we're going

9    to be in a situation where, based on whenever we get to

10   closing and the defendants are going to say, sure, there was

11   concealment, but it wasn't that big of a deal; it wasn't

12   everyone; it wasn't that extensive.

13           And that's why I think they're able to get into

14   it.

15           **MR. TADDEI:**  Your Honor, if I may, one additional

16   aspect of this, too, is motive.  She brought up the opening

17   statements.  They made a big deal over the allegation that

18   this is only 4,000, $7,000; it's small potatoes.  The motive

19   here, with respect to the mailer program evidence

20   originally, was to get that business and then to continue

21   making additional money.

22           If they're going to make the arguments that what

23   they got was small potatoes, this goes directly to their

24   motive for bigger business later on.

25           **THE COURT:**  I think that's a fair point.  You can

1    respond on that.  But I do think what was implicit in the

2    argument was, this was not worth doing anything bad about,

3    but -- and I think they're allowed to respond to that.

4           Now, none of this is -- you know, one of the

5    things, of course, about all of this is, if this evidence

6    comes in, that's going to give the government some ability

7    to obviously make its case on particular issues that I think

8    ultimately do go to elements in the case.

9           But I also think none of it fundamentally -- I'm

10   just going to say this because this goes to what I'm

11   thinking about and what jury instructions we need to give.

12   And it's going to color my additional views on evidentiary

13   motions.

14          That, you know, in thinking about what's at issue

15   and what isn't and what this goes to, I do think it goes to

16   contested issues.  But an interesting thing is, it doesn't

17   really fundamentally affect at least a huge defense theory,

18   which is that concealment could have been really bad.  You

19   still don't have a federal crime.  And I'm cognizant of that

20   as well.

21          But I do think that there is an issue about how

22   motivated Mr. Cothren was to conceal and why.  And you know

23   from a prior motion in limine ruling of mine that I'm not

24   going to take everything as motive evidence.

25          But I do think that the battle lines have been

1  drawn a bit about whether motive that would be indicative of

2  the kind of intent that -- whatever the jury instructions

3  are going to be -- the kind of intent required to violate

4  the statutes.  There have been battle lines drawn about the

5  nature, extent, probably the time duration also of

6  Mr. Cothren's motive to conceal who's behind Phoenix

7  Solutions.

8          So I'm going to let -- you know, you can object

9  to any particular question.  I'm going to overrule the

10 objection as to this line of questioning.  But, you know, I

11 don't know if there needs to be a limiting instructions.

12 One of the things --

13         **MS. SHERWOOD:**  Yes.  We would request one.  And

14 is it going to be document -- he's going to introduce

15 documents on this is what --

16         **MR. TADDEI:**  I was planning on showing her an

17 e-mail chain between her and Robin Smith in which Robin

18 Smith introduces her to Matthew Phoenix.

19         **MS. SHERWOOD:**  Why can't she just testify that?

20 The more of this cumulative --

21         **MR. TADDEI:**  That's not cumulative, Your Honor.

22         **THE COURT:**  Well -- yeah, I think -- we'll see

23 how it is.  I do think one -- you know, let's say one

24 exhibit will go with the testimony.  Doesn't sound like a

25 whole lot.  And I think the government is allowed to attempt

```
 1    to prove this aspect of its case with a document or two.

 2              MR. TADDEI:  That's what it is.  Two e-mails

 3    relating to two invoices.

 4              THE COURT:  Okay.

 5              MS. SHERWOOD:  Was the -- what about the limiting

 6    instruction?

 7              THE COURT:  Now, here's -- what would you

 8    propose?

 9              One of the things I can say is, you know, this is

10    something that would dovetail nicely with what

11    Ms. Longnecker was saying in her opening.  This testimony is

12    about certain communications not related to the postage and

13    printing allowance --

14              MS. SHERWOOD:  The charged --

15              THE COURT:  -- which is, you know --

16              MR. PHILLIPS:  I'm sorry.  I just -- you would

17    say it relates to the charged conduct --

18              THE COURT:  Well, true, true.  Yeah, yeah.  I

19    mean, you're right about that.  So we've got to be careful

20    in this regard.  It's something like -- because what we're

21    talking about here, is it campaign or caucus?

22              MR. TADDEI:  This is campaign.

23              MS. LONGNECKER:  Good question.

24              THE COURT:  Yeah.  "This upcoming evidence is

25    about communications between the witness and Robin Smith
```

1    concerning," we'll say work -- well, concerning --

2             (Simultaneous cross talk.)

3             **THE COURT:** Yeah, I think -- yeah, because I

4    think they will know that shorthand term, what it is,

5    because of what Ms. Longnecker did with laying the

6    foundation for that concerning campaign work, not work under

7    the postage and printing allowance.

8             **MR. FARMER:** So, Your Honor -- I'm sorry.

9             **THE COURT:** Okay. I was going to say, "And you

10   are reminded that campaign work did not involve any state

11   funds" -- I mean, this is the way I'm going to try and cabin

12   for them the notion of its importance, to put it that "it

13   did not involve any state funds and did not involve any

14   approval or payment processes or other activity by any -- by

15   the speaker's office or any state officials or agencies."

16            I think that's --

17            **MS. SHERWOOD:** In case they -- I'm fine with that

18   too. One other thought is, if you say "did not involve any

19   state funds" --

20            **THE COURT:** "Involve any approval or payment

21   processes or other activity by the speaker's office or any

22   state officials or agencies."

23            **MS. SHERWOOD:** I like that. But do you think

24   that they will understand, when you say it doesn't involve

25   state funds, that that means it's not charged conduct?

```
 1              MR. TADDEI:  It is charged conduct.

 2              MS. SHERWOOD:  Okay.  I see.  You're trying to --

 3    okay. Got it.

 4              THE COURT:  Yeah.  So I think I want to be

 5    careful not to say, well, this whole thing -- you know, that

 6    it doesn't have anything to do with the case at all, but to

 7    describe it in a way that they'll understand the limited

 8    function.  And additionally -- I was going to say,

 9    additionally, if you need to get back to this at closing to

10    say, look, you've heard from the government, so there's all

11    this testimony about campaign work and all this.

12              The judge instructed you.  This doesn't involve

13    all the things that are at the heart of the government's

14    case.  A limiting instruction sets you up to make that

15    argument as you see fit.  So I think that's the fair way to

16    do it.

17              Do you have any objection to that limiting

18    instruction?

19              MR. TADDEI:  I don't think so, Your Honor.

20              THE COURT:  Okay.

21         MR. FARMER:  Just housekeeping, Your Honor.  I

22    know you had said for the coconspirator, when one party

23    objects, everybody objects.

24              THE COURT:  Yeah, yeah.

25              MR. FARMER:  Is that true for all objections?  I
```

1   don't want to just jump up and --

2          **THE COURT:**  Well, can we stipulate that if one

3   defendant makes an objection, it's deemed preserved for

4   both?

5          **MR. TADDEI:**  I can't imagine trying to parse that

6   appellate record, so that sounds fine to me, Your Honor.

7          **THE COURT:**  All right.  Thanks, folks.

8          (WHEREUPON, the bench conference concluded, and

9   the following took place within the presence and hearing of

10  the jury:)

11         **THE COURT:**  Okay.  Thank you.

12         All right.  So here's how we're going to proceed,

13  folks.  A question had been asked and there was an

14  objection.  I'm going to deem that question withdrawn.

15  Mr. Taddei can ask another.

16         He's about to go into some questions that are

17  related to an -- involve communications between the witness

18  and Robin Smith concerning campaign work, not work under the

19  postage and printing allowance program.

20         And you are reminded that campaign work did not

21  involve any state funds and did not involve any approval or

22  payment processes or other activity by the speaker's office

23  or any state officials or agencies.

24         So, with that understanding and that caveat about

25  the purpose of this evidence, Mr. Taddei may inquire.

1          **MR. TADDEI:**  Thank you, Your Honor.

2    **BY MR. TADDEI:**

3    Q.    Going back to my last question, Ms. Helton.

4          In fall of 2020, did you hire Phoenix Solutions to do

5    work for your campaign?

6    A.    I did.

7    Q.    Did anyone recommend Phoenix Solutions to you?

8    A.    Yes.

9    Q.    Who recommended Phoenix Solutions to you?

10   A.    Robin Smith.

11   Q.    What, if anything, did Robin Smith tell you about

12   Phoenix Solutions?

13   A.    She told me that she met Matthew Phoenix at Turning

14   Point USA.

15          **MR. FARMER:**  And, Your Honor, we'll object to the

16   hearsay on this line of questioning.

17          **THE COURT:**  Oh, oh, yeah.  So the objection there

18   was to hearsay.

19          **MR. TADDEI:**  Response, Your Honor, is

20   801(d)(2)(E).

21          **THE COURT:**  All right.  So I think counsel know

22   how to proceed.  This will be conditionally admitted.

23   **BY MR. TADDEI:**

24   Q.    Did she say anything else about Matthew Phoenix or his

25   background?

1    A.    Just that he had experience, and he moved to New

2    Mexico.  I can't really remember where he lived prior.

3    Q.    Did she introduce you to Matthew Phoenix?

4    A.    No -- via e-mail.

5    Q.    Via e-mail?

6    A.    Via e-mail.

7    Q.    Okay.

8          Lauren, can we bring up Government Exhibit 105 for the

9    witness and the Court, please.

10         Can you see that exhibit on your screen, Ms. Helton?

11   A.    I can.

12   Q.    Okay.

13         If we can zoom in a little on the top for her, please,

14   Lauren.  Thank you.

15         Who is this e-mail chain between?

16   A.    From Robin Smith to me.

17   Q.    Okay.  And what's the date?

18   A.    It is October 12th, 2020.

19   Q.    And the subject?

20   A.    It's about --

21              MS. LONGNECKER:  I'm sorry to interrupt.  We

22   cannot see the exhibit.

23              THE COURT:  Oh, okay.  Let's see about putting it

24   up on counsel's screen.

25              COURTROOM DEPUTY:  I don't know what's wrong.  We

1    may have locked up.  Let me try again.

2              THE COURT:  Okay.  Stand by.

3              (Respite.)

4              THE COURT:  Okay.  All right.  Let's --

5              MR. TADDEI:  We can do a paper copy, Your Honor,

6    or counsel is welcome to come huddle around me, whatever.

7              THE COURT:  Yeah, let's -- do y'all have a paper

8    copy to show counsel?  We'll try to fix this on the break.

9              MR. FARMER:  Mr. Taddei, you'll tell us a number.

10             MR. TADDEI:  105.

11             I've handed the defense a hard copy of Government

12   Exhibit 105.

13             THE COURT:  All right.  Thanks for that.

14             We'll check on the break and see if we can work

15   out the kinks here.

16             Thank you.  You may proceed.

17   BY MR. TADDEI:

18   Q.    The next question, Ms. Helton, was what's the subject

19   of the e-mail?

20   A.    It's about me needing to send checks to -- to the GOP

21   for the postage because you could get a discount through

22   them.

23             MR. TADDEI:  Your Honor, the government moves to

24   admit Government Exhibit 105.

25             THE COURT:  All right.  Not hearing any

```
1   objection . . .
2               (Government Exhibit 105 was marked and admitted
3   into evidence.)
4               MR. TADDEI:  Can we publish to the jury, please?
5               THE COURT:  Yes.
6               MS. SHERWOOD:  Well, object -- I do have --
7               THE COURT:  Do you want to object?  Am I not
8   giving you enough time --
9               MS. SHERWOOD:  It's the same objection,
10  Your Honor, to relevance, to hearsay.
11              THE COURT:  Okay.  What -- well, on the issue of
12  relevance, anything beyond what we discussed previously?
13              MS. SHERWOOD:  No, Your Honor.
14              THE COURT:  The same line?  Okay.  All right.
15              So the relevance objection is overruled based on
16  what we had discussed.
17              And then on the hearsay piece, what's the
18  government's response?
19              MR. TADDEI:  801(d)(2)(E), Your Honor, or, you
20  know, effect on the listener.
21              THE COURT:  Yeah, and I'm going to say two
22  things.  Counsel can note this for later on the 801(d)(2)(E)
23  issue.
24              On that issue, it's conditionally admitted.  But
25  I'm going to admit it unconditionally, alternatively, that
```

1    this is effect-on-the-listener evidence.

2            So that objection is overruled in that way.  You

3    may continue.

4            **MR. TADDEI:**  Thank you, Your Honor.  Is this

5    published to the jury?

6            **THE COURT:**  You may publish.

7            **MR. TADDEI:**  Thank you.

8    **BY MR. TADDEI:**

9    Q.    Ms. Helton, can you please read what Ms. Smith wrote

10   to you.

11   A.    "Esther, please note that two checks need to be sent.

12   Please overnight one to the Tennessee GOP for postage.  It

13   won't be sent without the check on hand.  The other payment

14   goes to the vendor.  Thank you.  Robin Smith, senior project

15   manager."

16   Q.    What vendor did you understand her to be referring to,

17   if any?

18   A.    Phoenix Solutions.

19   Q.    And if we could drop down that box, please, and go

20   down to the e-mail below.

21         What is the "from" and "to" on that below e-mail?

22   A.    It's from Phoenix Solutions to House of

23   Representatives, Robin Smith.  And then it's about my

24   invoice.

25   Q.    Okay.  And then a little bit further down on the page,

1    does it say Phoenix Solutions sent you an invoice?

2    A.    Yes.

3    Q.    And for what amount?

4    A.    $5,406.43.

5    Q.    Did you pay that amount?

6    A.    I'm sure I did.

7    Q.    Did the money come out of your campaign account?

8    A.    Yes.

9            **MR. TADDEI:**  We can take down that exhibit,

10   please.

11           Can we show the jury -- I'm sorry.  Can we show

12   the witness and the Court Government Exhibit 106.

13           And for the record, I've handed a hard copy to

14   the defense.

15   **BY MR. TADDEI:**

16   Q.    Is this an e-mail exchange?

17   A.    Yes, it is.

18   Q.    Who is it between?

19   A.    It's from me to Robin.

20   Q.    What's the date?

21   A.    It's October 19th, 2020.

22   Q.    And the subject?

23   A.    It's about the same thing, postage and then -- paying

24   the vendor and postage.

25           **MR. TADDEI:**  Your Honor, we move to admit

1    Government Exhibit 106.

2             **MR. FARMER:**  Same objection, Your Honor.

3             **THE COURT:**  Same objection?

4             Okay.  It's overruled for the same reasons.

5    Thank you.

6             (Government Exhibit 106 was marked and admitted

7    into evidence.)

8             **MR. TADDEI:**  Can we please publish for the jury.

9    **BY MR. TADDEI:**

10   Q.    So the second e-mail down, Ms. Helton, can you read

11   what Robin Smith wrote?

12   A.    Okay.  Well, I responded, "Will do.  Thanks."

13         And then, "As the last time, please overnight a check

14   to Tennessee GOP for postage.  The other check to the mail

15   vendor can be regular mailed.  This is your law and order

16   piece that will hopefully hit mailboxes this Thursday or

17   Friday."

18   Q.    And to what mail vendor, if any, did you understand

19   she was referring?

20   A.    Phoenix Solutions.

21   Q.    If we could pop back out to the larger document.

22         A little bit further down the page, again, does it say

23   Phoenix Solutions sent you an invoice?

24   A.    Yes.

25   Q.    And what was the amount for this invoice?

1    A.    $5,265.06.

2    Q.    Did you pay that amount?

3    A.    I did.

4    Q.    Did that money come out of your campaign account?

5    A.    Yes, it did.

6    Q.    We can take down that exhibit, please.

7          Now, Ms. Helton, if you had believed that Mr. Cothren

8    was behind Phoenix Solutions, what impact, if any, would

9    that have had on your decision to hire Phoenix Solutions?

10   A.    I would not have hired them.

11   Q.    Why not?

12   A.    Just because of the scandal that occurred.

13   Q.    If you would believe that Mr. Casada was involved in

14   Phoenix Solutions, what impact, if any, would it have had on

15   your decision to hire Phoenix Solutions?

16   A.    I would not have hired them.

17            **MR. TADDEI:**  No further questions, Your Honor.

18            **THE COURT:**  All right.  Thank you.

19                       **CROSS-EXAMINATION**

20   **BY MS. SHERWOOD:**

21   Q.    Good afternoon, Ms. Helton.

22   A.    Hi.  Good afternoon.

23   Q.    I'm Cynthia Sherwood, and I represent Cade Cothren.

24   And I'll have some questions for you as well.

25   A.    Okay.

1    Q.    I won't go through your background.  I think you went

2    through that with them.

3          I wanted to talk to you about the legislature, the

4    general assembly's official duties, what your job is, what

5    you're hired to do.

6          And would you agree with me that the primary purpose

7    of a general assembly member is to make laws, pass laws?

8    A.    Yes.

9    Q.    You also are -- maybe it's even in the Constitution.

10   You do the annual budget -- prepare the annual budget for

11   the State of Tennessee; is that right?

12   A.    That's correct.

13   Q.    Okay.  You elect certain state constitutional

14   officers?

15   A.    Yes.

16   Q.    Okay.  Would it be fair to call these things your

17   official duties?

18   A.    Yes.

19   Q.    Are you aware that many members of the general

20   assembly have jobs other than -- well, they have other jobs?

21   A.    Yes.

22   Q.    Okay.  Because it's a part-time legislature?

23   A.    Yes, ma'am.

24   Q.    Are you familiar with Tim Rudd's consulting company?

25   A.    Vaguely.

Q.    Vaguely.  Are you aware that it does constituent mailers for legislators?

A.    Yes.

Q.    Did you know Mr. Casada when he was serving in -- when he was serving in the house?

A.    Yes.

Q.    Okay.  And he was pretty good at fundraising, pretty good at getting people elected?

A.    Yes.

Q.    And he helped your house -- I think it's 23 members came in with your group, including you?

A.    Yes.

Q.    And he had a big hand in getting all of you guys elected, didn't he?

A.    Yes.

Q.    And did Cade Cothren help him?

A.    I would see him with him.

Q.    Okay.  Because he's been his aide for many years helping him perform his duties, correct?

A.    Yes.

Q.    You also knew Ms. Smith, Robin Smith, when she was -- well, you've known her for a long time, have you not?

A.    I would say nine years.  But prior to that, I just knew of her.

Q.    You've known her since you were running for city

1    council; is that right?

2    A.    I met her through the man that I'm currently married

3    to.

4    Q.    Okay.  And did she do any work on your city council

5    campaign?

6    A.    No.

7    Q.    Okay.  Ms. Smith did help you run your 2018 house of

8    representatives campaign, didn't she?

9    A.    Yes.

10   Q.    And she did a good job?  You were elected?

11   A.    She did.  She did.

12   Q.    All right.  I want to talk about the postage and

13   printing account.  That -- those funds are governed --

14   they're addressed in the policies and procedures.  Have you

15   read the postage and printing account allowance procedures

16   before?

17   A.    I don't recall.

18   Q.    Okay.  Maybe we don't have to get those out.

19        So let me ask you about this.  So Ms. Smith just

20   offered to do your mailer; is that right?

21        Did she just reach out to you and say, "Would you like

22   me to do a legislative update or a survey?"

23   A.    Yes.

24   Q.    And I think she said, "I'm doing one for Patsy; do you

25   want one too?"

1    A.    Yes.

2    Q.    And you said, "Yes.  Thank you"?

3    A.    Yes.

4    Q.    Okay.  So you took her up on her offer and agreed to

5    do that with her.  And we've got -- let's see.

6          You understood that you were hiring Ms. Smith's

7    company River's Edge?

8    A.    Yes.

9    Q.    All right.  And you exchanged several texts back and

10   forth with Ms. Smith where she was talking about the content

11   of it.  Do you recall that, about what your mailer was going

12   to look like?

13   A.    Vaguely.

14   Q.    Okay.

15         Can we pull up Defense Exhibit 117, which is Tab 5.

16   We'll just start out with the first.

17         Well, first of all, tell me if you recognize this as a

18   text exchange between you and Ms. Smith.

19   A.    If it's there, I'm sure it's legitimate.

20   Q.    Okay.

21         MS. SHERWOOD:  I'd like to introduce this as

22   Defendants' Exhibit -- what did I just say?  117?  117.

23         MR. TADDEI:  Your Honor, a point of clarification

24   first.

25         THE COURT:  Yeah.

1          MR. TADDEI:  How many pages is this text?

2          MS. SHERWOOD:  Good question.  This is -- they're

3   single-sided?  They're double-sided.  Well, either side,

4   they're one, two, three, four -- four pages.

5          THE COURT:  All right.  Have you seen all the

6   pages?

7          MR. TADDEI:  No, Your Honor.  We only see one

8   initial exchange, it appears.

9          THE COURT:  There's only one up on the screen.

10          MS. SHERWOOD:  Can you scroll?

11          THE COURT:  Do you want to -- do you have the

12   paper of it?  Ms. Jackson may have the original.

13          MR. TADDEI:  Your Honor, we've pulled it up on

14   our own system.  It looks like it's a five-page exhibit,

15   actually.

16          MS. SHERWOOD:  One, two, three -- oh, there's a

17   photo.  It is five -- five pages of -- four pages of text.

18          THE COURT:  All right.  Any objection to the full

19   scope of this exhibit?

20          MR. TADDEI:  I think we would request first,

21   Your Honor, that the witness have an opportunity to read the

22   full exhibit first.

23          THE COURT:  Okay.  So right now we're at the --

24          MS. SHERWOOD:  May I approach?

25          THE COURT:  Well, do you want to have her review

```
1    the full paper version?

2              Okay.  All right.  That's fine.

3              MS. SHERWOOD:  That will be quicker, I think, for

4    her.

5              THE COURT:  Okay.

6              So let's be clear about what the witness should

7    be doing, reviewing to see whether she can say whether these

8    are texts between her and Ms. Smith.  That's her current

9    goal right now, right?

10             MS. SHERWOOD:  Yes, Your Honor.

11             THE COURT:  Yep.

12             (Respite.)

13             MS. SHERWOOD:  You could actually keep those

14   there if it's easier to look at.

15             THE COURT:  Yeah, yeah.  That's fine.  Yeah.

16   That works.

17   BY MS. SHERWOOD:

18   Q.   So if you'd look at the first text on that page, that

19   is -- we're just going a little bit backwards from what we

20   were talking about, but that's when she says she's talking

21   about wanting to do your --

22             MR. TADDEI:  Your Honor, objection.  Has this

23   been admitted yet?

24             MS. SHERWOOD:  Oh, I'd like to admit this.

25             THE COURT:  Well, I tell you, let's make sure --
```

1        Have you been able to kind of take a look at all
2   those texts?
3            **THE WITNESS:**  I did, yes, Your Honor.
4            **THE COURT:**  Would you say that all of them are
5   texts going one way or the other between you and Robin
6   Smith?
7            **THE WITNESS:**  Yes.
8            **THE COURT:**  Okay.
9            All right.  The offer has been made.  Any
10  objection?
11           **MR. TADDEI:**  No further objection, Your Honor.
12           **THE COURT:**  Okay.  All right.  117 is admitted.
13           (Government Exhibit 117 was marked and admitted
14  into evidence.)
15  **BY MS. SHERWOOD:**
16  Q.    Okay.  The first text, Ms. Smith, is saying find out
17  your postage and printing account balance, and y'all are
18  talking about that?
19  A.    Yes.
20  Q.    See if you had enough to do the mailer.  And then
21  Ms. Smith, on the second page there, if we can go to the
22  second page, is working with you on this, right?
23        She says, "I've been thinking of issues you might want
24  to include," and she's texting back and forth with you
25  during this process, right?

1    A.    Yes.

2    Q.    Then she reaches out to you and says on the next

3    page -- the third page, "Do you have a picture -- a pic with

4    you and Governor Lee?"  Because she wanted that for your

5    mailer, and --

6    A.    Yes.

7    Q.    She's working through all those issues with you.

8          Checks back and forth a little bit more, and then the

9    last page of that exhibit -- if we can go to that -- is a

10   picture of you and Governor Lee that she was getting for

11   your mailer?

12   A.    Yes.

13   Q.    Okay.  In getting you to -- asking you if she could do

14   your mailer or your survey, she never mentioned Phoenix

15   Solutions to you, did she?

16   A.    No.

17   Q.    She didn't mention Matthew Phoenix to you?

18   A.    No.

19   Q.    So she didn't tell you any lies about Matthew Phoenix

20   or Phoenix Solutions when she's saying, "Hey, Esther, can I

21   do your mailer?"

22   A.    No.  She -- no.

23   Q.    And when you hired her -- well, how many times had you

24   hired her before?  I know she -- well, let me ask you this:

25   She ran your 2018 campaign; is that correct?

1    A.    She did along with Vince Butler.

2    Q.    Okay.  And is Vince somebody, her partner or somebody

3    who works for her?

4    A.    They did, but he was not a part of her company.

5    Q.    Okay.  When you hired her to design -- or to do this

6    mailer, you did not think that Robin Smith was going to be

7    doing all of the things behind the scenes, did you -- the

8    printing, the mailing, the design or all of it?  Did you

9    know who-all was working on this project with her?

10   A.    I didn't ask.

11            MS. SHERWOOD:  Okay.  So let's see.  Let's pull

12   up Defense Exhibit 115, which is at Tab 8.  Actually, that

13   might have been one that the government just admitted.

14            THE COURT:  Do you want 115 pulled up?

15            MS. SHERWOOD:  Yes.

16            THE COURT:  Okay.

17            (Discussion off the record.)

18            MS. SHERWOOD:  The government just admitted that

19   one.  You want us to use the government -- there's one

20   admitted, but we'd like it to be a defendants' exhibit as

21   well.

22            THE COURT:  Well, I do think you have two

23   choices.  You're allowed to elicit evidence in the form of

24   questions based on any exhibit already in evidence, whether

25   it's your own or the government.  But if you have a

1  particular reason to have something in the record as a

2  defense exhibit, then you are free to do that as well.  So

3  it's your call.

4       **MS. SHERWOOD:**  We'll just introduce this as

5  Defendants' Exhibit 115.

6       **THE COURT:**  All right.  Let's pull it up for the

7  witness's identification.

8  **BY MS. SHERWOOD:**

9  Q.    And the government showed you this a moment ago.  I

10 think this is about your -- I'm not sure if they did or not.

11 This is about your legislative update.  And you see here,

12 Ms. Smith tells you the designer who did this is going to

13 continue to watch for photos.

14      So, you know, she lets you know she had some designer

15 working on it, correct?

16 A.    Yes.

17 Q.    And you didn't ask her about who that might be because

18 you didn't really care who all was behind the scenes doing

19 this work, did you?

20      **THE COURT:**  One moment.  I'm sorry.

21      (Respite.)

22      **THE COURT:**  All right.  I'm sorry.  Could you

23 read the question back, Ms. Watson.

24      (WHEREUPON, the reporter read back the pending

25 question.)

1            THE WITNESS:  Yes and no, because she usually had

2   used people locally, so I assumed she was for this, I guess.

3   BY MS. SHERWOOD:

4   Q.    But you didn't ask --

5            THE COURT:  Well, let me clarify this.  Right

6   now, you know, there hasn't been a technical offer of this.

7   This appears to me to be identical to Government

8   Exhibit 110.

9            Does the government agree with that?

10           MR. TADDEI:  Yes, Your Honor.

11           THE COURT:  All right.  So for the record, we can

12  be clear:  Defense wants their own exhibit, and it's

13  Defense 115.  But before we can show it, we need to see

14  whether it's admitted.

15           Does the government agree to allow this to be

16  admitted since it was admitted as a government exhibit

17  anyway?

18           MR. TADDEI:  Yes, Your Honor.

19           THE COURT:  All right.  So we now have an

20  admitted exhibit.  And if you need to display it to the

21  witness or the jury for any reason, you may do so.  All

22  right.

23           (Defense Exhibit 115 was marked and admitted into

24  evidence.)

25  ///

**BY MS. SHERWOOD:**

Q.   But Robin was your friend, and she'd done work with you in the past, correct?

A.   Yes.

Q.   And you trusted her to do good work?

A.   I did, yes.

Q.   And she did good work on this.  You got a good product, didn't you?

A.   Yes.

Q.   But when you got this, you hadn't said the designer -- you were, like, trusted Robin to do what she needed to do to give you the product?

A.   Yes.

Q.   I'm going to go to the second page of that.  It's the same exhibit.  And that's the invoice you received from River's Edge; is that right?

A.   I don't recall --

Q.   Okay.

A.   -- this.

Q.   And let's take a look at the next page.  Tell me if that is the postage and printing mailer that was drafted for you or that she prepared for you.

A.   I think so.

Q.   We can look at the second page too and that might help you be even more clear.  Oh.

```
1   A.    Yes, because this was at the Red Wolves
2   groundbreaking.
3   Q.    Okay.  And you told me a moment ago that it was good
4   work, but you actually -- do you remember telling her that
5   you loved this mailer that she had prepared for you?
6   A.    Possibly.
7   Q.    Let's just pull it up so we can look at it.  Defense
8   Exhibit 116.
9   A.    "I love it.  Thank you so much."
10        So yes.
11  Q.    Okay.
12             THE COURT:  Now, let's walk through it this way.
13  How many texts are you offering to admit?  Is it one page
14  worth of texts?
15             MS. SHERWOOD:  It is -- what number was that?
16  Defense Exhibit 116.  It is several pages.  So it's five
17  pages of texts.  There is the mailer.
18             THE COURT:  Okay.
19             MS. SHERWOOD:  And then a message on the back.
20             THE COURT:  Now, do you want to introduce the
21  whole document?  Do you want to use this document just to
22  refresh as to the last question?
23             MS. SHERWOOD:  I want to introduce all of the
24  text, Your Honor.
25             THE COURT:  Okay.  Here's what we'll do, then.
```

```
1    We'll take our midafternoon break, take about 15 minutes or
2    so.  And we'll pick back up with the cross-examination when
3    you get back, folks.  Thanks.
4              (WHEREUPON, the jury was excused from the
5    courtroom at 3:11 p.m., with matters being heard in open
6    court as follows:)
7              THE COURT:  All right, folks.  Thanks.  Please be
8    seated.
9              Here's what I'm going to recommend.  We come back
10   in 15 minutes or so.  We'll have the witness retake the
11   stand, and maybe while the jury is still out, if it's all
12   right with everyone, have a review of the document -- it's a
13   bunch of pages -- so that when she comes back, she can
14   answer the question that will be put to her as to whether
15   she recognizes it for purposes of authenticating it.  And
16   then we can go from there.
17             Alternatively -- well, she should look at the
18   whole thing anyway, even if the government was to stipulate.
19   So let's do it that way.
20             All right.  Anything else we need to discuss at
21   this time?
22             MR. TADDEI:  No, Your Honor.
23             THE COURT:  Thank you.
24             MR. YARBROUGH:  No, Your Honor.
25             THE COURT:  All right.  Counsel, we'll see you in
```

1    about 15.  Thank you.

2             (Recess 3:13 p.m. to 3:37 p.m.)

3             THE COURT:  All right.  We can call in our jury.

4             (WHEREUPON, the jury reentered the courtroom at

5    3:37 p.m., with matters being heard in open court as

6    follows:)

7             THE COURT:  Thanks, folks.  Please be seated.

8             All right.

9    BY MS. SHERWOOD:

10   Q.   Okay.  Ms. Helton, we were looking at Defense

11   Exhibit 116.  Have you had a chance to review that?

12   A.   I did.

13   Q.   And is that a text message exchange between you and

14   Ms. Smith?

15   A.   Yes, it is.

16   Q.   And see at the back are the attachments that were

17   included in the -- the PDFs that were included in the text

18   exchanges.

19   A.   Yes.

20            MS. SHERWOOD:  I'd like to enter that as

21   Defendants' Exhibit 116.

22            THE COURT:  Any objection?

23            MR. TADDEI:  No, Your Honor.

24            THE COURT:  All right.  Thank you.

25            116 is admitted.

```
 1              (Defense Exhibit 116 was marked and admitted into
 2   evidence.)
 3              MS. SHERWOOD:  Can we pull out that -- call up
 4   that first text on the first page?
 5   BY MS. SHERWOOD:
 6   Q.   She says -- Ms. Smith says to you, "Take a look at the
 7   first draft.  It has to be approved by the speaker's
 8   office."
 9        And what she means by approval, she means the
10   speaker's office now has to approve the content of this
11   mailer; is that correct?
12   A.   I'm not sure if it's content or cost.  I'm not sure.
13   Q.   So the speaker's office approves the -- so the
14   speaker's office -- that gets me to a question I was going
15   to ask later.  The speaker's --
16   A.   Sorry.
17   Q.   No, that's okay.
18        The speaker's office does two things with respect to
19   these mailers, correct?  One is approve the content to make
20   sure it is not campaigning, and two is to approve the price
21   and pay the invoice?
22   A.   Yes.
23   Q.   Okay.  And you're free to hire whatever vendor you
24   want to hire?
25   A.   Yes.
```

1    Q.    And so here you see she's saying that the content has

2    been approved, but she's also wanting to add a little bit

3    more.  She's still working on it.  Ms. Smith says she wants

4    to add a state seal and do a little bit more sprucing up to

5    it.

6          Is that what she says?

7    A.    Yes.

8    Q.    Okay.  And just if we can scroll through these texts.

9    We go to the next page.  You guys are still talking about

10   the texts -- I mean, the mailer back and forth, about

11   getting approval.

12         And if we go to the next page, if we can call out the

13   first one, she says, "Once approved, I'll get you the cost

14   of everything and work on getting the invoice to Connie

15   Ridley for payment."

16         So just to walk through -- let me get through this,

17   and then we'll do that.

18         The next page, you just continue to talk.  She's

19   continuing to work with you on this about how to get the

20   invoice in and how -- when you're going to mail it out.

21         Is that what's going on?

22   A.    Yes.

23   Q.    And then the next page which is page 5, she says, "The

24   invoice is less than $5,000.  We can do another piece in the

25   summer."

1          What did you tell her?

2     A.     "Sounds good."

3     Q.     "Sounds good."

4          And then the following pages is just a copy of the

5     mailer that she sent in to the speaker's office for content

6     approval we've already talked about.

7          And then the last page, if we could go to that.  This

8     is where she's showing you that Scott -- would that be Scott

9     Gilmer?

10    A.     Yes.

11    Q.     He's chief of staff?

12    A.     Yes.

13    Q.     Or was at that time for Cameron Sexton?

14    A.     Yes.

15    Q.     And this is where Scott Gilmer is telling Connie this

16    is approved and that the invoice can be paid; she can use

17    the postage and printing fund.

18    A.     Yes.

19    Q.     All right.

20         You can take the exhibit down.

21         The most important thing that you wanted out of this

22    transaction with Ms. Smith was to get a good, high-quality

23    mailer, correct?

24    A.     Yes.

25    Q.     And we looked at that exhibit earlier where you said

1   you loved the mailer.

2   A.    Yes.

3   Q.    And is that true?  Did you love it?

4   A.    Yes.

5   Q.    So let me just make sure I understand from you how

6   this process worked.  Ms. Smith comes to you, says, "Can I

7   do your mailer?" you say, "Sure, no problem." is kind of

8   what happened here, correct?

9   A.    Yes.

10  Q.    And then once she has it ready to go, you know, has it

11  like we looked at, she sends it to the speaker's office to

12  make sure there's nothing campaign-related in there?

13  A.    Yes.

14  Q.    And then she mails it out and sends the invoice to

15  Connie Ridley.  Is that how it works?

16  A.    Yes.

17  Q.    When you see -- received the invoice for payment, you

18  didn't have any reason to question the amount, what you were

19  charged?  You thought it was a fair price?

20  A.    Yes.

21  Q.    So Ms. Smith hired what you -- did what you hired her

22  to do?

23  A.    Yes.

24  Q.    And you understood that Robin Smith had a consulting

25  company and that she would make money from doing this

1  consulting work, correct?

2  A.    Yes.

3  Q.    I'm sorry.  You understood she was -- she would make

4  money from doing this consulting work?

5  A.    Yes.

6  Q.    You didn't have any agreement whatsoever with Phoenix

7  Solutions to do your mailer, did you?

8  A.    No.

9  Q.    In fact, you never heard of them when this process was

10  going on?

11  A.    No.

12  Q.    You had not heard of them?

13  A.    No.

14  Q.    Okay.  The agreement was Ms. Smith would do the work

15  and you would -- you were anticipating paying with your

16  postage and printing funds, correct?

17  A.    Correct.

18  Q.    But if you did not have enough postage and printing

19  funds, you would be responsible for the amount, correct, out

20  of campaign or some other source?

21  A.    Yes.

22  Q.    I'm sorry?

23  A.    Yes.

24  Q.    The State of Tennessee did not hire Ms. Smith to do

25  this work, did it?

1  A.    No.

2  Q.    And because you told me a minute ago you did not hire

3  Phoenix Solutions, you would not have been responsible for

4  paying Phoenix Solutions any money, would you?

5  A.    No.

6  Q.    If Ms. Smith hired Phoenix or Ms. Smith had a

7  subcontracting relationship or whatever working relationship

8  with Phoenix Solutions, it would be her responsibility to

9  ensure payment?

10  A.    Yes.

11  Q.    I think I might have touched on this.  I'm not sure if

12  I asked you, but you didn't ask Ms. Smith who was doing the

13  design work, who was doing the printing, who was doing

14  anything?  You just trusted her to get it done?

15  A.    Yes.

16  Q.    Would you agree with me that the speaker of the house

17  is a very powerful position?

18  A.    Yes.

19  Q.    Appoints people to committees?

20  A.    Yes.

21  Q.    And a lot, not all, legislators want to be on

22  committees, correct?

23  A.    Yes.

24  Q.    It gives them a little more power when you're on a

25  committee.

1  A.    Yes.

2  Q.    We may be about -- well, let me ask you about the --

3  we saw some e-mails and heard a little bit of testimony from

4  you about campaign, your campaign that Phoenix Solutions

5  worked on.  And looked like Robin Smith was working on it as

6  well, from the e-mails.

7       Was that right?  Was she interfacing with you as well?

8  A.    Yes.

9  Q.    Okay.  How many -- how many state dollars or taxpayer

10  dollars were used to hire Phoenix Solutions for your

11  campaign?

12  A.    Zero.

13  Q.    It's all private money, correct?

14  A.    Yes.

15       **MS. SHERWOOD:**  No further questions.  Oh, wait,

16  I'm sorry.

17  **BY MS. SHERWOOD:**

18  Q.    When I asked you a question earlier about Tim Rudd,

19  whether you knew if Tim Rudd did constituent mailers, do you

20  recall that?

21  A.    Yes.

22  Q.    You said yes?

23  A.    Yes.

24  Q.    Tim Rudd is a state legislator, is he not?

25  A.    Yes.

1    Q.    He's a member of the general assembly?

2    A.    Yes.

3          **MS. SHERWOOD:**  Okay.  No further questions.

4          **THE COURT:**  All right.

5                    **CROSS-EXAMINATION**

6    **BY MR. FARMER:**

7    Q.    Good afternoon, Ms. Helton.

8    A.    Good afternoon.

9    Q.    I'm Jonathan Farmer.  I represent Mr. Casada.

10         Can you hear me okay?

11   A.    I can.

12   Q.    We've got all these microphones, and sometimes I can't

13   tell who can hear me and who can't.

14         Just a couple of questions for you, ma'am.

15         Mr. Taddei asked you about Mr. Casada's -- I think his

16   reputation and whether that would have affected your using

17   Phoenix Solutions if you had known he had got some money

18   from Phoenix Solutions.

19         Do you remember that?

20   A.    Yes.

21   Q.    Okay.  You're aware Mr. Casada was reelected in 2022;

22   is that correct?

23   A.    Yes.

24   Q.    That was after the -- this scandal we've talked about,

25   correct?

1   A.    Yes.

2   Q.    And so is it your concern -- I guess let me ask it

3   this way:  Your understanding is that Mr. Casada had some

4   sort of business relationship with Phoenix and got some

5   money based on your mailer; is that right?

6   A.    From what I've heard in the press.

7   Q.    From what you've heard in the press.  Okay.

8         And is your concern that you didn't know about that on

9   the front end; is that right?

10  A.    Yes.

11  Q.    Okay.  So it was undisclosed to you he was getting

12  money?

13  A.    Yes.

14  Q.    But to be crystal clear, Ms. Helton, Mr. Casada never

15  said a word to you about any of those mailers; is that

16  correct?

17  A.    No.

18          **MR. FARMER:**  Okay.  Thank you.

19          **THE COURT:**  Okay.

20          **MR. TADDEI:**  May I approach, Your Honor?

21          **THE COURT:**  Yeah, you may.  Sorry.

22          **MR. TADDEI:**  Thank you.

23                    **REDIRECT EXAMINATION**

24  BY MR. TADDEI:

25  Q.    Ms. Helton, you were asked during cross-examination by

1  Ms. Sherwood if at the time Robin Smith was doing the

2  state-funded mailer work for you in 2020, if she lied to you

3  about who was doing it.

4  A.    Yes.

5  Q.    I believe your answer was no.

6  A.    No.

7  Q.    Based on what you know now, do you think she was

8  honest with you?

9          **MS. SHERWOOD:**  Objection; leading.

10         **MR. TADDEI:**  I can rephrase.

11         **THE COURT:**  I'm going to overrule that because I

12  don't know of a less leading way to ask an appropriately

13  narrow question.  So objection is overruled.

14  **BY MR. TADDEI:**

15  Q.    So I'll ask you again, Ms. Helton.  Based on what you

16  know now, do you think she was honest with you?

17  A.    No.

18  Q.    Why not?

19  A.    Can I -- you want a yes -- you want me to elaborate

20  more?

21  Q.    Yes, please.

22  A.    When River's Edge was doing things, it was always

23  local stuff.  When she mentioned Phoenix, she got into more

24  detail about this person's not local, they're in New Mexico,

25  I met this person at Turning Point USA.

1          She had never done that before.  So I think that's the

2     difference.

3     Q.    In November 2019 when she first approached you about

4     doing this work, did she mention Phoenix Solutions?

5     A.    Yes.

6     Q.    In November 2019?  Do I have that wrong?

7     A.    I thought it was 2020.  I'm sorry.

8     Q.    Did she mention Cade Cothren at that time?

9     A.    No.

10    Q.    Did she mention Glen Casada?

11    A.    No.

12    Q.    And later in 2020, would Phoenix Solutions have done

13    work for your campaign without Robin Smith?

14              **MS. SHERWOOD:**  Same objection, Your Honor.

15              **THE COURT:**  All right.  What's the response?

16              **MR. TADDEI:**  It's not leading, Your Honor.

17              **MS. SHERWOOD:**  Oh, I'm sorry.  Objection as to

18    campaign.

19              **THE COURT:**  Yeah, so the -- all right.  If

20    counsel want to approach on this one.

21              (WHEREUPON, a bench conference was had out of the

22    hearing of the jury, as follows:)

23              **THE COURT:**  All right.  So I think the objection

24    here, which I understand is materiality as to any

25    misrepresentations about campaign work, I think probably is

1  fair not to say -- it's fair to say is not at issue.  I

2  think concealment is the issue and I think the appropriate

3  cabinet to that.

4          What's your response?

5          **MR. TADDEI:**  I would add motive to that as well,

6  Your Honor, in terms of the additional funding that they

7  were receiving at the time.  But yes, concealment is an

8  aspect of this.

9          **THE COURT:**  Concealment is -- and I do understand

10  motive.  I think, though, that even if you're not allowed to

11  ask about that, you can argue motive the same way without

12  having to get into that additional piece about whether the

13  concealment was effective.

14          So I'm going to sustain the objection.  I think

15  it will help avoid the confusion that we're well on our way

16  to avoiding.

17          All right?  Thank you.

18          **IN UNISON:**  Thank you, Your Honor.

19          (WHEREUPON, the bench conference concluded, and

20  the following took place within the presence and hearing of

21  the jury:)

22          **THE COURT:**  All right.  So, folks, there was a

23  question that was on the floor.  I've sustained the

24  objection.  Mr. Taddei is free to ask another.

25  ///

1  **BY MR. TADDEI:**

2  Q.    And one more question for you, Ms. Helton.  Mr. Farmer

3  asked you during his cross-examination about your concern

4  with respect to Glen Casada potentially getting money from

5  this; is that right?

6  A.    Yes.

7  Q.    Okay.  Was that your only concern with respect to

8  Mr. Casada's potential involvement?

9  A.    No.  Just with the scandal and him being removed as

10 speaker.  That was, you know, another concern.

11 Q.    Would you have wanted your state office to be

12 associated with that?

13 A.    No.

14         **MR. FARMER:**  Objection; leading, Your Honor.

15         **THE COURT:**  That one's a close call.  I think, on

16 balance, it's not overly suggestive under the circumstances.

17 So I think the answer to that was no?

18         **THE WITNESS:**  No.

19         **THE COURT:**  Okay.

20         **MR. TADDEI:**  Thank you.  No further questions.

21         **THE COURT:**  Thank you.

22         Any recross within the scope of redirect?

23         **MS. SHERWOOD:**  Yes, Your Honor, very briefly.

24         **THE COURT:**  Okay.

25 ///

**RECROSS-EXAMINATION**

**BY MS. SHERWOOD:**

Q.   Ms. Helton, you were asked about whether you thought
she had been dishonest with you -- whether Ms. Smith had
been dishonest and you.  And you said the only thing that --
what made you think that she was dishonest is because when
she'd done things with River's Edge previously, she had used
local people?

A.   Yes.

Q.   Mr. Cothren is local, correct?

A.   No, I'm talking about Hamilton County.

Q.   Okay.  Did you know -- did you have these
conversations with -- let me ask you about this:

        Then you said Phoenix Solutions -- with Phoenix
Solutions, it was different because she said they were from
New Mexico.  Right?

A.   She --

Q.   Well, I'm just saying is that what you said a minute
ago?

A.   Yes.

Q.   Okay.  That is not related to postage and printing
constituent mail, is it?  Because she never mentioned
Phoenix Solutions with postage and printing, did she?

A.   No.

Q.   So that comment was made for campaign?

```
1    A.    Yes.

2    Q.    Is that right?

3          Okay.  And I have one thing --

4                MS. SHERWOOD:  Your Honor, it's not exactly

5    within the scope of redirect, but the government has no

6    objection.

7                I want to enter one final exhibit that I should

8    have entered, and that is -- if we go to Defendants'

9    Exhibit 42.

10               THE COURT:  Okay.

11               MS. SHERWOOD:  Okay.  Can we pull that up.

12   BY MS. SHERWOOD:

13   Q.    This is a photograph.  You've probably seen it a

14   couple times, but this is -- on its own, does this look like

15   the final product mailer that you got?

16         Here's the front.  I think we've seen this attached to

17   an e-mail before.  Here's the front.  And let's look at the

18   back.

19               MS. SHERWOOD:  Okay.  All right.  I'd like to

20   publish that.

21   BY MS. SHERWOOD:

22   Q.    Okay.  And this is what -- it looked like this is the

23   original -- paper copy of that.  That's what that looked

24   like?

25   A.    Uh-huh.  Yes.
```

1  Q.    Okay.

2              MS. SHERWOOD:  All right.  I would like to --

3              THE COURT:  And we're talking about 42 being

4  admitted without objection; is that right?

5              MR. TADDEI:  No objection, Your Honor.

6              THE COURT:  All right.  42 is admitted.

7              (Defense Exhibit 42 was marked and admitted into

8  evidence.)

9              MS. SHERWOOD:  And I would like to admit the

10  original.

11  BY MS. SHERWOOD:

12  Q.    Okay.  So I just -- I want to be clear.  When we're

13  talking about the postage and printing constituent mail,

14  Robin Smith did not tell you a lie; is that right?

15        She said going to get your mailer done, and that's

16  what happened.  Is that right?

17  A.    Yes.

18  Q.    Did she tell you a lie?

19  A.    I can't say with 100 percent certainty.

20  Q.    Of which you are aware, do you know of a lie that she

21  told you?

22  A.    Not that I'm aware of.

23  Q.    Do you know which printer Robin Smith used for your

24  mailer?

25  A.    For the legislative update?

```
1    Q.    Yes.

2    A.    I'm thinking someplace maybe in Soddy-Daisy,

3    Tennessee.

4    Q.    But you don't know?

5    A.    Not with 100 percent certainty, no.  That was five

6    years ago.

7    Q.    Okay.

8              MS. SHERWOOD:  No further questions.

9              THE COURT:  All right.

10                      RECROSS-EXAMINATION

11   BY MR. FARMER:

12   Q.    Ms. Helton, just to clarify your final comments on

13   Mr. Casada, just to be crystal clear about this, you didn't

14   learn about his role until the media report; is that

15   correct?

16   A.    Correct.

17   Q.    Okay.  Thank you, Ms. Helton.

18             THE COURT:  Okay.  One moment.

19             Any re-redirect within the scope of recross?

20             MR. TADDEI:  No, Your Honor.

21             THE COURT:  All right.

22             All right.  Thank you.  You may step down.

23             THE WITNESS:  Thank you.

24             (The witness stepped down.)

25             THE COURT:  One moment.
```

```
1              If the government wishes to call its next
2    witness.
3              MR. TADDEI:  Yes, Your Honor.  The government
4    calls Jay Reedy to the stand.
5              THE COURT:  All right.
6              (The witness was sworn.)
7                        *   *   *
8                        JAY REEDY,
9    was called as a witness, and after having been first duly
10   sworn, testified as follows:
11                   DIRECT EXAMINATION
12   BY MR. TADDEI:
13   Q.    Good afternoon, sir.
14   A.    Good afternoon.
15   Q.    Can you please introduce yourself to the jury.
16   A.    My name is Jay Reedy.
17   Q.    And what is your job?
18   A.    Well, first of all, I'm a state representative but
19   also a farmer as well as a locksmith.  I've got a small
20   locksmith business in Houston County.
21   Q.    Let's focus on the first one you mentioned.  How long
22   have you worked as a state representative?
23   A.    I was first elected to office in 2014.
24   Q.    Have you served continuously since then?
25   A.    Yes, sir.
```

1  Q.    And you mentioned another job in addition to being a

2  state representative, or maybe two.  What were those?

3  A.    Cattle farmer and also a locksmith that -- I started a

4  small locksmith company about 21 years ago.

5  Q.    Do you know a person named Glen Casada?

6  A.    I do.

7  Q.    How do you know Mr. Casada?

8  A.    I first met him after I won my seat to be a state

9  representative.

10 Q.    So both you and Mr. Casada serve in the state

11 legislature together?

12 A.    Yes, sir.

13 Q.    What positions did Mr. Casada have in the state

14 legislature while you were serving together?

15 A.    At that time he was caucus chairman.

16 Q.    Okay.  Hold any additional positions beyond that?

17 A.    He did.

18 Q.    Did he serve as speaker of the house?

19 A.    Later, he was elected as speaker of the house.

20 Q.    Do you know a person named Cade Cothren?

21 A.    I do.

22 Q.    How do you know Mr. Cothren?

23 A.    I knew him because of Glen Casada.

24 Q.    Did Mr. Cothren work for Mr. Casada?

25 A.    He did, yes, sir.

1    Q.    And what was his position, if you know?

2    A.    I'm guessing just chief of staff at -- as -- I'm

3    guessing that would be the position he was, as Glen Casada

4    was caucus chairman.

5    Q.    I'm going to ask you a couple questions that I would

6    ask that you only answer these yes or no, if you can.

7          Around May of 2019, was there a scandal relating to

8    Cade Cothren and Glen Casada?

9    A.    Yes.

10   Q.    Was the scandal widely reported in Tennessee media?

11   A.    Yes, sir.

12   Q.    Did Cothren resign from his position as chief of staff

13   soon after news of the scandal broke?

14   A.    Yes.

15   Q.    Due in whole or in part to the scandal, did the house

16   Republican caucus hold a vote of no confidence in Casada as

17   speaker of the house?

18   A.    Yes, they did.

19   Q.    Did the majority of the house Republican caucus vote

20   that they had no confidence?

21   A.    Yes.

22   Q.    Did Mr. Casada step down from the speakership shortly

23   after that and remain an ordinary house representative?

24   A.    Yes, he did.

25   Q.    Switching gears, do you know a person named Robin

1  Smith?

2  A.    Yes, sir.

3  Q.    How do you know Ms. Smith?

4  A.    I first met her in one of my reelection campaigns.  I

5  met her, and she had helped me with my campaign for

6  reelection.

7  Q.    Did she also serve with you in the legislature?

8  A.    She did later, yes, sir.

9  Q.    What was her position?

10  A.    As far as just being a state representative as well?

11  Yes, sir.

12  Q.    In the house?

13  A.    Yes.

14  Q.    Are you familiar with the Tennessee legislature's

15  postage and printing account program?

16  A.    Yes, I am.

17  Q.    Okay.  And what is it?

18  A.    Each year, you get X amount of dollars.  And in that

19  postage account is being able to reach out to your

20  constituent base in forms of letters or if you're needing to

21  mail out -- if somebody records or asks for a Tennessee Blue

22  Book, we can use that to mail those out as well.

23  Q.    And by "you" and "we," who is the universe of people

24  that have access to that --

25  A.    It's all house and senate members have a postage

1   account.

2   Q.    Elected officials?

3   A.    Yes, sir.

4   Q.    Where does the money come to pay for those things that

5   you mentioned?

6   A.    That would be taxpayer dollars.

7   Q.    The state treasury?

8   A.    Yes.

9   Q.    Does the house speaker's office have the authority to

10  approve the expenditure of that money for a constituent

11  mailer?

12  A.    Yes, sir.

13  Q.    Does the house speaker have the authority to approve

14  or deny a vendor?

15  A.    I would assume so.  And, with that, it's -- to tell a

16  quick story is it's always -- when the year starts, you

17  think that there -- or I thought that there was always

18  approved vendors.  So if you were mailing out something for

19  constituents to read or do a survey, that it was already

20  determined who they were.

21  Q.    Okay.  Who is Connie Ridley?

22  A.    Connie Ridley was in charge of human resources.

23  Q.    Okay.  What sort of, I guess, role, if any, did she

24  play in administering this program?

25  A.    Wherever we requested a -- let's say, a survey going

1  out, that it needed to be approved by the speaker of the

2  house, but then she would also approve the funding.  In

3  other words, you got X amount of dollars in that account,

4  and this is what you can just spend it on.  And she'd let

5  you know if you didn't have enough.

6  Q.    How long did you work with Ms. Ridley?

7  A.    I guess until she retired.  So it was since 2014.

8  Q.    In late 2019 did you use funds from your state

9  office's postage and printing account?

10  A.    Yes, I did.

11  Q.    What did you use those funds to do?

12  A.    I had requested to do a mailer.  And I -- to tell how

13  I used it, I did not want it to go out by USPS, that I had

14  actually had weekly newspapers in my district.  And I just

15  asked for the flyers to be made up that would be delivered

16  to those papers, and it would go out to their complete

17  subscriber list.

18  Q.    Who helped you with that process, if anybody?

19  A.    It was Nick Crawford, a young man that I guess was

20  working for the office.  He -- by telephone and visiting my

21  office, we worked through the design and the layout of that

22  piece of literature.

23  Q.    Okay.  You had mentioned that you served in the state

24  house with Glen Casada.

25  A.    Yes, sir.

1    Q.    Did you ever discuss the postage and printing account

2    program with Mr. Casada?

3    A.    I did not.

4    Q.    Okay.

5          **MR. TADDEI:**  Court's indulgence.  Just one

6    moment.

7          **THE COURT:**  All right.

8    **BY MR. TADDEI:**

9    Q.    So I asked you, Mr. Reedy, if you had ever discussed

10   the mailer program with Mr. Casada, and you couldn't recall?

11   A.    Right.

12   Q.    If I showed you a document, might it refresh your

13   recollection?

14   A.    I've seen so many documents.  Tell me the one --

15   Q.    Well, the question is, if I show you a document, do

16   you think it might refresh your recollection?

17   A.    Oh, yes.

18         **MR. TADDEI:**  Your Honor, I have a document I'd

19   like to show Mr. Reedy for the purposes of refreshment.

20         **THE COURT:**  All right.

21   **BY MR. TADDEI:**

22   Q.    Now, Mr. Reedy, if you could just quietly read the

23   fourth paragraph down.

24   A.    (Witness complies.)

25         **MR. FARMER:**  Can I see what you're refreshing him

1  with?

2           **MR. TADDEI:**  Certainly.

3           **THE WITNESS:**  Yes, sir.

4  **BY MR. TADDEI:**

5  Q.    Can you hand that back to me, please.

6        Does this document refresh your recollection?

7  A.    Yes, sir, it does.

8  Q.    I'll restate the question, sir, please.

9        The question was, did you discuss the mailer program

10 with Mr. Casada at any point?

11 A.    Yes, sir.

12 Q.    Okay.  What did you discuss with Mr. Casada?

13 A.    To my recollection, the discussion is that we could

14 actually use that postage account for a mailer.

15 Q.    Okay.  So in 2019, at the top, I think you mentioned

16 that Nick Crawford was helping you with this survey.

17        Did you know who was actually creating the survey

18 itself and mailing it?

19 A.    I did not.

20 Q.    Okay.  Now fast-forward to 2011.  Were you interviewed

21 by the FBI?

22 A.    I was.

23 Q.    Did they ask you about a company called Phoenix

24 Solutions?

25 A.    They did.

```
 1   Q.    Prior to that meeting with the FBI, had you ever heard
 2   of Phoenix Solutions?
 3   A.    I had not.
 4   Q.    Okay.  Who did you learn was behind Phoenix Solutions?
 5   A.    It was at that time where the agents had shown me a
 6   check --
 7              MS. SHERWOOD:  Objection; hearsay.
 8              THE COURT:  All right.
 9              What's the response?
10              MR. TADDEI:  It's not being offered for the
11   truth, Your Honor, but for the effect on the listener.
12              THE COURT:  All right.  Do you want to approach?
13              (WHEREUPON, a bench conference was had out of the
14   hearing of the jury, as follows:)
15              THE COURT:  Okay.  So the effect on the listener
16   is relevant.  You know, it's the effect on the listener
17   being told the factual assertion that -- undisputed, it
18   appears, that Mr. Cothren's behind Phoenix Solutions.
19              The effect on the listener is relevant why?
20              MR. TADDEI:  The effect on the listener is
21   relevant because the follow-up question is going to be what
22   was your reaction to the information you were told?
23              It's not the fact that the FBI is telling him
24   that it literally is Cade Cothren; it's the effect on the
25   listener and that the information he was given elicited
```

1  surprise, regardless of whether or not it was true.

2        **MS. SHERWOOD:**  I think that could have been

3  accomplished by just saying what was -- when did you learn

4  and what was your -- what did you feel when you learned it?

5  Having to bring the FBI into it, that's not --

6        **THE COURT:**  Well, yeah, I suppose that that's

7  probably true.  I do think -- you know, I think, in that

8  sense, I'll probably overrule the objection.  I think you

9  can get into what his attitude was about learning that

10  Phoenix -- well, let me ask this:

11        His attitude about learning that Phoenix

12  Solutions had Cade Cothren behind it, is it going to be made

13  relevant later based on him having retained -- you know, are

14  we going to learn that --

15        **MR. TADDEI:**  Yes.  Had you known that Phoenix

16  Solutions was involved in the mailers, what, if any,

17  reaction.

18        **THE COURT:**  Gotcha.  I think so far, we don't

19  have evidence of Phoenix Solutions being -- because we're

20  hearing about Nick Crawford, right, behind the mailer.

21        **MR. TADDEI:**  I'm sorry.  He said that Nick

22  Crawford assisted him in the process of working on the

23  mailer and then invoicing Phoenix Solutions.

24        **THE COURT:**  Okay.  Did you hear reference so far

25  to Phoenix Solutions being involved in this mailer at all?

|    |                                                              |
|----|--------------------------------------------------------------|
| 1  | **MS. SHERWOOD:**  No. |
| 2  | **MR. FARMER:**  Not yet. |
| 3  | **THE COURT:**  I really didn't.  And so that's kind |
| 4  | of another issue why.  But I do think if we can get a tie-in |
| 5  | to why his view or reaction to Mr. Cothren being behind |
| 6  | Phoenix Solutions is relevant, then I think you can get into |
| 7  | that.  But I think I need to sustain the objection because |
| 8  | we don't know why -- |
| 9  | **MR. TADDEI:**  I can lay a foundation for that. |
| 10 | Thank you. |
| 11 | **THE COURT:**  All right. |
| 12 | (WHEREUPON, the bench conference concluded, and |
| 13 | the following took place within the presence and hearing of |
| 14 | the jury:) |
| 15 | **THE COURT:**  Okay.  So, folks, I'll sustain the |
| 16 | objection to that question at this time, and Mr. Taddei can |
| 17 | ask another one. |
| 18 | **MR. TADDEI:**  If you can pull up Government |
| 19 | Exhibit 268, please, for the witness and the Court. |
| 20 | **BY MR. TADDEI:** |
| 21 | Q.   Mr. Reedy, if you could take a look at the screen, is |
| 22 | this the invoice for the mailer work that was done for your |
| 23 | state office? |
| 24 | A.   Yes, it was, and it appears to be.  But, of course, |
| 25 | previous discussions, I was not aware of the Phoenix |

1  Solutions name.  I had not received this invoice, and it was

2  the very first time when you showed it to me that I had seen

3  it.

4          MR. TADDEI:  Your Honor, this is -- we'd move for

5  the admission of this pursuant to the parties' stipulation.

6          MS. LONGNECKER:  Objection -- no, I'm sorry.  It

7  was stipulated to.

8          THE COURT:  Yeah.

9          On 268, any objection to that admission?

10          Okay.

11          MR. TADDEI:  Can we publish it for the jury,

12  please.

13          THE COURT:  268 is admitted and may be published.

14          (Government Exhibit 268 was marked and admitted

15  into evidence.)

16  BY MR. TADDEI:

17  Q.   So, Mr. Reedy, as I understand your answer, at the

18  time that this was invoiced, you weren't aware that Phoenix

19  Solutions had done the work?

20  A.   That is correct.

21  Q.   Did you become aware later on that Phoenix Solutions

22  had done this work?

23  A.   Not until I had met with the agents.  They brought it

24  to my attention.

25  Q.   Okay.  They brought to your attention the fact that

1  Phoenix Solutions was the one responsible for the mailer
2  program?
3  A.    Yes, sir.
4  Q.    Okay.  And so I'll go back to that question that I
5  asked you earlier.
6      When you learned who was behind Phoenix Solutions,
7  what was your reaction?
8  A.    I couldn't believe it.
9  Q.    Why not?
10  A.    It's -- because, in my mind, it was a very corrupt way
11  of doing business.  And with that, it's -- even me and my
12  locksmith business, because I'm a state rep, I don't do
13  government work, state, local, or otherwise.
14      And so when I become aware of what was going on here,
15  it was quite appalling.
16  Q.    Did you care about the reputation of people involved
17  in your communications with your constituents?
18  A.    Every day, the walk of my life, it matters who I
19  become friends with or who I befriend.
20  Q.    Why is that?
21  A.    Individuals with abrasive personalities or somebody
22  that I would not want around my wife or daughters, they're
23  sacred to me, and I would protect them.
24  Q.    So after the 2019 scandal you testified about earlier,
25  what was Cade Cothren's reputation in the Tennessee

1  legislature community?

2  A.    To me, he just has a very abrasive reputation.

3  Q.    What was Glen Casada's reputation in that community?

4  A.    I was honored to work with Glen Casada because he was

5  very helpful to me in navigating how to be a lawmaker but

6  then also in my time of reelection needs.

7  Q.    Did that change in 2019 when this scandal occurred

8  that you talked about earlier?

9  A.    Yes, sir.  I started to have my doubts.

10  Q.    If you had believed that Mr. Cothren would have been

11  involved in your constituent communications, what, if any,

12  impact would that have had on your decision to do this

13  mailer survey project?

14  A.    I would have asked for a different vendor or would not

15  have done it.

16          **MR. TADDEI:**  No further questions, Your Honor.

17          **THE COURT:**  All right.  Before we have cross, I

18  wanted to follow up on something.

19          The invoice that we looked at, it was dated

20  sometime in 2019, correct?

21          **THE WITNESS:**  Yes, sir.

22          **THE COURT:**  And it said on there Phoenix

23  Solutions, correct?

24          **THE WITNESS:**  Yes, sir.

25          **THE COURT:**  But you first heard the name Phoenix

1  Solutions from the FBI in 2021; is that right?

2          THE WITNESS:  Yes, sir.  That is correct.

3          THE COURT:  So does that mean that the invoice

4  that was submitted for payment was done by persons in your

5  office other than you?

6          THE WITNESS:  No.  We just -- Your Honor, I just

7  approved or was told the amount that it was going to cost

8  and add to that.  Because of the universe or the number of

9  pieces I wanted mailed out or put in the newspaper, that I

10  did not have sufficient funds.  So I had to pay the rest,

11  but I had sent that to Connie Ridley.

12          But no, I had never in my office never received

13  that invoice; it was just by word of mouth, the cost of it,

14  from a Nick Crawford.

15          THE COURT:  Okay.  So just trying to figure this

16  out.  It seems like the payment -- the invoice was

17  submitted -- it was an invoice that was directed to you or

18  your office; is that right?

19          THE WITNESS:  Yes, Your Honor.  It should have

20  been.

21          THE COURT:  Okay.  Then it seems that maybe

22  someone in your office would have seen it?  Anyone at all?

23  Or I'm just wondering sort of like the path of this invoice

24  if you know what that path was?

25          THE WITNESS:  Yes, Your Honor.  I'm just as

1   confused as you are.  And I only have a legislative

2   assistant, just one person, and she's been with me for seven

3   years -- eight years now.  And I believe if she would have

4   seen it, she would have put it in my in-box for me to

5   observe as well.

6               THE COURT:  Okay.  But what you're saying is you

7   did not see it at that time; is that right?

8               THE WITNESS:  That is correct, sir.

9               THE COURT:  All right.  Very well.  All right.

10              Do you have any follow-up on that?

11          MR. TADDEI:  No, Your Honor.  Thank you.

12              THE COURT:  All right.  Mr. Farmer?

13                      CROSS-EXAMINATION

14  BY MR. FARMER:

15  Q.    Let me see if I can get my mic put back together.

16  Okay.  Can you hear me?

17  A.    Yes, sir.

18  Q.    Great.  Good afternoon, Mr. Reedy.  I'm Jonathan

19  Farmer.  I'm one of Glen Casada's attorneys.

20  A.    Yes, sir.

21  Q.    I want to talk first with you a little bit about

22  Mr. Casada.  Okay?  And so I think you said that you had a

23  lot of respect for him?

24  A.    Yes, sir.

25  Q.    Can I get my notes here?

1    And that he helped you get elected?  Did I hear that

2 right?

3 A.    It was my reelection campaign.

4 Q.    He helped you with your reelection campaign.  So you

5 kind of considered him, I guess, instrumental in that

6 process.  Is that fair to say?

7 A.    That is correct.

8 Q.    Okay.  And what year was that?

9 A.    That would have been 2016.  Or let's see.  '14, '15,

10 '16.  So it would be 2016 going into 2017 --

11 Q.    Okay.

12 A.    -- election cycle.

13 Q.    Great, great, great.  Okay.  And is it fair to say he

14 helped a lot of people get elected?

15 A.    Yes, sir, he did.

16 Q.    He was good at that; is that right?

17 A.    Yes, very good.

18 Q.    Good at campaigns?  Very good?

19 A.    Yes, sir.

20 Q.    Good at raising money?

21 A.    That is correct.

22 Q.    And, in fact, a lot of people wanted Glen to help them

23 get elected; is that fair?

24 A.    That would be fair to say.

25 Q.    And I just want to be sure I understand.  Do you

1  recall hiring Glen to do work after the scandal?

2  A.    After the scandal?

3  Q.    Yes, sir.

4  A.    No, sir.

5  Q.    So I think Mr. Taddei went through May of 2019, was

6  when the scandal was.

7        Do you remember that?

8  A.    Yes, sir.

9  Q.    Do you recall your campaign writing Glen Casada a

10 check in October of 2019?  If I showed it to you, would that

11 help?

12 A.    Yes, please.

13       **MR. FARMER:**  Okay.  Can we pull up Casada IMP42

14 for the witness and the Court?

15       **THE COURT:**  All right.  So the way the process

16 works here, don't say anything or comment; just take a look

17 at it.  When you're done reviewing it, let us know, and

18 Mr. Farmer will follow up with a question.

19 **BY MR. FARMER:**

20 Q.    I guess go to the second page, please.  Okay.  And

21 let's go back to the top page.

22       Does that appear to be a check from your campaign

23 account?

24 A.    Yes, sir, it is.

25       **MR. FARMER:**  Okay.  So can I go ahead and mark

1  that, Your Honor, as -- what will be the exhibit number?

2        **THE COURT:**  All right.  So one of the things --

3  well, I had thought maybe the original purpose was to

4  refresh his memory, but you tell me.

5        **MR. FARMER:**  Well, he did say he couldn't

6  remember, so now that he does remember and identified, I do

7  want to admit it.

8        **THE COURT:**  Gotcha.  All right.  So what is the

9  government's position?  Any objection to this admission as

10  Defense Exhibit No. -- we'll have to figure it out.

11        **MS. LONGNECKER:**  111.

12        **MR. TADDEI:**  I think under Rule 49.1, Your Honor,

13  we would object to the nonredaction of the routing and

14  checking account number on this exhibit.

15        **THE COURT:**  Okay.  Probably fair enough.

16        **MR. FARMER:**  If I can conditionally admit it,

17  Your Honor, and then we can redact it later.

18        **THE COURT:**  All right.  So we'll conditionally

19  admit it.  And it's going to be Defense Exhibit 111, which

20  will be admitted, not published until redacted, though.  And

21  since it's not going to be published at this time, you're

22  welcome to, you know, ask the witness to describe it at this

23  time and so forth if you want.

24        (Defense Exhibit 111 was marked and admitted into

25  evidence.)

1     MR. FARMER:  Yes, sir.

2  BY MR. FARMER:

3  Q.    So you've looked at that check.  Do you recall that

4  now?

5        And, Mr. Reedy, let me be clear.  I'm not trying to

6  trick you.  Okay?  This was a long time ago.  And if you

7  would ask me what I did in 2019, I would tell you I don't

8  know.  Okay.  And so that's why I show you the check.

9        Okay.  But does this refresh your recollection that

10  you had Mr. Casada do some work for your campaign?

11  A.    It did.

12  Q.    So you did do work with him after the scandal?

13  A.    I'm not recalling it being after the scandal.

14  Q.    Well, and again, this was a long time ago, right?

15  Mr. Taddei, if you'll recall, he asked you if in May of

16  2019, that there was a media report.  And you said yes, you

17  remembered that.  Is that right?

18  A.    That's correct.

19  Q.    So you'll at least agree with me that October of 2019

20  is after May of 2019?

21  A.    Yes, sir.

22  Q.    We can agree with that.  You may not remember exactly.

23  Is that fair?

24  A.    That would be correct.

25  Q.    So I think what we're up here to talk to -- what I

1  perceive the reason you're here, primarily, is to talk about

2  the mailer piece that went out on your behalf.

3      Would you recognize that if I showed it to you?

4  A.   Absolutely.

5          MR. FARMER:  Okay.  So let's pull up that,

6  please, Ms. Staats.  It is Defense Exhibit 52.

7  **BY MR. FARMER:**

8  Q.   Do you see that --

9  A.   Yes, sir.

10  Q.   -- on your screen?  Do you want to see both pages to

11  be sure we're fully covered?

12  A.   The interesting conversation about this piece and

13  getting help with it from Nick Crawford, it was two

14  questions were the same, and we had to go back and forth

15  until we got the piece of literature satisfactory --

16  Q.   Okay.  And I want to talk about all of that,

17  Mr. Reedy.

18          MR. FARMER:  So, first, let's go ahead and admit

19  this as Defense Exhibit 52.

20          **THE COURT:**  Any objection?

21          **MR. TADDEI:**  No, Your Honor.

22          **THE COURT:**  All right.  Thank you.  52 is

23  admitted.

24          (Defense Exhibit 52 was marked and admitted into

25  evidence.)

1    **BY MR. FARMER:**

2    Q.   So let's look at this. And I want to talk to you --

3        Scroll back up, please.

4        So I think you just said it, Mr. Reedy, that you and

5    Nick Crawford went back and forth on this survey piece quite

6    a bit. Is that right?

7    A.   Yes, sir.

8    Q.   Okay. And so regarding this survey, this is what you

9    were focused on, right? Kind of what it looked like, what

10   the information was, what it was going to cost, those sorts

11   of things. Is that fair?

12   A.   Correct.

13   Q.   Well, let's look at it. It looks like your picture

14   upper right-hand side, you in the white shirt.

15       Did you pick that picture out?

16   A.   I had it taken, but as far as me picking it out

17   myself, no.

18   Q.   Well, I understand you had it taken, but did you pick

19   it out for this survey, or Dr. Mr. Crawford help you with

20   that?

21   A.   Mr. Crawford did. That's where the design came from.

22   Q.   He did a good job. Are those your cows in the back?

23   A.   They are not.

24   Q.   Oh, okay. Where was that picture taken?

25   A.   That was -- I think it was Williamson County. It was

1    on somebody else's farm that we just had a photo shoot in

2    the area because of the rolling hills and the scenic beauty.

3    Q.    What district do you represent, Mr. Reedy?

4    A.    House District 74.

5    Q.    What county is that?

6    A.    I've got five, but my home county is Houston County.

7    Q.    Is that west of here?

8    A.    It's right there on Kentucky Lake.

9    Q.    Okay.  So somewhat rural area; is that right?

10   A.    It is, uh-huh.

11   Q.    So, I mean, I guess it's possible that your

12   constituents would appreciate the rural nature of your

13   photograph.  Is that fair?

14   A.    That's fair.

15   Q.    Okay.  And then we also have another picture of you

16   kind of mid left.  It looks like that is your official

17   legislative picture; is that right?

18   A.    Yes.

19   Q.    Were you pleased with the overall look of this survey?

20   A.    I was.

21   Q.    It looks to you to be professionally done?

22   A.    Yes, sir.

23   Q.    Okay.  Let's go to the next page, please.

24         And so, you know, we've all been in here now, but I

25   guess you haven't.  You understand, I guess, the distinction

1   between a legislative survey versus a campaign piece; is
2   that correct?
3   A.    Correct.
4   Q.    And the legislative surveys, you're allowed to use
5   state dollars, right?
6   A.    Right.
7   Q.    But campaigning pieces, you're not allowed to use
8   state dollars; is that right?
9   A.    That's correct.
10  Q.    So what we're talking about here is a legislative
11  survey?
12  A.    Correct.
13  Q.    So this was funded by the postage account, postage and
14  printing account?
15  A.    Yes.
16  Q.    And then sent to your constituents; is that right?
17  A.    Correct.
18  Q.    So even though it's not a campaign piece, Mr. Reedy,
19  it's still got your name on it, right?
20  A.    Correct.
21  Q.    So you want it to look good?
22  A.    Sure.
23  Q.    And you want it to touch issues that your constituents
24  care about; is that right?
25  A.    Yes.

1   Q.   So let's -- I'm not going to ask you to read all these

2   questions, but let's just kind of look at them.

3        The first one looks like it talks about tax, right?

4   A.   Yes.

5   Q.   And that's something your constituents cared about?

6   A.   Yes.

7   Q.   Then we go into, it looks like, healthcare, criminal

8   justice, abortion, education, Second Amendment, marijuana

9   legalization, transportation, job wages.

10       Does it look to you like those are basically the

11  topics that are covered here?

12  A.   Yes, sir.

13  Q.   And so Mr. Crawford helped you come up with those

14  topics; is that right?

15  A.   Yes, sir.

16  Q.   That was a process?

17  A.   It was.

18  Q.   Required some work?

19  A.   Yes.

20  Q.   From Mr. Crawford, right?

21  A.   Yes.

22  Q.   Okay.  Are you pleased with the questions?

23  A.   I am.

24  Q.   Okay.  Do you think they're well written?

25  A.   Yes, sir.

1  Q.    Okay.  You think they touch on issues that your

2  constituents are likely to care about?

3  A.    Absolutely, yes.

4  Q.    Okay.  All right.  Had you done prior surveys?  I

5  think you said you had?  You had not.

6  A.    No.  No, I have not.

7  Q.    Okay.  All right.  So you saw the survey.  You spent a

8  lot of time on the survey.  But I think the invoice we just

9  looked at -- can we pull that up again, please?

10        Sometimes technology makes things better, and

11 sometimes it makes things worse.

12        And I think you -- you saw this invoice; is that

13 right?

14 A.    Yes, sir.

15 Q.    Okay.  But you didn't see that until, I guess, the FBI

16 showed it to you; is that right?

17 A.    Yes, sir, that's correct.

18 Q.    Do you remember when that was?

19 A.    That was --

20 Q.    Does 2021 sound right?

21 A.    Well, the first thing that I saw from the FBI was a

22 check that had the Phoenix Solutions on there.

23 Q.    Right.  But -- and I understand.

24 A.    But as far as this invoice, it was just not long ago.

25 Q.    Well --

         THE COURT:  Let me stop there.  Is this one in

evidence?

         MR. FARMER:  No.  It is a defense version of the

one that the government put in evidence.  I just couldn't

lay my hands --

         THE COURT:  I figured.  And do you recall what

government exhibit and page number this was?

         MR. TADDEI:  So this is 268 is the version that

we admitted, but I believe we introduced a slightly

different version in the approval process.  So this may be a

new exhibit.  But, regardless, Your Honor, we have no

objection to its admission.

         THE COURT:  It may look a little bit different,

and so you're -- yeah, you're free to inquire and make clear

for the record exactly what this exhibit is.  And then we'll

treat it as admitted, and you're free to ask to clarify

exactly what it is for the record.

         MR. FARMER:  Well, let's pull up the one the

government showed you, 268.

BY MR. FARMER:

Q.   So my question for you, though, Mr. Reedy -- and I

understand you talked with the FBI about a lot of things.

My question for you is do you remember when that was?

A.   Yes, sir.  This invoice, it was just a few weeks ago.

Q.   So are you telling me you first saw this invoice a few

1    weeks ago?

2    A.    Yes, sir.

3    Q.    I see.  Okay.  All right.  And that's because the FBI

4    showed it to you?

5    A.    That is correct, yes, sir.

6    Q.    Okay.  So you wouldn't have been in a position to look

7    at this and analyze this and tell us anything about this at

8    all until two weeks ago?

9    A.    That's correct.

10   Q.    Is that right?

11         Okay.  So going back to the fundraiser, though -- or

12   the survey, the update.  Going back to the survey, I just

13   want to be sure I understand.  So Glen Casada didn't say a

14   word to you about this survey; is that right?

15   A.    No, sir.  I spoke to no one other than Nick Crawford

16   about the survey.

17   Q.    Okay.  Robin Smith, then, obviously, didn't say a word

18   to you about this survey?

19   A.    No, sir.

20   Q.    Okay.  All right.  I know you'd never done surveys

21   before, but you've done campaign pieces, right?

22   A.    Yes, sir.

23   Q.    Did you have individuals do your campaign pieces for

24   you?

25   A.    I did.  Robin Smith had done some for me.

1   Q.    Okay.  Possibly Glen Casada too.  We saw a check for

2   him.

3   A.    In refreshing my memory on that, it was a fundraiser

4   out of Puckett's was --

5   Q.    Ah, okay.

6   A.    That was the check there.

7   Q.    That's fair.  So going to Robin Smith's campaign work,

8   I mean, you don't think Robin Smith has a printing press in

9   her basement, do you?

10  A.    No, sir.

11  Q.    You would expect there to be some outsourcing with

12  this operation; is that right?

13  A.    Yes, sir.

14  Q.    Same with Nick Crawford in the mailer we saw.  You

15  don't think Nick Crawford was going downstairs to a printing

16  press, do you?

17  A.    No, sir.

18  Q.    You don't think he's a graphic designer, do you?

19  A.    I don't.

20  Q.    You didn't think he necessarily supplied the paper for

21  that survey, do you?

22  A.    No, sir.

23  Q.    Do you agree that all those people should be paid for

24  the work they did?

25  A.    Absolutely.

```
1    Q.    Okay.

2    A.    Yes, sir.

3    Q.    All right.  But in your process as the -- I guess the

4    buyer, for lack of a better way to put it, of this product,

5    you cared about the things we talked about?

6    A.    Yes, sir.

7    Q.    What it looked like, right?

8    A.    Absolutely.

9    Q.    How much it cost?

10   A.    Yes.

11   Q.    How it made you look to your constituents?

12   A.    That is correct.

13   Q.    Is that right?

14   A.    Correct.

15             MR. FARMER:  Okay.  Mr. Reedy, I thank you for

16   answering my questions.

17             THE WITNESS:  Yes, sir.  Thank you.

18             THE COURT:  Okay.

19                        CROSS-EXAMINATION

20   BY MS. LONGNECKER:

21   Q.    Good afternoon, Mr. Reedy.  My name is Joy Longnecker,

22   and I represent Mr. Cothren.  I too have a few questions for

23   you here today.

24         I believe you stated on direct that you've been an

25   elected state representative since 2014.  Is that right?
```

1    A.    Yes.

2    Q.    And as a member of the Tennessee General Assembly,

3    you're generally familiar with the legislature's functions.

4    Fair to say?

5    A.    Yes.

6    Q.    And the general assembly, we have a -- we call it a

7    bicameral system, right?  We have a house made up of House

8    of Representatives, and we have a senate made up of

9    senators.  Fair to say?

10   A.    Yes.

11   Q.    You are part of the House of Representatives, right?

12   A.    That is correct.

13   Q.    And would you agree, generally speaking, the general

14   assembly's primary job is to make laws?

15   A.    That is correct.

16   Q.    Sometimes a general assembly amends laws, right?

17   A.    That's correct.

18   Q.    Sometimes a general assembly might overturn or repeal

19   a law.

20   A.    We do that often.

21   Q.    Okay.  And your job as a legislator, the people in

22   your district, elect you to go to the House of

23   Representatives to vote on things, right?

24   A.    Yes.

25   Q.    And part of the general assembly's responsibilities is

1  also to do things like review the proposed annual budget,

2  right?

3  A.    That's correct.

4  Q.    The budget for the whole state of Tennessee, right?

5  A.    Yes.

6  Q.    Part of the general assembly's role is to approve the

7  annual budget, right?

8  A.    Yes.

9  Q.    So the state agencies have all the money they need to

10  do to run their agencies on behalf of the citizens of

11  Tennessee, right?

12  A.    That's correct.

13  Q.    And the general assembly also elects certain

14  constitutional officers, right?

15  A.    That is correct.

16  Q.    And the House of Representatives also elects its own

17  officers, right?

18  A.    That is correct.

19  Q.    And the members of each political party, depending on

20  which is the majority party, they get to elect their

21  leaders, right?

22  A.    That is correct.

23  Q.    So if the general assembly's job is to vote on laws

24  and the budget and to vote on the state's constitutional

25  officers, would it be fair to call these your official

1  duties?

2  A.    That would be correct.

3  Q.    And the Tennessee legislature is a part-time

4  legislature, right?

5  A.    That's what they keep telling me.

6  Q.    It may not feel like a part-time legislature sometimes

7  at that, right?

8  A.    That is correct.

9  Q.    But technically speaking, the legislature only meets a

10 certain number of days.  You'd agree with that?

11 A.    It is, yes.

12 Q.    But you may have constituents calling you all year

13 round.  Fair to say?

14 A.    That is correct.

15 Q.    And you may have to attend to those issues even when

16 the legislature is not in session; is that right?

17 A.    Yes.

18 Q.    Okay.  I think you mentioned this on direct, but you

19 mentioned that you -- in addition to being a state

20 legislator, you have jobs of your own that you work outside

21 of the legislature.  Is that correct?

22 A.    That is correct.

23 Q.    I believe you said you own a cattle farm, right?

24 A.    Yes.

25 Q.    And a locksmith company, right?

```
1    A.    Yes.

2    Q.    And you're not alone in that, are you?

3    A.    No.

4    Q.    There's a lot of state representatives that have

5    different jobs or outside work.  Fair to say?

6    A.    Yes, ma'am.

7    Q.    Some state representatives are lawyers even, right?

8    A.    Correct.

9    Q.    Some might be insurance agents.  Fair to say?

10   A.    Yes.

11   Q.    Okay.  And some state representatives have businesses

12   that do political consulting work, right?

13   A.    That is correct.

14   Q.    And Robin Smith was one of those representatives,

15   right?

16   A.    Yes.

17   Q.    She had her own company and did political consulting

18   work through that company, right?

19   A.    That is correct.

20   Q.    The same is true for Mr. Casada, correct?

21   A.    That is correct.

22   Q.    Mr. Casada had his own political consulting company,

23   didn't he?

24   A.    That's correct.

25   Q.    And Representative Tim Rudd also has his own company,
```

1   right?

2   A.   That's also correct.

3   Q.   And Representative Rudd also does constituent mail

4   work and mailer work, right?

5   A.   I've not used him, but I'm assuming so.

6   Q.   You're familiar that -- that's common knowledge, in

7   other words?

8   A.   Yes.

9   Q.   Okay.  What about Representative Antonio Parkinson?

10  Are you familiar with his political consulting company?

11  A.   I'm not aware of that.

12  Q.   Okay.  Now, you testified on direct about the survey

13  that you just discussed with Mr. Farmer in about late 2019.

14       Do you remember that?

15  A.   Correct.  Yes, ma'am.

16  Q.   Do you remember -- and I don't -- and I apologize if I

17  missed it, but I don't think I heard you testify about how

18  this whole process got started with you.  The government

19  asked you about the mailer.  Mr. Farmer questioned you about

20  the mailer.  But I didn't hear you testify, and I apologize

21  if I missed it.  So I'm going to ask some questions again.

22       Do you remember how that process got started, how it

23  was that the whole constituent mailer process got started in

24  2019?

25  A.   First, upon becoming elected, I found out about the

```
1   postage account.  And then it was later information was sent

2   out what you could and could not use the postage account

3   for.

4        And then with -- Glen Casada had brought it up that

5   yes, you could use it for the mailer surveys out to your

6   constituents to try to get -- basically testing the waters

7   to find out what is important in your district.

8   Q.   Thank you for your response.  I don't think that was

9   the question I was asking, so I'm going to ask it again.

10  A.   Oh, sorry.

11  Q.   I understand generally how you became aware of the

12  mailers or the ability to use these postage and printing

13  funds for your mailer, but my question to you, Mr. Reedy, is

14  how did the whole mailer process for you -- in 2019, how did

15  that start?

16       Do you remember?

17  A.   And that's where I was -- I told Glen Casada that I

18  was interested in it.  And then that's when Nick Crawford

19  came to my office and we had the discussion about --

20  Q.   So let me back up.  You think that the process started

21  with Glen Casada approaching you in 2019?

22  A.   Yes.  Well, it was him as caucus chairman before he'd

23  become speaker of the house is when we had this discussion

24  about being able to do surveys.

25  Q.   But my question to you, Mr. Reedy, is how did this
```

1 particular survey get started?  Did you reach out -- and let

2 me just ask the question this way:

3      Do you recall saying at some earlier point that you

4 initially contacted the Republican caucus in 2019 and asking

5 for the caucus's help with the survey?

6      Does that sound familiar?

7 A.   The ask that I have, it was made known to all house

8 members what it was available for, what we could use the

9 postage account for.  Then I had reached out to the

10 speaker's office -- it was Mr. Casada -- and saying that I

11 was interested in doing one of these surveys.

12 Q.   So is it your testimony that you didn't reach out to

13 the Republican caucus initially and ask for this constituent

14 mailer?

15 A.   No.  The Republican caucus made us aware that we had

16 it.  And -- but also what was stated, at any time you were

17 doing something that was being mailed out on taxpayer money

18 had to be approved by the speaker's office.

19 Q.   Mr. Reedy, I'd like to show you a document and ask if

20 this maybe refreshes your recollection about the topic that

21 I'm asking you about.

22      Not for publication, just to refresh --

23        **THE COURT:**  Is there a question as to which he

24 said he couldn't recall something?

25        **MS. LONGNECKER:**  I believe Mr. Reedy is saying

1  that he did not -- or that the caucus made him aware of the

2  mailers, and I believe that he said something a little

3  different on a previous occasion.  And I would like to

4  refresh his recollection about that.

5          THE COURT:  All right.  So you want to ask him

6  about a prior statement, or do you want to refresh his

7  recollection?

8          MS. LONGNECKER:  I would like to refresh his

9  recollection.

10         THE COURT:  Okay.  So that -- is the government

11 okay with that?  Because I don't know if there's anything

12 pending right now where he says, "I don't recall."

13         MR. TADDEI:  That's exactly the government's

14 position, Your Honor.  I don't think he ever said he doesn't

15 remember.  I think he's responded several times where the

16 idea -- the genesis for this mailer came from.  That's

17 different from saying, "I don't remember."

18         THE COURT:  Yeah, so --

19         MS. LONGNECKER:  I'll ask a different --

20         THE COURT:  Yeah, yeah.  So you're certainly free

21 to explore, but I didn't want the confusion of kind of

22 refreshing on somewhere where I wasn't sure we had a pending

23 need to refresh.

24 BY MS. LONGNECKER:

25 Q.    Mr. Reedy, you've had several meetings with law

1  enforcement in the lead-up to this case, correct?

2  A.    Yes, ma'am.

3  Q.    And you've met with them on several occasions, have

4  you not?

5  A.    That is correct.

6  Q.    And you've met with them on May 5th, 2021, correct?

7  A.    That would be correct.

8  Q.    You mentioned that on direct?

9  A.    In that time, yes.

10  Q.    This was the meeting that you had the revelation about

11  Phoenix Solutions, right?

12  A.    In my office.  That is correct.

13  Q.    And do you recall saying during that meeting that you

14  reached out to the Republican caucus and requested some

15  surveys to be made?

16  A.    That would be correct.

17  Q.    Okay.  So I just want to be clear.  Is that a true

18  statement?

19       If that's what you told law enforcement in May of

20  2021, that you reached out to the Republican caucus to

21  request that some surveys be made, is that a true statement?

22  A.    I would say yes.

23  Q.    Because that was closer in time to when it all

24  happened, right?

25  A.    Sure.  And, of course, it's -- even your caucus

1  leadership is part of the caucus, so I would have to go with

2  that statement that yes, I reached out to the Republican

3  caucus.

4  Q.   And do you recall saying that the caucus chose Phoenix

5  Solutions as the vendor?

6           **MR. TADDEI:**  Your Honor, objection.

7           May we approach?

8           **THE WITNESS:**  No, I did not -- never said that.

9           **THE COURT:**  You may approach.

10          So, folks, please disregard the witness's answer

11 until we sort this out.

12          (WHEREUPON, a bench conference was had out of the

13 hearing of the jury, as follows:)

14          **MR. TADDEI:**  She's clearly reading just straight

15 off FBI 302 to the witness, and that is not improper

16 impeachment.

17          **THE COURT:**  So here's what I have the question:

18 Do you recall saying that the caucus chose Phoenix Solutions

19 as the vendor?

20          I think the way to do this is to ask him -- ask

21 him if that's his recollection rather than having the need

22 right now to get into what he said in the past.  If he says

23 something different, then maybe that changes the viability

24 of asking about the prior statement.

25          So I'm going to sustain the objection, but you're

```
1   free to ask questions about, you know, what the caucus did
2   or did not do.  All right?
3            MR. PHILLIPS:  Logistical question.  Would it be
4   fair to cut our witnesses for the day?
5            THE COURT:  Yeah.
6            MR. PHILLIPS:  Thank you, Your Honor.
7            THE COURT:  All right.  Thank you.
8            (WHEREUPON, the bench conference concluded, and
9   the following took place within the presence and hearing of
10  the jury:)
11           THE COURT:  All right, folks.  I'd ask you to
12  disregard the last question.  But Ms. Longnecker is free to
13  ask another.
14  BY MS. LONGNECKER:
15  Q.   Mr. Reedy, is it your belief, as you sit here today,
16  that the caucus chose Phoenix Solutions as the vendor who
17  would be helping you with your particular legislative
18  survey?
19  A.   I have no idea on how they check or approve a vendor
20  or anything else.  So names of vendors never came up.
21  Q.   Do you remember making a previous statement to that
22  effect, that the caucus chose Phoenix Solutions as the
23  vendor?
24  A.   I don't recall.
25  Q.   Would you like to see something that might refresh
```

1  your recollection about that statement?

2  A.    Sure.

3  Q.    Okay.  If you would just take a moment to look at

4  that, Mr. Reedy.

5              **THE COURT:**  And, you know, important to note the

6  way you look at it, the way we do it, yep, just look at it.

7  And when you're done reviewing it, reminding yourself what

8  it says --

9              **MR. TADDEI:**  Ms. Longnecker, a copy?

10             (Discussion off the record.)

11             **THE COURT:**  As I was saying, Mr. Reedy, the way

12  this works is that you don't comment on anything.  Just

13  review it, remind yourself what it says.  When you're done,

14  let us know, and Ms. Longnecker will ask you a question.

15  **BY MS. LONGNECKER:**

16  Q.    Have you had a chance to look at this particular

17  document?

18  A.    Yes, ma'am.

19  Q.    Have you seen it before today?

20  A.    Not this document, no.

21  Q.    Okay.  You've seen a lot of other documents, though --

22  A.    Yes.

23  Q.    -- that people have shown you to prepare for this

24  case.  Fair to say?

25  A.    Correct.

1  Q.    Don't remember being shown this one, though, right?

2  A.    No.

3  Q.    Does this document refresh your recollection about

4  what you might have said previously about your mailer and

5  the caucus's role in that?

6  A.    I don't recall stating that the caucus -- it was

7  apparent to me after I was shown the check stub for this

8  Phoenix --

9          MR. TADDEI:  Your Honor, objection.  He's not

10  said whether or not it's refreshed his recollection.

11          THE COURT:  Yeah, I do think it's a good

12  objection.

13          So I think the question right now -- if you need

14  more time to review it, you can.  But the question here,

15  does this refresh your recollection as to whether you told

16  law enforcement that the caucus chose Phoenix Solutions?

17  Does reviewing this refresh your recollection as to whether

18  you previously said that?

19          THE WITNESS:  No, Your Honor.

20          THE COURT:  Okay.  All right.

21          You may follow up or continue.

22  BY MS. LONGNECKER:

23  Q.    So your testimony is you don't remember whether you

24  said this or not.  Fair to say?

25  A.    If I could add to my statement, I would be happy to

1   explain what I'm seeing and what I'm saying.

2   Q.   But if you'll just please answer my question.

3        Is your testimony that you don't remember whether you

4   said that the caucus chose Phoenix Solutions as a vendor to

5   help with your mailer?  Yes or no?

6   A.   No.

7   Q.   Okay.  And I believe you testified earlier that Glen

8   made you aware that this postage and printing fund existed,

9   right?

10  A.   Correct.

11  Q.   And that the money in that fund could be used for

12  constituent mailers, right?

13  A.   Correct.

14  Q.   But you did not hire Glen to do this mailer, correct?

15  A.   That is correct.

16  Q.   And you didn't hire Robin to do this mailer, correct?

17  A.   That's correct.

18  Q.   So there was no pressure from Glen to do this mailer,

19  correct?

20  A.   That's correct.

21  Q.   And there was no pressure from Robin to do this

22  mailer, correct?

23  A.   That is also correct.

24  Q.   As I understood your testimony on direct, you didn't

25  hire Phoenix Solutions directly; is that right?

```
1    A.    Yes.  That's correct.
2    Q.    As I also understood your testimony, you never asked
3    anyone in the speaker's office if you could hire a
4    constituent mail vendor.  Fair to say?
5    A.    Yeah, that is also correct.
6    Q.    You never went to the speaker of the house, Cameron
7    Sexton, and said, "Can I hire a constituent mail vendor?"
8    A.    That is a correct statement.
9    Q.    You never asked Connie Ridley, "Can I hire a
10   constituent mail vendor?"
11   A.    Never.
12   Q.    That was your decision, right?
13   A.    I did not know it was a decision.
14   Q.    But it was within your authority as a state
15   representative to make a decision to send out a mailer.
16   Fair to say?
17   A.    To do that, yes.
18   Q.    And I believe you also testified that you worked with
19   Nick Crawford on your survey; is that right?
20   A.    That is correct.
21   Q.    As of December of 2019, Mr. Crawford was working for
22   the Tennessee Republican caucus, was he not?
23   A.    I would say that's correct, yes.  I knew he worked
24   somewhere there, but I'm not sure who he was working
25   directly with or for.
```

1  Q.    Do you have any reason to doubt that Nick Crawford in

2  December of 2019 was working for the Tennessee Republican

3  caucus?

4  A.    No.

5  Q.    And Mr. Crawford, you said, helped -- you worked with

6  Mr. Crawford on those survey questions, right?

7  A.    Yes.

8  Q.    As you sit here, you have no idea whether Mr. Crawford

9  was working with somebody else on the survey questions, do

10  you?

11  A.    That is also correct.

12  Q.    And as I understood your testimony, you never asked

13  Mr. Crawford if he was working with anybody else on your

14  questions.  Fair to say?

15  A.    Yes.

16  Q.    And it sounds like, from your direct testimony, you

17  never asked Mr. Crawford who the mail vendor was, did you?

18  A.    That is also correct.

19  Q.    You never asked Nick Crawford if the mail vendor was

20  going to outsource any part of your mailer to any other

21  companies, did you?

22  A.    No.

23  Q.    As I gathered from your direct testimony, the most

24  important thing to you -- and I think you maybe told

25  Mr. Farmer this already, but the most important thing you

1  wanted was a good-quality survey to send to your

2  constituents?

3  A.    Yes.

4  Q.    And you were happy with the survey, were you not?

5  A.    I was.

6  Q.    Nick Crawford showed you the questions.  I believe you

7  testified on direct that you went back and forth with Nick

8  Crawford on the questions; is that right?

9  A.    Yes, ma'am.

10  Q.    You approved of those questions?

11  A.    I did.

12  Q.    You approved the design of the survey?

13  A.    I did.

14  Q.    You approved the pricing, right?

15  A.    I did.

16  Q.    Those were the things that were important to you,

17  right?

18  A.    Yes, ma'am.

19  Q.    And as far as you know, the speaker's office did

20  approve the content of your mailer, did it not?

21  A.    Yeah.  That was required, yes.

22  Q.    Meaning, like, you wouldn't have been able to pay for

23  that mailer with your postage and printing funds if the

24  speaker's office had not signed off or approved that

25  content?

1    A.    That is correct.

2    Q.    So your assumption was that that approval was

3    obtained.  Fair to say?

4    A.    Yes, ma'am.

5    Q.    And I think you mentioned this on direct, but your

6    particular mailer, you wanted it inserted into various

7    newspapers in your district, right?

8    A.    That's correct, yes.

9    Q.    And that's different from a bulk mailing that goes out

10   to a bunch of people in a particular district.  Fair to say?

11   A.    Yes, ma'am.

12   Q.    And were you able to confirm that those mailers were,

13   in fact, inserted in your local newspapers?

14   A.    Absolutely, because the receivers could take and send

15   them back.  And I've got still today a drawer full of the

16   returned surveys, yes.

17   Q.    Okay.  And let's talk about that.  So in a survey

18   situation where you're sending out a survey to your

19   constituents, they can fill that survey out, right?

20   A.    Yes.

21   Q.    And they can mail it back to you, right?

22   A.    That is correct.

23   Q.    And they can tell you how they feel about different

24   issues, right?

25   A.    And they do.

1    Q.    And they do.  And so they did that for this particular

2    mailer, did they not?

3    A.    Yes, ma'am.

4    Q.    And you still, it sounds like, have some of those

5    survey responses from your constituents, right?

6    A.    I do.

7    Q.    And as a member of the general assembly, are you able

8    to access the balance in your postage and printing account

9    at any given time?

10   A.    We are, yes, ma'am.

11   Q.    So when the FBI paid you a visit in May of 2021, do

12   you recall pulling a copy of that account report?

13   A.    I did, yes, ma'am.

14   Q.    And seeing the transaction date for December 2019?

15   A.    Yes, ma'am.

16            MS. LONGNECKER:  Can we pull up Defense

17   Exhibit 53, the invoice, please.

18   BY MS. LONGNECKER:

19   Q.    I'm going to go back to this invoice that Mr. Farmer

20   asked you about and I think Mr. Taddei might have asked you

21   about as well.

22            Now, I want to make sure I understood your testimony

23   on direct.  You never saw this invoice -- your testimony is

24   you never saw this invoice before it was submitted for

25   payment, correct?

1    A.    I had not seen this invoice at all until the visit

2    from the federal folks.

3    Q.    The federal folks showed you the invoice, right?

4    A.    That is correct.

5    Q.    Okay.  And what's that total there on the invoice?

6    A.    Well, I'm seeing lines drawn through it.  Which one

7    are you wanting me to speak specific to?

8    Q.    That's a fair point.  How about the circled amount,

9    the subtotal amount?

10   A.    It was $4,263.

11   Q.    Okay.

12         And can we zoom -- or go back to the regular view,

13   please.

14         And I want to draw your attention to the bottom of the

15   page where it has what looks like a stamp and an amount

16   there with some writing that says 12/20/2019.

17         Can you see that at the bottom?

18   A.    Yes, ma'am.

19   Q.    What's that amount there?

20   A.    That's that 4,263.

21   Q.    And when you pulled your report when the FBI visited

22   you in May of 2019, was that the amount shown?

23               **THE COURT:**  I'm sorry.  May 2019?

24               **MS. LONGNECKER:**  I'm sorry.  May of 2021.  Thank

25   you, Your Honor.

1          **THE COURT:**  You got it.

2     **BY MS. LONGNECKER:**

3     Q.    When the FBI paid you a visit, do you recall pulling

4     your --

5     A.    I don't recall the account balance on that document

6     that I had given them.

7               (Defense Exhibit 53 was marked and admitted into

8     evidence.)

9               **THE COURT:**  All right.  I think maybe we've got

10    to leave it there since we hit 5:00.  And we'll have to pick

11    it back up tomorrow, continue cross-examination, finish

12    cross-examination, and then see about redirect and anything

13    else.

14              All right, folks.  Thanks for your continuing

15    service for another day.  Please remember my admonition

16    about no communications, research, or investigation.  And

17    please be back by 9:00 a.m. tomorrow.

18              Thanks.  You may step down.

19              (WHEREUPON, the jury was excused from the

20    courtroom at 5:02 p.m., with matters being heard in open

21    court as follows:)

22              **THE COURT:**  All right.  One thing I wanted to

23    raise, you know.  And I guess, you know, more power to

24    defense counsel.  No one's said anything.  They're, you

25    know, using first names.  I'm, to say the least, not a big

1    fan of that.

2            Does the government have a position on this?

3            Because if you say it doesn't bother you, I guess

4    I'll let my inclination go.  But I do have this concern.

5    You know, it's like we're sitting around watching a football

6    game.  Yeah, there's Robin and there's Glen and there's

7    Cade.  And I not a big fan, but if the government doesn't --

8    isn't bothered, I guess I won't be either.

9            **MR. PHILLIPS:**  And the government's preference

10   would be that at least the lawyers -- obviously, witnesses

11   are going to do what they're going to do, but the lawyers

12   refer to people by their last names formally.

13           **THE COURT:**  I just think that's a little more

14   appropriate.  And when I was a -- you know, I'm just going

15   to explain where I'm coming from on this before I ask the

16   defense about this.  And I admit I'm a little bit maybe

17   biased in this regard.

18           When I was third year in law school, decades ago,

19   my trial ad professor happens to have been Karl Dean, who

20   taught me a lot of things.  And one of the things he said

21   was, you know what?  In court, this first name stuff isn't

22   going to fly.

23           So we had a trial ad case for the course.  And it

24   was The State v. John Diamond.  And someone gets up there

25   and says John this and that.  And Karl Dean is like, you

know what?  In the courts I practice in -- he was then a

Metro public defender -- that wouldn't fly.  And he said,

you use Mr. Diamond, you can use John Diamond, but the John

thing won't fly.

Now, the reason I mention the -- and I've always

had that opinion.  The reason I mention that is I will

concede I come from a particular perspective.  It's not

written down as gospel or anything like that.  But I tend to

think that unless there's a confusion or there are multiple

people with the same last names, the proceedings are such --

and it's even been commented by at least one defense counsel

what a serious environment this is, what a big, formal

environment this is, and why would we be here.  And so --

you know, and how important it is to be here under these

circumstances.

I am concerned about the first name thing being

inconsistent with that.

All right.  Are any defense counsel going to push

back on that?  Because I am happy to have the discussion.

And it's not really an insignificant thing in that if you're

counsel and you get in a groove of calling particular

players in the story by a particular name, you know, it may

be a thing with you.

What do you think, Mr. Farmer?

**MR. FARMER:**  I don't know if I'm guilty of this

1  or not, Your Honor, but I am not going to push back.  I

2  intend to call him Mr. Casada.  I believe I have called him

3  Mr. Cothren.  I believe I have done that, but if I

4  haven't --

5          THE COURT:  Yeah, I can't recall if you did.  I

6  do know that both counsel for Mr. Cothren have done so.

7  And, again, it's not a criticism.  That's what they've

8  wanted to do, and they've been able to do it.  More power to

9  them.

10          Going forward, are y'all going to push back on

11  that?

12          MS. SHERWOOD:  No, Your Honor.

13          MS. LONGNECKER:  No.

14          THE COURT:  All right.  Thank you.

15          So I wanted to have that discussion because, when

16  possible, my approach is to do things by consensus or

17  something close to it.  And it sounds like we do have a

18  consensus on that.  I think it will be helpful.

19          To my knowledge, there may be two Smiths, right?

20  We have a Robin Smith or an Eddie Smith.  But other than

21  that, I'm not aware of a reason why we'd need to use first

22  names.

23          All right.  So I wanted to note a couple of

24  things.  On May the 1st, which is a week from today, we'll

25  need to break a little early.  I was asked to attend a local

law school graduation, which I committed to a while back,
and certainly don't want to break that commitment.

I think we all know how important law school
graduations can be for law school communities and in our
profession as a whole.  But probably break around 4:10 next
Thursday.  So that's a scheduling note.

Mr. Phillips, anything that you have before we
recommence tomorrow?

**MR. PHILLIPS:**  It's probably just a marker as
opposed to a discussion right now, Your Honor, but we do
anticipate that Speaker Sexton will be on tomorrow.
Obviously, the government filed a motion in limine that we
had some discussion on.

Part of the discussion on that was the
government's objections under 608(b) to certain lines of
cross and having extrinsic evidence introduced.

I don't know exactly where we landed on the
asking questions portion of that, which, again, the
government thinks is legitimate.  But, as alluded to in the
government's reply, I believe we certainly could see getting
into, like, a minitrial aspect of that.

And so I just want to flag that the government
would have 403 concerns if we start going down that path.  I
don't know that we need to have an argument about that right
now.  I think it may be premature.  But I just wanted to

1    flag that that's something that's likely to come up in --

2            **THE COURT:** Well, you know, if I understand

3    correctly, one of the things we're talking about is it's

4    really evidence of specific prior conduct of the witness

5    that may go to truthfulness, character for truthfulness; is

6    that right?

7            **MR. PHILLIPS:** That's my understanding.

8            **THE COURT:** Okay. And, you know, the general

9    idea being that if someone has a good -- if counsel has a

10    good faith basis to believe that particular conduct occurred

11    and that it does go to truthfulness, the question can be

12    asked about on cross-examination. If the witness admits it,

13    then as counsel, you're good; if not, then you're stuck with

14    the answer if the question was about something collateral.

15    And if it was noncollateral, you better be prepared to prove

16    it up when it's your time to go with evidence.

17            Everyone good on that part of it?

18            Okay. Now, your issue, Mr. Phillips, may be,

19    well, there may be some dispute still about what goes to

20    truthfulness. Is that --

21            **MR. PHILLIPS:** It's slightly different,

22    Your Honor, if I can explain. So as I stated in the oral

23    argument at the pretrial, if the defense wants to ask, "Is

24    it true you lied on juror per diem reimbursements?" the

25    government is totally fine with that.

          THE COURT:  Because that goes to truthfulness,
right?

          MR. PHILLIPS:  Absolutely.  My concern -- and
I'll take Mr. Farmer's excellent cross of Mr. Reedy of just
walking through in real, nice detail a bunch of the parts of
the exhibit.  If the lead-up to that question is, well,
let's get into where your kids went to school; let's get
into this mortgage; let's get into this rental agreement and
talk through, like, 100 different facts that are supposed to
be leading up to that ultimate question, I think we're in
sort of minitrial territory, which raises the 403 concerns.

          THE COURT:  So if you're -- the question, then,
for counsel for defendant, would you intend to say -- ask it
something like that -- and by the way, I'm not -- I don't
think I'm, you know, putting any ideas into anyone's head
and disclosing anything by saying this, and I'm not
suggesting what the witness's answers should be.

          But, for example, if the witness -- one approach
for defense counsel would say, "I'm going straight to the
chase.  Hey, isn't it true, Mr. Witness, that you were
untruthful on this particular form?  Do you remember filling
out this particular form?  Isn't it true that you were
untruthful on it?"

          And then, depending on what the answer -- you may
be able to get the answer you need like that without getting

1 into what's on the form and what about it was untruthful.

2    Does defense counsel intend to start out that

3 way? Or is it more like setting up the situation, setting

4 up what the answers were, and then on the back end ticking

5 off one by one what all was untruthful?

6    So, in other words, does the defense counsel

7 intend to start with an overarching question about

8 untruthfulness on particular sworn statements?

9    **MS. SHERWOOD:** Yes, Your Honor.

10    **THE COURT:** Mr. Phillips, you know, would that

11 sort of account for your concern? We're going to start that

12 way. See how it goes. Because if it's -- I do think if

13 that is the way it's asked, it might take care of the whole

14 issue.

15    If the answer is no and then counsel wants to

16 sort of break it down piece by piece, you may have a point

17 that that's not how it works and that your -- you take the

18 answer, you take the denial, and then it's on you -- if it's

19 a noncollateral matter, it's on you when you get to go with

20 evidence to prove the whole thing.

21    I don't know that you get to get a denial and

22 then -- and then start on cross-examination to be able to do

23 that. Now, in your case in chief, you might be able to call

24 that witness back, you know, to prove up a noncollateral

25 assertion of untruthfulness.

1          **MR. PHILLIPS:**  Yes, Your Honor.  The government

2     agrees.  And, really, most of our concerns for the moment,

3     at least, are all on collateral matters where we feel like

4     there could be this minitrial.

5          So really whether, you know, three dozen

6     questions on a collateral matter come before the ultimate

7     question or after, we still have major 403 concerns.

8          **THE COURT:**  So the one that we're all thinking of

9     as a primary issue -- and I'm confident we're all thinking

10     of the same one -- this is one where I'm confident counsel

11     can do what they say they're going to do and do it the right

12     way, which is to say -- you know, ask a question, maybe

13     something to set up the question, but really ask the

14     question.  You know, weren't you untruthful here?

15          And that -- if counsel gets the answer I think

16     they expect, that should resolve it on that particular

17     alleged act of untruthfulness.

18          If they don't get the answer they want, it

19     probably is collateral and they can't prove it up and don't

20     have to prove it up.  But would they be stuck with the

21     answer without being able to, you know, ask a million

22     questions to get the witness to change their answer?  I

23     don't think they are allowed to do that.  And I think that's

24     part of the rule against, you know, delving into too much

25     into collateral matters.

1          So if you're the -- you know, if you're the

2  witness and you know -- you understand how this all works,

3  maybe you're, like, well, let's make it all go away by

4  giving a false culpatory answer, well, that's the danger

5  with this approach in the federal rules.

6          But the problem is any witness who knowingly

7  testifies untruthfully acts at their own peril.  And I think

8  experience shows that this is a good tool if the facts are

9  really in the cross-examiner's favor.  Particularly for a

10  witness who has been well-prepared, this is a good tool for

11  counsel to get an honest answer about whether the alleged

12  prior act of untruthfulness occurred.

13          But we can sort of -- I think the best we can

14  probably do is play it by ear.  I would invite counsel, if

15  they think they can find authority for the proposition that,

16  you know, if the witness denies -- for whatever reason,

17  denies that they committed the alleged act showing

18  untruthfulness, they deny it on cross, that there can be

19  sort of follow-up questions that attempt to, through a

20  series of questions, to get them to admit to what they've

21  denied or to show that their denial was, in fact, false.

22          So that's probably the most I can say about that.

23          And so that is to say, you know, if counsel are

24  afraid of getting stuck with an answer that they believe is

25  untruthful when they ask about an alleged prior instance of

showing untruthfulness, they should come prepared to show

why they aren't stuck with the answer, particularly as it

relates to impeachment on a collateral matter.  That's

probably the most I could say about it.

        Does that make sense?

        **MS. SHERWOOD:**  Yes, Your Honor.  With respect to

that -- so maybe I spoke too hastily there.  There is no

universe in which I think we're going to ask this question

"Were you untruthful?" and that we're going to get a yes.

That's not going to happen.  So I do think -- I don't

think -- strange rule to expect an untruthful person to be

truthful.

        **THE COURT:**  You know, it's this odd balancing

thing because, if you're in your shoes and you think you've

got a witness who -- you know, any witness that you think

has -- is untruthful or is inclined to engage in acts of

untruthfulness, your way of showing that is to get them to

be truthful.  I do see the irony.  It's the federal rules

and, you know, the case law's way of sort of making sure we

don't have minitrials.

        I would encourage both sides to be prepared to

argue, to the extent they're interested, in saying, look, if

there's a denial, here's why we get to ask more questions

after the denial.  Or if you're the government, here's why

they don't get to ask more questions after the denial.

```
1              I'm inclined to think that the very purpose
2      behind the rule, particularly as it relates to impeachment
3      on a collateral act of untruthfulness, is to say, you know,
4      hey, you're stuck with it, and -- you know, and if the
5      witness falsely denied an allegation of a prior instance
6      involving untruthfulness, A, shame on them; and B, you know,
7      may blow back on them in any number of ways in the future
8      potentially.
9              MS. SHERWOOD:  Your Honor, that wasn't what I was
10     saying -- and I appreciate that.  I was saying I was a
11     little too hasty a moment ago when I said we were going to
12     jump right in and say, "Weren't you untruthful in this?"
13     There will have to be a few lead-up questions about you said
14     this, you know.
15             THE COURT:  Well, and I think -- right.  It
16     doesn't have to be sort of like one question.  You're
17     allowed to put it in context.  And I think a few minutes
18     ago, I referenced to, you know, a question or two to put
19     it -- and I do realize that.
20             MS. SHERWOOD:  Yeah, we'll have to.
21             THE COURT:  You have to be able to provide some
22     context and, I realize, not put it all in a single question.
23             And even with your prior answer, I wasn't
24     excluding the possibility of, you know, at least a couple of
25     questions to put it into context.
```

1          But that is to say, you know -- kind of, you

2    know, walking through all this information that particularly

3    may be on a particular form that you believe is associated

4    with untruthfulness would not be appropriate.

5          But I do -- you know, I am confident that, you

6    know, counsel will come prepared to argue whatever position

7    they want to assert depending on how this plays out.

8          Anything else, Mr. Phillips?

9          **MR. PHILLIPS:**  No, Your Honor.  Thank you.

10          **THE COURT:**  All right.  Thank you.

11          Mr. Yarbrough?

12          **MR. YARBROUGH:**  I don't believe so, Your Honor.

13          **THE COURT:**  Thank you.

14          Ms. Sherwood?

15          **MS. SHERWOOD:**  Nothing, Your Honor.

16          **THE COURT:**  Thank you, Counsel.  We'll reconvene

17    at 9:00 a.m. tomorrow.  Thank you.

18          (WHEREUPON, the foregoing proceedings were

19    adjourned for the day at 5:20 p.m., to be resumed April 25,

20    2025, at 9:00 a.m.)

21

22

23

24

25

REPORTER'S CERTIFICATE

        I, Deborah K. Watson, Official Court Reporter for the United States District Court for the Middle District of Tennessee, with offices at Nashville, do hereby certify:

        That I reported on the Stenograph machine the proceedings held in open court on April 24, 2025, in the matter of *UNITED STATES OF AMERICA vs. GLEN CASADA AND CADE COTHREN*, Case No. 3:22-cr-00282; that said proceedings in connection with the hearing were reduced to typewritten form by me; and that the foregoing transcript (Trial Volume 3 of 19, pages 1 through 275) is a true and accurate record of said proceedings.

        This the 23rd day of August, 2025.

        /s/ Deborah K. Watson
        DEBORAH K. WATSON, RPR, CRR
        Official Court Reporter