**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:22-CR-00091** |
| | ) | **Judge Eli Richardson** |
| | ) | |
| **CADE COTHREN,** | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT CADE COTHREN'S**
**STATEMENT REGARDING 3553(a) FACTORS/SENTENCING MEMORANDUM**

Comes now Defendant Cade Cothren, by and through undersigned counsel, and respectfully submits this Sentencing Memorandum, in which he will explain why, under all the considerations of 18 U.S.C. § 3553(a), a non-custodial sentence is appropriate. In making this request, Mr. Cothren acknowledges that the advisory Guidelines range for his projected Total Offense Level of 22 and Criminal History Category of I is 41-51 months.[1] As explained below, a substantial downward variance would achieve a sentence that is sufficient, but not greater than necessary, to fulfill the purposes of sentencing.

**Legal Standard**

In determining the appropriate sentence, the Court should (after calculating the advisory Guideline's range) weigh the factors set forth in 18 U.S.C. § 3553(a). As the Supreme Court underscored in *Gall v. United States*, a district court must always begin its determination of a sentence "with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007). On the other hand, it "may not presume that the Guidelines range

---

[1] Probation incorrectly calculated the Total Offense Level at 30 with a Guidelines range of 97-121 months. *See* Dkt. No. 415: Position of Defendant Cade Cothren Regarding Presentence Report at p. 9.

is reasonable." *Id.* at 39. The sentencing court's overarching duty is to "make an individualized assessment based on the facts presented," but in keeping with Section 3553(a). *Id.* "District courts are charged with imposing 'a sentence sufficient, but not greater than necessary' to fulfill the purposes of sentencing in § 3553(a)(2)." *United States v. Walls*, 546 F.3d 728, 736 (6th Cir. 2008) (citation omitted). Neither Section 3553 nor the courts has imposed a limit on the extent to which a district court may vary from the Guidelines range, provided that reasonable justification exists.

Mr. Cothren will now address the Section 3553(a) factors in turn.

<u>Discussion</u>

## A. The Factors in Section 3553(a)(1) Weigh in Favor of the Requested Downward Variance.

Section 3553(a)(1) instructs the Court to first look at both the "nature and circumstances of the offense" and Mr. Cothren's "history and characteristics." There are myriad 3553(a)(1) facts in Mr. Cothren's offense and history that weigh in favor of the requested downward variance.

### 1. <u>The nature and circumstances of the offense.</u>

Mr. Cothren vigorously contested the government's case, but he respects the jury's and this Court's decisions, even if he disagrees with the outcome. Mr. Cothren was charged with 20 felony counts, and now stands convicted of 16. Mr. Cothren has been acquitted of violating three of the substantive counts: 18 U.S.C. §§ 666(a)(1)(A), 2 (Theft Concerning Programs Receiving Federal Funds); 18 U.S.C. §§ 666(a)(1(B), 2 (Bribery and Kickbacks Concerning Programs Receiving Federal Funds); and 18 U.S.C. § 666(a)(2) (Bribery and Kickbacks Concerning Programs Receiving Federal Funds. Mr. Cothren's convictions on the six remaining substantive counts for 18 U.S.C. §§ 1343, 1346, 2 (Honest Services Wire Fraud) are derivative of the number of emails and iMessages sent by the alleged co-conspirators—only one of which was sent by Mr. Cothren. Each of the ten remaining counts of conviction stems from Mr. Cothren's convictions for honest services wire fraud.

2

While Mr. Cothren's acquittal on three of the four substantive statutes will likely not change Mr. Cothren's advisory Guidelines range, these acquittals certainly should inform this Court's analysis of the Section 3553 factors. Practically speaking, the acquittals on Counts, 2, 3, and 4 mean that Mr. Cothren did not pay bribes or kickbacks to agents ("insiders") of the State, nor did he defraud the State or a "program" receiving federal funds. At bottom, Mr. Cothren now stands guilty of concealing – and aiding and abetting Mr. Casada and Ms. Smith in their concealment of – Mr. Cothren's profit-sharing agreement with these individuals and his ownership of Phoenix Solutions. Because the offenses of conviction are now much narrower in scope, a greater justification exists for a downward variance. For each count of conviction, this Court opined at the September 9th hearing that there was evidence in the record for a rational jury to have acquitted him. The Court explained that although the jury was "authorized" to find Mr. Cothren guilty, it certainly was not "required" to do so. The Court also acknowledged the complexity of this case and the validity of the issues and questions of law Mr. Cothren can raise on appeal.

Mr. Cothren's views on the government's case and evidence are not a mystery to this Court, so he will not fully restate them here. Instead, Mr. Cothren will focus on three ways in which the nature and circumstances of the offense help place the convictions in the proper context. First, no one—not the State, nor the legislators who received constituent mailer services—was harmed nor suffered any monetary loss. Second, the convictions were based on novel government theories and conduct that did not follow the archetypal bribery fact pattern. Third, the political backdrop for the investigation and charges provides additional context for the charged conduct.

First, as Mr. Cothren reiterated over and over at trial, everyone—the State and every single legislator customer—got what they paid for. The State was billed and paid a total of $51,947 for these constituent mailers. Every single individual who utilized the services of Phoenix Solutions, Mr. Casada's company (Right Way Consulting ("RWC")), and Ms. Smith's company (Rivers Edge Alliance

("REA")) received exactly what they bargained for—high quality mailers sent to their constituents. Phoenix Solutions, RWC, and REA did the work, charged at or below market prices, and provided excellent mailers. Their customers uniformly said they were happy with the end product and had no issues with the price or quality of their mailers. Mr. Cothren's character letters consistently underscore that he not only did the work but delivered exceptional results.

- **Nadine Korby**, who worked with Mr. Cothren for fifteen years and introduced her daughter, Ava Korby, to Mr. Cothren, described his professionalism in this way: "Whenever Rep. Calfee needed a communication piece designed and written, he always went to Cade and not the other staff member to get it done because Cade is a very gifted writer. He has a talent for extrapolating information, prioritizing what needs to be said, and then eloquently and succinctly putting the message into words. He is also dependable - Cade does what he says he will do; in the timeframe he says he will do it. Rep. Calfee was delighted with all the work Cade did for him, including the mail pieces that Cade produced under the name Matthew Phoenix…True to his character, he did what he said he would do when he said he would do it-- produce a high-quality product that would delight clients, just like he always did while employed by the state." Collective Exhibit A at pp. 17-19.

- **Former State Representative Kent Calfee** was extremely pleased with the constituent mailers that went out to his district: "[W]hat we sent out was a very professional mailer worthy of our constituents … I didn't know at the time Rep Smith was using anyone other than her own company but later I found out it was Cade who did the layout and all the work. I certainly would have used him again. He produced a

top-notch mailer, not only for me but others…He delivered a product and he paid the taxes due." *Id.* at p. 6.

- **State Representative Todd Warner** also provided his professional endorsement of Mr. Cothren based on his extensive experience working with him: "I can say without hesitation that Cade is one of the most professional and dedicated people I have ever worked with. He doesn't just complete a job—he pours his heart into it. That's the difference with Cade. His work has always stood out because he does it with integrity and care, as many elected officials have testified. Cade's mail and campaign work have been some of the very best, not because he is trying to make a name for himself, but because he truly cares about the people he serves and wants to do things the right way." *Id.* at p. 9.

- **Ava Korby**, Mr. Cothren's longtime girlfriend, observed Mr. Cothren's work ethic and motivation for starting his mailer business firsthand: "When Cade created Phoenix Solutions, it wasn't to deceive or take advantage. I watched him stay up past midnight night after night, making sure the work he promised was not only completed but completed with excellence. He never cut corners — he cared deeply about the quality of what he produced. His pride was in doing things right, the same way he approaches the people in his life." *Id.* at p. 14.

- Mr. Cothren's mother, **Judy Cothren**, wrote that Cade "spoke with such pride in the work" he did through Phoenix Solutions. She also explained that Cade "would never knowingly involve [her]—or anyone he loves—in something dishonest." *Id.* at p. 12.

- Attorney **Angie Lawless**, Mr. Cothren's landlord for over ten years who also personally observed his work, attests: "I've also had the opportunity to review some of his work and believe, without question, that he is both highly intelligent and talented." *Id.* at pp. 1-2.

These consistent testimonials from family, friends, professional colleagues, and actual clients demonstrate that Mr. Cothren personally performed high-quality work that met and exceeded professional standards, negating any suggestion of fraud or deception regarding the services Mr. Cothren provided.

Second, with respect to the elements of honest services fraud, this was not a clear-cut case of bribery. Far from it. Like the novel theories pursued (and struck down) in *Snyder v. U.S., Ciminelli v. U.S., Percoco v. U.S., Kelly v. U.S., McDonnell v. U.S.,* and *Skilling v. U.S.*, this case also involved unconventional applications of federal statutes enacted to criminalize outright theft of federal funds or the direct exchange of legislative, official acts for bribes and kickbacks. The government's theory was that Mr. Cothren bribed Mr. Casada and Ms. Smith with money they each had earned by soliciting mailer clients and had agreed to split with Mr. Cothren, their business partner. The government claimed this arrangement was a kickback scheme. The jury agreed. A different jury could have just as easily acquitted Mr. Cothren and Mr. Casada by finding that their business arrangement was legal and the shared profits were payments that Mr. Casada and Ms. Smith earned instead of bribes or kickbacks. This Court acknowledged as much during the September 9th hearing.

There were no ethical rules or laws that prohibited Mr. Casada or Ms. Smith from running their own consulting businesses, hiring a subcontractor, or soliciting constituent mailer work from their fellow representatives. Indeed, witnesses at trial confirmed other state representatives had done the exact same thing in years past. The only difference between those state representatives' work and

the work done by Mr. Casada and Ms. Smith is that they chose to work with someone (Mr. Cothren) who certain State employees apparently felt was unworthy of the task. But there were no rules requiring Mr. Casada to disclose who he had hired to help him with the constituent mailers. True, they felt their odds of securing the work would improve if Mr. Cothren's involvement was not broadcasted, but given the unregulated nature and culture of deception and scandal that marked the halls of the Tennessee legislature at the time of the charged conduct, it is no small wonder that Mr. Cothren saw no harm in using a pseudonym or obscuring his identity when dealing with his former colleagues in the House. The money paid to Phoenix Solutions, Mr. Casada, and Ms. Smith indisputably was earned, and any "deception" about Phoenix Solutions and its origins or ownership occurred <u>after</u> the PPA payments were already due and owing or in the context of a separate line of business: campaign work. The evidence at trial clearly established the PPA work (or the campaign work, for that matter) was not done with an intent to harm or injure the State or anyone else—and it did not do so.

Mr. Cothren's status as a private citizen is also noteworthy. Unlike Mr. Casada and Ms. Smith, he was not a public official when he founded Phoenix Solutions or performed the constituent mailer work at issue. But one can understand how Mr. Casada and Mr. Cothren failed to view the former's private business activities as purported "official acts" undertaken in exchange for alleged "bribes." Even the government's "official act" theory shifted over time and during the trial itself. By closing, the government's argument was that simply asking the State to pay invoices for the services that Phoenix Solutions, Right Way Consulting, and Rivers Edge Alliance indisputably provided was enough "pressure" to constitute a federal crime. "Recommending" or "selecting" Phoenix Solutions as a mail vendor also amounted to an "official act" and a federal crime, too, according to the government. Neither species of routine decision-making even approaches the *McDonnell* definition of an "official act." At a minimum, if the presence or absence of any "official act" was (as the court also noted during the September 9th hearing) a matter in which reasonable jurors could disagree, then Mr. Cothren

should be given some grace for failing to appreciate that these routine, inconsequential decisions by Mr. Casada and other state representatives could be characterized as "a question, matter, cause, suit, proceeding, or controversy that involved a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee." Regardless, the nature and circumstances of this highly unusual (and still contested) offense merit careful consideration at sentencing.

Finally, the culture in the House of Representatives, the politically charged climate from which this case arose, and the "public flogging" of Mr. Cothren and Mr. Casada that ensued are also worth considering. The trial record bears this out. The current Speaker of the House (Cameron Sexton) began cooperating with the FBI before Phoenix Solutions was even formed. The media was somehow alerted to, and present for, the FBI's raid of Mr. Casada's home on January 8, 2021. On the same day, the FBI conducted armed raids on the homes of Mr. Cothren, newly elected State Representative Todd Warner (who was never charged); former State Representative Kent Calfee (never charged); former Chief of Staff to Glen Casada and Legislative Aid Holt Whitt (never charged); and the halls of the Tennessee State Capitol building, including the offices of Mr. Casada, Ms. Smith, and Legislative Assistant Nadine Korby. This is a highly unusual and elevated response by law enforcement to an alleged mail service fraud scheme that resulted in no financial harm and state payments totaling less than $52,000. Nevertheless, Mr. Cothren voluntarily spoke to FBI agents when they showed up at his home on January 8, 2021, and on several occasions thereafter. As this Court is aware, Mr. Cothren maintains his innocence but, at the time, his response to the investigation showed immense respect for law enforcement. He acknowledged he was the owner of Phoenix Solutions and used the alias "Matthew Phoenix" but also expressed genuine confusion as to how his use of a pseudonym was a crime. When Mr. Cothren declined to plead guilty to one count of honest services fraud, the government indicted him on 20 counts.

He requested—but was denied—the courtesy of turning himself in after his indictment. Instead, the FBI used a battering ram to force open Mr. Cothren's door at 6 a.m. on August 23, 2022, and they conducted an armed entry into Mr. Cothren's apartment, placed him in handcuffs and leg chains, and "perp walked" him to federal court in his sleeping shorts and a t-shirt. The media was again tipped off about the arrest and swarmed Mr. Cothren as he walked out of the federal courthouse following his initial appearance.

As the Court noted on more than one occasion, this case is unique in many ways. It is not a quintessential public corruption or bribery cases. Would Mr. Cothren do things differently based on what he knows now? Absolutely. Did he make mistakes? No question. Mr. Cothren was publicly shamed, lost his job, and he was determined to find work and support himself and his girlfriend. In hindsight, he would have been better served to use his own name and try to build his reputation back up. That fact, combined with the mitigating factors above, places this case in a category of its own. Put simply, the nature and circumstances of the offense weigh in favor of leniency.

### 2. Mr. Cothren's history and characteristics.

Mr. Cothren's personal history and characteristics overwhelmingly support a downward variance. The Section 3553(a)(1) analysis requires consideration of the "whole person" before the court. *United States v. Menyweather*, 447 F.3d 625, 629 (9th Cir. 2006).

Section "3553(a)(1) 'contains no express limitations as to what "history and characteristics of the defendant" are relevant.'" *United States v. Robinson*, 741 F.3d 588, 600 (5th Cir. 2014) (citing *United States v. Fernandez*, 443 F.3d 19, 33 (2d Cir. 2006)). This Court must "'consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue.' . . . Underlying this tradition is the principle that 'the punishment should fit the offender and not merely the crime.'" *United States v. Pineda*, 755 F.

App'x 543, 548 (6th Cir. 2018) (citing *Pepper v. United S tates*, 562 U.S. 476, 487-88 (2011) (citations omitted)).

        a.    *Mr. Cothren's overall character.*

In the interest of providing the Court with an informed perspective about Mr. Cothren, copies of letters from friends and family are attached as Collective Exhibit A. For the most part, these letters speak for themselves, but the letters all highlight several notable characteristics of Mr. Cothren—but for this conviction, Mr. Cothren has been a productive, family oriented, and law-abiding member of our society. Some of the words his friends and family used to describe him are: respectful; responsible; communicative; honest; dependable in every sense; kind; fair; hard worker; positive; strong moral compass; humility; faith; thoughtful; quiet strength; personable; willing to help; kindhearted; professional; dedicated; keeps his word, always; upstanding; intelligence; discipline; work ethic; and pride in his work.

Many of these letters also highlight Mr. Cothren's selflessness and provide examples of the ways in which Mr. Cothren has consistently shown up for others despite facing immense personal challenges during this multi-year ordeal. He has not wallowed in self-pity but has continued to contribute and provide support to others in his family and community.

Over the last three or four years, Mr. Cothren has been attempting to build a life that, for the first time, does not involve working in politics and that generates very little income. The Revised Presentence Report ("PSR") reflects the dramatic financial impact this case has had in his life. His annual income has dropped precipitously—from six figures to single digits—since 2019. PSR at ¶ 124.

Employment and other constraints prompted Mr. Cothren to leave Nashville, the city he has loved since college, and return home to Lawrenceburg. Despite his own struggles, he shows up for the people there. The letters also reflect that and his love of this state and this country. Nadine Korby

painted a vivid description of his home office today.  Collective Exhibit A at p. 18.  She describes his office as reflecting:

> …his love of history, politics, and all things Tennessee. There is a copy of the Declaration of Independence, as well as a copy of the Constitution hanging on the wall as you enter.  Prints of significant Tennessee landmarks decorate the remaining walls, and a Lego replica of the White House sits on his desk.  A myriad of books lie on shelves; books by and about Ronald Reagan, Howard Baker, Sean Hannity, and other notable political figures, as well as books on leadership.

*Id.*  Despite everything that has occurred in this case, Ms. Korby's letter confirms that Mr. Cothren is not bitter and has not lost the passion he has for this great state and country. He remains committed to this country and its ideals, something his mother wrote was evidenced by the pride he had in seventh grade when he won a government and public service award.  *Id.* at p. 11. Mr. Cothren is now a convicted felon, which carries with it legal and practical limitations on what type of role he can have in public service in the future.

### b. *Mr. Cothren's strong family and community support.*

When examining the history and characteristics of a defendant pursuant to Section 3553(a), the defendant's family support is a factor for the courts to consider. *United States v. Allen*, No. 24-1110, 2025 U.S. App. LEXIS 3470, at *7 (6th Cir. Feb. 12, 2025) (considering but not varying downward).  In another case, the Southern District of New York granted a downward variance under Section 3553(a)(1) for several reasons, including family and community support. *See United States v. Harding*, 05 Cr. 1285-02 (RWS), 2006 U.S. Dist. LEXIS 71423, at *11 (S.D.N.Y. Sep. 27, 2006).  In *Harding*, the defendant's Guidelines range was 70-87 months, and the court varied downward to 48 months because of the "severity of the defendant's drug abuse problem," and the strength of his family and community support ready to assist him upon release.  *Id.* at *11, 13-14.

The sixteen character letters submitted on Mr. Cothren's behalf demonstrate overwhelming family and community support from people who know him intimately and have actively stood by him through his legal ordeal. *See* Collective Exhibit A. Former Representative Kent Calfee (one of the constituent mail clients) provides an absolute statement of support: "If Cade were to come to me and need a loan, he would get it; if he needed me to vouch for a place to live, I would do it; if he needed to use me as a reference for a job, I wouldn't hesitate – that's how much I think of Cade Cothren[.]" *Id.* at p. 6.

Ava Korby writes: "We have wanted to start a family for years. But this case — this long, exhausting fight — has stolen five years from us…The day the FBI came to our home with a battering ram and handcuffed Cade against a brick wall, he wasn't worried about himself — his first concern was me." *Id.* at p. 15.

Ava Korby's father, Tracy Korby, who also knows Mr. Cothren well, states: "Cade is a welcome addition to our family…I would be proud to call Cade a son. That's my pinnacle, all else is less. I proudly stand by, with and for Cade." *Id.* at p. 20. Nadine Korby demonstrates active family support: "I would be proud to call him my son. This is no small thing. As a mother who has only her children's best interests at heart, I sincerely tell you that if Cade was anything like the person the press and prosecutors made him out to be, my family would have chased him off long ago with me leading the charge!" *Id.* at p. 18 (emphasis original). She additionally states: "Not only do I trust Cade explicitly with my daughter's physical, mental, and emotional well-being, I trust him with financial matters. My daughter and Cade currently live in a house I own. The rent they pay each month is fair market. They have never been late or missed a payment." *Id.*

Kimberly Korby, Ava Korby's step-mother, trusted Mr. Cothren with her most precious responsibility: "I believe so much in his ability to do what is right and make good decisions, that when I was going through treatment for breast cancer he and Ava were the family I enlisted to take care of

my daughter [, T.K.,] if the need arose." *Id.* at p. 21. Mr. Cothren's longtime friend and sister-in-law, Fallon Cothren, emphasizes: "In all the 20 plus years I have known him, I have never seen him act in aggression or malice. He has never raised his voice to his parents, a deep reflection of the deep respect he carries for those around him." *Id.* at p. 13.

Danny Eltzroth speaks of Mr. Cothren's loyalty during a personal crisis: "More importantly, Cade was there for me during one of the hardest times in my life—my divorce…I truly don't know how I would have made it through that time without their help." *Id.* at p. 3. Dave Ray acknowledges the foundational strength of Mr. Cothren's family: "Cade comes from a family I've known and admired for many years—people of deep Christian faith, strong moral character, and unwavering integrity. They are respected in our community[.]" *Id.* at p. 4. Finally, Angie Lawless observes: "In recent years, Cade has moved closer to his family, where he has surrounded himself with a supportive environment. His long-term relationship and close-knit family have provided him with a solid foundation." *Id.* at p. 2. She notes that Mr. Cothren "stepped into positions of significant power at a young age—roles that many would find difficult to navigate—and while this experience has brought serious consequences, I believe it has also given him the kind of humility, perspective, and wisdom that often takes decades to develop." *Id.*

Judy Cothren provides the most heartfelt statement and unwavering maternal support: "Even when he was living in Nashville and working long, demanding hours as Chief of Staff, he called me every single day just to check in…Family has always been at the very center of Cade's heart. If we had a dinner or event, he showed up…When all of this came to light, it was Cade who sat us down and told us directly. I never once doubted him. Not because I was ignoring what was being said in the media, but because I know who he is through his actions, every single day of his life." *Id.* at pp. 11-12.

The letters all show a support network that has actively stood by Mr. Cothren through his darkest hours. These familial and community ties strongly weigh in favor of a downward variance.

### c. *Mr. Cothren's education and employment history.*

Under Section 3353(a)(1), the Court can also consider a defendant's employment history. *See United States v. Young*, No. 22-2164, 2023 U.S. App. LEXIS 26425 (6th Cir. Oct. 4, 2023) (weighing employment history, age at the time of the crime, and mental health concerns). Mr. Cothren's education and employment history are commendable.

Mr. Cothren's passion and proclivity for government and public service was apparent even in middle school. When he was in the seventh grade, Mr. Cothren won the History and Government award from the United States Achievement Academy. *See* Collective Exhibit A at p. 11. Mr. Cothren's mother explained that he was "so proud, not just because he had won, but because it meant he had done well in something he truly cared about." *Id.* "That love of government and public service never left him." *Id.* "He graduated from Lawrence County High School with honors and went to earn his college degree summa cum laude– a testament of his intelligence, discipline, and work ethic." *Id.* at p. 13. He graduated from Columbia State Community College with a 4.0 grade point average and from the University of Tennessee Knoxville with a 3.92 grade point average. PSR at ¶¶ 117, 118. He held various jobs with the Tennessee Republican Party from 2010-2012. PSR at ¶ 118. He was selected for a prestigious internship at the Tennessee State Capitol while still in college. PSR at ¶ 104. Mr. Cothren served the State of Tennessee from 2013-2019. PSR at ¶ 120. After that, as this Court heard at trial, Mr. Cothren helped Speaker Cameron Sexton with his speakership race and then started Phoenix Solutions. Despite his excellent academic credentials and work history, he has struggled to find steady, long-term employment since the news of the FBI raid broke in 2021. He has submitted at least 24 job applications and made diligent efforts to obtain employment using his once marketable talents, but no company can or will hire him. *See* Dkt. Nos. 310 at p. 2, 310-2, 379 at p. 2, 379-2. He does still co-own short-term rental property and has been able to work for, and earn some income

from, that business. He has done some construction work for Representative Todd Warner. Dkt. No. 310 at p. 2. He is studying to obtain his contractor's license. *Id.*; PSR at ¶ 115.

### d. *At best, this was legal conduct; at worst, it was aberrant behavior.*

The Court may also vary downward if the conviction conduct was aberrant behavior. *See United States v. Madden*, 515 F.3d 601, 611 (6th Cir. 2008); *accord United States v. Rhodes*, 410 F. App'x 856, 864 (6th Cir. 2010). While Mr. Cothren disagrees with the verdict, even taking that into account, he has otherwise led a law-abiding life. Criminal conduct is a marked deviation from Mr. Cothren's past behavior.

The letters of support reveal a consistent pattern of Mr. Cothren giving to others—not taking. *See* Collective Exhibit A. This Court surely recognizes that this is not the typical fraud or public corruption case—this is a case in which no restitution is due because the services ordered were provided in full.

As Fallon Cothren writes: "Cade has always been an upstanding individual…I truly feel that if Cade knew what he was doing was illegal; he would not have done it. I think that is why he did not take a plea deal because he knew in his heart he did not do anything wrong." *Id.* at p. 13.

Marilyn Calfee wrote that she believes in her "heart of hearts he would never do anything illegal and certainly not take a chance on ruining his life; he was just trying to start a new chapter and build a reputation on what he knew he could produce. . . ." *Id.* at p. 8.

Dave Ray writes: "What stands out most to me about Cade is his passion for doing what is right. He is not afraid to stand for the truth or speak up for what he believes in, even when it may come at a personal cost. His convictions are not performative—they are rooted in a sincere desire to honor God, serve others, and live a meaningful life." *Id.* at p. 4.

Angie Lawless offers her firsthand observations about Mr. Cothren's character: "Throughout his tenancy, Cade was respectful, responsible, and communicative. He always paid rent on time,

maintained the property diligently, and treated both me and the space with care. In an era where long-term tenancies are increasingly rare—especially among young adults—his reliability stood out. He lived in the same home for more than a decade and even made improvements to the property at his own expense, stating that he wanted to leave it better than he found it. That mindset speaks to a desire to contribute positively, even in the small details of daily life." *Id.* at p. 1. She further notes: "While I cannot speak to the specifics of his legal case, I can attest that in all of our interactions, Cade has conducted himself with integrity, decency, and maturity. I've also had the opportunity to review some of his work and believe, without question, that he is both highly intelligent and talented." *Id.* at pp. 1-2.

T.K., a young person who has known Mr. Cothren throughout her childhood, offers this touching handwritten tribute: "He's always willing to help out no matter how busy he is. I've known him since I was a child. He has never spoke down to me because of my age. He has always treated me and everyone else with the same amount of extreme respect and kindness, much more than any of us deserve…He is very selfless. He will always go out of his way to help others. Even if it interrupts his day. He always does what should be done for the betterment of society." *Id.* at p. 23.

Nadine Korby similarly attests: "I've witnessed Cade do countless acts of kindness modestly without fanfare. He is the first to offer to help someone, even strangers…Throughout this ordeal and even after the verdict, Cade's primary concern has not been for himself, but for others." *Id.* at p. 19.

**B.      The Factors in Section 3553(a)(2) Weigh in Favor of the Requested Downward Variance.**

      **3.      <u>The need to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense under Section 3553(a)(2)(A).</u>**

Mr. Cothren was a young man in his early 30s when the underlying investigation began. Federal agents raided his home twice, and his life has been on hold since his 2021 indictment and arrest. Job opportunities have been scarce due to the publicity surrounding this case and the charges, but he has persevered, buoyed by support from his family and friends. *See e.g.*, Collective Exhibit A. Mr. Cothren has never been arrested for any criminal conduct apart from this offense. He poses no danger to the public.

Though he recognizes that the Court must sentence him, Mr. Cothren also knows that he will have to deal with the stigma and attendant consequences of multiple felony convictions for the rest of his life. As the Sixth Circuit recognized in *U.S. v. Wulff*, "a felony conviction irreparably damages one's reputation." 758 F.2d 1121, 1125 (6th Cir. 1985). Thus, this Court may consider the reputational impact of a felony conviction on Mr. Cothren as one factor that justifies a non-custodial sentence.

The passage of time between a defendant's criminal conduct and his sentencing is another fact that weighs in favor of leniency at sentencing.  A marked delay between the alleged crime and the sentencing is significant for two reasons. First, a defendant typically experiences tremendous stress during the period of delay and that stress constitutes a form of punishment. *See United States v. Akers*, 499 F. Supp. 43, 45 (D. Or. 1980) (S.D.N.Y. Aug. 12, 1997) (explaining that "excessive delay, and the uncertainty which accompanies it, may well be, in itself, a severe punishment to the defendant.").  That certainly holds true for Mr. Cothren, who experienced tremendous stress both leading up to and during his trial, culminating in an emergency surgery within days of the verdict. PSR at ¶ 108. Second, the deterrent value of the punishment is diluted by the passage of time. *Coleman v. Balkcom*, 451 U.S. 949, 952 (1982) (Stevens, J., concurring) ("The deterrent value of any punishment is, of course, related to the promptness with which it is inflicted.").

Where a defendant lives an exemplary life during the years between his offense and his sentencing, his good conduct is a strong indicator that he will continue to live a law-abiding life going

forward. *See, e.g., United States v. Baker*, 502 F.3d 465 (6th Cir. 2007) (affirming variance from advisory range of 27-33 months to sentence of probation with one year of house arrest based, in part, on finding that defendant "had done 'exceedingly well' while under [pre-trial] supervision" and "incarceration was unnecessary to protect [the victim] or the public"); *United States v. Munoz-Nava*, 524 F.3d 1137, 1143 (10th Cir. 2008) (emphasizing defendant's "exemplary record on pretrial release" and the corresponding unlikelihood that he would reoffend); *United States v. Jaber*, 362 F. Supp. 2d 365, 383 (D. Mass. 2005) (emphasizing perfect record on pretrial release, despite significant life stressors, as basis for significant variance).

Here, despite personal stressors including significant financial hardship, Mr. Cothren has not committed any new offenses while on pretrial supervision, has found various means of employment, and has complied with the numerous conditions of pretrial release. He has also moved back to his hometown of Lawrenceburg, Tennessee, to be closer to his immediate and extended family.

4. **A non-custodial sentence will afford adequate specific and general deterrence (Section 3553(a)(2)(B)) and is sufficient to protect the public from future crimes (Section 3553(a)(2)(C)).**

One of the most prominent Section 3553 factors in a white-collar case is the need to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). There are two forms of deterrence—specific and general—that a court should consider in fashioning a sentence. *U.S. v. Camiscione*, 591 F.3d 832, 834 (6th Cir. 2010)

For Mr. Cothren, a non-custodial sentence will achieve specific deterrence and promote respect for the law. "Generally, a lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to re-offend." *United States v. Qualls*, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005). A prison term would mean more to a defendant who has never been imprisoned than one who previously had been imprisoned. Here, specific deterrence has been achieved by charging and

convicting Mr. Cothren of nineteen felony offenses, three of which this Court has seen fit to overturn on legal grounds. Apart from any sentence this Court will impose, Mr. Cothren has learned some very hard lessons about the criminal justice system and been profoundly changed by this experience. His life was on hold for nearly five years while he awaited trial. The media has hounded him at every turn. He, his family, and his friends endured a month-long criminal trial during which his character was repeatedly assailed. He can never run for a state public office, own a firearm, obtain a passport, serve on a jury, or vote. For someone who envisioned a lifetime of public service and possibly running for public office one day, these consequences are devastating.

As to general deterrence, the Sixth Circuit's decision opinion in *U.S. v. Musgrave* (Musgrave-II) is instructive. In that case, the court upheld a sentence of one-day incarceration, five-years supervised release and two-years house arrest for a white-collar criminal whose advisory Guidelines range was 57-71 months (and who was found responsible for causing $1.7 million in loss). *U.S. v. Musgrave*, 647 F. App'x 529 (6th Cir. May 4, 2016). This was the second time this sentence had been imposed and the second time the Sixth Circuit reviewed it. On the first review, the Sixth Circuit found that the District Court had "failed to address adequately how…a non-custodial sentence afforded adequate general deterrence." *U.S. v. Musgrave* (Musgrave-I), 761 F.3d 602, 609 (6th Cir. 2014). However, the District Court's subsequent rationale for the sentence on remand was accepted in Musgrave-II:

> As to general deterrence, when a would-be white-collar criminal looks to the sentence imposed in this case, what he will find is that Musgrave, who the judge found was the lesser culpable defendant, was nonetheless punished by being required to serve two years on home incarceration, where the sashaying about and attending to children's dogs and the likes will simply not occur. Your liberty has been restrained, and properly so, and very significantly.
>
> So, in general deterrence, when a would-be white-collar criminal looks to the Musgrave sentence, he got sentenced to a day in prison, five years of supervised release, two years of home incarceration. Start to think about what it would be like to live for two years incarcerated in your home with no absences outside the home but for the preapproved stuff I have indicated.

> Moreover, he got fined a quarter of a million dollars and is required to pay back the 1.7 million in restitution, and the court imposed an aggressive payment plan.
>
> If 30 percent of the fraud defendants get a sentence with no imprisonment, here Musgrave is punished significantly in order to send the adequate general deterrence message, because he ends up with two years of home incarceration, a quarter-of-a-million-dollar fine, his liberty extraordinarily restrained.

(R. 228, Resentencing Tr., PageID 4415–16.) The district court concluded by quoting *Gall*'s acknowledgement that "[o]ffenders on probation are…subject to several standard conditions that substantially restrict their liberty." *Gall*, 552 U.S. at 48.

\*\*\*

> The district court's imposition of and rationale for a "severe financial penalty" ($1.7 million in restitution plus a $250,000 fine, in addition to five years of supervised release with 24 months of home confinement) does not conflict with its earlier reference to punishment of mere "financial inconvenience." *See* United States Sentencing Commission, Guidelines Manual, §5F1.2 (Nov. 2014) (providing that home confinement may be used "as a substitute for imprisonment").

*Musgrave-II*, 647 F. App'x 529, 533-34 (6th Cir. 2016).

Finally, prison is not the only effective or meaningful tool available to this Court to promote respect for the law. Non-custodial alternatives like home detention or incarceration and probation can and do achieve the same goal for defendants like Mr. Cothren whose convictions represent aberrations in their otherwise exemplary personal and professional lives. A probationary sentence in Mr. Cothren's case would also support Congressional intent, which is "to ensure that prison resources are, first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society." Sentencing Reform Act of 1984, Pub. L. 98-473, § 239, 98 Stat. 1987, 2039 (1984). Far from an "act of leniency," probation is a "substantial restriction of freedom" that comes with months of supervision, strict reporting conditions, and "harsh consequences" if those conditions are violated. *Gall v. U.S.*, 552 U.S. 38, 44 (2007) (internal citations and quotations omitted); *see also United States v. Knights*, 534 U.S. 112, 119 (2001) ("Inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled") (internal quotation marks omitted).

Imposing a term of probation in addition to the other penalties Mr. Cothren has already incurred (and will continue to incur for the rest of his life) will ensure he is sufficiently punished. Incarceration would be a disproportionately severe sentence, *i.e.*, a punishment "greater than necessary," based on the underlying circumstances and the lack of harm occasioned by his conduct.

### 5. The need to protect the public from further crimes under Section 3553(a)(2)(C) weighs in favor of the requested downward variance.

The next Section 3553 factor is the need to protect the public from further crimes of the defendant under 18 U.S.C. § 3553(a)(2)(C). This Court should consider, among other things, Mr. Cothren's complete lack of criminal history and exceptionally low statistical probability of reincarceration as evidence of a lack of need to protect the public from Mr. Cothren and support for a downward variance.

Mr. Cothren is 38 years old with no criminal history. The reconviction rates for individuals with no criminal history points is only 17.4%. *See* Exhibit B: Recidivism Among Federal Offenders: A Comprehensive Overview at Appendix A-2. Moreover, Mr. Cothren's federal offense type falls into the fraud category, which saw the lowest reconviction rate of all crime categories at 21.2%. *Id.*

Other facts in Mr. Cothren's favor are that he graduated college at the University of Tennessee Knoxville with a 3.92 GPA, has a strong employment history with marketable skills, is currently employed with project-based work, and is working on his general contractor's license to get his construction company off the ground. PSR at ¶¶ 118-120. Importantly, college graduates see a reconviction rate of a mere 10.4%. *Id.*

Furthermore, Mr. Cothren is a zero-point offender and, as such, is substantially less likely to recidivate than other offenders. "The Sentencing Commission's report, Recidivism and the 'First Offender' (May 2004)…suggests that individuals…with zero criminal history points are less likely to recidivate than all other offenders." *United States v. Cabrera*, 567 F. Supp. 2d 271, 279 (D. Mass. 2008). "Commission studies show that the recidivism rate for such individuals is substantially lower than

recidivism rates for other offenders, and even for offenders with only one criminal history point." *Id.* (internal citation omitted).

Finally, Mr. Cothren has a strong network of family and friends who have high regard for him as well as his family, have actively supported him throughout this lengthy process, and have promised to continue to support him after his sentencing. PSR at ¶¶ 97-101, 107; Collective Exhibit A. All of these factors individually and cumulatively weigh in favor of a substantial downward variance.

6. **There is no need to provide Mr. Cothren with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner under Section 3553(a)(2)(D) .**

Mr. Cothren does not need any of the services contemplated in Section 3553(a)(2)(D). Thus, this factor does not weigh for or against the proposed sentence.

## C. The Kinds of Sentences Available – Section 3553(a)(3).

This Court has broad discretion to deviate from the Guidelines if "the Guidelines sentence itself fails to properly reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless." *Rita v. United States*, 551 U.S. 338, 351 (2007). Indeed, neither Section 3553 nor applicable precedent imposes any limit on the extent to which a district court may vary from the Guidelines range, provided that reasonable justification exists and the court articulates such justification(s) on the record.

When Congress chose to mandate no mandatory minimum sentence for certain crimes, it "not only envisioned, but accepted, the possibility that some defendants found guilty…would receive no jail time at all." *U.S. v. Husein,* 478 F.3d 318, 332 (6th Cir. 2007). Should this Court find the justification for a non-custodial sentence exists, it most certainly has the power to impose that type of sentence.

## D. The Applicable Guidelines Range – Section 3553(a)(4).

As set forth in his Position Regarding Presentence Report (Dkt. No. 415), the applicable Guidelines range as calculated by Probation is inaccurate. PSR at ¶¶ 84-93. Based on Mr. Cothren's calculations, the correct Offense Level is 22. *Id.* Therefore, with a Criminal History Category of I, the applicable Guidelines range is 41-51 months. Dkt. No. 415. Specifically, Paragraph 84(c) of the PSR incorrectly characterizes revenue that Phoenix Solutions earned through legal conduct that is outside the scope of the charged conspiracy as the "value of anything obtained or to be obtained by a public official or others acting with a public official" and fails to give credit for the value of the services provided before the conduct was discovered as is required by Application Note 3 to Section 2B1.1. Paragraph 84 incorrectly urges this Court to impose a two-point enhancement for "sophisticated laundering." The correct calculation is: Base Offense Level 12; two-point enhancement for more than one bribe or extortion; four-point enhancement because the offense involved an elected official; four-point enhancement for "benefit received"; two-point enhancement for 1956 money laundering; and two-point reduction for zero-point offender.[2] This results in a Final Offense Level of 22. This Offense Level grossly overstates the offense conduct and disregards the lack of harm or damage in this case.

The PSR recommends a $75,000 fine. PSR at p. 35. Mr. Cothren, however, has been declared indigent by this Court and is not financially able to pay a fine. Mr. Cothren also disputes the government's request for forfeiture in the amount of $10,600.00.

**E.      Recent Policy Changes Reflect Growing Support for Non-Custodial Sentences and Conservation of Resources for Non-Violent, First Time Offenders – Section 3553(a)(5).**

Historically, some courts, practitioners, and commentators have expressed skepticism about the efficacy of probationary sentences for white collar offenders. *See, e.g.,* Daniel Richman, <u>Federal White Collar Sentencing in the United States: A Work in Progress</u>, 76(1) LAW & CONTEMP. PROBS. 53,

---

[2] Mr. Cothren's Position on Pre-Sentence Report (Dkt. No. 15) expounds on his PSR objections, which are adopted and incorporated herein.

60-61 (2013)[3]. Two policy developments in recent years signal that this line of thinking is evolving. First, the United States Sentencing Commission created an adjustment for "Zero-Point Offenders," now found at Guideline Section 4C1.1. Defendants who satisfy certain criteria (detailed further below) are entitled to a two-level reduction in their Total Offense Level. The Commission's rationale for this adjustment is revealed in Application Note 10(A) to Guideline Section 5C1.1:

> If the defendant received an adjustment under §4C1.1 (Adjustment for Certain Zero-Point Offenders) and the defendant's applicable guideline range is in Zone A or B of the Sentencing Table, a sentence other than a sentence of imprisonment . . . is generally appropriate.

U.S.S.G. § 5C1.1, Application Note 10(A).

Mr. Cothren qualifies for the Zero-Point Offender adjustment, which is designed to give first-time offenders the opportunity to avoid incarceration in appropriate situations. This case presents such a situation. Even if the Guidelines sentencing table suggests a sentence of imprisonment, the Section 3553 factors nonetheless weigh in favor of probation.

A probationary sentence will also serve the current administration's priorities, which were outlined in a June 17, 2025 Directive[4] issued by the Bureau of Prisons:

- Avoid wasting millions of taxpayer dollars on unnecessary incarceration;

- Reduce strain on prison bedspace and staffing; and

- Eliminate prolonged and unnecessary burdens on inmates and their families—particularly those with stable home environments and strong community ties.

While these priorities were mentioned in the context of the First Step Act and Second Chance Act, these priorities presumably hold true in Mr. Cothren's case. The federal government has already

---

[3] This article is available at:
https://scholarship.law.columbia.edu/faculty_scholarship/2463?utm_source=scholarship.law.columbia.edu%2Ffaculty_scholarship%2F2463&utm_medium=PDF&utm_campaign=PDFCoverPages
[4] "Bureau of Prisons Issues Directive to Fully Implement First Step Act and Second Chance Act," attached hereto as Exhibit D.

expended inordinate resources on the investigation, prosecution, and trial of Mr. Cothren. A sentence of probation will conserve federal resources, reduce overcrowding, and avoid burdening Mr. Cothren's family, given his stable home environment and strong ties to the Lawrenceburg community.

## F. The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct – Section 3553(a)(6).

"Section 3553(a)(6) identifies as one of the sentencing factors to be considered 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.'" *United States v. Conatser*, 514 F.3d 508, 521 (6th Cir. 2008) (quoting *United States v. Simmons*, 501 F.3d 620, 623-24 (6th Cir. 2007)). This factor concerns national disparities. *Id.*

According to the U.S.S.C.'s Judiciary Sentencing Information ("JSIN"), "[d]uring the last five fiscal years (FY2020-2024), there were 9 defendants whose primary guideline was § 2C1.1, with a Final Offense Level of 22 and a Criminal History Category of I, after excluding defendants who received a § 5K1.1 substantial assistance departure." Exhibit C: JSIN Data Report - § 2C1.1. For those that received sentences of imprisonment , "the average length of imprisonment imposed was 37 month(s) and the median length of imprisonment imposed was 41 month(s)."[5]  *Id.*  Moreover, 36% of those defendants received a downward departure or variance. *Id.*

Focusing on the most recent sentencing history, in 2024, 199 cases were sentenced under Section 2C1.1 with a defendant in Criminal History Category I. Exhibit E: USSG Interactive Data Analyzer - § 2C1.1. Of those, 69.3% of those defendants received a sentence length of less than 2 years with a median sentence length of 12 months and an average sentence length of 20 months. *Id.*

---

[5] The statistics for the 9 defendants with a Final Offense Level of 22 seem to be significantly swayed by some outlier data, as the average sentence length is higher than it is for some defendants with higher offense levels. For instance, JSIN reports that Section 2C1.1 defendants with a Final Offense Level of 23 received an average sentence of just 29 months. Defendants with a Final Offense Level of 24 received an average sentence of 35 months. Defendants with a Final Offense Level of 25 received and average sentence of 34 months. This Court should consider this discrepancy in its calculus.

Finally, and significantly, of those 199 cases, 20.1% received a sentence that did not include <u>any</u> prison time. *Id.*

For cases in which Section 2S1.1 was was the primary Guideline, the statistics did not significantly change. "During the last five fiscal years (FY2020-2024), there were 56 defendants whose primary guideline was § 2S1.1, with a Final Offense Level of 22 and a Criminal History Category of I, after excluding defendants who received a § 5K1.1 substantial assistance departure." Exhibit F: JSIN Data Report - § 2S1.1. Of those defendants, 9% received a sentence of no imprisonment at all. *Id.* For those that did, "the average length of imprisonment imposed was 31 month(s) and the median length of imprisonment imposed was 32 month(s)." *Id.* Moreover, 59% of those defendants received a downward departure or variance. *Id.*

In 2024 alone, 41.7% of those sentenced received less than two years in total sentence length and 12.5% received a sentence with no prison time. Exhibit G: U.S.S.G. Interactive Data Analyzer - § 2S1.1.

Thus, under either Guideline (Section 2C1.1 or Section 2S1.1), the requested non-custodial sentence is not an unwarranted departure from national trends of defendants in similar positions to Mr. Cothren. If anything, given the 2024 averages, a Guidelines sentence would create an unwarranted disparity that does not fully account for the Section 3553 factors. Therefore, this Court would not be creating a disparity by sentencing Mr. Cothren to a non-custodial sentence, which would be a sufficient but not greater than necessary punishment in this case.

### G.    The Need to Provide Restitution to Any Victims of the Offense – Section 3553(a)(7).

Because every representative received what they paid for, the State of Tennessee and government lost no money, and as noted in the PSR, there is no restitution owed in this case. PSR at ¶ 73.

<u>Conclusion</u>

For all of these reasons, Mr. Cothren respectfully requests a non-custodial sentence, with no fine and $0 in restitution and forfeiture ordered.

Respectfully Submitted,

**Sherwood Boutique Litigation, PLC**

/s/ Cynthia A. Sherwood
Cynthia A. Sherwood, #20911
Austin M. Correll, #39561
414 Union Street
Suite 1110
Nashville, TN 37219
T: 615-873-5670
F: 615-900-2312
cynthia@sherwoodlitigation.com
austin@sherwoodlitigation.com
*Counsel for Defendant Cade Cothren*

**Barnes & Thornburg LLP**

/s/ Joy Boyd Longnecker
Joy Boyd Longnecker, #29627
1600 West End Avenue
Suite 800
Nashville, TN 37203
T: 615-621-6012
joy.longnecker@btlaw.com
*Counsel for Defendant Cade Cothren*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing motion was electronically filed with the Clerk on September 12, 2025, and service was made upon the following via CM/ECF and/or by email.

Edward M. Yarbrough
Jonathan P. Farmer
Steven C. Fann
Spencer Fane LLP
511 Union Street
Suite 1000
Nashville, TN 37219
eyarbrough@spencerfane.com
jfarmer@spencerfane.com
cfann@spencerfane.com

John P. Taddei
Blake J. Ellison
U.S. Department of Justice
Public Integrity Section
1301 New York Ave. NW
Ste 10th Floor
Washington, DC 20530
john.taddei@usdoj.gov
blake.ellison@usdoj.gov

Taylor J. Phillips
U.S. Attorney's Office
719 Church Street
Suite 3300
Nashville, TN 37203
taylor.phillips@usdoj.gov

W. David Bridgers
L. Wells Trompeter
Holland & Knight LLP
511 Union Street, Suite 2700
Nashville, Tennessee 37219
david.bridgers@hklaw.com
wells.trompeter@hklaw.com

Ben M. Rose
RoseFirm, PLLC
Post Office Box 1108
Brentwood, Tennessee 37024
ben@rosefirm.com

/s/ Joy Longnecker
Joy Longnecker