IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | NO.    3:22-cr-00282 |
| v. | ) | |
| | ) | JUDGE RICHARDSON |
| [1] GLEN CASADA | ) | |
| | ) | |

## UNITED STATES' SENTENCING MEMORANDUM AND RESPONSE TO DEFENDANT'S POSITION REGARDING PRESENTENCE REPORT

"[A] democracy is effective only if the people have faith in those who govern, and that faith is bound to be shattered when high officials and their appointees engage in activities which arouse suspicions of malfeasance and corruption." *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 562 (1961). Glen Casada, while serving as a Representative of the State of Tennessee, and his coconspirators shattered that faith by engaging in a lengthy conspiracy to cheat the State and corrupt the process through which State legislators communicated with their constituents. Casada exploited his significant power for his own personal benefit by trading his public office for private gain for himself and his associates, all the while carefully and deliberately concealing his conduct from detection. Casada stands convicted of 14 counts, including conspiracy, fraud, bribery, and money laundering.[1] Casada has expressed no remorse for his crimes. As further described below, Casada's offense conduct was consistent with a pattern of dishonesty, as well as a persistent refusal to take responsibility for his actions.

Sentencing is scheduled for Tuesday, September 16, 2025. Pending Casada's Rule 32(i)(4) statement at sentencing, if any, the United States anticipates requesting that the Court sentence

---

[1]    The jury found Casada guilty of 17 counts. (D.E. #350.) Following the verdict, this Court granted Casada's motion for acquittal as to Counts 2-4. (D.E. #420.) The government is considering an appeal of the Court's decision to vacate those convictions.

Casada to a term of imprisonment within the Guidelines range, a $75,000 fine, forfeiture of $7,143.64, a mandatory special assessment of $1,700, and the conditions of supervision recommended in the Presentence Report (PSR).

## I.    FACTUAL BACKGROUND

In early 2019, Casada was one of the most powerful public officials in Tennessee. He was Speaker of the Tennessee House of Representatives, and Cothren was his Chief of Staff and right-hand man. (PSR, at ¶¶ 13-14.) In May 2019, news media published offensive text messages Cothren had written between 2014 and 2016. Among other things, the articles reported that Cothren bragged about using cocaine in the Tennessee Statehouse, talked about soliciting oral sex and nude photographs from an intern, and referred to Black people as "idiots." (Declaration of Special Agent Clayton Worcester ("Worcester Decl."), at ¶ 3, Ex. 1-4.). Reporting indicated that Casada participated in several of the sexually explicit exchanges. (*Id.*)  In the wake of this reporting, Cothren's reputation was "pretty much destroyed," as former Rep. Patsy Hazlewood testified at trial, and Cothren resigned. (PSR, at ¶ 14.) Likewise, Casada's reputation was "not good," as Representative Esther Helton-Haynes testified.   (*See id.*, at ¶ 13.)   Later that year, the Tennessee Republican Caucus held a vote of no-confidence in Casada as Speaker, and, in August 2019, he stepped down as Speaker of the House. (*See id.*) Casada remained a Representative until 2023.   (*Id.*, at ¶ 112.)

Shortly after Casada stepped down, he, Cothren, and Representative Robin Smith (collectively, the "conspirators"), conspired to defraud the State of Tennessee and its citizens. (*See id.*, at ¶¶ 16-17.) Through the State's Postage and Printing Allowance ("PPA"), each Representative was allocated $3,000, compounding each year, to fund the printing and postage for constituent communications. (*Id.*, at ¶ 15.) The expenditure of PPA funds required the approval of

the Representative, the Office of the Speaker of the House, and Connie Ridley, the Director of Legislative Administration. (*Id.*, at ¶ 67.)

The conspirators agreed that Cothren would create an LLC called Phoenix Solutions to provide constituent mailer services to Tennessee Republican House members. (*Id.*, at ¶ 16.) Because of Cothren's tarnished reputation, the conspirators knew that the venture would be unsuccessful if Cothren's involvement was widely known. (*Id.*, at ¶ 58.) Instead, Casada and Smith either approached their colleagues in the legislature on behalf of Phoenix Solutions or they did not disclose the LLC's involvement at all. (*Id.*, at ¶¶ 16-17.) For his part, Cothren hid behind the fake identity, "Matthew Phoenix," supposedly an experienced political consultant formerly with the prominent D.C. consulting firm Jamestown Associates. (*Id.*, at ¶ 16.) Both Matthew Phoenix and the purported relationship with Jamestown Associates were complete fabrications. (*Id.*)

To keep up this sham, the conspirators repeatedly deceived their colleagues and State officials. For example, Cothren sent the State of Tennessee a fraudulent W-9 in the name of "Matthew Phoenix." (*Id.*, at ¶ 26.) He also involved his girlfriend, Ava Korby, in the scheme by directing her to falsely pose as another, made-up employee of Phoenix Solutions during an extended email exchange intended to dupe Ridley. (*Id.*, at ¶ 32.) The conspirators even manufactured a fake confrontation between Casada and Smith that took place on the floor of the Tennessee House of Representatives—intended to be in full view of other legislators—to throw the current Speaker off their scent. (*See* GX 59.)[2]

They went to these lengths because, had Cothren's involvement been known, the conspirators' invoices would not have been paid. For starters, legislators testified at trial that they

---

[2]     Citations to "GX" are to government exhibits admitted during trial.

would not have agreed to work with Cothren if they had known the true situation. (PSR, at ¶ 65.) Connie Ridley testified that she would not have approved the conspirators' invoices had she known of Cothren's involvement. (*See id.*, at ¶ 66.) Likewise, Representatives testified that, if they had known that other Representatives, namely Casada and Smith, were secretly profiting off State-funded mailers, they would have "adamantly objected." (Testimony of J. Reedy.) And the conspirators knew that, for these reasons, the Office of the Speaker of the House would not have approved Phoenix Solutions' invoices. (*See, e.g.*, PSR, at ¶ 47.).

As suspicions at the State grew, payment of the conspirators' invoices slowed. (Testimony of R. Smith.) To break the logjam, Cothren "officially set [Smith] loose on [Ridley's] ass." (GX 58.) As sitting State Representatives, Smith and Casada had unparalleled access to Ridley and her superiors in the Speaker's Office compared to a typical State vendor. (Testimony of C. Ridley; Testimony of R. Smith.) Smith asked the Speaker's Chief of Staff—effectively Ridley's boss—to put pressure on Ridley to pay Phoenix Solutions' invoices and met personally with Ridley in an effort to do the same. (PSR, at ¶ 27.) Casada also met with Ridley regarding the delayed payment of the conspirators' invoices and told Smith he was "going to touch base with [the Chief of Staff] tomorrow on this situation of ours." (PSR, at ¶¶ 28-29; GX 33.) Ridley testified that her sole goal was to "maintain the integrity of the fiscal operation of" the legislature. (Testimony of C. Ridley.) But when Ridley continued to resist Casada and Smith's pressure campaign, they called her a "bitch." (GX 39.)

In exchange for Casada and Smith's efforts with their colleagues, Connie Ridley, and the Speaker's Office, Cothren kicked back to the Representatives portions of the more than $50,000 the State ultimately paid to the conspirators. (*See, e.g.*, PSR, at ¶¶ 30, 70.) As Smith testified, the conspirators also concealed these kickbacks. The conspirators routed payments from the State

4

through Smith and Casada's personal consulting companies to accounts controlled by Cothren before he kicked back a portion of the profits to them. (*See* GX 405-409.) Casada's company, Right Way Consulting, did not even exist until he created it in January 2020 to receive fraudulently induced payments from the State. (GX 368.) And he used it almost exclusively as a shell, conduiting money from the State to Phoenix Solutions, and to receive kickbacks from Cothren. (*See* GX 387, 390, 405, 407, 408, 409.)

The initial business with the State and the corresponding abuses of Casada and Smith's public offices was a crucial launching pad for building a much more lucrative business. They leveraged the initial, State-funded success of the company, and their contacts within and intertwined with government, to gain much more lucrative caucus and campaign work. (*See* GX 410.) For example, Cothren posed as "Matthew Cyrus" in a bid to persuade Chip Saltsman, the House Republican Caucus consultant, to use Phoenix Solutions for caucus work. (GX 91.) In recorded calls with Daniel Cox, the political director of the Tennessee House Republican caucus, Cothren disguised himself as "Matthew Phoenix" in an effort to win caucus business for Phoenix Solutions. (Worcester Decl., at ¶ 4.) Cothren also used the "Matthew Phoenix" pseudonym to deceive Representative Johnny Garrett in an effort to obtain the legislator's campaign business. (GX 104, 454.) Witnesses who used or recommended Phoenix Solutions for campaign and caucus work testified that they would not have done so if they had known that Cothren was involved or that sitting Representatives were secretly profiting from the work. (Testimony of N. Crawford, E. Helton-Haynes.) In total, building on the foundation of the State-funded work the conspirators received via bribery and fraud, Phoenix Solutions received approximately $159,496.48 in revenue from caucus and campaign work. (PSR, at ¶ 70.)

## II.   GUIDELINES CALCULATION

Even though the U.S. Sentencing Guidelines are advisory, *United States v. Booker*, 543 U.S. 220 (2005), provides that sentencing courts "must consult those Guidelines and take them into account when sentencing." *Id.* at 264. Using the Guidelines Manual for 2024, the PSR calculates Casada's Guidelines Offense Level as 32. (PSR, at ¶ 91.) With a Criminal History Category of I, the PSR calculates Casada's Guidelines range as 121-151 months' imprisonment. (*Id.*, at ¶ 121.)

Casada has three objections to the Probation Office's calculation of the Guidelines and a series of objections to facts in the PSR. (D.E. #416.) For the following reasons, the Court should overrule his objections.

### A.   *The Offense Involved More than One Bribe*

The PSR recommends an enhancement of two levels pursuant to U.S.S.G. § 2C1.1(b)(1) because the offense conduct involved more than one bribe. (PSR, at ¶ 82(b).) That Guidelines provision states, "If the offense involved more than one bribe or extortion, increase by two levels." U.S.S.G. § 2C1.1(b)(1). The evidence at trial and the jury's verdict proved that Casada's offenses involved multiple bribe and kickback payments. As the PSR correctly indicates, "Cothren made at least one payment each to Smith and [Casada], with each payment representing a separate 'kickback' or bribe." (PSR, at ¶ 82(b); *see, e.g.*, GX 48 (Casada retaining "my portion" of kickback for securing business for Phoenix Solutions from Representative Ragan); GX 387 ($4,143.64 check from Phoenix Solutions to Casada); GX 388 ($4,143.64 check from Phoenix Solution to Robin Smith)). The payment of bribes to more than one conspirator triggers the application of the enhancement. *See United States v. Hills*, 27 F.4th 1155, 1194 (6th Cir. 2022) (holding that "solicitation of different [potential bribe-payors] would count separately" for purposes of Section

6

2C1.1(b)(1)); *United States v. Grosso*, 658 F. App'x 43, 46 (3d Cir. 2016) (holding that the enhancement applied where "two exchanges involved the same amount ($1,000) and the same actors").

Moreover, the enhancement also applies if the bribe payor makes payments "to influence more than one event." *Hills*, 27 F.4th at 1194 (citing *United States v. Ford*, 344 F. App'x 167, 170 (6th Cir. 2009)). The evidence showed that Cothren paid kickbacks to Casada and Smith in exchange for them performing three distinct categories of actions: (1) using Phoenix Solutions for their own PPA work; (2) inducing other representatives to use Phoenix Solutions for their PPA work; and (3) pressuring State officials to pay Phoenix Solutions. Casada himself acknowledged that Cothren was paying Casada and Smith based, in part, on each "lead"—or Representative— they signed on to do business with Phoenix Solutions. (GX 215.) Correspondence between the conspirators indicated that Casada and Smith successfully generated more than a dozen such "leads." (GX 90.) In other words, Cothren's payments to Casada and Smith were "made in a manner to clearly influence more than one event." *Ford*, 344 F. App'x at 170.

Casada does not dispute that the offense involved more than one kickback payment. Instead, he argues that the "facts developed in this case prove that the payments were made towards a single action," namely, "assisting in the operations of the business." (D.E. #416, at 3.) He claims that the payments are akin to "installment payments for a single action." *See* U.S.S.G. § 2C1.1 cmt. n. 2. This vague framing of Casada and Smith's actions is inconsistent with the facts at trial and the jury's verdict. First, Casada ignores that Cothren paid kickbacks to *both* Casada and Smith. Casada's objection does not even acknowledge Cothren's payments to Smith. Moreover, it also ignores that, to get paid, Casada and Smith agreed to, and did in fact, perform multiple, distinct actions. "Courts confronted with similar situations have uniformly held that multiple payments

7

meant to influence more than one action should not be merged together for purposes of § 2C1.1 merely because they share a single overall goal or are part of a large conspiracy to enrich a particular defendant or enterprise." *United States v. Arshad*, 239 F.3d 276, 281 (2d Cir. 2001). For these reasons, the PSR correctly applied a two-level enhancement for more than one bribe.

### B. The Value Obtained by Casada, Smith, and Cothren Exceeded $150,000

The PSR recommends an enhancement of ten levels pursuant to U.S.S.G. § 2C1.1(b)(2) because "the value of anything obtained or to be obtained by a public official or others acting with a public official was $211,443.48." (PSR, at ¶ 82(c).) The applicable Guidelines direct the Court to enhance the offense level by an amount corresponding to the "greatest" of the following:

> the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government from the offense.

U.S.S.G. § 2C1.1(b)(2).

Under the Guidelines' definition of relevant conduct, this amount should be determined based on both the offense of conviction, as well as "all acts and omission committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant." U.S.S.G. § 1B1.3(a)(1)(A). With respect to conspiracies (whether or not charged), relevant conduct also includes:

> all acts and omissions of others that were—
>
> > (i) within the scope of the jointly undertaken criminal activity,
> >
> > (ii) in furtherance of that criminal activity, and
> >
> > (iii) reasonably foreseeable in connection with that criminal activity;
>
> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

U.S.S.G. § 1B1.3(a)(1)(B). For the purposes of money or property fraud that occurred during a bribery scheme, relevant conduct includes all acts and omissions described above that were part of the same course of conduct or common scheme or plan as the offense of conviction. *See* U.S.S.G. § 1B1.3(a)(2).

The PSR correctly calculates a ten-level enhancement based on $211,443.48, which was the total amount obtained pursuant to all relevant and foreseeable acts of the conspirators. That figure is based on the following proof at trial: (1) the conspirators obtained $51,947 from the State of Tennessee as a result of the charged honest services fraud, (GX 414.); and (2) Phoenix Solutions obtained $159,496.48 from campaign and caucus sources other than Smith. (*See* GX 411.) Thus, the "value of anything obtained or to be obtained by a public official or others acting with a public official" was $211,443.48. This calculation appropriately gives the phrase "the value of anything *obtained* or *to be obtained*" a meaning distinct from "the value of the payment" and "the benefit received." *Cf.* U.S.S.G. § 2B4.1 (including only the "value of the bribe" and the "improper benefit to be conferred" in other bribery Guideline section).

In addition to the charged honest services fraud, the proof at trial showed that the conspirators lied to get campaign and caucus funds. (*See, e.g.*, GX 91, 104, 454.) As the government stated during a colloquy with the Court on the fifth day of trial, this was uncharged conduct that met the elements of money or property fraud. *See* Sixth Circuit Pattern Jury Instructions 10.01, 10.02. As described on p. 5, *supra*, and elicited in further detail at trial, the conspirators obtained money or property (campaign and caucus funds) by means of materially false or fraudulent representations, pretenses, or promises. In addition, the proof at trial showed that Cothren used interstate mail in furtherance of the entirety of the Phoenix Solution scheme. (*See, e.g.*, GX 83, 396, 455.) Furthermore, Cothren and Casada were convicted of using a false

name for the purpose of carrying on unlawful business by means of the Postal Service. (D.E. #352.) Accordingly, there is sufficient evidence for the Court to conclude by a preponderance of the evidence that the campaign and caucus lies constituted mail fraud in violation of 18 U.S.C. § 1341. Thus, pursuant to U.S.S.G. § 1B1.3, the amount obtained through that fraud should be included in the calculation under U.S.S.G. § 2C1.1(b)(2). *Cf. United States v. Manrich*, 529 F. App'x 322, 325 (4th Cir. 2013) (approving of district court's aggregation of kickbacks with fraud losses and vacating sentence on other grounds).[3]

The Court should not rely on the alternative means of calculating the offense level because they would not result in the "greatest" value or loss, as required under Section 2C1.1(b)(2). For example, "the value of the payment[s]" to Casada and Smith was $35,406.90. (*See* D.E. #414-1.)[4] A reasonable estimate of "the benefit received" for the bribes is the $22,891.40, as calculated by Cothren. (*See* D.E. #415, at 6.) Notably, Casada does not even address this prong of U.S.S.G. § 2C1.1(b)(2). Finally, there is no evidence in the record of "loss to the government from the

---

[3]     Casada reiterates his trial argument that, pursuant to *United States v. Sadler*, 750 F.3d 585, 591 (6th Cir. 2014), he could not have been charged with mail fraud at the time of the underlying conduct. (D.E. #4-5.) This is incorrect. *See United States v. Bolos*, 104 F.4th 562, 570 (6th Cir. 2024) (distinguishing *Sadler* because "[t]he government is not charging [the defendant] with fraud to obtain the *contracts* with [the victims], but with fraud to obtain the *money* from them"). Similarly, Casada's reference to the Court's evidentiary ruling is a red herring. Casada cites no authority for the proposition that relevant conduct need be admissible at trial.

[4]     Casada argues that he "should not be held accountable for any" payments other than the bribes he was paid by Cothren. (D.E. #416, at 7.) But a defendant is responsible for acts that were "within the scope of the defendant's agreement and foreseeable by him." *United States v. Hills*, 27 F.4th 1155, 1196 (6th Cir. 2022). Cothren's kickbacks to Smith were plainly within the scope of Casada's agreement and foreseeable by him. As Smith testified, all three conspirators met to discuss the objects of the conspiracy, which included using the PPA program as a springboard for more lucrative campaign and caucus work. Casada and Smith divvied up legislators. (*See* GX 18.) And most obviously, Casada saw that Cothren was paying Smith for legislators' PPA work. (*See* GX 90.) Casada remained engaged with Cothren regarding Phoenix Solutions work throughout the summer and fall of 2020. (*See, e.g.*, GX 50.)

offense." Because the $211,443.48 obtained by the public official or others acting with the public official is greater than any of these calculations, the Court should use that amount and Casada's Guidelines level should be increased by ten levels pursuant to Section 2C1.1(b)(2).

### C.  The Offenses Involved Sophisticated Laundering

Casada opposes the application of U.S.S.G. § 2S1.1(b)(3), which provides for a two-level enhancement if the offense involved "sophisticated laundering." (D.E. #416, at 8-9.) Notably, Casada cites no case in which the enhancement either was not applied or was applied erroneously.

"Sophisticated laundering" means "complex or intricate offense conduct," and "typically involves the use of (i) fictitious entities; (ii) shell corporations; (iii) two or more levels (*i.e.* layering) of transactions, transportation, transfers, or transmissions, involving criminally derived funds that were intended to appear legitimate; or (iv) offshore financial accounts." U.S.S.G. § 2S1.1 cmt. n. 5(A). "The factors listed in Application Note 5 are illustrative but not required; they are typical but non-exhaustive." *United States v. Fish*, 731 F.3d 277, 280 (3d Cir. 2013).

Here, the conspirators sent the proceeds of their unlawful activity through Rivers Edge Alliance or Right Way Consulting to Phoenix Solutions, after which Cothren kicked back payments to Casada and Smith. For the purposes of these payments, Rivers Edge Alliance and Right Way Consulting essentially acted as shell companies (or "pass-through" entities, as Smith called them at trial). Each was a sole proprietorship with no employees, nor any physical presence—Right Way Consulting's business address was Casada's home. (*Compare* PSR, at ¶ 115 *with* GX 290.) Insofar as either entity had any legitimate operations at the time, that activity would merely enhance the conspirators' ability to disguise the nature, source, ownership, and control of the illegitimate funds. Furthermore, Cothren falsely labeled the kickbacks as "consulting" payments. (*See, e.g.*, GX 387, 388, 389, 391.)

11

Accordingly, the offense conduct functionally involved shell companies and layering.[5] And even absent the application of the exemplars in Application Note Five, this conduct is sufficiently complex to warrant application of the sophisticated laundering enhancement. *See United States v. Hagen*, 60 F.4th 932, 951 (5th Cir. 2023) (affirming application of enhancement where conduct involved "(i) division of illegal kickbacks into two invoices, (ii) mislabeling of those divided invoices as relating to legitimate services, and (iii) prepayment of those mislabeled invoices to further conceal the kickbacks"). The fact that the defendants were ultimately unsuccessful in hiding their crimes from authorities is irrelevant. *See United States v. Miles*, 360 F.3d 472, 482 (5th Cir. 2004) ("It is true that [the defendant] was not very successful in obscuring the source or destination of the illegally-obtained funds used in this series of transactions. Nevertheless, the conduct [the defendant] engaged in, even though inept, is paradigmatic 'layering,' a blatant attempt to hide the flow of taxpayer money to her private use.").

### D. Casada Was Not A Minimal or Minor Participant

In a supplemental objection raised almost a month after disclosure of the PSR, (*Cf.* LR 32.01(c)(1) (setting time for objections to PSR), Casada claims that he deserves a reduction in his Guidelines range based on his "mitigating role in the offense." (D.E. #431, at 1-2.) No such reduction is warranted.

---

[5]     The fact that the conspirators engaged in multiple levels of transactions which resulted in proceeds beginning and ending with the Representative conspirators does not preclude a finding of layering. *See United States v. Rubashkin*, 718 F. Supp. 2d 953, 976–77 (N.D. Iowa 2010) ("Defendant caused customer payments to be diverted from the depository account to another account controlled by [a company where he was a vice president]. From there, the funds were deposited into [an account at another company at which he was an officer] before the payments were returned to [the first company] and then to [a victim]. This involves two or more layers of transactions. It is of no consequence that each individual layer was not particularly sophisticated.").

The Guidelines state that the offenses level should be decreased by four levels "[i]f the defendant was a minimal participant in any criminal activity," or two levels "[i]f the defendant was a minor participant." U.S.S.G. § 3B1.2. The commentary further explains that, to qualify for such a reduction, the defendant must "play[] a part in committing the offense that makes him *substantially* less culpable than the average participant in the criminal activity." U.S.S.G. § 3B1.2 cmt. n. 3(A) (emphasis added). "Although [a] defendant may be less culpable than some of his coconspirators, this does not require a finding that he was *substantially* less culpable than the others." *United States v. Miller*, 56 F.3d 719, 720 (6th Cir. 1995). The commentary further provides a "non-exhaustive list of factors" for the Court's consideration:

> (i) the degree to which the defendant understood the scope and structure of the criminal activity; (ii) the degree to which the defendant participated in planning or organizing the criminal activity; (iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority; (iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; (v) the degree to which the defendant stood to benefit from the criminal activity.

U.S.S.G. § 3B1.2 cmt. n. 3(C).

As established during trial and summarized in the factual background above on pp. 2-5, *supra*, addressed by the Probation Office in an addendum to the PSR (*see* PSR, at Add. 6.), and further explained below in the government's sentencing submission addressing the nature and circumstances of the offense on pp. 18-19, *infra*, none of these factors support a mitigating role reduction. Casada, Cothren, and Smith stood shoulder to shoulder in setting up and launching the Phoenix Solutions scheme. "A defendant does not become a minor participant simply because others planned a scheme and made all the arrangements for its accomplishment." *Miller*, 56 F.3d at 720. Text messages, emails, and witness testimony showed that Cothren set up the business, while Casada and Smith recruited their colleagues in the legislature and shielded his identity. The

13

conspirators then executed different, crucial roles in maintaining the scheme until the FBI shut it down. Casada was fully aware of, and participated in, the pressure campaign against Connie Ridley. He set up Right Way Consulting and used it as a pass-through company just as invoice payments began rolling in. And he continued to work with Cothen on Phoenix Solutions business throughout summer 2020 and receive payments from Cothren late into 2020, just before the FBI intervened.

Casada principally argues that he deserves a role reduction because he "received only $4,643.64 for his part in Phoenix Solutions as related to the PPA funds." (D.E. #431, at 2.) Even under this artificially narrow framing of the scheme, this claim does not withstand even light scrutiny. The figure Casada cites appears to be a reference to the amount he received pursuant to the "first run" of PPA work. (*See* GX 90.) However, Casada ignores that Smith *also* received $4,143.64, and Cothren received $4,972.37, with the remaining money left in the business for the future. (*Id.*) Earning the same amount of money as Smith, and only a few hundred dollars less than Cothren, at the beginning of the scheme is hardly indicative of a mitigating role. Furthermore, as addressed above, Casada's framing ignores the full scope of the business the conspirators continued to realize as they shifted more heavily to campaign and caucus work, and would have realized had the FBI not shut down the scheme. No downward adjustment is warranted.

### E. Casada's Other Objections to the PSR Are Not Well-Founded

In addition to his objections to the calculation of the Guidelines, Casada objects to a series of facts set forth in the PSR. (D.E. #416, at 9-11.) Other than through allusions to the trial evidence, he does not present any evidence to contradict these facts.[6] Accordingly, the Court should rely on

---

[6] For example, Defendant repeatedly objects to Smith's testimony without presenting any contrary evidence. (*See* D.E. 416, at 10-11 (objecting to PSR Paragraphs 43, 45, 61, 62, 63).)

the facts set forth in the PSR. *United States v. House*, 872 F.3d 748, 752 (6th Cir. 2017) ("A district court may generally rely on the PSR's facts unless the defendant produces evidence that contradicts the PSR's findings.").

First, Casada objects to the PSR's statement that the Tennessee House Speaker's Office had the authority to approve or deny a PPA vendor. (D.E. #416, at 9.) As noted in the PSR, however, Ridley testified "the Speaker of the House . . . would have ultimate authority to approve or deny a vendor." (PSR, at ¶ 67.)

Next, Casada quibbles with the PSR's statement that "Smith, Casada, and Cothren told others . . . that Phoenix Solutions was run by an individual named 'Matthew Phoenix.'" (D.E. #416, at 9-10.) He claims that "[t]hese representations were made by Mr. Cothren and Mrs. Smith, not Mr. Casada." (*Id.*, at 10.) Regardless of who directly perpetuated the false Matthew Phoenix narrative to others, Casada was fully aware of its use to further his own financial and business interests. (*See, e.g.*, G.X. 25 (Cothren texting Casada "Just sent you 3 emails from Matthew Phoenix" with PPA survey drafts); GX 31 (Cothren texting Casada "Make sure to take my name off!"); GX 50 (Casada texting Cothren "That Matthew is a good guy!")).

Casada objects to the PSR's statement that he concealed Cothren's involvement in Phoenix Solutions. After Cothren repeatedly told Casada to keep his name off invoices and communications, however, Casada did so. (*See, e.g.*, GX 21, 28, 29, 31.) In that objection and his objections to Paragraphs 18 and 27, Casada objects to the characterization of Cothren's payments as "kickbacks" or that there was an illegal agreement. "To the extent that the defendant's objections relate to his dissatisfaction with the verdict and fact-finding of his jury . . . he is misplaced in using his PSR objections as the avenue for voicing those complaints." *United States v. Ruffin*, No. 2:09-CR-045, 2011 WL 4373755, at *1 (E.D. Tenn. Sept. 19, 2011).

15

Casada then admits that Cothren made the statement in Paragraph 50 of the PSR, but denies the truthfulness of it. (D.E. #416, at 10.) For the purposes of sentencing, however, "[s]o long as the information has some evidentiary basis to satisfy a minimal indicium of reliability, the district court can consider it without regard for the rules of evidence. The indicia-of-reliability standard is a relatively low hurdle. It allows courts to consider any information that may be reliable." *United States v. Armstrong*, 920 F.3d 395, 398 (6th Cir. 2019) (cleaned up). Cothren's statement against interest clears this low hurdle. Casada also objects to the statement's relevance. But 18 U.S.C. § 3661 permits no such limitation on the information the Court can consider at sentencing.

Casada also argues that Paragraph 70—which describes the amount the conspirators as a whole obtained—"should reflect that Mr. Casada earned approximately $4600 from Mailer Program clients and $7100 in total for his work related to Phoenix Solutions." (D.E. #416, at 11.) He cites no evidence for this calculation, although the government acknowledges that the appropriate forfeiture money judgment amount is $7,143.64. (*See* D.E. #413.)

Finally, Casada objects to the PSR's recommendations regarding the payment of a fine and forfeiture, as well as the PSR's recommendations regarding supervised release. (D.E. #416, at 11-12.) Casada does not object to any particular fact underlying the PSR's recommendations, nor does he claim that the PSR's recommendations were inconsistent with the law.

For the reasons set forth below, the Section 3553(a) factors militate in favor of a fine and the PSR's recommendations regarding supervised release. As to the special conditions of supervised release, the nature and circumstances of the offense and history of characteristics of Casada indicate a need to deter Casada from further financial crimes and to protect the public from the same. *See* 18 U.S.C. § 3583(d), *infra*. As to his objection to standard condition of release 7,

16

the government agrees with the Probation Office that the enforcement of this condition is better left to the discretion of the defendant's supervising Probation Officer.

With respect to the recommended fine, the Guidelines state that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2. Casada bears the burden to establish that he cannot pay fine and likely will be unable to do so. *United States v. Tosca*, 18 F.3d 1352, 1354-55 (6th Cir. 1994) (affirming imposition of fine, even where defendant had "no assets or present earnings," because "he [could] make installment payments from prisoner pay earned under the Inmate Financial Responsibility Program"). Imposition of the recommended fine of $75,000 is appropriate because Casada's substantial net worth indicates that he can pay the recommended fine; no restitution is recommended (and thus a fine will not impair his ability to pay restitution); he has no dependents; and he is unlikely to be able to pass on the expense of the fine to others. *See* 18 U.S.C. § 3572. Furthermore, the cost to the government of a Guidelines sentence, plus supervision, will exceed the recommended fine. (*See* PSR, at ¶ 133.)

As to forfeiture, the entry of a money judgment is appropriate for the reasons set forth in the government's motion for entry of a money judgment. (D.E. #413.)

### III.  FACTORS UNDER 18 U.S.C. § 3553(A)

In addition to determining a defendant's advisory Guideline range, a court must assess other applicable sentencing factors. *See* 18 U.S.C. § 3553(a). Those factors include the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense; to promote respect for the law; to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; and to

protect the public from further crimes of the defendant; the need to avoid unwarranted sentencing disparities; and the need to provide restitution to the victims. *See* 18 U.S.C. § 3553(a).

Notably, the Guidelines range itself provides a useful framework for evaluating all of the other factors together because it provides a "rough approximation" of sentences that will achieve all of § 3553's objectives. *Rita v. United States*, 551 U.S. 338, 350 (2007); *United States v. Perez-Rodriguez*, 960 F.3d 748, 754 (6th Cir. 2020). As set forth in more detail below, this conclusion is not an abstract or academic one; the particular facts of this case, viewed through the prism of § 3553(a), fully support a within-Guidelines sentence.

### A. Nature and Circumstances of the Offense

The defendant's crimes were serious. While serving as an elected State Representative, Casada engaged in a lengthy conspiracy to defraud the State of Tennessee and its citizens. The conspiracy lasted more than a year, with every indication that it would have continued well beyond 2020 had the FBI not uncovered it. Casada accepted bribes and kickbacks, set up and utilized pass-through companies, and lied to further the business interests of Phoenix Solutions, all with the ultimate goal of enriching himself and his co-conspirators. In exchange for bribes, Casada used the power and authority of his public office to cajole his colleagues in the legislature and pressure career public officials to perform actions that would secretly benefit him financially. And he disparaged at least one key official, a respected, 30-year veteran public servant, simply because she would not do his corrupt bidding.

Casada knew that what he was doing was wrong and that the scheme would unravel if anyone caught on. Casada, Cothren, and Smith developed and discussed elaborate steps to avoid being caught. Text messages showed that Casada was receptive to Cothren's careful and consistent warnings about concealing the true makeup and activities of Phoenix Solutions. Casada and Smith

went so far as to stage a performative confrontation on the floor of the House of Representatives in a desperate attempt to maintain concealment of their illegal scheme and throw reform-minded officials in the Office of Legislative Administration and Speaker's Office off their trial. Shortly after Cothren created Phoenix Solutions, Casada also personally founded Right Way Consulting and used it to launder the scheme's proceeds, with every indication that the primary purpose of the company was to hide the true volume of State money that was flowing to Phoenix Solutions and maintain distance between Cothren and potential future sources of profit.

These criminal actions were not an aberration or a brief lapse in judgment. When interviewed by the FBI under oath at the twilight of the scheme, Casada lied. He told the FBI he did not even know the name Matthew Phoenix, much less that Cothren was connected to Phoenix Solutions, despite reams of text messages and other evidence proving otherwise. (GX 148, 172.) He went so far as to falsely claim, "I in no way participated with Cade in Phoenix Solutions" and "wasn't part of the business model." (GX 174.) In one moment of honesty, he said that he knew that Cade could not bill for State-funded mailers because he would never get approved. (GX 192.)

In short, there is nothing mitigating about the nature and circumstances of the offense and Casada's role in it.

### B. History and Characteristics of the Defendant

There is nothing in the defendant's background that would mitigate, excuse, or explain his conduct. Casada was a Tennessee Representative for more than two decades, amassing considerable influence to the point that he was elected Speaker of the House, one of the three most powerful people in the elected government of the State of Tennessee. Unlike many others who come before this Court for sentencing, Casada had a stable childhood, a strong education, and a successful professional career in both politics and business. (PSR, ¶¶ 99-105, 109-111.) He has

had no significant mental health issues and reported no drug addiction. (*Id.*, at ¶¶ 107, 108.) He is neither exceptionally youthful nor old and is in good health. (*Id.*, at ¶ 106.)

In sum, the defendant has had every opportunity that life could have presented him. He has experienced no hardships that could even arguably justify or explain his criminal conduct. Quite simply, the defendant chose to use his considerable advantages and opportunities to engage in conduct that was selfish, corrupt, and criminal. His history and characteristics are those of someone who should have known the gravity of his criminal conduct and who has no external causes to blame. *See United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999) (citation omitted) ("Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime."); *United States v. Stall*, 581 F.3d 276, 286 (6th Cir. 2009) ("We do not believe criminals with privileged backgrounds are more entitled to leniency than those who have nothing left to lose.").[7] This factor weighs in favor of a within-Guidelines sentence.

Casada has no criminal history. This is reflected in both his Criminal History Category and his two-level reduction under U.S.S.G. § 4C1.1. Accordingly, his lack of criminal history is already properly accounted for by the Guidelines and does not warrant any additional downward variance.

---

[7]  Relatedly, if Casada argues that his reputation has suffered from the investigation, indictment, or trial, or that he will have a felony on his record, those are "impermissible considerations" for the Court at sentencing. *See United States v. Musgrave*, 761 F.3d 602, 608 (6th Cir. 2014) (vacating and remanding sentence with instructions to disregard the "punishment" of "four years of legal proceedings, legal fees, the likely loss of his CPA license, and felony convictions that would follow him for the rest of his life."); *see also United States v. Morgan*, 635 F. App'x 423, 445 (10th Cir. 2015) ("By considering publicity, loss of law license, and deterioration of physical and financial health as punishment, the court impermissibly focused on the collateral consequences of Morgan's prosecution and conviction.").

Although Casada has no criminal history points, the offenses of conviction are not the only wrongdoing in which he has engaged. Indeed, Casada's crimes involved trying to hide Cothren, his longtime aide, from the consequences of misconduct he and Casada committed several years earlier, which resulted in Casada losing his position as Speaker. (Worcester Decl., at ¶ 3, Ex. 1-3, 4 (quoting Casada as stating, "Three years ago, I participated in base locker room talk, if you will, among two adult men.").) As described above, when asked by FBI agents about his connection to Phoenix Solutions, Casada repeatedly lied. Furthermore, in April 2025, just before trial was set to commence, Casada attempted to use his political influence to short circuit this case. He called at least one wealthy political donor and urged the donor to contact a "new committee called the weaponization of the FBI," as well as Tennessee's two U.S. Senators, Marsha Blackburn and Bill Hagerty, and "put a good word in for him" in the hope that it would result in Casada's prosecution being dismissed by the Justice Department. (Worcester Decl., at ¶ 13.) He falsely claimed that his prosecution was "a political witch hunt by the Biden administration." (*Id.*)

In sum, the defendant's crimes were not isolated errors in judgement. Both his offense conduct and other relevant unethical and potentially illegal actions were calculated, multifaceted, and complex. He leveraged his connections and knowledge of the inner workings of Tennessee government to facilitate his self-serving criminal objections. On the eve of trial, he corruptly tried to use those connections to avoid trial by a jury of his peers—a trial which resulted in an overwhelming verdict of his guilt.

Casada's history and characteristics are aggravating and merit a significant sentence of incarceration.

### C. The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law and Provide Just Punishment for the Offense

In light of the seriousness of the offense and the lack of any substantial mitigating factors, a meaningful custodial sentence is appropriate. Any time an offense involves elected public officials abusing their office for personal gain, it "cannot properly be seen as a victimless crime, for in a sense it threatens the foundation of democratic government" and "tears at the general belief of the citizenry that government officials will carry out their duties honestly, if not always competently." *United States v. Hayes*, 762 F.3d 1300, 1309 (11th Cir. 2014). An offense of this nature is exceptionally serious, since "[t]he corruption of elected officials undermines public confidence in our democratic institutions." *United States v. Rosen*, 716 F.3d 691, 694 (2d Cir. 2013), *abrogated on other grounds by McDonnell v. United States*, 136 S. Ct. 2355 (2016). Indeed, "[a] democratic government cannot function when those occupying the most elevated offices act to benefit themselves rather than the citizenry for which they work and to which they owe their highest loyalty." *Morgan*, 635 F. App'x at 469 (Holmes, J., concurring).

As one court has explained:

> We need not resign ourselves to the fact that corruption exists in government. Unlike some criminal justice issues, the crime of public corruption can be deterred by significant penalties that hold all offenders properly accountable. The only way to protect the public from the ongoing problem of public corruption and to promote respect for the rule of law is to impose strict penalties on all defendants who engage in such conduct, many of whom have specialized legal training or experiences. Public corruption demoralizes and unfairly stigmatizes the dedicated work of honest public servants. It undermines the essential confidence in our democracy and must be deterred if our country and district is ever to achieve the point where the rule of law applies to all—not only to the average citizen, but to all elected and appointed officials.

*United States v. Spano*, 411 F. Supp. 2d 923, 940 (N.D. Ill. 2006).

Casada's crimes added another chapter to the book of corruption in the Tennessee Capitol. *See, e.g.,* Federal Bureau of Investigation, *Tennessee Waltz*, *available at*

22

https://www.fbi.gov/history/famous-cases/tennessee-waltz (describing undercover investigation into local and state government); Ronald Smothers, *et al.*, *Tennessee Republicans See an Election Weapon in State Bingo Scandal*, N.Y. Times, Jan. 28, 1990 (describing "Operation Rocky Top," an undercover investigation into bribery of state officials by bingo operators); *see generally* Joel Ebert and Erik Schelzig, *Welcome to Capitol Hill: Fifty Years of Scandal in Tennessee Politics* (2023). Conduct like Casada's has eaten away at citizens' confidence in their elected representatives. Majorities of Americans believe that all or most people in office ran because they wanted to make a lot of money. *See* Pew Research Center, *Americans' Dismal Views of the Nation's Politics*, Sept. 19, 2023, *available at* https://www.pewresearch.org/politics/2023/09/19/candidate-quality-and-what-drives-elected-officials-to-run-for-office/. A light sentence for greed-fueled corruption would only fan the flames of this cynicism. It would perpetuate the perception that there is a two-tiered justice system: one for the average defendant, and another for the well connected. On the other hand, by imposing a meaningful term of imprisonment, the Court can address the seriousness of the defendant's crimes and assure the public of its government's ability to police and punish conduct that would corrupt our democracy and deny the public the right to the honest services of its elected officials.

### D. The Need to Afford Adequate Deterrence to Criminal Conduct and Protect the Public from Further Crimes of the Defendant

High-level public officials in the State of Tennessee need to receive the simple, undiluted, and unequivocal message that if they engage in corruption, they will be sent to prison for a long period of time. As the Sixth Circuit has stated, "white-collar crimes 'are especially susceptible to general deterrence' and 'there is a general policy favoring incarceration for these crimes.'" *United States v. Musgrave*, 647 F. App'x 529, 533 (6th Cir. 2016) (quoting *United States v. Musgrave*, 761 F.3d 602, 609 (6th Cir. 2014)). "Because economic and fraud-based crimes are more rational,

cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *Musgrave*, 761 F.3d at 609 (cleaned up); *see also United States v. Arroyo*, 75 F.4th 705, 708-09 (7th Cir. 2023) ("Bribery is a premeditated crime—those tempted to sell out the public have plenty of time to weigh the risks and rewards before doing so."); *see also Morgan*, 635 F. App'x at 450 (noting that "[d]eterrence is a crucial factor in sentencing decisions for economic and public corruption crimes such as this one").

The need for general deterrence is particularly compelling in this case. This public corruption prosecution has been identified as one of the most significant in this district for many years. Everyone within Tennessee government will be aware of what this Court does. The message should be that corruption of the extent here will be met with a very stiff sentence.

One court explained the importance of general deterrence in public corruption cases during the sentencing of a former Illinois State Representative for accepting thousands of dollars in bribes, an amount similar to the benefit that Casada personally received:

> I have to think about other members of the Illinois House. I need to think about the senators. I need to think about aldermen. I need to think about all of the public officials in the state/city government, high and low who might be tempted to sell out the public like you did and turn to public corruption. Public officials are watching. Public officials are listening. I need to make sure that they hear a message loud and clear. The message is this: Public corruption isn't worth it. I need to make sure that the message gets out that public corruption isn't worth it.

> From a supply-and-demand perspective, the length of the sentence matters. The lower the cost—in other words, the lower the sentence—the more public corruption you're going to get. Public officials are rational actors. They think about the costs and benefits of public corruption. They think about how likely it is they're going to get caught. They think about what will happen to them if they do get caught. They think about the costs and benefits of corruption.

> Judges play a role in that decision-making. Judges need to make sure that the costs of public corruption are high enough to deter other people from engaging in public corruption. For whatever reason, that message isn't getting through. I don't know why public officials in this city and in this state aren't hearing the message, but they need to. Public corruption isn't worth it. If you engage in public corruption, like Mr. Arroyo, there will be serious consequences. Public corruption doesn't pay.

24

*United States v. Arroyo*, 19-cr-805 (N.D. Ill.), D.E. #162 at 120-22. In affirming the 57-month sentence in that case, the Seventh Circuit recognized that the need for general deterrence can outweigh other mitigating factors, such as age and lack of criminal history. *Arroyo*, 75 F.4th at 709.

Casada's conduct here—planned well in advance and coordinated with confederates—is a classic example of a rational, cool, calculated crime that is a "prime candidate" for general deterrence. Public corruption is exceptionally difficult to detect. *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."). Unlike violent crimes or frauds, victims rarely rush to law enforcement to report bribery. Given how rarely public corruption is detected, a significant sanction is needed to deter prospective corrupt officials and their confederates. A substantial term of imprisonment would deliver a message to all who have the privilege of participating in public office, and those who seek to influence their actions, that no bribe is worth the risk of a lengthy term in federal prison.

The role of specific deterrence is limited here. Casada no longer holds public office and is 66 years old. However, Casada so far has failed to accept responsibility in this case and went so far as to personally lobby a wealthy political donor on the eve of trial to pressure U.S. Senators to get his case dismissed through back channels in a desperate effort to avoid accountability for his actions. These facts indicate that the need for specific deterrence, although perhaps minimal, cannot be ignored.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

The government respectfully requests that the Court impose a significant custodial sentence for another reason: to avoid unwarranted sentencing disparities. According to the Judicial Sentencing Information ("JSIN") system's records, in the last five fiscal years, there have been 25 defendants who are comparably situated to Casada under the Guidelines, with primary a guideline of Section 2S1.1, a Final Offense Level of 32, a Criminal History Category of I, and without a substantial assistance departure. The median sentence of incarceration imposed for these defendants was 92 months.

However, the Sentencing Commission's national statistics are "starting point[s]," rather than ending points, for courts' efforts to "to avoid unwarranted sentence disparities among defendants with similar criminal records who have been found guilty of similar conduct." *See United States v. Stock*, 685 F.3d 621, 630, n.6 (6th Cir. 2012); *United States v. Brown*, 828 F. App'x 256, 260 (6th Cir. 2020). Indeed, the disparity between white-collar crime and other crimes is also appropriate for the Court to consider: "One of the central reasons for creating the sentencing guidelines was to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crimes." *United States v. Davis*, 537 F.3d 611, 617 (6th Cir. 2008).

Furthermore, Casada's case is unique in terms of his long-standing, high-level position in Tennessee government, the year-long period he engaged in criminal conduct, the sophisticated nature of his criminal activity, including his efforts at concealment, and his lies to the FBI and corrupt effort to have his case dismissed via back channels. Nevertheless, it may be instructive to review the sentences imposed on other high-ranking state officials:

- Former Speaker of the Illinois House of Representatives Michael Madigan was sentenced to 7.5 years' imprisonment following a conviction at trial for conspiracy,

wire fraud, and bribery. *United States v. Madigan*, No. 1:22-cr-115 (N.D. Ill.), D.E. #453.

- Former Speaker of the Ohio House of Representatives Larry Householder was sentenced to 20 years' imprisonment following a conviction at trial for racketeering conspiracy related to an approximately $60 million bribery scheme to pass and uphold a nuclear plant bailout. *United States v. Householder*, No. 20-cr-77 (S.D. Ohio), D.E. #288.

- Former Speaker of the New York State Assembly Sheldon Silver was sentenced to 78 months' imprisonment for bribery and money laundering. *United States v. Silver*, No. 1:15-cr-93 (S.D.N.Y.), D.E. #527.

- Former member of the Illinois House of Representatives, Luis Arroyo, was sentenced to 57 months' imprisonment following a conviction for honest services fraud involving a few thousand dollars in bribe payments. *Arroyo*, No. 19-cr-805 (N.D. Ill.), D.E. #144.

The significant sentences imposed on other high-ranking public officials further confirm that a significant custodial sentence is warranted and appropriate in this case. In any event, one of the most foolproof ways to avoid sentencing disparities is sentencing within the guideline range, and the Government requests that the Court do so here.

## F. The Need to Provide Restitution to Any Victims of the Offense

There is no restitution owed in this case and so this factor need not affect the sentence imposed by the Court.

## IV. CONCLUSION

For the reasons set forth above, and subject to Casada's Rule 32(i)(4) statement at sentencing, if any, the United States anticipates requesting that the Court sentence Defendant to a term of imprisonment within the Guidelines range, a $75,000 fine, forfeiture of $7,143.64, a mandatory special assessment of $1,700, and the conditions of supervision recommended in the Presentence Report.

27

Respectfully submitted,

ROBERT E. McGUIRE
Acting United States Attorney for the
Middle District of Tennessee

*/s/ Taylor J. Phillips*
TAYLOR J. PHILLIPS
Assistant United States Attorney
719 Church Street, Ste 3300
Nashville, Tennessee 37203
Telephone: 615-736-5151

*/s/ John P. Taddei*
JOHN P. TADDEI
Trial Attorney
Criminal Division
United States Department of Justice