IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

UNITED STATES OF AMERICA      )
                              )      NO.     3:22-cr-00282
        v.                    )
                              )      JUDGE RICHARDSON
[2] CADE COTHREN              )
                              )

**UNITED STATES' SENTENCING MEMORANDUM AND RESPONSE TO
DEFENDANT'S POSITION REGARDING PRESENTENCE REPORT**

"[A] democracy is effective only if the people have faith in those who govern, and that

faith is bound to be shattered when high officials and their appointees engage in activities which

arouse suspicions of malfeasance and corruption." *United States v. Mississippi Valley Generating

Co.*, 364 U.S. 520, 562 (1961). Cade Cothren and his coconspirators engaged in a lengthy

conspiracy to cheat the State of Tennessee and corrupt the process by which State legislators

communicated with their constituents. Cothren stands convicted of 16 counts, including

conspiracy, fraud, bribery, and money laundering.[1]  As further described below, Cothren's offense

conduct was consistent with a longstanding pattern of dishonesty and deception, as well as a

persistent refusal to take responsibility for his actions.

Sentencing is scheduled for Tuesday, September 16, 2025. Pending Cothren's Rule 32(i)(4)

statement at sentencing, if any, the United States anticipates requesting that the Court sentence

Cothren to a term of imprisonment within the Guidelines range, a $75,000 fine, forfeiture of

$10,600, a mandatory special assessment of $1,900, and the conditions of supervision

recommended in the Presentence Report (PSR).

---

[1]     The jury found Cothren guilty of all 19 counts. (D.E. #352.) Following the verdict, this
Court granted Cothren's motion for acquittal as to Counts 2-4. (D.E. #420.) The government is
considering an appeal of the Court's decision to vacate those convictions.

# I. FACTUAL BACKGROUND

In early 2019, Glen Casada was Speaker of the Tennessee House of Representatives, and Cothren was his Chief of Staff and right-hand man. (PSR, at ¶¶ 13-14.) In May 2019, news media published offensive text messages Cothren had written between 2014 and 2016. Among other things, the articles reported that Cothren bragged about using cocaine in the Tennessee Statehouse, talked about soliciting oral sex and nude photographs from an intern, and referred to Black people as "idiots." (Declaration of Special Agent Clayton Worcester ("Worcester Decl."), at ¶ 3, Ex. 1-4.). In the wake of this reporting, Cothren's reputation was "pretty much destroyed," as former Rep. Patsy Hazlewood testified at trial, and Cothren resigned. (PSR, at ¶ 14.) Later that year, the Tennessee Republican Caucus held a vote of no-confidence in Casada as Speaker, and, in August 2019, he stepped down as Speaker of the House. (*See id.*, at ¶ 13.)

Shortly after Casada stepped down, he, Cothren, and Representative Robin Smith (collectively, the "conspirators") conspired to defraud the State of Tennessee and its citizens. (*See id.*, at ¶¶ 16-17.) Through the State's Postage and Printing Allowance ("PPA"), each Representative was allocated $3,000, compounding each year, to fund the printing and postage for constituent communications. (*Id.*, at ¶ 15.) The expenditure of PPA funds required the approval of the Representative, the Office of the Speaker of the House, and Connie Ridley, the Director of Legislative Administration. (*Id.*, at ¶ 67.)

The conspirators agreed that Cothren would create an LLC called Phoenix Solutions to provide constituent mailer services to Tennessee Republican House members. (*Id.*, at ¶ 16.) Because of Cothren's tarnished reputation, the conspirators knew that the venture would be unsuccessful if Cothren's involvement was widely known. (*Id.*, at ¶ 58.) Instead, Casada and Smith either approached their colleagues in the legislature on behalf of Phoenix Solutions or they did not

2

disclose the LLC's involvement at all. (*Id.*, at ¶¶ 16, 17.) For his part, Cothren hid behind the fake identity, "Matthew Phoenix," supposedly an experienced political consultant formerly with the prominent D.C. consulting firm Jamestown Associates. (*Id.*, at ¶ 16.) Both Matthew Phoenix and the purported relationship with Jamestown Associates were complete fabrications. (*Id.*)

To keep up this sham, the conspirators repeatedly deceived their colleagues and State officials. For example, Cothren sent the State of Tennessee a fraudulent W-9 in the name of "Matthew Phoenix." (*Id.*, at ¶ 26.) He also involved his girlfriend, Ava Korby, in the scheme by directing her to falsely pose as another, made-up employee of Phoenix Solutions during an extended email exchange intended to dupe Ridley. (*Id.*, at ¶ 32.) The conspirators even manufactured a fake confrontation between Casada and Smith that took place on the floor of the Tennessee House of Representatives—intended to be in full view of other legislators—to throw the current Speaker off their scent. (*See* GX 59.)[2]

They went to these lengths because, had Cothren's involvement been known, the conspirators' invoices would not have been paid. For starters, legislators testified at trial that they would not have agreed to work with Cothren if they had known the true situation. (PSR, at ¶ 65.) Connie Ridley testified that she would not have approved the conspirators' invoices had she known of Cothren's involvement. (*See id.*, at ¶ 66.) Likewise, Representatives testified that, if they had known that other Representatives, namely Casada and Smith, were secretly profiting off State-funded mailers, they would have "adamantly objected." (Testimony of J. Reedy.) And the conspirators knew that, for these reasons, the Office of the Speaker of the House would not have approved Phoenix Solutions' invoices. (*See, e.g.*, PSR, at ¶ 47.)

---

[2]     Citations to "GX" are to government exhibits admitted during trial.

3

As suspicions at the State grew, payment of the conspirators' invoices slowed. (Testimony of R. Smith.) To break the logjam, Cothren "officially set [Smith] loose on [Ridley's] ass." (GX 58.) As sitting State Representatives, Smith and Casada had unparalleled access to Ridley and her superiors in the Speaker's Office compared to a typical State vendor. (Testimony of C. Ridley; Testimony of R. Smith.) Smith asked the Speaker's Chief of Staff—effectively Ridley's boss—to put pressure on Ridley to pay Phoenix Solutions' invoices and met personally with Ridley in an effort to do the same. (PSR, at ¶ 27.) Casada also met with Ridley regarding the delayed payment of the conspirators' invoices and told Smith he was "going to touch base with [the Chief of Staff] tomorrow on this situation of ours." (PSR, at ¶¶ 28, 29; GX 33.) Ridley testified that her sole goal was to "maintain the integrity of the fiscal operation of" the legislature. (Testimony of C. Ridley.) But when Ridley continued to resist Casada and Smith's pressure campaign, they called her a "bitch." (GX 39.)

In exchange for Casada and Smith's efforts with their colleagues, Connie Ridley, and the Speaker's Office, Cothren kicked back to the Representatives portions of the more than $50,000 the State ultimately paid to the conspirators. (*See, e.g.*, PSR, at ¶¶ 30, 70.) As Smith testified, the conspirators also concealed these kickbacks. The conspirators routed payments from the State through Smith and Casada's personal consulting companies to accounts controlled by Cothren before he kicked back a portion to them. (*See* GX 405-409.)

The initial business with the State and the corresponding abuses of Casada and Smith's public offices was a crucial launching pad for building a much more lucrative business. They leveraged the initial, State-funded success of the company, and their contacts within and intertwined with government, to gain much more lucrative caucus and campaign work. (*See* GX 410.) For example, Cothren posed as "Matthew Cyrus" in a bid to persuade Chip Saltsman, the

House Republican Caucus consultant, to use Phoenix Solutions for caucus work. (GX 91.) In recorded calls with Daniel Cox, the political director of the Tennessee House Republican caucus, Cothren disguised himself as "Matthew Phoenix" in an effort to win caucus business for Phoenix Solutions. (Worcester Decl., at ¶ 4.) Cothren also used the "Matthew Phoenix" pseudonym to deceive Representative Johnny Garrett in an effort to obtain the legislator's campaign business. (GX 104; 454.) Witnesses who used or recommended Phoenix Solutions for campaign and caucus work testified that they would not have done so if they had known that Cothren was involved or that sitting Representatives were secretly profiting from the work. (Testimony of N. Crawford, E. Helton-Haynes.) In total, building on the foundation of the State-funded work the conspirators received via bribery and fraud, Phoenix Solutions received approximately $159,496.48 in revenue from caucus and campaign work. (PSR, at ¶ 70.)

## II.  GUIDELINES CALCULATION

Even though the U.S. Sentencing Guidelines are advisory, *United States v. Booker*, 543 U.S. 220 (2005), provides that sentencing courts "must consult those Guidelines and take them into account when sentencing." *Id.* at 264. Using the Guidelines Manual for 2024, the PSR calculates Cothren's Guidelines Offense Level as 30. (PSR, at ¶ 91.) With a Criminal History Category of I, the PSR calculates Cothren's Guidelines range as 97-121 months' imprisonment. (*Id.*, at ¶ 125.)

Cothren has two objections to the Probation Office's calculation of the Guidelines and a series of objections to facts in the PSR. For the following reasons, the Court should overrule his objections.

5

*A. The Value Obtained by Casada, Smith, and Cothren Exceeded $150,000*

The PSR recommends an enhancement of ten levels pursuant to U.S.S.G. § 2C1.1(b)(2) because "the value of anything obtained or to be obtained by a public official or others acting with a public official was $211,443.48." (PSR, at ¶ 82(c).) The applicable Guidelines direct the Court to enhance the offense level by an amount corresponding to the "greatest" of the following:

> the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government from the offense.

U.S.S.G. § 2C1.1(b)(2).

Under the Guidelines' definition of relevant conduct, this amount should be determined based on both the offense of conviction, as well as "all acts and omission committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant." U.S.S.G. § 1B1.3(a)(1)(A). With respect to conspiracies (whether or not charged), relevant conduct also includes:

> all acts and omissions of others that were—
>
> > (i) within the scope of the jointly undertaken criminal activity,
> >
> > (ii) in furtherance of that criminal activity, and
> >
> > (iii) reasonably foreseeable in connection with that criminal activity;
>
> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

U.S.S.G. § 1B1.3(a)(1)(B). For the purposes of money or property fraud that occurred during a bribery scheme, relevant conduct includes all acts and omissions described above that were part of the same course of conduct or common scheme or plan as the offense of conviction. *See* U.S.S.G. § 1B1.3(a)(2).

6

The PSR correctly calculates a ten-level enhancement based on $211,443.48, which was the total amount obtained pursuant to all relevant and foreseeable acts of the conspirators. That figure is based on the following proof at trial: (1) the conspirators obtained $51,947 from the State of Tennessee as a result of the charged honest services fraud, (GX 414.); and (2) Phoenix Solutions obtained $159,496.48 from campaign and caucus sources other than Smith. (*See* GX 411.) Thus, the "value of anything obtained or to be obtained by a public official or others acting with a public official" was $211,443.48. This calculation appropriately gives the phrase "the value of anything *obtained* or *to be obtained*" a meaning distinct from "the value of the payment" and "the benefit received." *Cf.* U.S.S.G. § 2B4.1 (including only the "value of the bribe" and the "improper benefit to be conferred" in other bribery Guideline section).

In addition to the charged honest services fraud, the proof at trial showed that the conspirators lied to get campaign and caucus funds. (*See, e.g.*, GX 91, 104, 454.) As the government stated during a colloquy with the Court on the fifth day of trial, this was uncharged conduct that met the elements of money or property fraud. *See* Sixth Circuit Pattern Jury Instructions 10.01, 10.02. As described on pp. 4-5, *supra*, and elicited in further detail at trial, the conspirators obtained money or property (campaign and caucus funds) by means of materially false or fraudulent representations, pretenses, or promises. In addition, the proof at trial showed that Cothren used interstate mail in furtherance of the entirety of the Phoenix Solution scheme. (*See, e.g.*, GX 83, 396, 455.) Furthermore, Cothren and Casada were convicted of using a false name for the purpose of carrying on unlawful business by means of the Postal Service. (D.E. #352.) Accordingly, there is sufficient evidence for the Court to conclude by a preponderance of the evidence that the campaign and caucus lies constituted mail fraud in violation of 18 U.S.C. § 1341. Thus, pursuant to U.S.S.G. § 1B1.3, the amount obtained through that fraud should be included in

7

the calculation under U.S.S.G. § 2C1.1(b)(2). *Cf. United States v. Manrich*, 529 F. App'x 322, 325 (4th Cir. 2013) (approving of district court's aggregation of kickbacks with fraud losses and vacating sentence on other grounds).[3]

The Court should not rely on the alternative means of calculating the offense level because they would not result in the "greatest" value or loss, as required under Section 2C1.1(b)(2). For example, "the value of the payment[s]" to Casada and Smith was $35,406.90. (*See* D.E. #414-1.) A reasonable estimate of "the benefit received" for the bribes is the $22,891.40, as calculated by Cothren. (*See* D.E. #415, at 6.) Finally, there is no evidence in the record of "loss to the government from the offense." Because the $211,443.48 obtained by the public official or others acting with the public official is greater than any of these calculations, the Court should use that amount and Cothren's Guidelines level should be increased by ten levels pursuant to Section 2C1.1(b)(2).

### B. The Offenses Involved Sophisticated Laundering

Cothren opposes the application of U.S.S.G. § 2S1.1(b)(3), which provides for a two-level enhancement if the offense involved "sophisticated laundering." "Sophisticated laundering" means "complex or intricate offense conduct," and "typically involves the use of (i) fictitious entities; (ii) shell corporations; (iii) two or more levels (*i.e.* layering) of transactions, transportation, transfers, or transmissions, involving criminally derived funds that were intended to appear legitimate; or

---

[3]     Cothren contends that this amount constitutes "the total revenue Phoenix Solutions generated from the PPA work, plus all of its private campaign work during 2020." (D.E. #415, at 4.) Similarly, he states, "Several of these sources were people (like Ms. Smith) who hired Mr. Cothren and Phoenix Solutions directly. *See* Gov. Ex. 411." (*Id.*, at 5.)

This is wrong. The calculation excludes sources associated with Robin Smith (namely, "Citizens to Elect Robin Smith" and "Robin T. Smith"). Had the PSR included the entire amount reflected in Government Exhibit 411 and the PPA fraud, the total would have been $226,587.20 (i.e., $174,640.20 plus $51,947).

8

(iv) offshore financial accounts." U.S.S.G. § 2S1.1, cmt. n. 5(A). [4] "The factors listed in Application Note 5 are illustrative but not required; they are typical but non-exhaustive." *United States v. Fish*, 731 F.3d 277, 280 (3d Cir. 2013).

Here, the conspirators sent the proceeds of their unlawful activity through Rivers Edge Alliance or Right Way Consulting to Phoenix Solutions, after which Cothren kicked back payments to Casada and Smith. For the purposes of these payments, Rivers Edge Alliance and Right Way Consulting essentially acted as shell companies (or "pass-through" entities, as Smith called them at trial). Each was a sole proprietorship with no employees, nor any physical presence—Right Way Consulting's business address was Casada's home. (*Compare* Casada PSR, at ¶ 115 *with* GX 290.) Insofar as either entity had any legitimate operations at the time, that activity would merely enhance the conspirators' ability to disguise the nature, source, ownership, and control of the illegitimate funds. Furthermore, Cothren falsely labeled the kickbacks as "consulting" payments. (*See, e.g.*, GX 387, 388, 389, 391.)

Accordingly, the offense conduct functionally involved shell companies and layering. [5] And even absent the application of the exemplars in Application Note Five, this conduct is sufficiently complex to warrant application of the sophisticated laundering enhancement. *See*

---

[4]    Cothren cites only one case which analyzes Section 2S1.1(b)(3). (*See* D.E. #415, at 7 (*citing United States v. Otunyo*, 63 F.4th 948, 957 (D.C. Cir. 2023).) In *Otunyo*, the D.C. Circuit affirmed the application of the enhancement and the language Cothren cites is dicta.

[5]    The fact that the conspirators engaged in multiple levels of transactions which resulted in proceeds beginning and ending with the Representative conspirators does not preclude a finding of layering. *See United States v. Rubashkin*, 718 F. Supp. 2d 953, 976–77 (N.D. Iowa 2010) ("Defendant caused customer payments to be diverted from the depository account to another account controlled by [a company where he was a vice president]. From there, the funds were deposited into [an account at another company at which he was an officer] before the payments were returned to [the first company] and then to [a victim]. This involves two or more layers of transactions. It is of no consequence that each individual layer was not particularly sophisticated.").

*United States v. Hagen*, 60 F.4th 932, 951 (5th Cir. 2023) (affirming application of enhancement where conduct involved "(i) division of illegal kickbacks into two invoices, (ii) mislabeling of those divided invoices as relating to legitimate services, and (iii) prepayment of those mislabeled invoices to further conceal the kickbacks"). The fact that the defendants were ultimately unsuccessful in hiding their crimes from authorities is irrelevant. *See United States v. Miles*, 360 F.3d 472, 482 (5th Cir. 2004) ("It is true that [the defendant] was not very successful in obscuring the source or destination of the illegally-obtained funds used in this series of transactions. Nevertheless, the conduct [the defendant] engaged in, even though inept, is paradigmatic 'layering,' a blatant attempt to hide the flow of taxpayer money to her private use.").

### C.  Cothren's Other Objections to the PSR Are Not Well-Founded

In addition to his objections to the calculation of the Guidelines, Cothren objects to a series of facts set forth in the PSR. (D.E. #415, at 2-3.) Other than through references to the trial evidence, he does not present any evidence to contradict these facts. Accordingly, the Court should rely on the facts set forth in the PSR. *United States v. House*, 872 F.3d 748, 752 (6th Cir. 2017) ("A district court may generally rely on the PSR's facts unless the defendant produces evidence that contradicts the PSR's findings.").

Cothren first objects to the PSR's statement that "[i]n 2019, multiple news forums published allegations that Cothren committed inappropriate and illegal conduct." (D.E. #415, at 2.) Unless Cothren considers using cocaine at work and soliciting oral sex and nude photographs from an intern to be appropriate and legal, this statement is clearly an accurate description of the news articles. (Worcester Decl., at ¶ 3, Ex. 1-4.) Insofar as Cothren objects to the Court considering the facts *in* the news reports, the Government notes that Cothren gave statements to the press purporting to apologize for his conduct. *See United States v. Armstrong*, 920 F.3d 395, 398 (6th

10

Cir. 2019) ("So long as the information has some evidentiary basis to satisfy a minimal indicium of reliability, the district court can consider it without regard for the rules of evidence. The indicia-of-reliability standard is a relatively low hurdle. It allows courts to consider any information that may be reliable." (cleaned up)).

Cothren repeatedly objects to the PSR's statements that the Tennessee House Speaker's Office or Connie Ridley had the authority to approve or deny a PPA vendor. (D.E. #415, at 2, 3.) As noted in the PSR, however, Ridley testified as to her authority and that "the Speaker of the House . . . would have ultimate authority to approve or deny a vendor." (PSR, at ¶ 67.)

Cothren also argues that, although the proof indicated that his girlfriend, Ava Korby, played the role of "Candice" during phone calls in support of the Phoenix Solution scheme, she did not send emails under "Candice McKay's" name. (D.E. #415, at 2.) However, while discussing those emails, Smith testified that "Candice McKay" was "not a real person." Later, she was redirected to this testimony and asked Candice McKay's true identity. She replied that Ava Korby assumed the role of Candice McKay. Smith did not cabin this to phone calls.

Cothren then objects to the PSR's statement that, "During [his interview with the FBI], Casada admitted he knew Cameron Sexton . . . would not have approved work done by Cothren or allowed Cothren to bill the State of Tennessee for work had Sexton known Cothren was involved." (D.E. #415, at 2.) However, in sum and substance, Casada told the FBI exactly this—indeed, Cothren moved for a mistrial when this statement was played during the trial. As with the text messages, insofar as Cothren objects to the Court considering the truth of Casada's statement, this statement against interest satisfies the "low hurdle" required for indicia of reliability at sentencing. *See Armstrong*, 920 F.3d at 398.

11

Cothren next objects to the PSR's statement that the conspirators agreed to incorporate taxes into their overall invoices to the State when they learned the State would not pay taxes. (D.E. #415, at 3.) This agreement was established at trial, however. (*See* Testimony of R. Smith; GX 40, 60, 90.)

Cothren objects to the inclusion of facts from FBI interviews, rather than trial testimony, in Paragraph 65 of the PSR. (D.E. #415, at 3.) Presentence reports routinely include facts from reports of law enforcement interviews, and there is no reason they cannot. Insofar as Cothren objects on the grounds that he has evidence which contradicts Paragraph 65 of the PSR, he should present it at sentencing.

Finally, Cothren also objects to the PSR's recommendations regarding the payment of a fine and forfeiture, as well as the PSR's recommendations regarding supervised release. (D.E. #415, at 8-9.) Cothren does not object to any particular fact underlying the PSR's recommendations, nor that the PSR's recommendations were inconsistent with the law.

For the reasons set forth below, the 3553(a) factors militate in favor of a fine and the PSR's recommendations regarding supervised release. As to the duration and special conditions of supervised release, the nature and circumstances of the offense and history of characteristics of Cothren indicate a need to deter Cothren from further financial crimes and to protect the public from the same. *See* 18 U.S.C. § 3583(d), *infra*.

As to the recommended fine, the Guidelines state that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2. Cothren bears the burden to establish that he cannot pay fine and likely will be unable to do so. *United States v. Tosca*, 18 F.3d 1352, 1354-55 (6th Cir. 1994) (affirming imposition of fine, even where defendant had "no assets or present earnings,"

because "he [could] make installment payments from prisoner pay earned under the Inmate Financial Responsibility Program"). Imposition of the recommended fine of $75,000 is appropriate because Cothren's substantial net worth indicates that he can pay the recommended fine; no restitution is recommended (and thus a fine will not impair his ability to pay restitution); he has no dependents; and he is unlikely to be able to pass on the expense of the fine to others.[6] *See* 18 U.S.C. § 3572. Furthermore, the cost to the government of a Guidelines sentence, plus supervision, will exceed the recommended fine. (*See* PSR, at ¶ 137.)

As to forfeiture, the entry of a money judgment is appropriate for the reasons set forth in the government's motion for entry of a money judgment. (D.E. #414.)

### III.   FACTORS UNDER 18 U.S.C. § 3553(A)

In addition to determining a defendant's advisory Guideline range, a court must assess other applicable sentencing factors. *See* 18 U.S.C. § 3553(a). Those factors include the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense; to promote respect for the law; to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; and to protect the public from further crimes of the defendant; the need to avoid unwarranted sentencing disparities; and the need to provide restitution to the victims. *See* 18 U.S.C. § 3553(a).

Notably, the Guidelines range itself provides a useful framework for evaluating all of the other factors together because it provides a "rough approximation" of sentences that will achieve all of § 3553's objectives. *Rita v. United States*, 551 U.S. 338, 350 (2007); *United States v. Perez-Rodriguez*, 960 F.3d 748, 754 (6th Cir. 2020). As set forth in more detail below, this conclusion is

---

[6]      The government acknowledges that Cothren's self-reported cash flow is negative, but notes that more than half his monthly budget is consumed by "Other Expenses." (*Id.*)

not an abstract or academic one; the particular facts of this case, viewed through the prism of § 3553(a), fully support a within-Guidelines sentence.

### A. Nature and Circumstances of the Offense

The defendant's crimes were serious. Cothren engaged in a lengthy conspiracy to defraud the State of Tennessee and its citizens. Sitting at the center of the Phoenix Solutions conspiracy, Cothren used lies, kickbacks, and pass-through companies to accomplish his illegal ends. And as shown by Cothren's careful and consistent warnings to Casada, Cothren contemporaneously knew that what he was doing was wrong and that the scheme would unravel if anyone caught on.

This offense was not an aberration or a brief lapse in judgment. The conspiracy lasted more than a year, with every indication that it would have continued well beyond 2020 had the FBI not uncovered it. Cothren repeatedly lied about his identity to deceive his former colleagues and the State of Tennessee. He often developed and discussed with his coconspirators elaborate steps to avoid being caught. He even enlisted his girlfriend, Ava Korby, in his crimes, having her play the role of "Candice" in a phone call with a State representative and in a lengthy email string calculated to pressure and trick Connie Ridley. In short, there is nothing mitigating about the nature and circumstances of the offense and Cothren's central role in it.

### B. History and Characteristics of the Defendant

There is nothing in Cothren's background that would mitigate, excuse, or explain his conduct. Unlike many others who come before this Court for sentencing, Cothren had a stable childhood, a strong education, and—prior to the self-induced scandal which preceded the offenses of conviction—a successful professional career, in which he played an integral part at the highest levels of Tennessee government. (PSR, ¶¶ 99-104, 118-122.) He has had no significant mental health issues and reported no drug addiction. (*Id.*, at ¶¶ 109-113.) He is neither exceptionally

youthful nor old and is in good health. (*Id.*, at ¶ 105.) In sum, the defendant has had every opportunity that life could have presented him. He has experienced no hardships that could even arguably justify or explain his criminal conduct. Quite simply, the defendant chose to use his considerable advantages and opportunities to engage in conduct that was selfish, corrupt, and criminal. His history and characteristics are those of someone who should have known the gravity of his criminal conduct and who has no external causes to blame. *See United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999) (citation omitted) ("Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime."); *United States v. Stall*, 581 F.3d 276, 286 (6th Cir. 2009) ("We do not believe criminals with privileged backgrounds are more entitled to leniency than those who have nothing left to lose.").[7]

Cothren has no criminal history. This is reflected in both his Criminal History Category and his two-level reduction under U.S.S.G. § 4C1.1. Accordingly, his lack of criminal history is already properly accounted for by the Guidelines and does not warrant any additional downward variance.

Although Cothren has no criminal history points, the offenses of conviction are not the only wrongdoing in which he has engaged. Indeed, Cothren's crimes involved trying to hide from

---

[7]     Relatedly, if Cothren argues that his reputation has suffered from the investigation, indictment, or trial, or that he will have a felony on his record, those are "impermissible considerations" for the Court at sentencing. *See United States v. Musgrave*, 761 F.3d 602, 608 (6th Cir. 2014) (vacating and remanding sentence with instructions to disregard the "punishment" of "four years of legal proceedings, legal fees, the likely loss of his CPA license, and felony convictions that would follow him for the rest of his life."); *see also United States v. Morgan*, 635 F. App'x 423, 445 (10th Cir. 2015) ("By considering publicity, loss of law license, and deterioration of physical and financial health as punishment, the court impermissibly focused on the collateral consequences of Morgan's prosecution and conviction.").

15

the consequences of misconduct he committed several years earlier. In addition to texting that "black people are idiots,"[8] Cothren stated that he "did a gram of cocaine in [his] office" while on the State payroll and solicited oral sex and nude photographs from an intern. (Worcester Decl., at ¶ 3, Ex. 1-4.)

Furthermore, in 2020, shortly after creating Phoenix Solutions, Cothren created a Tennessee State political action committee (PAC) called Faith Family Freedom Fund PAC (FFFF), purportedly based in Utah. Cothren asked a much younger woman with whom he had developed a romantic relationship to be the treasurer of FFFF. (Worcester Decl., at ¶¶ 6-8.) After she agreed, Cothren opened an email account in her name, conducted the PAC's business using the email account in her name without her knowledge, and later deleted the email account. (*See* Worcester Decl., at Ex. 6-10.) Among other things, he repeatedly impersonated her in communications with the Tennessee Bureau of Ethics and Campaign Finance. (*See id.*) After first discovering what Cothren had done based on phone calls she received from news media, the woman told the FBI that Cothren had taken advantage of her infatuation with him.

In spring 2023, Cothren engaged in a series of social media and messaging attacks on current Tennessee House Speaker Cameron Sexton, whom Cothren anticipated would testify against him. For instance, in correspondence on Twitter, Cothren encouraged at least two other users in their efforts to discredit Sexton. When one user told Cothren that "[t]his is the time to take [Sexton] down," Cothren responded that he was "doing all I can." (Worcester Decl., at Ex. 14.)

---

[8]     Around the time this text was publicized in May 2019, Cothren told the media, "While I'm not proud of who I was in the past, I am proud that, with God's grace and a strong support system, I've been able to achieve so much in the years since." (Worcester Decl., at ¶ 3, Ex. 1, p.2.)

    Remarkably, within days of making that statement in May 2019, Cothren replied, "Hell yeah brother" to a contact's proposal to "hang some Alabama wind chimes up." (Worcester Decl., at ¶ 5, Ex. 7.) The phrase "Alabama wind chimes" refers to lynching a group of Black people.

Cothren then entreated the user to "please, please, please join in as much as you can." (*Id.*) On another occasion, Cothren told another user that the "[h]eat [on Sexton] is HEAVY" and instructed the user to "keep up the pressure." (*Id.*, at Ex. 15.)

In sum, Cothren's crimes were not isolated errors in judgement. Both his offense conduct and other relevant unethical and potentially illegal actions were calculated, multifaceted, and complex. He leveraged his connections and knowledge of the inner workings of Tennessee government to facilitate his self-serving criminal objectives. He manipulated people close to him—including two different romantic partners who would have otherwise had no involvement in his schemes—to shield himself from scrutiny and to facilitate his illegal behavior.

Cothren's history and characteristics are aggravating and merit a significant sentence of incarceration.

### C. The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law and Provide Just Punishment for the Offense

In light of the seriousness of the offense and the lack of any substantial mitigating factors, a meaningful custodial sentence is appropriate. Any time an offense involves elected public officials abusing their office for personal gain, it "cannot properly be seen as a victimless crime, for in a sense it threatens the foundation of democratic government" and "tears at the general belief of the citizenry that government officials will carry out their duties honestly, if not always competently." *United States v. Hayes*, 762 F.3d 1300, 1309 (11th Cir. 2014). An offense of this nature is exceptionally serious, since "[t]he corruption of elected officials undermines public confidence in our democratic institutions." *United States v. Rosen*, 716 F.3d 691, 694 (2d Cir. 2013), *abrogated on other grounds by McDonnell v. United States*, 136 S. Ct. 2355 (2016). Indeed, "[a] democratic government cannot function when those occupying the most elevated offices act

17

to benefit themselves rather than the citizenry for which they work and to which they owe their highest loyalty." *Morgan*, 635 F. App'x at 469 (Holmes, J., concurring).

As one court has explained:

> We need not resign ourselves to the fact that corruption exists in government. Unlike some criminal justice issues, the crime of public corruption can be deterred by significant penalties that hold all offenders properly accountable. The only way to protect the public from the ongoing problem of public corruption and to promote respect for the rule of law is to impose strict penalties on all defendants who engage in such conduct, many of whom have specialized legal training or experiences. Public corruption demoralizes and unfairly stigmatizes the dedicated work of honest public servants. It undermines the essential confidence in our democracy and must be deterred if our country and district is ever to achieve the point where the rule of law applies to all—not only to the average citizen, but to all elected and appointed officials.

*United States v. Spano*, 411 F. Supp. 2d 923, 940 (N.D. Ill. 2006).

Cothren's crimes added another chapter to the book of corruption in the Tennessee Capitol. *See, e.g.*, Federal Bureau of Investigation, *Tennessee Waltz*, *available at* https://www.fbi.gov/history/famous-cases/tennessee-waltz (describing undercover investigation into local and state government); Ronald Smothers, *et al.*, *Tennessee Republicans See an Election Weapon in State Bingo Scandal*, N.Y. Times, Jan. 28, 1990 (describing "Operation Rocky Top," an undercover investigation into bribery of state officials by bingo operators); *see generally* Joel Ebert and Erik Schelzig, *Welcome to Capitol Hill: Fifty Years of Scandal in Tennessee Politics* (2023). Conduct like Cothren's has eaten away at citizens' confidence in their elected representatives. Majorities of Americans believe that all or most people in office ran because they wanted to make a lot of money. *See* Pew Research Center, *Americans' Dismal Views of the Nation's Politics*, Sept. 19, 2023, *available at* https://www.pewresearch.org/politics/2023/09/19/candidate-quality-and-what-drives-elected-officials-to-run-for-office/. A light sentence for greed-fueled corruption would only fan the flames

of this cynicism. It would also perpetuate the perception that there is a two-tiered justice system: one for the average defendant, and another for the well connected. On the other hand, by imposing a meaningful term of imprisonment, the Court can address the seriousness of the defendant's crimes and assure the public of its government's ability to police and punish conduct that would corrupt our democracy and deny the public the right to the honest services of its elected officials.

### D. The Need to Afford Adequate Deterrence to Criminal Conduct and Protect the Public from Further Crimes of the Defendant

The defendant's serious offense conduct, post-indictment social media attacks on an anticipated trial witness, and post-conviction denialism demonstrate a profound disrespect for the law and suggest a likelihood of recidivism. Cothren is unlikely to be in a position to defraud the State in connection with the PPA program again. However, the risk of recidivism should not be circumscribed so narrowly. Through both the lengthy Phoenix Solutions conspiracy and the FFFF deception, Cothren has demonstrated a consistent willingness to lie to achieve his ends. The volume of Cothren's lies and his extraordinary pattern of dishonesty speaks to his high likelihood of reoffending and the concomitant need to remove him from the community he has repeatedly victimized.

Furthermore, he has given the Court no reason to believe that he recognizes the wrongfulness of his conduct, much less that he has any remorse. On the contrary, on the eve of trial, Cothren wrote on X that this prosecution was "a staggering waste of resources, a mockery of justice, and proof that [the government's] priorities have nothing to do with the law—or the truth." (Worcester Decl., at ¶ 12, Ex. 16.) Even after facing overwhelming evidence of guilt at trial—and following the jury's unanimous verdict against him on all counts—Cothren remains unrepentant and defiant. Soon after trial, he reposted a claim on X that he was "targeted by Biden's DOJ, persecuted by the FBI and other agencies, and is now facing 20 years in prison for what amounts

to a false, TN State, minor infraction." (Worcester Decl., at ¶ 12, Ex. 17.) Cothren's refusal to acknowledge the seriousness of his conduct shows that a significant carceral sentence is necessary to deter him.

General deterrence is also important in this case. As the Sixth Circuit has stated, "white-collar crimes 'are especially susceptible to general deterrence' and 'there is a general policy favoring incarceration for these crimes.'" *United States v. Musgrave*, 647 F. App'x 529, 533 (6th Cir. 2016) (quoting *Musgrave*, 761 F.3d at 609). "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *Musgrave*, 761 F.3d at 609 (cleaned up); *see also United States v. Arroyo*, 75 F.4th 705, 708-09 (7th Cir. 2023) ("Bribery is a premeditated crime—those tempted to sell out the public have plenty of time to weigh the risks and rewards before doing so."); *see also Morgan*, 635 F. App'x at 450 (noting that "[d]eterrence is a crucial factor in sentencing decisions for economic and public corruption crimes such as this one").

The need for general deterrence is particularly compelling in this case. This public corruption prosecution has been identified as one of the most significant in this district for many years. Everyone within Tennessee government will be aware of what this Court does. The message should be that corruption of the extent here will be met with a very stiff sentence.

One court explained the importance of general deterrence in public corruption cases during the sentencing of a former Illinois State Representative for accepting thousands of dollars in bribes, an amount similar to the bribes that Cothren paid to Casada and Smith:

> I have to think about other members of the Illinois House. I need to think about the senators. I need to think about aldermen. I need to think about all of the public officials in the state/city government, high and low who might be tempted to sell out the public like you did and turn to public corruption. Public officials are watching. Public officials are listening. I need to make sure that they hear a message

20

loud and clear. The message is this: Public corruption isn't worth it. I need to make sure that the message gets out that public corruption isn't worth it.

From a supply-and-demand perspective, the length of the sentence matters. The lower the cost—in other words, the lower the sentence—the more public corruption you're going to get. Public officials are rational actors. They think about the costs and benefits of public corruption. They think about how likely it is they're going to get caught. They think about what will happen to them if they do get caught. They think about the costs and benefits of corruption.

Judges play a role in that decision-making. Judges need to make sure that the costs of public corruption are high enough to deter other people from engaging in public corruption. For whatever reason, that message isn't getting through. I don't know why public officials in this city and in this state aren't hearing the message, but they need to. Public corruption isn't worth it. If you engage in public corruption, like Mr. Arroyo, there will be serious consequences. Public corruption doesn't pay.

*United States v. Arroyo*, 19-cr-805 (N.D. Ill.), D.E. #162 at 120-22.   In affirming the 57-month

sentence in that case, the Seventh Circuit recognized that the need for general deterrence can

outweigh other mitigating factors, such as age and lack of criminal history. *Arroyo*, 75 F.4th at

709.

Cothren's conduct here—planned well in advance and coordinated with confederates—is

a classic example of a rational, cool, calculated crime that is a "prime candidate" for general

deterrence. Public corruption is exceptionally difficult to detect. *See United States v. Heffernan*,

43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing

more heavily those offenses that either are lucrative or are difficult to detect and punish, since both

attributes go to increase the expected benefits of a crime and hence the punishment required to

deter it."). Unlike violent crimes or frauds, victims rarely rush to law enforcement to report bribery.

Given how rarely public corruption is detected, a significant sanction is needed to deter prospective

corrupt officials and their confederates. A substantial term of imprisonment would deliver a

message to all who have the privilege of participating in public office, and those who seek to

influence their actions, that no bribe is worth the risk of a lengthy term in federal prison.

21

### E. The Need to Avoid Unwarranted Sentencing Disparities

The government respectfully requests that the Court impose a significant custodial sentence for another reason: to avoid unwarranted sentencing disparities. According to the Judicial Sentencing Information ("JSIN") system's records, in the last five fiscal years, there have been 50 defendants who are comparably situated to Cothren under the Guidelines, with a primary guideline of Section 2S1.1, a Final Offense Level of 30 a Criminal History Category of I, and without a substantial assistance departure. The median sentence of incarceration imposed for these defendants was 84 months.

However, the Sentencing Commission's national statistics are "starting point[s]," rather than ending points, for courts' efforts to "to avoid unwarranted sentence disparities among defendants with similar criminal records who have been found guilty of similar conduct." *See United States v. Stock*, 685 F.3d 621, 630, n.6 (6th Cir. 2012); *United States v. Brown*, 828 F. App'x 256, 260 (6th Cir. 2020). Indeed, the disparity between white-collar crime and other crimes is also appropriate for the Court to consider: "One of the central reasons for creating the sentencing guidelines was to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crimes." *United States v. Davis*, 537 F.3d 611, 617 (6th Cir. 2008). In any event, one of the most foolproof ways to avoid such sentencing disparities is sentencing within the guideline range, and the Government requests that the Court do so here.

As one recent comparator, Judge John F. Kness sentenced Timothy Mapes, the former Chief of Staff to the Speaker of the Illinois House of Representatives, to 30 months in prison for lying to a grand jury about his former boss's criminal conduct. *See United States v. Mapes*, 1:21-cr-00345, D.E. #168 (Judgment) (N.D. Ill. Feb. 20, 2024).

22

**F. The Need to Provide Restitution to Any Victims of the Offense**

There is no restitution owed in this case and so this factor need not affect the sentence imposed by the Court.

**IV. CONCLUSION**

For the reasons set forth above, and subject to Cothren's Rule 32(i)(4) statement at sentencing, if any, the United States anticipates requesting that the Court sentence Defendant to a term of imprisonment within the Guidelines range, a $75,000 fine, forfeiture of $10,600, a mandatory special assessment of $1,900, and the conditions of supervision recommended in the Presentence Report.

Respectfully submitted,

ROBERT E. McGUIRE
Acting United States Attorney for the
Middle District of Tennessee

*/s/ Taylor J. Phillips*
TAYLOR J. PHILLIPS
Assistant United States Attorney
719 Church Street, Ste 3300
Nashville, Tennessee 37203
Telephone: 615-736-5151

*/s/ John P. Taddei*
JOHN P. TADDEI
Trial Attorney
Criminal Division
United States Department of Justice
