IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | NO. 3:22-cr-00282 |
| v. | ) | |
| | ) | JUDGE RICHARDSON |
| [2] CADE COTHREN | ) | |
| | ) | |

## UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION FOR RELEASE PENDING APPEAL

After a jury convicted Defendant Cade Cothren of all nineteen counts against him, and the Court dismissed three counts on jurisdictional grounds, this Court imposed a sentence of 30 months and ordered Cothren to surrender to serve his sentence on November 17, 2025. Cothren now moves for release pending appeal pursuant to 18 U.S.C. § 3143(b). (D.E. #462 (the "Motion").) Cothren offers this Court no reason to depart from the presumption under 18 U.S.C. § 3143(b) that a defendant who has been sentenced should begin serving his sentence during a pending appeal. All of his arguments for release are incorporations by reference of his motion for a new trial, which this Court properly denied as legally and factually insufficient. Furthermore, Cothren has not shown by clear and convincing evidence that he is not a flight risk or a danger to the community. For both of these independently sufficient reasons, the Court should deny his motion for release pending appeal.

### BACKGROUND

In early 2019, Glen Casada was Speaker of the Tennessee House of Representatives, and Cothren was his Chief of Staff and right-hand man. (PSR, at ¶¶ 13-14.) In May 2019, news media published offensive text messages Cothren had written between 2014 and 2016. Among other things, the articles reported that Cothren bragged about using cocaine in the Tennessee Statehouse, talked about soliciting oral sex and nude photographs from an intern, and referred to Black people

as "idiots." (D.E. #439, Declaration of Special Agent Clayton Worcester ("Worcester Decl."), at ¶ 3, Ex. 1-4.). In the wake of this reporting, Cothren's reputation was "pretty much destroyed," as former Rep. Patsy Hazlewood testified at trial, and Cothren resigned. (PSR, at ¶ 14.) Later that year, the Tennessee Republican Caucus held a vote of no-confidence in Casada as Speaker, and, in August 2019, he stepped down as Speaker of the House. (*See id.*, at ¶ 13.)

Shortly after Casada stepped down, he, Cothren, and Representative Robin Smith (collectively, the "conspirators"), conspired to defraud the State of Tennessee and its citizens. (*See id.*, at ¶¶ 16-17.) Through the State's Postage and Printing Allowance ("PPA"), each Representative was allocated $3,000, compounding each year, to fund the printing and postage for constituent communications. (*Id.*, at ¶ 15.) The expenditure of PPA funds required the approval of the Representative, the Office of the Speaker of the House, and Connie Ridley, the Director of Legislative Administration. (*Id.*, at ¶ 67.)

The conspirators agreed that Cothren would create an LLC called Phoenix Solutions to provide constituent mailer services to Tennessee Republican House members. (*Id.*, at ¶ 16.) Because of Cothren's tarnished reputation, the conspirators knew that the venture would be unsuccessful if Cothren's involvement was widely known. (*Id.*, at ¶ 58.) Instead, Casada and Smith either approached their colleagues in the legislature on behalf of Phoenix Solutions or they did not disclose the LLC's involvement at all. (*Id.*, at ¶¶ 16, 17.) For his part, Cothren hid behind the fake identity, "Matthew Phoenix," supposedly an experienced political consultant formerly with the prominent D.C. consulting firm Jamestown Associates. (*Id.*, at ¶ 16.) Both Matthew Phoenix and the purported relationship with Jamestown Associates were complete fabrications. (*Id.*)

To keep up this sham, the conspirators repeatedly deceived their colleagues and State officials. For example, Cothren sent the State of Tennessee a fraudulent W-9 in the name of

2

"Matthew Phoenix." (*Id.*, at ¶ 26.) He also involved his girlfriend, Ava Korby, in the scheme by directing her to falsely pose as another, made-up employee of Phoenix Solutions during an extended email exchange intended to dupe Ridley. (*Id.*, at ¶ 32.) The conspirators even manufactured a fake confrontation between Casada and Smith that took place on the floor of the Tennessee House of Representatives—intended to be in full view of other legislators—to throw the current Speaker off their scent. (*See* GX 59.)[1]

They went to these lengths because, had Cothren's involvement been known, the conspirators' invoices would not have been paid. For starters, legislators testified at trial that they would not have agreed to work with Cothren if they had known the true situation. (PSR, at ¶ 65.) Connie Ridley testified that she would not have approved the conspirators' invoices had she known of Cothren's involvement. (*See id.*, at ¶ 66.) Likewise, Representatives testified that, if they had known that other Representatives, namely Casada and Smith, were secretly profiting off State-funded mailers, they would have "adamantly objected." (Testimony of J. Reedy.) And the conspirators knew that, for these reasons, the Office of the Speaker of the House would not have approved Phoenix Solutions' invoices. (*See, e.g.*, PSR, at ¶ 47.).

As suspicions at the State grew, payment of the conspirators' invoices slowed. (Testimony of R. Smith.) To break the logjam, Cothren "officially set [Smith] loose on [Ridley's] ass." (GX 58.) As sitting State Representatives, Smith and Casada had unparalleled access to Ridley and her superiors in the Speaker's Office compared to a typical State vendor. (Testimony of C. Ridley; Testimony of R. Smith.) Smith asked the Speaker's Chief of Staff—effectively Ridley's boss—to put pressure on Ridley to pay Phoenix Solutions' invoices and met personally with Ridley in an

---

[1] Citations to "GX" are to government exhibits admitted during trial.

effort to do the same. (PSR, at ¶ 27.) Casada also met with Ridley regarding the delayed payment of the conspirators' invoices and told Smith he was "going to touch base with [the Chief of Staff] tomorrow on this situation of ours." (PSR, at ¶¶ 28, 29; GX 33.) Ridley testified that her sole goal was to "maintain the integrity of the fiscal operation of" the legislature. (Testimony of C. Ridley.) But when Ridley continued to resist Casada and Smith's pressure campaign, they called her a "bitch." (GX 39.)

In exchange for Casada and Smith's efforts with their colleagues, Connie Ridley, and the Speaker's Office, Cothren kicked back to the Representatives portions of the more than $50,000 the State ultimately paid to the conspirators. (*See, e.g.*, PSR, at ¶¶ 30, 70.) As Smith testified, the conspirators also concealed these kickbacks. The conspirators routed payments from the State through Smith and Casada's personal consulting companies to accounts controlled by Cothren before he kicked back a portion to them. (*See* GX 405-409.)[2]

## APPLICABLE LAW

"The Bail Reform Act, 18 U.S.C. § 3143(b), creates a presumption against release pending appeal." *United States v. Chilingirian*, 280 F.3d 704, 709 (6th Cir. 2002). A defendant seeking release pending appeal of a conviction bears the burden of establishing the following: (1) by clear and convincing evidence that he is not likely to flee, (2) by clear and convincing evidence that he does not pose a danger to the safety of any other person or the community, (3) the appeal is not for the purpose of delay, and (4) the appeal raises a substantial question of law or fact likely to result in reversal, an order for new trial, or a sentence that does not include a term of imprisonment. 18 U.S.C. § 3143(b); *see Chilingirian*, 280 F.3d at 709; *United States v. Vance*, 851 F.2d 166, 169 (6th Cir. 1988).

---

[2] The government incorporates its response to Cothren's post-trial motions. (D.E. #383.)

4

Case 3:22-cr-00282    Document 478    Filed 10/21/25    Page 4 of 9 PageID #: 8997

An appeal raises a "substantial question" of law or fact when it presents a "close question or one that could go either way." *United States v. Pollard*, 778 F.2d 1177, 1182 (6th Cir. 1985) (citing *United States v. Powell*, 761 F.2d 1227, 1233–34 (8th Cir. 1985)). The question must be "so integral to the merits of the conviction that it is more probable than not that reversal or a new trial will occur if the question is decided in the defendant's favor." *Id.* "It is not sufficient to show simply that reasonable judges could differ . . . or that the issue is fairly debatable or not frivolous." *Id.* at 1234. And, as the Northern District of Illinois recently opined, "[n]ovel questions are not necessarily substantial." *United States v. McClain*, Order, D.E. #521, 20-cr-812 (N.D. Ill. Oct. 14, 2025) (denying motion for release pending appeal in a public corruption case).

The factors a defendant must meet are conjunctive, and thus, the absence of any factor will prevent release. Furthermore, a defendant must show that *each* count of conviction is vulnerable to a substantial question of law or fact likely to result in relief if decided in the defendant's favor. *Id.*, at 1233. This challenging standard means that post-conviction release is limited to defendants "who are among the more promising candidates for ultimate exoneration." *United States v. Shoffner*, 791 F.2d 586, 589 (7th Cir. 1986).

## ARGUMENT

Cothren has not raised a substantial question as to each of the remaining sixteen counts of conviction, nor has he established by clear and convincing evidence that he is not a flight risk. The Court should deny his motion.

1. **Cothren Has Not Identified a Substantial Question of Fact or Law That Is Likely to Result in a New Trial on All Counts**

None of Cothren's arguments, alone or in combination, present a substantial question of law because they each lack merit. Because this Court imposed concurrent sentences on each count of conviction, Cothren must show that there was a "substantial question" as to every count of

5

conviction.[3] He cannot surmount this high hurdle to defeat the Congressional presumption in 18 U.S.C. § 3143(b).

Cothren first argues that the government failed to prove an "official act." (Motion, at 3.) This sufficiency claim is not a "close question" that "could go either way." As a threshold matter, when seeking a new trial on the grounds of sufficiency, a defendant must show that the "manifest weight of the evidence" "heavily preponderated" against the verdict. *United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007). And here, the government alleged and proved three different categories of official acts: (1) Reps. Casada and Smith's selection of mailer vendors to perform State-funded PPA work; (2) other legislators' selection of mailer vendors to perform State-funded PPA work; and (3) the Office of Legislative Administration's authorization of payment on PPA invoices. To show a "substantial question" now, Cothren would need to show that the Court's conclusion on his Rule 33 motion could have gone either way as to *each* of these categories of official acts.

For the reasons set forth in the government's opposition to his Rule 33 motion, he cannot do that. The jury easily could have concluded that Reps. Casada and Smith's direction of State funds for their own PPA mailers was an official act, as only legislators had the authority to exercise that power. And the evidence of other officials taking official acts based on the persuasion or pressure of Reps. Smith and Casada was plainly consistent with the Court's instructions.

Compounding the error in his "official act" argument, Cothren incorrectly states that, if he establishes that there was no official act taken, all other charges would fall. However, Count Eleven, which charged Cothren with operating an unlawful business, is not inherently predicated

---

[3]   Cothren identifies no defect in his sentencing proceedings and thus has not established that reversal would be likely to result in a lower sentence (except insofar as his sentence was vacated as a result of reversal or new trials on each count).

on an honest services violation. As the Court instructed the jury, that charge has two elements: (1) that Cothren used or assumed, or requested to be addressed by, any fictious, false, or assumed name or a name other than his own proper name; and (2) that he did so for the purpose of conducting, promoting, and carrying on *any* unlawful business by means of the United States Postal Service. Cothren's submission of a fraudulent W-9 standing alone was clearly unlawful. Because this Court sentenced Cothren to 30 months imprisonment on that Count, even if he could demonstrate that his "official act" argument was a "close question"—which he had not—he still would not be entitled to release on that basis. (D.E. #452.)

Next, Cothren argues that he did not engage in a bribery or kickback scheme. (Motion, at 3.) Like his "official act" argument, Cothren couches this as a sufficiency argument. Whether the manifest weight of the evidence heavily preponderated against the jury's finding of a kickback scheme was not a close question, however. Rep. Smith's testimony on this point was unambiguous and supported by contemporaneous text messages and emails between the conspirators.

Cothren then reiterates his argument that he did not use a fictious name for the purpose of conducting an unlawful business. (Motion, at 3.) As amply shown at trial, however, Cothren routinely used the fictitious names "Matthew Phoenix" and "Matthew Cyrus" to deceive those doing business with Phoenix Solutions. This was not a close question.

He also argues that the government failed to prove "concealment" such that he would be entitled to a new trial on Counts 13-18. (Motion, at 3.) As demonstrated by the charts of FBI Forensic Accountant Alexandra Hunter, however, the conspirators used Rightway Consulting and Rivers Edge Alliance as functional shell or front companies into which criminally derived proceeds were deposited before they were sent to Cothren and kicked back to Casada and Smith. (*See* GXs 405-409.) These transactions included multiple levels of layering, a classic money-laundering

7

technique. The jury's verdict on the concealment counts was not against the manifest weight of the evidence, nor was the Court's conclusion to that effect a question which "could have gone either way."

In sum, Cothren has failed to show that there were substantial questions as to each count of conviction and thus the Motion should be denied.

**2. Cothren Has Not Shown by Clear and Convincing Evidence That He Is Not a Flight Risk**

Even if Cothren had met his burden to show substantial questions as to each count, he does not cite evidence establishing by clear and convincing evidence that he not a flight risk. Instead, he refers back to his post-conviction argument in favor of continued release. That argument, which was premised on his pre-trial compliance with conditions of release and family ties, is flawed.[4]

District courts throughout the Sixth Circuit have rejected similar requests for release after public corruption convictions. *See, e.g.*, *United States v. Dimora*, No. 1:10-CR-387, 2012 WL 1409396, at *4 (N.D. Ohio Apr. 23, 2012), *aff'd* (June 21, 2012) ("The argument [that a defendant complied with pre-trial release provisions] is routinely rejected because prior to trial there is the possibility of no imprisonment, which evaporates upon a finding of guilt." (citation omitted)); *United States v. Kilpatrick*, No. 10-20403, 2013 WL 1273822, at *1 (E.D. Mich. Mar. 27, 2013) (same); *United States v. Hills*, No. 1:16-CR-329, 2018 WL 3956865, at *1 (N.D. Ohio Aug. 17, 2018) (same).

Cothren has a substantial net worth. (PSR, at ¶ 121.) His release plan seems to include his

---

[4] At sentencing, the government contended that Cothren should produce evidence to satisfy his burden before the government offered counterargument. *See United States v. Vance*, 851 F.2d 166, 168 (6th Cir. 1988) ("[T]he statute does not require the government to make an initial showing of dangerousness. Rather, it presumes dangerousness and the criminal defendant must overcome this presumption."). After Cothren's argument for release and before counterargument by the government, the Court granted his request to be released until November 17, 2025.

continued residence with his girlfriend whom he has already involved in the illegal conduct. *Cf. Dimora*, 2012 WL 1409396, at *3 (noting the defendant's "apparent lack of concern for his family is demonstrated in his willingness to expose his wife to possible criminal charges by including her in his efforts to conceal his crimes."). Finally, as shown by the evidence at trial, Cothren is willing to assume fake identities and submit falsified documents to the government. Similarly, the government's sentencing submissions showed how Cothren stole the identity of another woman to deceive the Tennessee Board of Ethics and Campaign Finance. (Worcester Decl., at ¶¶ 7-9.) Given his financial resources and demonstrated willingness to assume false identities, Cothren has not shown by clear and convincing evidence that he will voluntarily report to prison.

## CONCLUSION

For the foregoing reasons, the Court should deny Cothren's motion for release pending appeal.

Respectfully submitted,

ROBERT E. McGUIRE
Acting United States Attorney for the
Middle District of Tennessee

*/s/ Taylor J. Phillips*
TAYLOR J. PHILLIPS
Assistant United States Attorney
719 Church Street, Ste 3300
Nashville, Tennessee 37203
Telephone: 615-736-5151

*/s/ John P. Taddei*
JOHN P. TADDEI
Trial Attorney
Criminal Division
United States Department of Justice