IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | NO.   3:22-cr-00282 |
| v. | ) | |
| | ) | JUDGE RICHARDSON |
| [1] GLEN CASADA | ) | |
| | ) | |

## UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION FOR RELEASE PENDING APPEAL

After a jury convicted Defendant Glen Casada of 17 counts, and the Court dismissed three counts on jurisdictional grounds, this Court imposed a sentence of 36 months and ordered Casada to surrender to serve his sentence on November 21, 2025. Casada now moves for release pending appeal pursuant to 18 U.S.C. § 3143(b). (D.E. #471 (the "Motion").) Casada offers this Court no reason to depart from the presumption under 18 U.S.C. § 3143(b) that a defendant who has been sentenced should begin serving his sentence during a pending appeal. All of his arguments for release refer to previous arguments which this Court properly denied as legally and factually insufficient, and there is no "substantial question" as to those rulings. Furthermore, Casada has not shown by clear and convincing evidence that he is not a flight risk or a danger to the community. For both of these independently sufficient reasons, the Court should deny his motion for release pending appeal.

### BACKGROUND

In early 2019, Glen Casada was Speaker of the Tennessee House of Representatives, and Cade Cothren was his Chief of Staff and right-hand man. (PSR, at ¶¶ 13-14.) In May 2019, news media published offensive text messages Cothren had written between 2014 and 2016. Among other things, the articles reported that Cothren bragged about using cocaine in the Tennessee Statehouse, talked about soliciting oral sex and nude photographs from an intern, and referred to

Black people as "idiots." (D.E. #439, Declaration of Special Agent Clayton Worcester ("Worcester Decl."), at ¶ 3, Ex. 1-4.). In the wake of this reporting, Cothren's reputation was "pretty much destroyed," as former Rep. Patsy Hazlewood testified at trial, and Cothren resigned. (PSR, at ¶ 14.) Later that year, the Tennessee Republican Caucus held a vote of no-confidence in Casada as Speaker, and, in August 2019, he stepped down as Speaker of the House. (*See id.*, at ¶ 13.)

Shortly after Casada stepped down, he, Cothren, and Representative Robin Smith (collectively, the "conspirators"), conspired to defraud the State of Tennessee and its citizens. (*See id.*, at ¶¶ 16-17.) Through the State's Postage and Printing Allowance ("PPA"), each Representative was allocated $3,000, compounding each year, to fund the printing and postage for constituent communications. (*Id.*, at ¶ 15.) The expenditure of PPA funds required the approval of the Representative, the Office of the Speaker of the House, and Connie Ridley, the Director of Legislative Administration. (*Id.*, at ¶ 67.)

The conspirators agreed that Cothren would create an LLC called Phoenix Solutions to provide constituent mailer services to Tennessee Republican House members. (*Id.*, at ¶ 16.) Because of Cothren's tarnished reputation, the conspirators knew that the venture would be unsuccessful if Cothren's involvement was widely known. (*Id.*, at ¶ 58.) Instead, Casada and Smith either approached their colleagues in the legislature on behalf of Phoenix Solutions or they did not disclose the LLC's involvement at all. (*Id.*, at ¶¶ 16, 17.) For his part, Cothren hid behind the fake identity, "Matthew Phoenix," supposedly an experienced political consultant formerly with the prominent D.C. consulting firm Jamestown Associates. (*Id.*, at ¶ 16.) Both Matthew Phoenix and the purported relationship with Jamestown Associates were complete fabrications. (*Id.*)

To keep up this sham, the conspirators repeatedly deceived their colleagues and State officials. For example, Cothren sent the State of Tennessee a fraudulent W-9 in the name of

2

"Matthew Phoenix." (*Id.*, at ¶ 26.) He also involved his girlfriend, Ava Korby, in the scheme by directing her to falsely pose as another, made-up employee of Phoenix Solutions during an extended email exchange intended to dupe Ridley. (*Id.*, at ¶ 32.) The conspirators even manufactured a fake confrontation between Casada and Smith that took place on the floor of the Tennessee House of Representatives—intended to be in full view of other legislators—to throw the current Speaker off their scent. (*See* GX 59.)[1]

They went to these lengths because, had Cothren's involvement been known, the conspirators' invoices would not have been paid. For starters, legislators testified at trial that they would not have agreed to work with Cothren if they had known the true situation. (PSR, at ¶ 65.) Connie Ridley testified that she would not have approved the conspirators' invoices had she known of Cothren's involvement. (*See id.*, at ¶ 66.) Likewise, Representatives testified that, if they had known that other Representatives, namely Casada and Smith, were secretly profiting off State-funded mailers, they would have "adamantly objected." (Testimony of J. Reedy.) And the conspirators knew that, for these reasons, the Office of the Speaker of the House would not have approved Phoenix Solutions' invoices. (*See, e.g.*, PSR, at ¶ 47.).

As suspicions at the State grew, payment of the conspirators' invoices slowed. (Testimony of R. Smith.) To break the logjam, Cothren "officially set [Smith] loose on [Ridley's] ass." (GX 58.) As sitting State Representatives, Smith and Casada had unparalleled access to Ridley and her superiors in the Speaker's Office compared to a typical State vendor. (Testimony of C. Ridley; Testimony of R. Smith.) Smith asked the Speaker's Chief of Staff—effectively Ridley's boss—to put pressure on Ridley to pay Phoenix Solutions' invoices and met personally with Ridley in an

---

[1] Citations to "GX" are to government exhibits admitted during trial.

effort to do the same. (PSR, at ¶ 27.) Casada also met with Ridley regarding the delayed payment of the conspirators' invoices and told Smith he was "going to touch base with [the Chief of Staff] tomorrow on this situation of ours." (PSR, at ¶¶ 28, 29; GX 33.) Ridley testified that her sole goal was to "maintain the integrity of the fiscal operation of" the legislature. (Testimony of C. Ridley.) But when Ridley continued to resist Casada and Smith's pressure campaign, they called her a "bitch." (GX 39.)

In exchange for Casada and Smith's efforts with their colleagues, Connie Ridley, and the Speaker's Office, Cothren kicked back to the Representatives portions of the more than $50,000 the State ultimately paid to the conspirators. (*See, e.g.*, PSR, at ¶¶ 30, 70.) As Smith testified, the conspirators also concealed these kickbacks. The conspirators routed payments from the State through Smith and Casada's personal consulting companies to accounts controlled by Cothren before he kicked back a portion to them. (*See* GX 405-409.)[2]

## APPLICABLE LAW

"The Bail Reform Act, 18 U.S.C. § 3143(b), creates a presumption against release pending appeal." *United States v. Chilingirian*, 280 F.3d 704, 709 (6th Cir. 2002). A defendant seeking release pending appeal of a conviction bears the burden of establishing the following: (1) by clear and convincing evidence that he is not likely to flee, (2) by clear and convincing evidence that he does not pose a danger to the safety of any other person or the community, (3) the appeal is not for the purpose of delay, and (4) the appeal raises a substantial question of law or fact likely to result in reversal, an order for new trial, or a sentence that does not include a term of imprisonment. 18 U.S.C. § 3143(b); *see Chilingirian*, 280 F.3d at 709; *United States v. Vance*, 851 F.2d 166, 169

---

[2] The government incorporates its responses to Casada's motion to dismiss and post-trial motions, as well as the government's sentencing memorandum. (D.E. #75, 383, 437.)

(6th Cir. 1988).

An appeal raises a "substantial question" of law or fact when it presents a "close question or one that could go either way." *United States v. Pollard*, 778 F.2d 1177, 1182 (6th Cir. 1985) (citing *United States v. Powell*, 761 F.2d 1227, 1233–34 (8th Cir. 1985)). The question must be "so integral to the merits of the conviction that it is more probable than not that reversal or a new trial will occur if the question is decided in the defendant's favor." *Powell*, 761 F.2d at 1234. "It is not sufficient to show simply that reasonable judges could differ . . . or that the issue is fairly debatable or not frivolous." *Id.* And, as the Northern District of Illinois recently opined, "[n]ovel questions are not necessarily substantial." *United States v. McClain*, Order, D.E. #521, 20-cr-812 (N.D. Ill. Oct. 14, 2025) (denying motion for release pending appeal in a public corruption case).

The factors a defendant must meet are conjunctive, and thus, the absence of any factor will prevent release. Furthermore, a defendant must show that *each* count of conviction is vulnerable to a substantial question of law or fact likely to result in relief if decided in the defendant's favor. *Id.* at 1233. This challenging standard means that post-conviction release is limited to defendants "who are among the more promising candidates for ultimate exoneration." *United States v. Shoffner*, 791 F.2d 586, 589 (7th Cir. 1986).

**ARGUMENT**

Casada begins his argument for release pending appeal by stating that he "has consistently and specifically challenged every aspect of the prosecution of this matter, both legally and factually throughout the entirety of the case." (Motion, at 4.) This statement is revealing. It underscores the fundamental, overarching flaw in Casada's 27-page motion for release. Instead of even attempting to present only close questions or questions that could go either way on appeal, Casada continues to throw everything at the wall to see if any of it will stick. He provides little in the way of actual

5

legal precedent or authority to support his dozens of claims of alleged error, much less provide any sound basis to meet his burden to overcome the presumption against release pending appeal. For the reasons already set forth in the government's responses to Casada's motions to dismiss and for a new trial and in the government's sentencing memorandum, and further explained as necessary below, none of Casada's scattershot claims will present a close question likely to result in meaningful relief on appeal. Nor has Casada established by clear and convincing evidence that he is not a flight risk. The Court should deny his motion.

1. **Casada Has Not Identified a Substantial Question of Fact or Law That Is Likely to Result in a New Trial on All Counts**

None of Casada's arguments, alone or in combination, present a substantial question of law because they each lack merit. Because this Court imposed concurrent sentences on each count of conviction, Casada must show that there was a "substantial question" as to every count of conviction or a defect in his sentencing proceedings that would be likely to result in a lower sentence. He cannot surmount this high hurdle to defeat the Congressional presumption in 18 U.S.C. § 3143(b).

   a. Casada's Challenges to the Indictment and the Sufficiency of the Evidence

Casada argues that several aspects of the indictment were flawed to the degree that they will result in reversal of convictions on appeal. (Motion, at 4-7.) Many of these arguments are intertwined with Casada's claims regarding the sufficiency of the evidence. (Motion, at 10-15.) As already addressed at length in the government's responses opposing Casada's motions to dismiss and for a new trial, none of his claims raises a *close* question—regardless of whether this Court recognized them as issues Casada was entitled to appeal.

First, Casada renews his complaint that the indictment did not sufficiently allege that the conspirators' misrepresentations were material to State actors or other legislators. He also claims

6

that the evidence at trial did not prove any material misrepresentations. Casada's indictment-based claim is foreclosed by binding Sixth Circuit precedent, which holds that "an indictment is not fatally insufficient for its failure to allege th[is] element[] *in haec verba*, if the facts alleged in the indictment warrant the inference of such [an] element, i.e., materiality." *United States v. McAuliffe*, 490 F.3d 526, 532 (6th Cir. 2007) (citations omitted). Moreover, as explained in the government's response to the motion to dismiss (D.E. #75 at 38-39), the one case that Casada cites to support his position recognizes that a defendant's knowledge of the importance of a misrepresentation to the person who receives it bears on materiality. *See Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 193 (2016) (explaining that materiality sometimes depends on whether a defendant "knew . . . that the recipient of the representation attaches importance to the specific matter" or "that for some special reason [the representation] is likely to induce the particular recipient to manifest his assent" (alteration in original) (citations omitted)).

With respect to proof of materiality at trial, as a threshold matter, when seeking a new trial on the grounds of sufficiency, a defendant must show that the "manifest weight of the evidence" "heavily preponderated" against the verdict. *United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007). As explained in the government's response to the motion to dismiss (D.E. #383, at 10-12), multiple trial witnesses credibly testified that they did not want to associate themselves or their offices with Cothren because he was the central figure in a prominent scandal. Every legislator who testified, Connie Ridley, and Nick Crawford told the jury that they would have acted differently had they known that Cothren was behind Phoenix Solutions. In other words, the conspirators' concealment did in fact influence those witnesses' decisions. And the defendants' concealment of the kickback scheme was plainly material. *See United States v. Rybicki*, 354 F.3d 124, 147 (2d Cir. 2003) (en banc) (holding that bribed employees' failure to advise their employers

7

of the bribe scheme constituted "material omissions in the employes' communications with their employers").[3]

Next, Casada argues that the government failed to alleged in the indictment, and failed to prove at trial, an "official act." Neither claim holds water. As explained in the government's responses to the motions to dismiss (D.E. #75 at 40-45) and for a new trial (D.E. # 383 at 15-23), the indictment alleged and the government proved at trial three kinds of official acts: (1) Reps. Casada and Smith's selection of mailer vendors to perform State-funded PPA work; (2) other legislators' selection of mailer vendors to perform State-funded PPA work; and (3) the Office of Legislative Administration's authorization of payment on PPA invoices. To convict Casada of honest services wire fraud, the jury needed to have found only that one of those decisions was an official act that formed part of the bargain. So to justify a new trial, Casada must establish that the great weight of the evidence disqualifies all three kinds of decisions from being official acts. He cannot do that because, as explained at length in the government's motion responses, these actions are quintessential uses of governmental power under longstanding definitions blessed by the Supreme Court in *McDonnell v. United States*, 579 U.S. 550, 567 (2016), and related Sixth Circuit cases, like *United States v. Hills*, 27 F.4th 1155, 1179 (6th Cir. 2022).[4]

---

[3] Relatedly, Casada's repeated invocation of *Kousisis v. United States*, 145 S. Ct. 1382 (2025), misses the mark. In *Kousisis*, the Supreme Court held that wire fraud—"which reaches only those schemes that target traditional money or property interests"—prohibits fraudulent inducement. *Id.* at 1388. The Court said nothing about the definition of "materiality" for the purposes of honest services fraud.

[4] Casada incorrectly states that, if he establishes that there was no official act taken or no concealment of a kickback scheme, all other charges would fall. (Motion, at 11.) However, Count Eleven, which charged Casada with aiding and abetting the operation an unlawful business, is not predicated on an honest services violation. As the Court instructed the jury, that charge has two elements: (1) that Cothren used or assumed, or requested to be addressed by, any fictious, false, or assumed name or a name other than his own proper name; and (2) that he did so for the purpose of conducting, promoting, and carrying on *any* unlawful business by means of the United States

Casada claims that the honest services fraud statute, 18 U.S.C. § 1346, and the bribery and kickback scheme alleged in the indictment are unconstitutionally vague. As explained in the government's responses to the motions to dismiss (D.E. #75 at 47) and for a new trial (D.E. #383 at 52-54), this claim is foreclosed by Supreme Court precedent. *See Skilling v. United States*, 561 U.S. 358, 412 (2010) ("Interpreted to encompass only bribery and kickback schemes, § 1346 is not unconstitutionally vague."). Thus, it cannot raise a close question on appeal.

Casada claims that the evidence of money laundering was insufficient. The government addressed this in response to the motion to dismiss (D.E. # 383 at 28-31.) Casada provides no reason to believe that the court of appeals would credit his claim that there was no concealment because a trained FBI forensic accountant was able to trace the transactions. (Motion, at 13.) To the contrary, "structuring the transaction in a way to avoid attention," as the conspirators did, is strong evidence supporting intent to conceal. *United States v. Fallon*, 61 F.4th 95, 117 (3d Cir. 2023) (citation and internal quotation marks omitted). Likewise, the Sixth Circuit has rejected a claim comparable to Casada's that he could not be convicted of transactional money laundering because he did not personally participate in the particular transaction at issue. *See United States v. Kerley*, 784 F.3d 327, 345-46 (6th Cir. 2015). The jury could have inferred from ample evidence that Casada knew about and encouraged the transaction in Count 19.

Even if the court of appeals reversed the money-laundering counts for the reasons Casada urges, it would not result in a new sentencing hearing because this Court sentenced Casada on the basis of the Section 3553(a) factors, rather than the application of disputed Guidelines provisions.

---

Postal Service. Because this Court sentenced Casada to 36 months imprisonment for aiding and abetting the crime alleged in that Count, even if he could demonstrate that his "official act" argument was a "close question"—which he has not—he still would not be entitled to release on that basis. (D.E. #452.)

9

And he has identified no reason to believe the evidence of the money-laundering charge—i.e., transactions amongst the conspirators—would have been inadmissible absent the laundering charges themselves, much less why it was so prejudicial that it would warrant a new trial.

    b.  <u>Casada's Challenges to the Court's Evidentiary Rulings</u>

Casada claims (Motion, at 7-10) that several of his objections to admission of evidence at trial present "close questions" likely to "result in meaningful relief" on appeal. He is incorrect. The Court's evidentiary rulings will be reviewed for abuse of discretion on appeal. *United States v. Campbell*, 135 F.4th 376, 393 (6th Cir. 2025). There is no indication that this Court erred, much less committed abuse.

Casada raises an aspect of his failed motion for a mistrial, claiming that the inadvertent admission and publication of half of a sentence of his recorded interview violated his due process rights because the government had stipulated it would redact portions of the recorded interview to satisfy *Bruton* concerns that Cothren had raised. Casada cites no authority to support his claim of a due process violation. As the government explained in its Rule 33 response (D.E. # 383 at 39 n.12), it is unaware of any case applying due process considerations to any pretrial evidentiary stipulation, much less a case in which the remedy for breach was a new trial. More importantly, Casada does not explain how he was prejudiced by the published statement, particularly considering it was otherwise admissible against him as an unquestionably relevant statement of a party opponent.

Casada renews his claim that the Court erred by admitting evidence related to campaign and caucus work. Compared to the PPA work, the campaign and caucus work involved the same type of conduct by the same conspirators, using the same company, during the same period, targeting a similar group (Tennessee Republicans) to produce communications to constituents and

prospective voters. As explained in the government's Rule 33 response (D.E. # 383 at 39-42), there is no reason to believe that an appellate court would disturb this Court's appropriate ruling that the conspirators' caucus and campaign work was *res gestae* evidence that was inextricably intertwined with their PPA work. That fact-bound decision was well within the Court's discretion.

    c. <u>Casada's Challenges to the Jury Instructions</u>

Casada makes several arguments related to the jury instructions (Motion, at 15-18). The government has already responded to all of them in its Rule 33 submission (D.E. # 383 at 45-52). Notably, in his motion for release pending appeal, Casada argues the instructions were incomplete or insufficient; he does not claim that the instructions the Court gave were in error. A district court abuses its discretion by rejecting a defendant's proposed jury instruction when: "(1) the denied instruction correctly stated the law; (2) the actual instruction did not substantially cover the denied instruction; and (3) the denied instruction concerned such an important point in the trial that its absence substantially impaired the defense." *United States v. Henderson*, 2 F.4th 593, 597 (6th Cir. 2021). Importantly, "the court's refusal to give an instruction does not substantially impair the defense when the jury was already 'well aware' of that defense theory." *Id.* (quoting *United States v. Godofsky*, 943 F.3d 1011, 1027 (6th Cir. 2019)).

Casada contends that the Court erred by failing to instruct the jury that "[i]t is not a violation of federal law for a public official to engage in undisclosed self-dealing" and that Tennessee state law permitted him to provide services to the State. (Motion, at 16-17.) But neither the government's evidence nor its theory of the case showed "self-dealing." And the government did not argue that the mere provision of services to the State by a State legislator constituted bribery. Rather, the government proved and argued to the jury that Cothren paid kickbacks to Reps.

11

Casada and Smith in exchange for official acts. Casada's proposed jury instructions on undisclosed self-dealing and Tennessee state law would have therefore misled the jury, so the Court did not err by rejecting them.

    d.  <u>Casada's Challenges to His Sentencing</u>

Finally, Casada reasserts the objections he made to his Sentencing Guidelines calculation, including a two-level enhancement because the offense conduct involved more than one bribe, a six-level enhancement for the value obtained, a two-level enhancement for sophisticated money laundering, and the Court's refusal to apply a four-level reduction for a mitigating role. (Motion, at 21-25.) The government explained in its sentencing memorandum why none of these claims has merit. (D.E. #437 at 6-14.) Furthermore, the Court painstakingly explained its reasoning for denying each of Casada's arguments. Moreover, the Court also stated that, regardless of whether the Court correctly evaluated Casada's Guidelines objections, the Court would have given Casada the same 36-month sentence—which already represented a significant downward variance from the bottom of the calculated Guidelines range of 78 to 97 months of imprisonment—based on an application of the 18 U.S.C. § 3553(a) factors. As a result, none of Casada's sentencing-based claims raise a substantial question of law or fact likely to result in a sentence that does not include a term of imprisonment. Therefore, they do not constitute a valid basis for bail pending appeal.

  **2. Casada Has Not Shown by Clear and Convincing Evidence That He Is Not a Flight Risk**

Even if Casada had met his burden to show substantial questions as to each count, he does not cite evidence establishing by clear and convincing evidence that he not a flight risk. Instead, he refers back to his post-conviction argument in favor of continued release. That argument, which was premised on his pre-trial compliance with conditions of release and family ties, is flawed.[5]

---

[5]    At sentencing, the government contended that Casada should produce evidence to satisfy

12

District courts throughout the Sixth Circuit have rejected similar requests for release after public corruption convictions. *See, e.g.*, *United States v. Dimora*, No. 1:10-CR-387, 2012 WL 1409396, at *4 (N.D. Ohio Apr. 23, 2012), *aff'd* (June 21, 2012) ("The argument [that a defendant complied with pre-trial release provisions] is routinely rejected because prior to trial there is the possibility of no imprisonment, which evaporates upon a finding of guilt." (citation omitted)); *United States v. Kilpatrick*, No. 10-20403, 2013 WL 1273822, at *1 (E.D. Mich. Mar. 27, 2013) (same); *United States v. Hills*, No. 1:16-CR-329, 2018 WL 3956865, at *1 (N.D. Ohio Aug. 17, 2018) (same).

Casada has a substantial net worth. (PSR, at ¶ 116.) As described in the Worcester Declaration and unchallenged during the sentencing hearing, Casada has demonstrated a willingness to act outside the boundaries of the orderly judicial process to avoid accountability in this case. He engaged in a scheme with Cothren and Smith whereby he supported and facilitated Cothren's use of a fake identity to achieve financial goals. Given these circumstances, Casada has not shown by clear and convincing evidence that he will voluntarily report to prison.

---

his burden before the government offered counterargument. *See United States v. Vance*, 851 F.2d 166, 168 (6th Cir. 1988) ("[T]he statute does not require the government to make an initial showing of dangerousness. Rather, it presumes dangerousness and the criminal defendant must overcome this presumption."). After Casada's argument for release, the Court granted his request to be released until November 21, 2025.

13

## CONCLUSION

For the foregoing reasons, the Court should deny Casada's motion for release pending appeal.

Respectfully submitted,

ROBERT E. McGUIRE
Acting United States Attorney for the
Middle District of Tennessee

*/s/ Taylor J. Phillips*
TAYLOR J. PHILLIPS
Assistant United States Attorney
719 Church Street, Ste 3300
Nashville, Tennessee 37203
Telephone: 615-736-5151

*/s/ John P. Taddei*
JOHN P. TADDEI
Trial Attorney
Criminal Division
United States Department of Justice